Case No. 19-3034

## In the United States Court of Appeals for the Tenth Circuit

United States of America,
Plaintiff-Appellee,

v.

Curtis Wayne Allen,
Defendant-Appellant.

On Appeal from the United States District Court
For the District of Kansas (Wichita)
The Honorable Judge Eric F. Melgren
Case No. 6:16-cr-10141-EFM-1

### Appellant's Opening Brief and Required Attachments

Kansas Federal Public Defender
117 SW 6th Street, Suite 200
Topeka, Kansas 66603
Tel: (785) 232-9828
Fax: (785) 232-9886
Email: paige_nichols@fd.org

Melody Brannon
Federal Public Defender

Paige A. Nichols
Assistant Federal Public Defender

Attorneys for Appellant
Curtis Wayne Allen

**Oral argument is requested.**

# Table of Contents

Jurisdictional Statement......................................................................................1

Issues Presented for Review ...............................................................................2

Statement of the Case .........................................................................................3

Argument Summary ...........................................................................................27

Argument ...........................................................................................................28

1. The district court erred in denying Allen's Jury Act challenge ...................28

   Issue raised and ruled on ..............................................................................28

   Standard of review ........................................................................................28

   Statutory provisions ......................................................................................28

   Discussion......................................................................................................29

   A. The defendants timely filed a cognizable Jury Act motion.....................31

   B.  Having timely filed a cognizable Jury Act motion, the defendants had
       standing to challenge compliance with § 1861's "all citizens" provision..........32

   C.  The District of Kansas substantially violates the Jury Act by systematically
       excluding citizens in half of the district's jury divisions from petit jury
       service .................................................................................................35

   D.  The remedy for the Jury Act violation at this stage is reversal and a new
       trial with a properly selected petit jury panel....................................38

2.  The district court violated Allen's due-process rights by refusing to instruct the
    jury on entrapment ......................................................................................41

    Issue raised and ruled on .............................................................................41

    Standard of review .......................................................................................41

    Legal background .........................................................................................41

A. The due-process right to a jury instruction on a viable defense...........................41

B. Entrapment: a defense "traditionally reserved for jury resolution"....................42

Discussion...............................................................................................................43

A. Evidence of the conspiracies .........................................................................45

B. Evidence of inducement..................................................................................46

C. Evidence of lack of predisposition .................................................................51

D. Conclusion ......................................................................................................53

3. The district court erroneously applied the terrorism adjustment under USSG § 3A1.4(a) ...........................................................................................................55

Conclusion...............................................................................................................56

Oral Argument Statement ......................................................................................56

Jury Plan, D. Kan. Rule 38.1.............................................................Attachment A

Orders on Jury Act, R1.1041, R1.1295 ............................................Attachment B

Denial of entrapment instruction, R6.5325.....................................Attachment C

Order on terrorism enhancement, Supp.R2.11 ..............................Attachment D

Judgment, R3.1314 ...........................................................................Attachment E

## Table of Cases and Authorities

**Cases**

*Aid for Women v. Foulston*, 441 F.3d 1101 (10th Cir. 2006)..................................32

*Ballard v. United States*, 329 U.S. 187 (1946).............................................. 34, 40

*Bennett v. Spear*, 520 U.S. 154 (1997) ...........................................................23

*California v. Trombetta*, 467 U.S. 479 (1984) .................................................41

*Davis v. Passman*, 442 U.S. 228 (1979) .........................................................33

*Francis v. Southern Pac. Co.*, 162 F.2d 813 (10th Cir. 1947) ...............................38

*Jacobson v. United States*, 503 U.S. 540 (1992) .............................................51

*Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)......................33

*Mathews v. United States*, 485 U.S. 58 (1988)............................................ 41, 42

*Powers v. Ohio*, 499 U.S. 400 (1990)...............................................................32

*Rabinowitz v. United States*, 366 F.2d 34 (5th Cir. 1966) .....................................34

*Roe No. 2 v. Ogden*, 253 F.3d 1225 (10th Cir. 2001) ..........................................28

*Sherman v. United States*, 356 U.S. 369 (1958).........................................48, 49, 51

*Sorrells v. United States*, 287 U.S. 435 (1932)................................42, 48, 49, 50, 52

*Theil v. Southern Pac. Co.*, 328 U.S. 217 (1946) ..........................34, 35, 37, 38, 40

*United States v. Abeyta*, 877 F.3d 935 (10th Cir. 2017)........................................55

*United States v. Bailey*, 76 F.3d 320 (10th Cir. 1996).......................................36, 37

*United States v. Barta*, 776 F.3d 931 (7th Cir. 2015) ..........................................49

*United States v. Calabrese*, 942 F.2d 218 (3d Cir. 1991)....................................37, 39

*United States v. Contreras*, 108 F.3d 1255 (10th Cir. 1997)....................................31, 38, 39

*United States v. Cromitie*, 727 F.3d 194 (2d Cir. 2013) .............................................47, 48, 50

*United States v. Dennis*, 826 F.3d 683 (3d Cir. 2016) ...................................................... 43, 47

*United States v. Duran*, 133 F.3d 1324 (10th Cir. 1998) ................................................. 44, 45

*United States v. Fadel*, 844 F.2d 1425 (10th Cir. 1988) ................................................... 41, 42

*United States v. Grajales*, 450 Fed. Appx. 893 (11th Cir. 2012) .................................... 48, 53

*United States v. Gurolla*, 333 F.3d 944 (9th Cir. 2003) .................................................... 52, 53

*United States v. Haymond*, 139 S.Ct. 2369 (2019)..................................................................53

*United States v. Hyde*, 448 F.2d 815 (5th Cir. 1971) .............................................................34

*United States v. Joost*, 92 F.3d 7 (1st Cir. 1996)...............................................45, 49, 53

*United States v. Kamahele*, 748 F.3d 984 (10th Cir. 2014) ....................................................36

*United States v. Kennedy*, 548 F.2d 608 (5th Cir. 1977) .........................................................39

*United States v. Mayfield*, 771 F.3d 417 (7th Cir. 2014).................................... 48, 49, 52, 53

*United States v. McGill*, 754 F.3d 452 (7th Cir. 2014).................................................. 48, 53

*United States v. Mendoza-Salgado*, 964 F.2d 993 (10th Cir. 1992) .......................................52

*United States v. Nelson*, 718 F.2d 315 (9th Cir. 1983) ...........................................................39

*United States v. Nguyen*, 413 F.3d 1170 (10th Cir. 2005) ................................................ 44, 51

*United States v. Ortiz*, 804 F.2d 1161 (10th Cir. 1986) .................27, 41, 42, 43, 44, 53, 54

*United States v. Ovalle*, 136 F.3d 1092 (6th Cir. 1998) ..........................................................39

*United States v. Pillado*, 656 F.3d 754 (7th Cir. 2011) ................................................... 49, 50

*United States v. Plowman*, 700 F.3d 1052 (7th Cir. 2012).....................................................43

*United States v. Russell*, 411 U.S. 423 (1973) .................................................................42

*United States v. Scull*, 321 F.3d 1270 (10th Cir. 2003) .............................................43, 44, 53

*United States v. Shinault*, 147 F.3d 1266 (10th Cir. 1998)...................................................28

*United States v. Shrum*, 908 F.3d 1219 (10th Cir. 2018) .......................................................35

*United States v. Test*, 550 F.2d 577 (10th Cir. 1976) ............................................................34

*United States v. Vincent,* 611 F.3d 1246 (10th Cir. 2010) ....................................................47

*United States v. Wells*, 873 F.3d 1241 (10th Cir. 2017) .........................................................33

*United States v. Young*, 954 F.2d 614 (10th Cir. 1992)..............................................42, 43, 54

## Statutes

18 U.S.C. § 2332a(a)(2) ........................................................................................................18

18 U.S.C. § 2332a(a)(2) ........................................................................................................26

18 U.S.C. § 2332b(g)(5).........................................................................................................26

18 U.S.C. § 241 ......................................................................................................................18

18 U.S.C. § 3231 ......................................................................................................................1

18 U.S.C. § 3742 ......................................................................................................................1

28 U.S.C. § 1291 ......................................................................................................................1

28 U.S.C. § 1861 .............................................21, 22, 24, 25, 27, 28, 30, 31, 32, 33, 34, 35

28 U.S.C. § 1863 ....................................................................................................................28

28 U.S.C. § 1863(6)..........................................................................................................29, 36

28 U.S.C. § 1865 ..............................................................................................................29, 36

28 U.S.C. § 1867 ........................................................................24, 29, 32

28 U.S.C. § 1867(a) .........................................................24, 29, 31, 32, 33

28 U.S.C. § 1867(b) ...............................................................................33

28 U.S.C. § 1867(c) ...............................................................................33

28 U.S.C. § 1867(d) ........................................................... 29, 32, 33, 38

**Other Authorities**

D. Kan. 4. 38.1(h)(6)(B) ........................................................................19

D. Kan. R. 38.1 ............................................................................... 18, 31

D. Kan. R. 38.1(a) .................................................................................18

D. Kan. R. 38.1(d) .................................................................................19

D. Kan. R. 38.1(h) ........................................................................... 19, 20

Fed. R. App. P. 28(i) .............................................................................55

H.R. Rep. 90-1076, 1968 WL 4922 (1968) ...........................................39

H.R. Rep. No. 1076, 90th Cong., 2d Sess. (1968) ...............................39

U.S. Const. amend. VI ..................................................................... 21, 25

USSG § 3A1.4(a) ............................................................................2, 26, 55

USSG 3A1.4, comment. (n.1) ................................................................26

## Prior or Related Appeals

This appeal has been consolidated with:

> *United States v. Stein*, No. 19-3030.
> *United States v. Wright*, No. 19-3035.
> *United States v. Allen, et al.*, No. 19-3053 (government's cross-appeal).

The government previously filed an interlocutory appeal from the district court's dismissal of one count against Allen, in *United States v. Allen*, No. 17-3200 (dismissed on government's motion Jan. 30, 2018).

Stein has a direct appeal pending in an unrelated case, *United States v. Stein*, No. 19-3043.

## Jurisdictional Statement

1.  This is a direct criminal appeal from a federal jury trial and sentencing.

2.  The district court had jurisdiction under 18 U.S.C. § 3231.

3.  This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

4.  The filing dates establishing the timeliness of this appeal are:

    Sentencing: January 25, 2019. R5.5773.[1]

    Judgment filed: January 31, 2019. R3.1289.

    Amended judgment filed: February 4, 2019. R3.1314.

    Notice of appeal filed: February 13, 2019. R3.1338.

5.  This appeal is from a final judgment that disposes of all parties' claims.

---

[1] Our citations will take the following form: "R1.1" "R1" indicates the volume of the record on appeal, and ".1" indicates the page number of that volume. This latter number is the number that appears in the bottom right corner of the record on appeal. For digital readers, this number also corresponds with the .pdf page number of the referenced volume. *See* 10th Cir. R. 28.1(A)(2). We will cite to Volume 7, which is defendant-specific, as R7Allen.1, et seq. We will cite to the exhibits in Supplemental Volume 1 by exhibit number: Supp.R1.Exh. 1, et seq.

**Issues Presented for Review**

1. Did the district court erroneously deny the defendants' motion to comply with the Jury Act?

2. Did the district court erroneously refuse to instruct the jury on entrapment?

3. Did the district court erroneously apply the terrorism adjustment under USSG § 3A1.4(a)?

## Statement of the Case

### Introduction

At the FBI's behest (and on its dime), Dan Day infiltrated the Kansas Security Force, a Western Kansas militia group. R6.2709-12; R6.3430. He befriended, in particular, Patrick Stein, and to a lesser extent Gavin Wright and Curtis Allen. *Id.*; Supp.R1.Exh. 957. Throughout eight months of nearly daily FBI-directed contact, Day stoked their fears about Muslims taking over the United States. *Id.*; R6.2772-74. He urged them to focus their attention on an apartment complex in Garden City that contained a mosque and housed Somali immigrants. R6.2898; R6.3269; R6.3359-61. He goaded them to meet a man ("Brian") who could help them build a powerful bomb that would destroy the complex. R6.2937-38; R6.3515-16; R6.4018; Supp.R1.Exhs. 127a, 127b. And he secretly recorded their conversations for the FBI in exchange for cash payments that he never reported to the IRS. R6.2724; R6.3097-98; R6.3100-03; R6.3122; R6.3140-41; R6.3145; R6.3151; R6.4603; Supp.R1.Exhs. 909a-909p.

Curtis Allen never met with Brian, and no such powerful bomb was ever built. R6.3968; R6.3385; R6.3388. Allen was nonetheless charged with conspiring with Wright and Stein to use a weapon of mass destruction, and to violate the civil rights of the Garden City complex's residents. R1.335. A jury convicted Allen of both conspiracy charges. R2.738. The district court sentenced Allen—who was 51 years old

at the time—to 25 years in prison, followed by 10 years of supervised release. R3.1315-16; R7Allen.130.

In the following sections, we will first summarize the trial evidence,[2] and then summarize the relevant proceedings in the district court from pretrial through sentencing.

**Curtis Allen**

Curtis Allen served his country for nearly two decades in the Marine Corps, the Army, and the Kansas National Guard before settling in Southwest Kansas in a modest trailer home that he sometimes shared with his on-again-off-again girlfriend Lula Harris. R6.1833-34; R6.1843; R6.1995-97; R6.5084-88; Supp.R1.Exhs. 912-a, 912-b. As a military veteran, Allen displayed his patriotism in part by surrounding his home with stones painted red, white, and blue, and flying an American flag from his porch. R6.1845-46; Supp.R1.Exhs. 912-a, 912-b.

Allen was working for a security company in 2016 when he took on a second job at a mobile home dealership, G & G Mobile Home, owned by Gavin and Garrett Wright. R6.1847. He was also in the process of starting his own ammunition business. R6.1986-87; R6.5038-39; R6.5041. To that end, Allen had met nine times with an advisor at the Kansas Small Business Development Center. R6.5042; R6.5044;

---

[2] Given the size of the trial record, this summary is necessarily abbreviated.

R6.5048. By May 2016, Allen was ready to take his business plan to the bank. R6.5050.

Meanwhile, Allen and his girlfriend had been "preppers" for about ten years. R6.1902-04. A prepper stocks up on food, ammunition, and other supplies in case of a natural disaster or government breakdown. R6.1735; R6.1902-03; R6.1810; R6.2439-40; R6.2616. Allen also belonged to the Kansas Security Force (KSF), a militia that recognized the value in bringing together people with various skills who could help each other survive a catastrophic event. R6.1836; R6.1906. Its members included Patrick Stein and Gavin Wright, and a newcomer named Dan Day. R6.2711-12.

**Dan Day**

Unbeknownst to KSF members, Dan Day had been a paid FBI informant before he met Stein, and before he joined KSF. R6.3100; R6.3141; R6.3146; R6.4603; Supp.R1.Exh. 909a. The FBI had recruited Day in October 2015 after recognizing his militia leanings. R.3392-93; R6.4574. The FBI also knew that Day had been fired from a previous law-enforcement job. R6.3543-44. He was struggling financially, working part-time odd jobs. R6.3098; R6.3104. He used the cash the FBI gave him to cover basic living expenses and debt. R6.3099. He received $33,000 over about 10 months, a sum he never reported to the IRS. R6.3097-98; R6.3100-03; R6.3122; R6.3140-41; R6.3145; R6.3151; R6.4603; Supp.R1.Exhs. 909a-909p.

**Kansas Security Force (KSF)**

Dan Day met Patrick Stein through a different militia group that Day was monitoring for the FBI. R6.2662-63. At some point, Stein asked Day to show him some Somali stores and apartments in Garden City, since Day was from that area. R6.2666. Day showed Stein a complex of apartments near the corner of Eighth and Mary Streets that were primarily rented by Somalis and housed a mosque. R6.1710; R6.2670; R6.3275-76. Stein had heard about this complex, but had not been there before. R6.2666; R6.2670-71. Later that day, Stein invited Day to join KSF. R6.2673.

KSF's purpose was defensive—to protect its members and the Constitution. R6.1735; R6.1810. It held family cookouts, helped tornado victims, and promoted its activities at the county fair. R6.1749; R6.1856. It provided training in survival tactics. R6.1736. It also provided an outlet for its members to blow off steam while discussing concerns about radical Islam and other political issues. R6.1766; R6.1789; R6.1807; R6.2452. Allen, for one, feared that an influx of Muslim immigrants was threatening job security, Christianity, and the United States as a country. R6.1848-49; R6.1976.

KSF members talked about such issues most nights through Zello, a communications app. R6.1739; R6.1865; R6.2713. The Zello meetings could go on for an hour or two on a wide range of topics. R6.2714. Allen checked in to Zello most nights, but he usually just listened. R6.2720. Dan Day, on the other hand, spoke regularly, telling the others what he was learning about Muslims in Garden City. R6.2010. And then there was Patrick Stein, KSF's most vocal Zello participant.

R6.2722. Stein would refer to Muslims and Somalis as "cockroaches" who needed to be killed. R6.2715. Other KSF members would "chime[ ] in" with pretty much the same views. R6.2715. But Day didn't take these conversations seriously; "[i]t was more kind of . . . letting off steam or just joining in what others were saying." *Id.*; R6.3448.

Day and Stein had one-on-one phone conversations "[p]retty much every day." R6.2712; Supp.R1.Exh. 957. In one of these conversations, Day told Stein (and then Stein told Allen) that the Garden City apartment complex used to house "just average white, all kinds of races—just normal families living there." R6.2011-12. Then one day "it's completely emptied out." *Id.* The next day "it has been filled with Muslim refugees or the Somali refugees that they had brought over," as if the "normal families" had been kicked out to make room for the refugees. *Id.*

At trial, Day's FBI handler recalled that Stein's anti-Somali sentiment increased significantly a few months after he met Dan Day. R6.4718-20. This was a pattern the handler had observed before with Day, that is, that another person he was informing on had become more radicalized a few months after meeting Day. *Id.*

**The meetings**

On **June 14, 2016**, Patrick Stein called a KSF meeting that Stein, Day, Brody Benson, and Shelby Lewis attended at Benson's rural property. R6.1751; R6.2761-62. As would happen with many of Day's contacts with Stein, Day was equipped by the FBI to secretly record his ride to the meeting with Stein, as well as the meeting itself.

7

R6.2724; R6.3520. Gavin Wright was not at the meeting, and Curtis Allen showed up only after everyone but Stein and Benson had left (including Day and his recorder). R6.2761-62; R6.1769. A Muslim man had killed a large number of Americans during a mass shooting at the Pulse Nightclub in Orlando, Florida a few days earlier, and people were agitated. R6.1751; R6.1779-80; R6.2746. Stein told Day before the meeting that he was "ready to take action." R6.2745.

At the meeting, Stein ranted about Muslim immigrants, saying that "the fucking cockroaches in this country have got to go" because "they are the fucking problem in this country right now." Supp.R1.Exh. 13h/0:12. He complained that immigrants were being brought into the country through Garden City, and Day added that "Garden's full of Somalians." *Id.*/0:35. Day told the others that "there were several hundred Somalians" living on Mary Street, and that there was a mosque there, too. R6.3359-60. At some point, Day suggested creating a diversion on the other side of town so that they could set up explosions at the Mary Street complex. R6.3360-61. Brody Benson talked about hunting Muslims and shooting an Imam between the eyes. R6.1765; R6.1789-90. And Stein said about the Garden City complex: "I'll run some RPG's right through, I'll blow every goddamn building up right there." Supp.R1.Exh. 13j/2:07. Everybody understood that the talk that night was "just venting," "just nothing but banter and blowing smoke" after the Pulse shooting. R6.1755-56; R6.1765-66; R6.1781; R6.2452; R6.2466-67.

During the meeting, Day showed signs of heat stroke; he passed out and had to be taken to a hospital. R6.1768. R6.2764-66. Shelby Lewis went home, and Stein and Benson hung around waiting for Allen. R6.1769. Benson had come to know Allen through KSF. R6.1749. He knew that Allen didn't trust Muslims (just as Benson didn't trust them), but also that Allen's views weren't as extreme as Stein's, and that Allen "didn't have the hatred" for Muslims that Stein had. R6.1749; R6.1784. Once Allen arrived, he and Benson talked about businesses that they were trying to get started. R6.1796-97. According to Benson's later testimony, Stein was possibly outside during much of the conversation, engrossed in his phone, while Allen possibly fell asleep and was possibly the one who broke up the meeting. R6.1784; R6.1797-98. But Benson also testified to a "gut feeling" that a plan was taking place after Allen arrived, because, according to Benson, Stein started "talking about acquiring explosives," and Allen "actually discussed making a—or cooking or making an explosive substance to use as a catalyst or something at that particular point that, you know, there was actually some action that was up looking to be taken." R6.1806; R6.2460. None of Benson's testimony about this (unrecorded) part of the meeting was corroborated. R6.2459-61. Benson resigned from KSF later in June, though he remained Facebook friends with Stein and Allen. R6.1785; R6.2469.

From this meeting through early October, Day and Stein met with Allen and Wright—and sometimes others—several times. According to Day, there were recruitment meetings at which the message was: "they're ready to start kicking off the

plan, start killing Muslims." R6.2769; Supp.R1.Exhs. 22, 14. At one meeting, Dan Day insisted that "some people need to do something . . . . Somebody makes a first strike and other groups are gonna make a strike too . . . war is hell." Supp.R1.Exh. 22j/2:07. At that same meeting, Stein, apparently in reference to Garden City, complained that they "probably got a frickin' mosque right downtown. Nobody even knows it. Shit we got two of em' up on Mary Street." Supp.R1.Exh. 22n/0:01. At another meeting, Allen warned an attendee that they were going to talk about "probably killing people and going to prison for life." Supp.R1.Exh. 14c/0:01. Despite all this talk, nobody planned any actions at these meetings. R6.2771.

The planning, according to Day, came later in the summer during meetings at Gavin Wright's business, G & G Mobile Home. R6.2769; R6.2834-35. There, Stein, Wright, Day, and Allen talked about targets ranging from Garden City to Chicago to San Antonio, and entertained a "whole host" of ideas for how to attack them, including using explosives. R6.2836-38; R6.4614-20; Supp.R1.Exhs. 15j, 16b, 16d, 16h. But they did not narrow their focus to Garden City until an **August 14, 2016** meeting when Stein and Allen asked Dan Day for his thoughts and Day proposed the Garden City "Somalian Mall," "that or I was thinking freaking take out one of those whole buildings on Eighth Street, like where that mosque is." R6.2898; R6.3259-62; Supp.R1.Exhs. 16i/0:01, 16k/1:44, 16m/0:01. Stein had previously asked Day for maps of the area, which the FBI had printed and given to Day for delivery to Stein. R6.2799-2800; R6.3358. Day told Stein, Wright, and Allen that a Friday would be a

10

good day to attack the mosque, because "Friday is one of their holidays. That's when that fucking place . . . the parking lot was clear full of cars." Supp.R1.Exhs. 16m/1:15, 16mm/0:23. He suggested attacking during prayer time when "there might be a hundred" people there. Supp.R1.Exh. 16p/0:01. He assured them that "I can almost guarantee you that every one of those fuckers" in the apartment complex where the mosque was located "are Somalians, there ain't no white people." Supp.R1.Exh. 16q/0:29. When the conversation veered into attacking the landlord's family, Day even offered to find out where the landlord's daughter and grandchildren lived. R6.2910-11; Supp.R1.Exh. 16uu/0:29.

Once Day put the Garden City location firmly in everyone's mind, everyone started dreaming up different types of explosives and ways to deliver them. R6.2915-16; R6.2975; Supp.R1.Exh. 16. But it was Day who urged everyone to "set a date, a goal" to work towards. Supp.R1.Exh. 16ttt/0:46. And it was Day who, on **September 2, 2016**, told Stein, Wright, and Allen that he had a contact who could help them build or get explosives, and it was Day who urged the others to give him a "shopping list" of items to request from the contact. R6.2937-38; R6.2941-43; Supp.R1.Exhs. 127a, 127b, 127e, 127oooo, 187a.

**"Brian"**

Day's contact was "Brian," an undercover FBI agent. R6.2932-33; R6.3441-42. Day's FBI handlers gave Day explicit instructions for introducing the idea of an outside player, in hopes of getting both Allen and Wright to state their actual intent

and agree to Brian's involvement. R6.3056-57; R6.4645-46; R6.4651-57; Supp.R1.Exh. 130. The agents were concerned about "how quickly we build it," that is, "how fast we get the snowball rolling," and cautioned Day not to push things too quickly for it to "make sense in the end game." Supp.R1.Exh. 130/10:12/10:57/12:17. They directed Day to "get either Curtis or Gavin to say 'we want you to talk to these people.'" Supp.R1.Exh. 130/10:29. The goal, as Day understood it, was "[t]o make them agree to see the undercover agent," or at least "give them the option." R6.3058; R6.4641 (FBI Agent Kuhn: "Dan Day was to encourage them to meet with the undercover officer").

Day was never able to reach that goal. Instead, Allen stated "over and over" that he didn't want to meet with Brian, and he ultimately refused to do so. R6.3675; R6.4913-14.

**Dissention, and arrests**

On **September 4, 2016**, Stein and Day talked privately about whether Allen was "in or out." R6.4959. Day said that he knew Stein was serious, but he was unsure about Allen. R6.4962. He was unsure whether Allen had "the balls to do something or not." *Id.* Stein proposed "having his own plan" with Day and leaving Allen out of it. R6.4957. Day urged Stein to sit down and work it out with Allen. R6.3487-89; R6.3667. Day told Stein that he (Day) would humor Allen if necessary. R6.3489. Day emphasized that time was of the essence, because they were at a critical planning stage. R6.3489-90. This private conversation was consistent with Day and Stein's

ongoing relationship apart from Wright and Allen. The two would sometimes converse alone after group meetings. R6.4955-56. Stein was sometimes critical of Allen, and would tell Day not to share information with Allen. R6.4775; R6.4952-56. At one point, Stein complained that Allen must be an undercover. R6.4956.

At a meeting on **September 18, 2016**, Allen and Wright reported testing a homemade explosive on the stove at G & G. R6.3086-88; Supp.R1.Exh. 17a. They reported that it had burned the hair off of Allen's finger. *Id.* Day tried to turn their attention to getting explosives from Brian, telling them that his contact wanted to meet with them, saying "to me this is good news—they sound like they're willing to . . . to work with us, you know?" R6.3090; Supp.R1.Exhs. 17b, 17d. Allen "really didn't want to meet with them." R6.3091; Supp.R1.Exh. 17b. When Allen expressed fear that Day's contacts were cops, Day insisted, "oh no, I guarantee you, I guarantee you, I guarantee you fucking they're not." Supp.R1.Exh. 17k/0:40. Day called Allen on the phone six times over the next few days during his efforts to sell Brian. R6.2712; R6.4954; Supp.R1.Exh. 957.

Despite Day's efforts, in the end, only Stein agreed to meet with Brian. Their first meeting was on **September 25, 2016**. R6.3106; R6.3750; R6.3930; R6.3926. Stein told Brian that he wanted to attack the Muslim community. R6.3751-52. He talked a lot about a civil war that he seemed to truly believe was coming. R6.4000. He and Brian talked about what items Brian could provide at what price in aid of creating explosives. R6.3754-59. Brian later testified that he took Stein seriously, but also that

it was pretty obvious Stein didn't know what he was talking about when it came to explosives. R6.3765; R6.3931-32.

After this meeting, the FBI decided to expedite its investigation. R6.3765. The agents in charge recognized that Stein, Wright, and Allen had not yet come to any agreement "as to what they were going to do," and that they did not pose any immediate danger. R6.4669-70. Had the agents believed that they had reached the point of an imminent threat, they "would have arrested them." R6.4671. Having no basis for an arrest, the agents decided to create one. They decided that Brian would give Stein, Wright, and Allen an opportunity to fire fully automatic weapons in order to "build chargeable offenses" against them (since even just shooting the weapon would be illegal). R6.4021-23; R6.4666-69; R6.4734-35. That way, they could be arrested should they become an immediate danger. R6.4668. The agents set about getting the necessary approval for this plan. R6.4667-69.

Meanwhile, on **October 5, 2016**, Stein and Day met with Wright and Allen to tell them about Stein's meeting with Brian and try to bring them on board. R6.3110; R6.3515; Supp.R1.Exhs. 129c-h. Stein reported that Brian had said "he would do anything he could to you know make things, you know, happen," and that "[h]e is willing to put his own money into it as well, it's not just us putting money into it." Supp.R1.Exhs. 129e/0:20, 129l/0:01. Allen remained skeptical—"I don't want to meet him"—and suggested that Stein and Day get more information. R6.3516; R6.3675-76; Supp.R1.Exhs. 129h, 129l-q. After the meeting, Day spoke privately with

14

Stein. R6.3677; R6.4914-15. Day was frustrated with Allen, and told Stein that "it pisses me off" that Allen and Wright would not agree to meet with Brian. R6.3676-77; R6.4951. At trial, Day claimed he did not think that Allen was flat-out refusing to meet with Brian, and that he didn't remember complaining to Stein about Allen's lack of trust. R6.3675-77. These claims were impeached by FBI Agent Kuhn's testimony about Day's recorded statements to Stein, which included: "I don't know what it would take to bring them on board"; "Curtis doesn't want to go meet [Brian]"; "Curtis flat-out said, 'Well, I ain't gonna meet'"; "I think he's fricking a little bit too, I don't know if he'll get anything done, he's too, too cautious you know?" R6.4950-52. Day and Stein also talked that night about the possibility that Brian was a government agent, and Stein told Day that "if it wasn't for you, and the fact that you know these people . . . . Fuck I wouldn't . . . . Wouldn't even consider it." Supp.R1.Exh. 129z/0:28.

Stein emphasized his dependence on Day again later in a message to Brian, telling him "[t]he only reason we entertained talking with you is because of Dan." R6.3695; Supp.R1.Exh. 111f. In a series of messages to Brian after their first meeting, Stein expressed his general concern for the state of the country, writing about the coming war, a jihadi training camp in Oklahoma, blasting caps, and a satanic club meeting in a school. R6.4006-08; Supp.R1.Exhs. 108-113. He believed that Muslims were taking over Dearborn, Michigan and Amarillo, Texas. R6.4011. He said "a lot of fanciful things." R6.4009. He also said that "we are going to blow up a mosque when they are

15

all at their prayer time and they are packed in there like sardines. This is in a location where a select few pieces of shit property owners in this town are housing these bastards. They have taken some of the apartments and converted them into their mosques." R6.3812; Supp.R1.Exh. 108-032. Stein and Brian exchanged messages about the best way to attack the complex. R6.3813-15. They discussed meeting a second time. R6.3824. Stein was "very passionate about conducting an attack on Muslims." R6.3828. From the messages, Brian gauged that Stein "truly believed that there was a war coming." *Id.*

As for Allen, there was no evidence that he knew the content of the messages between Stein and Brian, and Brian never communicated directly with Allen or Wright or had any contact with them. R6.3954; R6.3959; R6.3977-78; R6.3978; R6.4031-32. Stein messaged Brian at one point that Allen and Wright were "on board"; but at another point, while trying to gauge Brian's own commitment, Stein said "if you are going to sit this one out I need to get on with the building of the project myself," as if he intended to act alone. R6.3836; R6.3961; Supp.R1.Exh. 111a.

And act alone he did. On **October 11, 2016**, Allen was arrested on a domestic violence complaint and Gavin Wright's business was seized as a result of reports Lula Harris made to the police about Allen and Wright making explosives at G & G. R6.2556-61. Stein met with Brian the next day, on **October 12, 2016**. R6.3858; R6.3861. Stein told Brian that "Curtis Allen's out of the picture," and "Gavin Wright . . . no longer wanted to be involved," so "[f]rom now on it's just me and Dan."

16

R6.3973; R6.4024; Supp.R1.Exh. 21l/0:59. During this meeting, Stein shot the

automatic weapons that the FBI had arranged to make available; went to Garden City

with Brian to show him the Mary Street apartment complex and mosque; and offered

to give Brian 300 pounds of fertilizer for use in making a bomb. R6.3862; R6.3882;

R6.3885.

Stein met Brian at a McDonald's two days later, on **October 14, 2016**, with a truck

full of urea fertilizer. R6.3892-94; R6.3975; R6.4027. They talked about how Brian

would deliver the finished bomb, and about timing and payment. R6.3900. Stein told

Brian that "only him and Dan knew anything about any of this." R6.3976. As they

walked out of the McDonald's, Stein was arrested. R6.4029.

**Search warrants**

The arrests precipitated the execution of search warrants for Allen's home and car,

G & G Mobile Home, Wright's home and car, Stein's home and truck, a storage unit,

and a storm shelter. R6.2196; R1.2252; R6.2426; R6.2516; R6.2563; R6.4289; R6.4338.

From these various locations, law-enforcement officers seized a large number of

(legally owned) guns and ammunition. R6.239-49; R6.2522-23; R6.2563-69; R6.2576-

81; R6.4290-93. They seized a notebook containing a draft "manifesto" believed to

have been written by Allen for distribution upon any action. R6.2860-67; R6.2870;

R6.4828-31; Supp.R1.Exhs. 127q, 127ii, 101a. And they seized instructions for making

explosives; ingredients and supplies that an FBI expert later opined could be

combined with other ingredients to make explosives (but could also have noncriminal

purposes); and, at G & G, a small improvised detonator made with a hobby fuse and containing a gram of HMTD (hexamethylene triperoxide diamine), a primary explosive material. R6.2163-83; R6.2307-30; R6.2377; R6.2387-88; R6.4087-89; R6.4114; R6.4162; R6.4217-20. But there was "no complete bomb." R6.4195.

**The conspiracy charges**

Allen was ultimately prosecuted for conspiring with Stein and Wright from "approximately June 14, 2016 and continuing until on or about October 14, 2016" to use a weapon of mass destruction, 18 U.S.C. § 2332a(a)(2) (Count 1), and to "injure, oppress, threaten, and  intimidate the residents of 312 West Mary Street in the free exercise and enjoyment" of their civil rights, 18 U.S.C. § 241 (Count 2). R1.335; R2.535; R6.4438.

**Jury panel selection**

About five months before trial, a jury-selection issue arose. The issue is best understood against the backdrop of the Kansas District Court local rule for the random selection of grand and petit jurors (D. Kan. R. 38.1, attached).

The local rule divides the state into six jury divisions:

1. Kansas City-Leavenworth
2. Wichita-Hutchinson
3. Topeka
4. Dodge City
5. Fort Scott
6. Salina

D. Kan. R. 38.1(a). The divisions together comprise all of the counties

within the District of Kansas (divisions drawn on county maps below by our office

for this appeal):



The rule instructs the clerk to maintain a qualified jury wheel for each division. D.

Kan. R. 38.1(h). Names placed in the jury wheels are to be selected at random from

voter-registration lists. D. Kan. R. 38.1(d). The rule further instructs the clerk which

jury wheels to draw from for grand jury panels. D. Kan. 4. 38.1(h)(6)(B):

| For grand jury service in . . . | Draw from the jury wheels for . . . |
| --- | --- |
| Kansas City | Kansas City-Leavenworth<br>Fort Scott |
| Topeka | Topeka<br>Salina |

| For grand jury service in . . . | Draw from the jury wheels for . . . |
|---|---|
| Wichita | Wichita-Hutchinson<br>Dodge City |

*Id.* The method pairs each division in which there is an active federal courthouse with an adjacent division, thus ensuring that all citizens in Kansas will have the opportunity to be considered for service on federal grand juries in Kansas:



The rule does *not* instruct the clerk which jury wheels to draw from for *petit* jury panels. D. Kan. R. 38.1(h); R1.1041-42.

At a pretrial hearing to discuss the content of juror questionnaires in Allen's case, the district court mentioned that while the Wichita jury coordinator draws from Southwest Kansas for grand juries, "[f]or our jury trials, we tend not to pull that far

out." R6.84. The district court asked the jury coordinator (who was present) "how far west do we go for petit jurors?" *Id.* She responded that "I'd have to look at the local rule to see. But you're correct, for grand jury we go pretty far west. We pull from our Wichita/Hutchinson division just for regular petit juries." *Id.*

Allen thereafter moved the district court to order the jury coordinator to draw from the jury wheels for both the Wichita-Hutchinson and the Dodge City divisions for his petit jury panel. R1.801. He based his motion in part on two Jury Act provisions:

> [1] It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes.

> [2] It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose.

28 U.S.C. § 1861 (numbering added). Allen requested a jury drawn from a fair cross-section of the community, as required by both the Sixth Amendment and the first provision of § 1861. R1.801-17. He also invoked both the excluded jurors' equal-protection rights and § 1861's "all citizens" provision.[3] R1.804; R1.816-19. He noted

---

[3] The statute's "all citizens" provision is the only jury-selection issue we press on appeal.

that, according to the most recent voter-registration data, the district court's selection

practice worked to deprive some 113,896 qualified Dodge City division jurors of any

opportunity for petit jury service in federal cases. R1.808.

In response, the government addressed Allen's fair-cross-section and equal-

protection arguments, but did not address § 1861's "all citizens" provision. R1.827.

After hearing argument on the issue, the district court denied the motion. R6.532-

84; R1.1041. In its order, the district court noted with respect to Allen's case that "[a]ll

of the alleged events occurred in Western Kansas within the confines of the Dodge

City jury division." R1.1043. The district court then found that "the jury coordinator

only summons jurors from the Wichita-Hutchinson division when a jury trial is held

at the Wichita federal courthouse." R1.1043. The district court explained that this

exclusion of courthouse-adjacent jury divisions from petit jury service applies

statewide: "The same goes for jury trials held in Kansas City and Topeka: jurors are

summoned from the Kansas-City Leavenworth division when a trial is held in Kansas

City, and jurors are summoned from the Topeka division when a trial is held in

Topeka. Thus, in practice, citizens from the Dodge City, Fort Scott, and Salina jury

divisions do not have the opportunity to serve as petit jurors in the District of

Kansas." *Id.* The map below illustrates this practice. Qualified citizens who reside in

the shaded divisions are all excluded from petit jury service in federal cases (civil and

criminal)—even when those cases arise in their own divisions.



The district court rejected Allen's fair-cross-section arguments under both the Constitution and the Jury Act. R1.1044-56. The district court then declined to address whether the District of Kansas's petit jury selection practice violates either the equal-protection rights or the Jury Act rights of citizens in the excluded divisions. R1.1063. Instead, the district court sua sponte concluded that Allen lacked prudential standing[4] to raise a third party's rights under either the Constitution or the Jury Act. R1.1056-63. The district court relied on standing jurisprudence from cases solely involving the Constitution. *Id.*

---

[4] "Prudential standing" is a term of art referring to "judicially self-imposed limits on the exercise of federal jurisdiction." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (citation omitted).

Six days after receiving the district court's order, Allen moved to dismiss or stay the proceedings, invoking the Jury Act's remedy provision at 28 U.S.C. § 1867(a). R1.1170. Allen argued that the District's systematic practice of excluding qualified Dodge City division jurors from the petit jury panel, uncorrected by the district court, violated the plain language of § 1861's "all citizens" provision. R1.1171-74. He further argued that § 1867 authorized him to challenge that practice without imposing any extra "standing" requirement. *Id.* He nonetheless attempted to satisfy the district court's standing concerns by submitting sworn declarations from five qualified citizens within the Dodge City division. R1.1182-87. These citizens stated their desire to have an opportunity to perform their civic duty and sit as federal petit jurors, and granted Allen permission to challenge their exclusion from that opportunity on their behalf. *Id.* Allen also submitted an editorial from the publisher of the *High Plains Daily Leader & Times*, a newspaper of Seward County (a county within the Dodge City division). R1.1183. The editorial decried the district court's order refusing to draw jurors from the Dodge City division, concluding that "any rural Kansan should be concerned that if they were ever charged with a federal crime, that it would be a predominantly urban jury deciding innocence or guilt. The solution is simple—everyone in the judicial district that is an eligible juror should be in the jury pool. Anything less will not represent justice." *Id.*

In its response, the government made four arguments. First, it argued that Allen was improperly trying to relitigate a settled matter. R1.1277-78. Second, it argued that

24

Allen had not established a violation of the Jury Act under Sixth Amendment standards. R1.1278-80. Third, it argued that Allen lacked standing to argue noncompliance with § 1861's "all citizens" provision. R1.1280. Fourth, it argued that this statutory provision was satisfied in the absence of any constitutional violation. R1.1280-82.

The district court denied the motion, but only on the third ground pressed by the government, holding that Allen lacked standing to argue noncompliance with § 1861's "all citizens" provision. R1.1295-98. The district court further held that "[i]f the excluded jurors truly wish to challenge the jury selection procedure they are welcome to bring a separate action." R1.1298.

**Jury instructions and verdict**

After the close of the evidence, the defendants jointly requested an entrapment instruction. R2.594. The Government objected. R2.623-34. The district court heard argument on the issue and denied the instruction, explaining, "I agree with the Government that the threshold requirement for an entrapment offense is relatively high, and I do not think it exists here. I do not think, frankly, either the inducement or the predisposition standards were met. I'm not going to give the entrapment defense. I do not think the evidence at all warrants it." R6.5317-25.

The jury thereafter convicted Allen of both conspiracies. R2.738.

## Sentencing

Before sentencing, a probation officer prepared a presentence investigation report. R7Allen.128. The report included an adjustment for committing a felony "that involved, or was intended to promote, a federal crime of terrorism," under USSG § 3A1.4(a). R7Allen.148; R7Allen.168-74. "Terrorism" means, as relevant here, a violation of 18 U.S.C. § 2332a(a)(2) (Count 1) that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5) (cross-referenced by USSG 3A1.4, comment. (n.1)). The report's inclusion of this adjustment both increased Allen's offense level by 12 levels from 36 to 48, and increased his criminal history category from category I to category VI. R7Allen.148; R7Allen.150. It consequently increased his guidelines range on Count 1 from 188-235 months' imprisonment to life in prison.

Allen objected to this adjustment, challenging the factfinder, the standard of proof, and the mens rea required to apply it. R3.320-25. After hearing arguments, the district court overruled the objection, found by a preponderance of evidence that Allen's intent was "in part" to influence government, and determined that Allen's guidelines range on Count 1 was life imprisonment. R6.5654-5725; Supp.R2.11; R6.5795. The district court nonetheless imposed a non-guidelines total sentence of 25 years' imprisonment, followed by 10 years of supervised release. R6.5878-80; R6.5886; R3.1314. The district court observed that this was "a staggeringly long sentence, particularly for a man who's 50 years old." R6.5880. Allen timely appealed. R3.1338.

26

## Argument Summary

The Jury Act provides that "all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States." 28 U.S.C. § 1861. And yet the District Court found that in Kansas, "citizens from the Dodge City, Fort Scott, and Salina jury divisions do not have the opportunity to serve as petit jurors in the District of Kansas." R1.1043. This practice violates the Jury Act. The Act itself gives Allen "standing" to challenge this practice, and the district court erred in holding otherwise. Allen's convictions must be reversed.

The district court also erred when it denied an entrapment instruction on grounds that Allen failed to meet the "relatively high" threshold requirement. The requirement is the same as that for obtaining a jury instruction on any other theory of defense— the defendant need only show that the defense "is supported by the law and has sufficient foundation in the evidence to create a genuine issue of fact." *United States v. Ortiz*, 804 F.2d 1161, 1163 (10th Cir. 1986). Allen met this standard, and the district court should have given the instruction. Allen's convictions must be reversed.

Finally, the district court erred when it applied the terrorism enhancement. The enhancement dramatically increased Allen's guidelines range and thus the facts supporting it should have been proved to a jury beyond a reasonable doubt, or at the very least to the judge by clear and convincing evidence. Additionally, the enhancement requires a showing that the defendant's *primary* purpose (not just "in part") was to influence government. If nothing else, resentencing is necessary.

27

**Argument**

**1.  The district court erred in denying Allen's Jury Act challenge.**

**Issue raised and ruled on**

Allen moved the district court to draw from the jury wheels for both the Wichita-Hutchinson and the Dodge City divisions for his petit jury panel. R1.801. The district court denied the motion for lack of standing. R1.1041. Allen then moved the district court to dismiss or stay the proceedings for substantial failure to comply with the Jury Act. R1.1166. The district court denied that motion for lack of standing as well. R1.1295.

**Standard of review**

This Court reviews a district court's legal rulings under the Jury Act de novo. *United States v. Shinault*, 147 F.3d 1266, 1271 (10th Cir. 1998). This Court likewise reviews standing determinations de novo. *Roe No. 2 v. Ogden*, 253 F.3d 1225, 1228 (10th Cir. 2001).

**Statutory provisions**

Section 1861 of the Jury Act states that "[i]t is . . . the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States." 28 U.S.C. § 1861.

The Act directs district courts to adopt a written plan for the random selection of grand and petit jurors to achieve this objective. 28 U.S.C. § 1863. The Act defines with specificity who is categorically exempt from service, and who is categorically not

qualified for service. 28 U.S.C. § 1863(6); 28 U.S.C. § 1865. Nothing in the Act

authorizes a district court to categorically exclude any other persons from service.

Section 1867 of the Act grants criminal defendants the right to challenge a

"substantial failure to comply" with the Act in selecting the petit jury; it further directs

the district court, upon a substantial-failure determination, to stay the proceedings

"pending the selection of a petit jury in conformity with this title":

> (a) In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.

> * * *

> (d) Upon motion filed under subsection (a), (b), or (c) of this section, containing a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title, the moving party shall be entitled to present in support of such motion . . . any . . . relevant evidence. . . . If the court determines that there has been a substantial failure to comply with the provisions of this title in selecting the petit jury, the court shall stay the proceedings pending the selection of a petit jury in conformity with this title.

28 U.S.C. § 1867(a), (d).

## Discussion

The District of Kansas's petit jury selection practice violates the plain language of

the Jury Act. The Act provides that "all citizens shall have the opportunity to be

considered for service on grand and petit juries in the district courts of the United

States." 28 U.S.C. § 1861. And yet the District Court found that in Kansas, "citizens from the Dodge City, Fort Scott, and Salina jury divisions do not have the opportunity to serve as petit jurors in the District of Kansas." R1.1043. This practice excludes citizens living in half of the district's jury divisions—nearly two-thirds of Kansas counties (69 out of 105 counties, as shown by the shaded counties in the map below):



The district court erred in refusing to summon jurors from the Dodge City division for Allen's trial, and in denying, on standing grounds, Allen's motion to dismiss or stay the proceedings for substantial failure to comply with the Jury Act. The only remedy at this point is reversal of Allen's convictions, and a remand for a retrial in compliance with the Act.

We will first address Allen's Jury Act filing and his standing to raise § 1861's "all citizens" provision. We will then address the Jury Act violation and its remedy.

## A. The defendants timely filed a cognizable Jury Act motion.

The Jury Act provides that "[i]n criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury." 28 U.S.C. § 1867(a). These requirements "are designed to give the district court an opportunity to evaluate the alleged noncompliance and to correct such noncompliance before precious judicial resources are invested in a trial." *United States v. Contreras*, 108 F.3d 1255, 1266 (10th Cir. 1997). This Court requires "[s]trict compliance with these procedural requirements." *Id.*

The District of Kansas's jury plan gives no indication that half of the district's jury divisions are regularly excluded from petit jury service. D. Kan. R. 38.1. The practice came up unexpectedly during a November 16, 2017 hearing to discuss the content of juror questionnaires R6.84. In response, on December 8, 2017, the defendants jointly moved the district court "to issue summonses to prospective jurors from both the Wichita-Hutchinson and Dodge City jury divisions." R1.801. At a hearing on the motion, Allen explained that the motion was brought in an effort to correct the practice before any jurors were summoned. R6.270-73. At that point, there was ample

time for the district court to do so, as voir dire was not scheduled to begin until more than three months later, on March 19, 2018. R1.800.

On January 17, 2018, the district court denied the motion, thereby settling the method by which it would summon the jury panel in this case. R1.1041. Six days later, on January 23, 2018 (nearly two months before voir dire), the defendants jointly moved under § 1867 to dismiss or stay the proceedings in order to comply with the Act. R1.1166. The motion included Curtis Allen's sworn statement of facts alleging that the district court's denial of his first motion constituted a substantial failure to comply with § 1861's "all citizens" provision. R1.1180. This motion complied with the Act's requirement of timely filing a motion containing a sworn statement of facts. 28 U.S.C. § 1867(a), (d). The district court denied the motion—not on any statutory basis, but on prudential standing grounds. R1.1295.

## B. Having timely filed a cognizable Jury Act motion, the defendants had standing to challenge compliance with § 1861's "all citizens" provision.

The district court held that Allen lacked prudential standing to challenge compliance with the "all citizens" provision of § 1861. R1.1056-64; R1.1296-97. This decision was based on the wrong body of law, and was error.

The district court based its decision on two cases discussing prudential standing requirements for litigants invoking the *constitutional* rights of third parties: *Aid for Women v. Foulston*, 441 F.3d 1101 (10th Cir. 2006) (physicians invoking constitutional privacy rights of minor patients), and *Powers v. Ohio*, 499 U.S. 400 (1990) (criminal

defendant invoking equal-protection rights of venirepersons subject to race-based peremptory challenges). R1.1056-58; R1.1297. But "the question of who may enforce a *statutory* right is fundamentally different from the question of who may enforce a right that is protected by the Constitution." *Davis v. Passman*, 442 U.S. 228, 240 (1979) (emphasis in original). "Statutory rights and obligations are established by Congress, and it is entirely appropriate for Congress, in creating these rights and obligations, to determine in addition, who may enforce them and in what manner." *Id.* Once Congress acts, a court "cannot limit a cause of action that Congress has created merely because 'prudence' dictates." *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014); *accord United States v. Wells*, 873 F.3d 1241, 1261 (10th Cir. 2017) ("the Supreme Court has made clear that courts err by characterizing as a question of 'standing' the issue of whether a particular litigant is authorized to bring a substantive claim under a statute") (citing *Lexmark*).

In the Jury Act, Congress established a right for all citizens to have an opportunity to serve on petit juries, and created a process by which litigants in both criminal and civil cases may enforce that right. 28 U.S.C. §§ 1861, 1867(a)-(d). Congress also created a remedy for those litigants: upon a finding of a substantial violation of the Act, the district court "shall stay the proceedings pending the selection of a petit jury in conformity with this title." 28 U.S.C. § 1867(d). Allen followed the process created by Congress when he moved for relief within seven days of the district court's order

33

announcing its intended selection process. R1.1166. No further showing of prudential standing was necessary.

A brief review of Jury Act cases and their predecessors illustrates this point. In *United States v. Test*, this Court considered a claim based on § 1861's fair-cross-section provision, noting that "[t]he fact that defendants are not members of some of the allegedly excluded classes does not affect their standing to bring the present actions." 550 F.2d 577, 581 (10th Cir. 1976). Similarly, the Fifth Circuit has held that "[n]o specialized showing of standing is necessary for a defendant to challenge jury composition as illegal under the federal jury statutes." *United States v. Hyde*, 448 F.2d 815, 822 n.7 (5th Cir. 1971) (citing *Rabinowitz v. United States*, 366 F.2d 34, 37 n.1 (5th Cir. 1966)). In *Rabinowitz*, the Fifth Circuit addressed a predecessor jury-selection statute and stated that "a departure from the statutory scheme . . . may be asserted by any litigant, even though he is not a member of the excluded class." 366 F.2d at 37 n.1 (citing *Ballard v. United States*, 329 U.S. 187 (1946)). *Id.* In *Ballard*, the Supreme Court, exercising its supervisory power, reversed Defendant Ballard's criminal conviction on grounds that the systematic exclusion of women from his grand and petit jury panels "was a departure from the scheme of jury selection which Congress adopted." 329 U.S. at 193. The Supreme Court required no showing of prudential standing on Ballard's part. *Id. Ballard* was consistent with an earlier case reversing a criminal conviction on grounds that the district court failed to abide by the jury-selection statutes. *Theil v. Southern Pac. Co.*, 328 U.S. 217 (1946). In *Theil*, after discussing the

violation, the Supreme Court held that it was "unnecessary to determine whether the petitioner was in any way prejudiced by the wrongful exclusion *or whether he was one of the excluded class*." *Id.* at 224 (emphasis added). What was true in 1946 remains true today: no showing of prudential standing may be required of a criminal defendant challenging compliance with federal jury statutes.

The district court erred when it denied Allen's Jury Act motion for lack of prudential standing. Allen's claim was a statutory claim, and the only question to be answered was whether the claim fell within the statute. It did, and the district court should have decided the merits of Allen's motion.

## C. The District of Kansas substantially violates the Jury Act by systematically excluding citizens in half of the district's jury divisions from petit jury service.

This Court may reach the merits of Allen's Jury Act claim even though the district court did not. The historical facts are undisputed and the record is adequately developed for this Court to decide the claim in the first instance. *United States v. Shrum*, 908 F.3d 1219, 1234 (10th Cir. 2018).

The district court found that in the District of Kansas, "citizens from the Dodge City, Fort Scott, and Salina jury divisions do not have the opportunity to serve as petit jurors in the District of Kansas." R1.1043. The Act, in contrast, provides that "all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States." 28 U.S.C. § 1861. The Act itself defines who is exempt and who is not qualified; it does not authorize district courts to

create new exemptions or disqualifications. 28 U.S.C. § 1863(6); 28 U.S.C. § 1865. The District of Kansas's practice does just this, and it fails to comply with the Act.

This failure to comply is substantial, as it systematically excludes half of the district's jury divisions from ever serving on petit juries. This Court has held that a failure to comply with the Act is substantial when it "frustrates one of the three principles underlying the Act," that is, "(1) the random selection of jurors, (2) culling of the jury from a fair cross-section of the community, and (3) determination of disqualifications, exemptions, and exclusions based on objective criteria." *United States v. Kamahele*, 748 F.3d 984, 1022 (10th Cir. 2014). With respect to random selection, this Court has recognized that "Congress considered proportional representation based on voter registration to be a 'fundamental' and 'important' procedural requirement by the Jury Selection Act." *United States v. Bailey*, 76 F.3d 320, 322 (10th Cir. 1996). No such proportional (and therefore random) representation is possible when half of a district's divisions are not merely underrepresented, but *never* summoned for service.

In *Bailey*, a district court clerk made numerical errors in compiling the master jury wheels, "resulting in some counties being overrepresented and others being underrepresented." *Id.* at 322. But the effect of the errors was insignificant, as "[e]ach county and division remained 'substantially proportionally represented' in both the grand and petit master jury wheels." *Id.* at 323. The deviation did not amount to a substantial failure to comply with the Act. *Id.*

36

The Kansas District Court's practice stands in stark contrast to the errors identified in *Bailey*, and qualifies as a substantial failure. The Kansas District Court has essentially created a new category of exclusion—all persons residing in courthouse-adjacent divisions. By creating such a large exclusion category, the District of Kansas has violated the Act even more substantially than did the district court in *United States v. Calabrese*, 942 F.2d 218 (3d Cir. 1991). In *Calabrese*, the district court systematically excluded all jurors who reported that they knew one of the defendants. *Id.* at 221. The Third Circuit deemed this violation of the Act substantial because it involved "the *de facto* creation of a new category of exclusions." *Id.* at 228. The Third Circuit explained that the Act "is designed to confine excusals and exclusions to a limited list of specifically enumerated grounds. Were we to hold the exclusions in this case to be insubstantial, we would permit one of the Act's central precepts to be avoided by mere silence. We decline to do so." *Id.* at 229. The violation in *Calabrese* resulted in the wrongful exclusion of 12 jurors—4% of a pool of approximately 300. *Id.* at 228. If that violation was substantial, surely so was the violation in Allen's case, which wrongfully denied some 113,896 qualified Dodge City division jurors of any opportunity for service. R1.808.

The substantial nature of the District of Kansas's Jury Act violation is also evident by *Theil* standards. In *Theil*, the district court systematically excluded wage earners from jury service. 328 U.S. at 221-22. The Supreme Court held that "[c]ertainly nothing in the federal statutes warrants such an exclusion." *Id.* at 222. In explaining

why reversal was necessary, the Supreme Court observed that not every jury must contain "representatives of all the economic, social, religious, racial, political and geographical groups of the community." *Id.* at 220. That said, the "American tradition" of trial by an impartial jury means that "prospective jurors shall be selected without systematic and intentional exclusion of any of these groups." *Id.* (emphasis added); *accord Francis v. Southern Pac. Co.*, 162 F.2d 813, 817 (10th Cir. 1947) ("[W]hile it is not necessary that every jury shall include representatives of all economic, social, racial, political, or geographical groups of the community, the stamp of approval cannot be placed upon a system for the selection of the panel of prospective jurors through which members of any of these groups are intentionally excluded.") (citing *Thiel*).

## D. The remedy for the Jury Act violation at this stage is reversal and a new trial with a properly selected petit jury panel.

Had the district court recognized the Jury Act violation, the court would have been statutorily required to "stay the proceedings pending the selection of a petit jury in conformity with" the Act. 28 U.S.C. § 1867(d). The remedy at this stage is reversal and a new trial by a petit jury selected in conformity with the Act.

It does not appear that this Court has previously found a substantial failure to comply with the Act. But this Court has recognized that remedying such a failure does not require any showing of prejudice. In *Contreras*, this Court explained that strict compliance with the procedural rules of the Act is the "price" that litigants pay for the

Act's inclusion of a remedy "regardless of whether the litigant challenging the jury ha[s] been prejudiced by the jury selection." *Contreras*, 108 F.3d at 1266 (quoting *United States v. Kennedy*, 548 F.2d 608, 612 (5th Cir. 1977)). *Kennedy* explained that Congress deleted a prejudice requirement from an earlier version of the bill. 548 F.2d at 612 (citing H.R. Rep. No. 1076, 90th Cong., 2d Sess. (1968)). The House Report cited in *Kennedy* states that "[a] committee amendment to S. 989 eliminates the need to prove prejudice as a condition of judicial intervention when substantial noncompliance with the act is established. The committee believes that the 'prejudice' requirement would unduly burden the procedure established by the bill for challenging noncompliance." H.R. Rep. 90-1076, 1968 WL 4922 at *1806 (1968).

Other circuits have held that the appellate remedy for a substantial failure to comply with the Jury Act is reversal and a new trial. *Calabrese*, 942 F.2d at 230 ("As we have noted, no prejudice to defendant need be shown. Therefore we will vacate appellants' convictions, and remand to the district court for a new trial."); *United States v. Ovalle*, 136 F.3d 1092, 1100 (6th Cir. 1998) ("We therefore hold that the Jury Selection Plan is in substantial violation of the JSSA and that Canales's conviction must be reversed and the case of appellant Canales must be remanded to the district court to permit a retrial with a properly selected jury."); *United States v. Nelson*, 718 F.2d 315, 318 (9th Cir. 1983) (Under the Jury Act, "[i]f a statutory challenge to petit jury selection succeeds on appeal, the remedy is a new trial. . . . No prejudice to the litigant need be shown.") (citations omitted).

The Supreme Court has held the same in decisions involving violations of predecessor jury-selection statutes. In *Theil*, for instance, the Supreme Court held that the trial court's refusal to strike a panel that excluded wage earners "requires us to reverse the judgment below in the exercise of our power of supervision over the administration of justice in the federal court. . . . On that basis it becomes unnecessary to determine whether the petitioner was in any way prejudiced by the wrongful exclusion." 328 U.S. at 225; *accord Ballard*, 329 U.S. at 193-94 (where systematic exclusion of women from jury panel departed from statutory scheme, "reversible error does not depend on a showing of prejudice in an individual case").

In sum, the district court reversibly erred in denying Allen's Jury Act motion. His convictions must be reversed, and a new trial granted with a properly selected petit jury panel.

## 2. The district court violated Allen's due-process rights by refusing to instruct the jury on entrapment.

**Issue raised and ruled on**

Allen requested an entrapment instruction. R2.594-95. The district court refused to give it. R6.5325.

**Standard of review**

"Whether there is sufficient evidence to constitute a triable issue of entrapment is a question of law, reviewable by this Court on a de novo basis." *United States v. Fadel*, 844 F.2d 1425, 1434 (10th Cir. 1988).

**Legal background**

## A. The due-process right to a jury instruction on a viable defense

Constitutional principles of due process require that "criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). It is "well established that a defendant is entitled to have a jury consider any defense which is supported by the law and has sufficient foundation in the evidence to create a genuine issue of fact." *United States v. Ortiz*, 804 F.2d 1161, 1163 (10th Cir. 1986). In other words, "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988). "This right is so important that the failure to allow a defendant to present a theory of defense which is supported by sufficient evidence is reversible error." *Ortiz*, 804 F.2d at 1163-64.

41

## B. Entrapment: a defense "traditionally reserved for jury resolution"

"Congress could not have intended criminal punishment for a defendant who has committed all the elements of a proscribed offense but was induced to commit them by the Government." *United States v. Russell*, 411 U.S. 423, 435 (1973). Consequently, a person may not be convicted of committing a crime that results from entrapment, that is, "when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense." *Sorrells v. United States*, 287 U.S. 435, 441-42 (1932).

"The defense of entrapment is generally an issue for the jury and not for the court." *United States v. Young*, 954 F.2d 614, 616 (10th Cir. 1992). The preference for a jury decision is "grounded in the fact the defense of entrapment is intertwined with the issue of intent and is typically based on credibility determinations, an area traditionally reserved for jury resolution." *Fadel*, 844 F.2d at 1430.

The defendant is thus entitled to a jury decision on entrapment "if he can identify evidence 'from which a reasonable juror *could* derive a reasonable doubt as to the origin of criminal intent.'" *Ortiz*, 804 F.2d at 1165 (emphasis original; citation omitted). In other words, "the ultimate test is whether the evidence (regardless of amount) creates a fact issue requiring submission to the jury." *Id.* at 1166 n.4; *accord Mathews*, 485 U.S. at 62 ("even if the defendant denies one or more elements of the crime, he is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment"). Specifically, the defendant

must point to evidence creating a fact issue regarding (1) whether government agents "induced the defendant to commit the offense"; and (2) whether the defendant was "otherwise predisposed to commit the offense, given the opportunity." *Young*, 954 F.2d at 616.

In considering whether the defendant has met this burden, "the testimony most favorable to the defendant should be accepted," and the evidence must be considered "in the light viewed most favorably to the accused." *United States v. Scull*, 321 F.3d 1270, 1275 (10th Cir. 2003); *Ortiz*, 804 F.2d at 1164; *accord United States v. Dennis*, 826 F.3d 683, 686 n.2 (3d Cir. 2016) (in reviewing denial of request for entrapment instruction, "we will resolve all factual conflicts in favor of Dennis no matter how improbable we may find the defense version of the facts") (marks and citation omitted); *United States v. Plowman*, 700 F.3d 1052, 1057 (7th Cir. 2012) ("The district court must accept the defendant's evidence as true for purposes of this pretrial ruling."). The defendant may point either to the defendant's own evidence or to the government's evidence. *Scull*, 321 F.3d at 1275.

Finally, "[o]nce a credible entrapment defense is raised, the prosecution has the burden of proving, beyond a reasonable doubt, that a defendant was not entrapped." *Young*, 954 F.2d at 616.

**Discussion**

The district court denied Allen's requested entrapment instruction, explaining that "the threshold requirement for an entrapment offense is relatively high, and I do not

43

think it exists here. I do not think, frankly, either the inducement or the predisposition standards were met. I'm not going to give the entrapment defense. I do not think the evidence at all warrants it." R6.5325. The district court erred.

To begin with, the threshold requirement for an entrapment defense is not "relatively high." Rather, it is the same as the requirement for obtaining a jury instruction on any other theory of defense—the defendant need only show that the defense "is supported by the law and has sufficient foundation in the evidence to create a genuine issue of fact." *Ortiz*, 804 F.2d at 1163. This is a far less burdensome requirement than, for instance, what the defendant must show in order to win a claim of entrapment as a matter of law:

| The defendant is entitled to an *instruction* when: | The defendant is entitled to an *acquittal as a matter of law* when: |
|---|---|
| In the light most favorable to the defendant, *Scull*, 321 F.3d at 1275; *Ortiz*, 804 F.2d at 1164, | In the light most favorable to the government, *United States v. Duran*, 133 F.3d 1324, 1335 (10th Cir. 1998), |
| there is "a genuine issue of fact" as to whether the defendant was entrapped, that is, "a reasonable juror *could* derive a reasonable doubt" as to entrapment, *Ortiz*, 804 F.2d at 1163, 1165 (emphasis original). | there is "undisputed testimony which shows conclusively and unmistakably" that the defendant was entrapped, *Duran*, 133 F.3d at 1335. |
| The defendant loses if, in light of "*undisputed* evidence," it is "hard to dispute" that the defendant was not entrapped. *United States v. Nguyen*, 413 F.3d 1170, 1179-80 (10th Cir. 2005) (emphasis added). | The defendant loses if the government has presented "*any* evidence to contradict the entrapment defense." *Duran*, 133 F.3d at 1335-36 (emphasis added). |

The difference between these standards was illustrated in *Duran*, where this Court held that the defendant was not entrapped as a matter of law, 133 F.3d at 1335-36, but nonetheless granted the defendant a new trial due to plain error in the district court's entrapment instructions, *id.* at 1329-34. *See also United States v. Joost*, 92 F.3d 7, 12 (1st Cir. 1996) (noting difference between standards: "we emphasize that we are not considering the sufficiency of a verdict for the government on this record, if an entrapment instruction had been given, but the closer question whether a rational jury could have found entrapment if allowed to consider that defense").

When viewed under the correct standard, the district court should have given the entrapment instruction, at least as to Allen. As we show below, there was a sufficient foundation in the evidence, taken in the light most favorable to Allen, to create a genuine issue of fact regarding both whether Allen was induced to join the charged conspiracies, and whether he was predisposed to join the charged conspiracies.

## A. Evidence of the conspiracies

As a starting point, the evidence raised a genuine issue of fact as to *when* Allen allegedly committed either charged conspiracy, that is, at what point he agreed—with the requisite specific intent—to any plan either to "use a weapon of mass destruction" (Count 1), or to "[i]njure, oppress, threaten, and intimidate the residents of 312 West Mary Street" (Count 2). R1.335. The second superseding indictment as amended charged that both conspiracies began "approximately June 14, 2016"—the date of the meeting at Brody Benson's property after the Pulse nightclub shooting. R1.335;

R2.535; R6.4438. That was the night when Allen showed up late (after Day had left with his recorder), and Wright didn't show up at all. R6.2761-62; R6.1769. Brody Benson testified that he had a "gut feeling" that some unspecific plan involving explosives was "up looking to be taken" once Allen arrived, but that part of the meeting was unrecorded and Benson contradicted himself on this point by describing everything else that night as "just venting" in response to the Pulse shooting. R6.1765-66; R6.1781-82; R6.1806-07; R6.2452; R6.2460-67.

More to the point, Day himself testified that there were no "specific plans made to actually carry out an attack" until the meetings at G & G later in the summer. R6.2771. Day's FBI handler testified that even as late as October 4, 2016, "their plan was still evolving. We took what they were saying very seriously, but they had not come up with the final plan as to what they were going to do. They were still discussing." R6.4669-70.

Given this evidence, there was a genuine issue of fact with respect to when Allen entered into the charged conspiracies. Consequently, evidence of events leading up to the point of Stein's arrest is relevant to the questions of both inducement and lack of predisposition.

**B. Evidence of inducement**

This Court has "consistently" described "persuasion, fraudulent misrepresentations, coercive tactics, promises of reward, or a plea based on friendship" as defining "the type of government inducement that may form the basis

46

of an entrapment defense." *United States v. Vincent,* 611 F.3d 1246, 1250 (10th Cir. 2010). With these concepts in mind, the following evidence created a genuine issue of fact with respect to inducement:

First, there was ample evidence that Dan Day: (1) drew the defendants' attention to the existence of Muslims in Garden City as often as possible, R6.2010; R6.2011-12; R6.3359-61; (2) proposed the Garden City apartments and mosque as the focal point of an attack on Muslims, R6.2898; R6.3259-62 (Day: "It was my idea to choose the location."); Supp.R1.Exhs. 16i, 16k, 16m, 16mm, 16p, 16q; and (3) urged Stein, Wright, and Allen to use a weapon of mass destruction for the attack, specifically, by using an explosive or explosive parts provided by Brian, R6.2937-38; R6.2941-43; R6.3090; Supp.R1.Exhs. 127a, 127b, 127e, 127oooo, 187a, 17b, 17d. *See United States v. Cromitie*, 727 F.3d 194, 211 (2d Cir. 2013) (inducement as a matter of law where FBI informant proposed "specifics of the planned attacks and supplying bombs and missiles"); *Dennis*, 826 F.3d at 691 (evidence that informant played "central role" in getting defendant to participate in stash-house robbery, including setting up meeting with undercover agent, supported entrapment instruction).[5]

---

[5] Entrapment cases are all decided on their own unique facts. It does not appear that this Court has previously been presented with the *degree* of inducement required to reverse on failure-to-instruct-on-entrapment grounds. *Vincent*, 611 F.3d at 1250. We thus rely on out-of-circuit cases involving a higher degree of inducement than this Court's cases as persuasive authority for reversal here.

Second, evidence that Day's efforts were made under the guise of a carefully constructed "persona" sympathetic to the defendants supported an entrapment instruction. R6.2771-74. *See Sherman v. United States*, 356 U.S. 369 (1958) (entrapment as a matter of law where government informer posed as fellow suffering addict to induce defendant to supply him with narcotics); *Sorrells v. United States*, 287 U.S. 435, 441 (1932) (entrapment should have been submitted to jury where evidence showed government agent used shared war experiences to induce defendant to supply him with illegal liquor); *United States v. Mayfield*, 771 F.3d 417, 441 (7th Cir. 2014) (en banc) (appeals to friendship, camaraderie, and common struggle "are among the oldest tactics recognized as forms of government inducement"); *United States v. McGill*, 754 F.3d 452, 457 (7th Cir. 2014) ("Government exploitation of friendship can constitute improper inducement."); *Mayfield*, 771 F.3d at 434-35 (conduct that moves beyond furnishing an ordinary opportunity includes "pleas based on need, sympathy, or friendship").

Third, evidence of the *duration* of Day's months-long efforts supported an entrapment instruction. R6.2712. *See Cromitie*, 727 F.3d at 211 (evidence that informant courted defendant for eleven months taken into account when finding inducement as a matter of law); *Mayfield*, 771 F.3d at 441 (evidence that informant "pestered Mayfield over a substantial period of time" contributed to fact question about inducement); *United States v. Grajales*, 450 Fed. Appx. 893, 899 (11th Cir. 2012) (unpublished) (entrapment should have been submitted to jury where it took

48

informant months to get defendant to participate in robbery); *Joost*, 92 F.3d at 13 (entrapment should have been submitted to jury where it took agents three months before defendant produced firearm).

Fourth, evidence of the *increasing intensity* of Day's efforts when Allen resisted meeting or using Brian supported an entrapment instruction. While Day and Stein had talked on the phone nearly every day for months, Day never called Allen until late September, when he called six times in the span of a few days during his efforts to sell Brian. R6.2712; R6.4954; Supp.R1.Exh. 957. And it was only in September that Day started griping to Stein about Allen, apparently in hopes that Stein would put the screws to Allen and get him on board. R6.3667; R6.3676-77; R6.3487-89; R6.4951; R6.4959; R6.4950-52. *See Sherman*, 356 U.S. at 372 (inducement as a matter of law where defendant did not acquiesce to informer's request for drugs until "after a number of repetitions of the request"); *Sorrells*, 287 U.S. at 441 (entrapment should have been submitted to jury where evidence showed government agent's "repeated and persistent solicitation" by asking defendant three to five times for illegal liquor); *United States v. Barta*, 776 F.3d 931, 937 (7th Cir. 2015) (entrapment as a matter of law where FBI made "repeated attempts at persuasion" when defendant did not respond); *United States v. Pillado*, 656 F.3d 754, 765 (7th Cir. 2011) (evidence of pressure in face of hesitation supported entrapment instruction); *Mayfield*, 771 F.3d at 434-35 (conduct that moves beyond furnishing an ordinary opportunity includes "repeated attempts at persuasion"); *Joost*, 92 F.3d at 13 (entrapment should have been submitted to jury

49

where, "[w]hen defendant failed to take the bait the first time, [the agents] repeated their effort with even more urgency"; "number, frequency, and immediacy" of contacts all raised fact issue as to inducement).

Fifth, evidence that Brian assured the defendants, through Stein, that he "would do anything he could" to make things happen, and that he was even "willing to put his own money into it" supported an entrapment instruction. Supp.R1.Exhs. 129e/0:20, 129l/0:01. *See Pillado*, 656 F.3d at 765 (explaining in hypothetical that offering to sell guns at going rate would be mere ordinary opportunity not rising to level of entrapment, whereas offering to sell guns at "one penny per piece" would be extraordinary inducement justifying entrapment instruction); *Cromitie*, 727 F.3d at 211 (inducement included offering the defendant money and gifts).

Finally, evidence that the FBI *intended to induce* the defendants to commit a crime supported the entrapment instruction. The agents described their efforts as "build[ing] it," and "get[ting] the snowball rolling." Supp.R1.Exh. 130/10:12/10:57/12:17. They directed Day to "get either Curtis or Gavin to say 'we want you to talk to these people.'" Supp.R1.Exh. 130/10:29. And when the agents didn't think they had enough evidence yet to arrest the defendants for a conspiracy, they decided to "build chargeable offenses" by inducing them to commit a different crime—shooting fully automatic weapons (an inducement the FBI failed to complete, since Allen and Wright never showed up). R6.4021-23; R6.4666-69; R6.4734-35. *See Sorrells*, 287 U.S.

at 441 (evidence sufficient to go to jury on entrapment where crime was "the creature

of [the undercover prohibition agent's] purpose").

## C. Evidence of lack of predisposition

The predisposition element is meant to draw a line "between the trap for the

unwary innocent and the trap for the unwary criminal." *Sherman*, 356 U.S. at 372. This

element "is viewed at the time the government agent first approaches the defendant,

but inferences about that predisposition may be drawn from events occurring after

the two parties came into contact." *Nguyen*, 413 F.3d at 1178 (marks and citations

omitted). The Supreme Court has cautioned that "evidence that merely indicates a

generic inclination to act within a broad range, not all of which is criminal, is of little

probative value in establishing predisposition." *Jacobson v. United States*, 503 U.S. 540,

550 (1992) (government failed as a matter of law to prove defendant's predisposition

to possess illegal child pornography). That is because "a person's inclinations and

fantasies are his own and beyond the reach of government." *Id.* at 551-52. Thus, a

person's responses to entreaties by an undercover agent that merely confirm those

inclinations and fantasies "hardly support an inference that he would commit the

crime." *Id.* at 551.

Evidence that, before Dan Day came along, Curtis Allen was living a quiet life as a

military veteran, working steadily and looking forward to starting his own business,

created a genuine issue of fact with respect to Allen's predisposition. R6.1833-34;

R6.1843; R6.1847; R6.1986-87; R6.1995-97; R6.5038-39; R6.5041-42; R6.5044;

R6.5048; R6.5084-88; Supp.R1.Exhs. 912-a, 912-b. *See Sorrells*, 287 U.S. at 441 (trial court erred in refusing to submit entrapment to jury where "defendant had no previous disposition to commit [the charged crime] but was an industrious, law-abiding citizen"); *United States v. Gurolla*, 333 F.3d 944, 956 (9th Cir. 2003) ("Because there was no evidence of predisposition beyond the fact that Ortega joined the conspiracy, the jury could have believed that he lacked the predisposition to become a money launderer.").

Additionally, the government offered no proof that Allen had previously engaged in terror-related activities through the Kansas Security Force or otherwise. Rather, the evidence showed that KSF was a community-focused organization that held family cookouts, helped tornado victims, provided survival training, and attended the county fair. R6.1736; R6.1749; R6.1856. *Cf. United States v. Mendoza-Salgado*, 964 F.2d 993, 1002 (10th Cir. 1992) ("[e]vidence of a defendant's predisposed character may derive from direct proof the individual previously engaged in the illegal activity").

Finally, evidence that Allen lacked eagerness and balked at meeting Brian pointed toward the absence of predisposition. R6.3675 ("He had stated over and over, no, he didn't want to meet him."); R6.4962 (FBI handler's testimony that by September 4, Day was unsure whether Allen was serious, and whether he had "the balls to do something or not"); R6.4950-52 (FBI handler's testimony that on October 5, Day complained to Stein that "I don't know if he'll get anything done, he's too, too cautious you know?"). *See Mayfield*, 771 F.3d at 437 ("evidence of the defendant's

reluctance to commit the crime looms large in the analysis of predisposition");

*Grajales*, 450 Fed. Appx. at 899 (evidence that defendant "was having second thoughts about going through with the CI's proposed scheme" supported entrapment instruction); *Joost*, 92 F.3d at 14 (evidence of defendant's excuses and delays supported entrapment instruction).

## D. Conclusion

In considering whether to instruct the jury on entrapment, the district court was required to accept "the testimony most favorable to the defendant" and consider the evidence "in the light viewed most favorably to the accused." *Scull*, 321 F.3d at 1275; *Ortiz*, 804 F.2d at 1164. The presence of evidence sufficient for the jury to reject the defense should not have defeated Allen's request for the instruction. "However substantial or substantiated the government's evidence may seem to the court, its weight is a question for the jury." *Mayfield*, 771 F.3d at 442; *accord McGill*, 754 F.3d at 460 ("The existence of competing inferences is precisely why the issue of entrapment should have been submitted to the jury."); *Gurolla*, 333 F.3d at 955 (entrapment should have been submitted to jury even though defendant's version of events was "not particularly convincing"); *Joost*, 92 F.3d at 13 ("It may well be that a jury would dismiss all this [the defendant's version of events] as a pack of lies, but it seems to us that this was a task for the jury, not the judge.").

The right to trial by jury is "the heart and lungs" of our liberties. *United States v. Haymond*, 139 S.Ct. 2369 (2019) (citation omitted). The district court should have

allowed Curtis Allen's jury to decide whether or not he was entrapped. *Young*, 954 F.2d at 616; *Ortiz*, 804 F.2d at 1163. The district court error in refusing the entrapment instruction violated Allen's due-process right to present his theory of defense to the jury. His convictions must be reversed, and a new trial granted with a properly instructed jury.

**3. The district court erroneously applied the terrorism adjustment under USSG § 3A1.4(a).**

**Issue raised and ruled on**

Allen objected to the terrorism adjustment. R7Allen.168-74; R3.320-25. The

district court overruled the objection. Supp.R2.11.

**Standard of review**

Review is de novo. *United States v. Abeyta*, 877 F.3d 935, 939 (10th Cir. 2017).

**Discussion**

In its order setting a briefing schedule, this Court directed that "Appellants shall

avoid repeating or duplicating each other's arguments whenever possible." Order filed

05/06/2019. Patrick Stein has argued in Issue 3 in consolidated Appeal No. 19-3030

that the district court erroneously applied the terrorism adjustment under USSG

§ 3A1.4(a). We adopt by reference that argument here. Fed. R. App. P. 28(i).

## Conclusion

For the above reasons, Curtis Allen requests that this Court reverse his convictions and order a new trial, or remand this case for resentencing without the terrorism adjustment.

## Oral Argument Statement

Oral argument is requested. This is a multi-issue appeal from a five-week jury trial with a large and cumbersome record. Oral argument will help this Court analyze the issues in the context of the record on appeal.

Respectfully submitted,
By: s/ Melody Brannon
MELODY BRANNON
Kansas Federal Public Defender

By: s/ Paige A. Nichols
PAIGE A. NICHOLS
Assistant Federal Public Defender
Kansas Federal Public Defender
117 SW 6th Avenue, Suite 200
Topeka, Kansas 66603-3840
Tel: (785) 232-9828
Fax: (785) 232-9886
Email: paige_nichols@fd.org

Attorneys for Defendant-Appellant
Curtis Wayne Allen

**Certificate of Compliance with Fed. R. App. P. 32(a)**

I certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(5) & (7)(B) in that it contains 12,902 words in a proportionally spaced typeface (14-point Garamond; as allowed by 10th Circuit Rule 32(a)), as shown by Microsoft Word 2016, which was used to prepare this brief.

<u>s/ Paige A. Nichols</u>
PAIGE A. NICHOLS
Assistant Federal Public Defender

Dated: November 8, 2019

**Certificate of Compliance with 10th Circuit Rule 25.5**

I certify that this brief complies with the applicable privacy and redaction requirements of 10th Circuit Rule 25.5 and the rules cited therein.

<u>s/ Paige A. Nichols</u>
PAIGE A. NICHOLS
Assistant Federal Public Defender

Dated: November 8, 2019

**Certificate of Compliance with 10th Circuit Rule 25.3**

I certify that the hard copies of this brief submitted to the Court are exact copies of the version submitted electronically, and that the electronic submission was scanned for viruses with the most recent version of Symantec Endpoint Protection (Live Update on November 8, 2019), and is free of viruses.

<u>s/ Paige A. Nichols</u>
PAIGE A. NICHOLS
Assistant Federal Public Defender

Dated: November 8, 2019

**Certificate of Service**

I certify that on 11/08/2019, this brief was filed with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. Because opposing counsel and counsel for the consolidated codefendants are registered CM/ECF users, they will also be served by the CM/ECF system. 10th Cir. R. 31.5.

Seven hard copies will be mailed to the Clerk of the Court per 10th Cir. R. 31.5 at:

Tenth Circuit Court of Appeals
1823 Stout Street
Denver, Colorado 80257

<u>s/ Paige A. Nichols</u>
PAIGE A. NICHOLS
Assistant Federal Public Defender

Dated: November 8, 2019

**-VI-**
**TRIALS**

**RULE 38.1**
**RANDOM SELECTION OF GRAND AND PETIT JURORS**

The selection of grand and petit jurors will be as follows:

**(a) Places for Holding Court and Designation of Counties.** The counties designated as constituting each jury division are as follows:

(1) *Kansas City - Leavenworth Division.* Atchison, Doniphan, Douglas, Franklin, Johnson, Leavenworth, Miami, and Wyandotte.

(2) *Wichita - Hutchinson Division.* Butler, Cowley, Harper, Harvey, Kingman, Marion, McPherson, Reno, Rice, Sedgwick, and Sumner.

(3) *Topeka Division.* Brown, Chase, Clay, Dickinson, Geary, Jackson, Jefferson, Lyon, Marshall, Morris, Nemaha, Osage, Pottawatomie, Riley, Shawnee, Wabaunsee, and Washington.

(4) *Dodge City Division.* Barber, Barton, Clark, Comanche, Edwards, Finney, Ford, Grant, Gray, Greeley, Hamilton, Haskell, Hodgeman, Kearney, Kiowa, Lane, Meade, Morton, Ness, Pawnee, Pratt, Rush, Scott, Seward, Stafford, Stanton, Stevens, and Wichita.

(5) *Fort Scott Division.* Allen, Anderson, Bourbon, Chautauqua, Cherokee, Coffey, Crawford, Elk, Greenwood, Labette, Linn, Montgomery, Neosho, Wilson, and Woodson.

(6) *Salina Division.* Cheyenne, Cloud, Decatur, Ellis, Ellsworth, Gove, Graham, Jewell, Lincoln, Logan, Mitchell, Norton, Osborne, Ottawa, Phillips, Rawlins, Republic, Rooks, Russell, Saline, Sherman, Sheridan, Smith, Thomas, Trego, and Wallace.

**(b) Applicability.** This rule, except as otherwise provided, applies separately to each division designated herein.

**(c) Management of the Jury Selection Process.** Pursuant to 28 U.S.C. § 1863 (b)(1), the clerk is hereby authorized to manage the jury selection process in the District of Kansas. The clerk acts under the general supervision and control of the chief judge of the court.

Pursuant to 28 U.S.C. § 1863(a), the court may authorize other persons to assist the clerk in the jury selection process.

The clerk must keep one book for the entire district known as the "Jury Selection Journal." In the book, the clerk must enter chronologically:

Attachment A

(1) each order of the court pursuant to this rule; and

(2) a minute entry of each act the clerk performs under this rule.

**(d) Source of Names.** The names of prospective grand and petit jurors must be selected at random from the official lists of registered voters in each of the counties comprising the divisions herein designated. The names selected must be assigned serial numbers by division as determined by the clerk. The clerk must maintain a record of the names and numbers assigned to each name.

**(e) Name Selection Procedures.** At the clerk's option, and after consultation with the court, the clerk may use a properly programmed electronic data processing system to make the following selections by a purely randomized process:

(1) names from complete source list databases in electronic media for the master jury wheel;

(2) names from the master wheel for the purpose of determining qualification for jury service; and

(3) names from the qualified wheel for summoning persons to serve as grand or petit jurors.

Each county within the jury division must be substantially proportionally represented in the master jury wheel in accordance with 28 U.S.C. § 1863(b)(3). And the mathematical odds of any single person being picked from the source list, the master wheel, and the qualified wheel must be substantially equal.

**(f) Master Jury Wheel.** Each jury division must be provided with a master jury wheel into which the clerk must proportionately place the names of those selected from the voter registration lists under this rule.

The minimum number of names to be placed initially in each master jury wheel are as follows:

(1) *Kansas City - Leavenworth Division*: 7,500 names.

(2) *Wichita - Hutchinson Division*: 7,000 names.

(3) *Topeka Division*: 5,000 names.

(4) *Dodge City Division*: 1,000 names.

(5) *Fort Scott Division*: 1,000 names.

(6) *Salina Division*: 1,000 names.

The chief judge may order additional names to be placed in the master jury wheel as necessary. The additional names must be selected as provided in subsection (e) of this rule.

51

The master jury wheel must be emptied and refilled every two years.

**(g) Drawing of Names from the Master Jury Wheel and Completion of Qualification Form.**

    (1) *Initial Draw*.

        (A) *In General*.  From time to time, as the court directs, the clerk must draw at random from each divisional master jury wheel, the names or numbers of as many persons as may be required for jury service.  The clerk may draw either manually or by use of a properly programmed data computer.  Whenever a divisional master jury wheel is maintained on a data computer, the names to be drawn from the master jury wheel must be selected by using the random number formula, as the court directs.

        (B) *Public Notice*.  The clerk or jury commission must post a general notice for public review in the clerk's office and on the court's website explaining the process by which names are periodically and randomly drawn.

        (C) *Alphabetical List*.  The clerk may, upon order of the court, prepare an alphabetical list of the names drawn from the master jury wheel.  Such list must not be disclosed to any person except upon court order, and except as required by 28 U.S.C. §§ 1867-1868.

        (D) *Jury Qualification Form*.  Upon drawing names or numbers from a divisional master jury wheel, the clerk must mail a jury qualification form [as defined in 28 U.S.C. § 1869(h)] to every person whose name or number is drawn, for each person to fill out and return—duly signed and sworn—to the clerk by mail or through the court's internet site within 10 days.  If it appears there is an omission, ambiguity, or error in a filled-out and returned qualification form, the clerk may return the form with instructions to:

           (i)   make such additions and corrections as may be necessary; and

           (ii)  return the form to the clerk within 10 days.

(2) *Supplementation For Undeliverable and Non-Responding Juror Qualification Forms.* For all juror qualification forms returned to the court as "undeliverable" or those to which no response has been received (after the clerk has sent a follow-up letter to the person who has not responded), the clerk—as soon as practicable—must issue the same number of new juror qualification forms to be mailed to addresses within the same zip code area to which the undeliverable or non-responding juror qualification forms had been sent. The clerk must draw these names or numbers from the Master Jury Wheel.

(3) *National Change Of Address Database.* The clerk must submit the names on the Master Jury Wheel once a year to be updated and corrected through the national change-of-address system of the United States Postal Service.

**(h) Qualified Jury Wheel.**

(1) *In General.* The clerk must maintain a qualified jury wheel for each division of the court. Into each divisional qualified jury wheel, the clerk must place the names of all persons previously drawn from the divisional master jury wheels, in accordance with subsection (g) of this rule, who have been determined to be qualified as jurors and not exempt or excused pursuant to this rule.

(2) *Periodic Drawings.* From time to time, at the direction of any judge of this district, the clerk must draw at random as many names or numbers of persons as may be required for assignment to grand and petit jury panels. The clerk must draw from a divisional qualified jury wheel, either manually or by use of a properly programmed data computer. Whenever a divisional qualified jury wheel is maintained on the computer, the names to be drawn from said wheel must be selected by using the random number formula, as directed by the court. The clerk must prepare or cause to be prepared a separate alphabetical list of names of all persons so drawn and assigned to each grand and petit jury panel.

(3) *Public Notice.* The clerk or jury commission must post a general notice for public review in the clerk's office and on the court's website explaining the process by which names are periodically and randomly drawn.

(4) *Summons.* When the court orders a grand or petit jury to be drawn, the clerk must issue a summons for the required number of jurors. Persons drawn for jury service may, in accordance with 28 U.S.C. § 1866(b), be served personally or by mail addressed to such persons at their usual residence or business address.

(5) *Disclosure of Names*.

    (A) *Petit Jurors*.  The names of petit jurors drawn from the qualified jury wheel may be disclosed to the parties, the public, or the media on the day following the drawing upon leave of the court and the request of any party, member of the public, or the media.  But the court in which any of the prospective jurors concerned are expected to serve may, by special order, require that the clerk keep these names confidential where the interests of justice so require.

    (B) *Grand Jurors*.  The names of grand jurors drawn from the qualified jury wheel must not be maintained in any public record or otherwise disclosed to the public, except upon the order of the judge in charge of the grand jury on a showing that exceptional circumstances have created a demonstrated need for disclosure.

(6) *Assignment of Jurors to Panels*.

    (A) *Petit Jury Panels and Panels to be Assigned to the Bankruptcy Court*.  In assigning prospective jurors to petit jury panels or to panels to be assigned to the Bankruptcy Court, the clerk must place the names or numbers of available petit jurors drawn from the divisional qualified jury wheel, as provided in this rule, and who are not excused, in a jury wheel. The clerk must then draw such necessary names and assign them to particular panels for each jury case as the court directs.

    (B) *Grand Jury Panels*.  Separate grand jury panels as may be required for service at the places in the district where court is held must be drawn at random as ordered by the court, either manually or by use of a programmed data computer, or by a combination thereof, from the qualified jury wheels on a divisional basis as follows:

        (i) At Kansas City, Leavenworth, and Fort Scott: From the Kansas City - Leavenworth and Fort Scott jury wheels.

        (ii) At Topeka and Salina: From the Topeka

54

> > > and Salina jury wheels.
> >
> > (iii) At Wichita, Hutchinson, and Dodge City:
> > From the Wichita - Hutchinson and Dodge
> > City jury wheels.

The required number of names for each centralized grand jury panel must be taken at random from the qualified jury wheels in proportion as nearly as possible to the number of registered voters in each division every two years. For example, if the total number of registered voters in the Kansas City - Leavenworth and Fort Scott jury divisions was 150,000 and 90,000, respectively, and if 48 prospective jurors were to be summoned for grand jury service at Kansas City, Leavenworth, or Fort Scott, then 30 names should be selected at random from the Kansas City - Leavenworth qualified jury wheel and 18 names from Fort Scott's qualified wheel.

> > (C) *Summons.* The clerk must issue summonses for the required number of jurors to be called to be served personally or by mail addressed to their usual residence or business address.

**(i) Disqualification or Exemption from Jury Service.**
Pursuant to 28 U.S.C. § 1865(a), the chief judge or clerk of this court under the supervision of the court, or, in his or her absence, any other district court judge, shall determine whether a prospective grand or petit juror is unqualified for, or exempt, or to be excused from jury service. The judge or clerk will make the determination from information provided on the juror qualification form and other competent evidence. The clerk shall enter such determination in the space provided on the juror qualification form or in the juror records in the database from a divisional master jury wheel.

> (1) *Disqualification.* Pursuant to 28 U.S.C. § 1865(b), any person shall be determined to be qualified to serve on either grand or petit juries in the district court unless he or she:

> > (A) is not a citizen of the United States 18 years of age who has resided for a period of one year within the judicial district;
> >
> > (B) is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;
> >
> > (C) is unable to speak the English language;
> >
> > (D) is incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or

55

(E) has a charge pending against him for the commission of, or has been convicted in a state or federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored.

(2) *Exemption*. Pursuant to 28 U.S.C. § 1863(b), the following persons are barred from jury service on the grounds that they are exempt:

(A) members in active service in the Armed Forces of the United States;

(B) members of the fire or police departments of any State, the District of Columbia, or such territory possession;

(C) public officers in the executive, legislative, or judicial branches of the Government of the United States, or of any State, the District of Columbia, or such territory or possession, who are actively engaged in the performance of official duties.

**(j) Individual Excuse from Jury Service.** In addition to the members of groups and classes subject to excuse from jury service on request, as provided in subsection (i) of this rule, any person summoned for jury service may be excused by the court, or the clerk under the supervision of the court upon a showing of undue hardship or extreme inconvenience, or both, pursuant to 28 U.S.C. §1866(c). The names of deferred persons are to be reinserted into the qualified jury wheel.

Whenever a person is excused for reason of undue hardship or extreme inconvenience, the clerk must note the reason for the excuse in the space provided on the jury qualification form or in the juror records in the database from a divisional master jury wheel.

**(k) Groups and Classes, Members of Which are Subject to Excuse on Request.** Pursuant to 28 U.S.C. § 1863(b)(5), and by the adoption of this rule, it is hereby found that jury service by the following groups of persons and occupational classes of persons would entail undue hardship or extreme inconvenience to the members thereof and that the excuse from jury service of the members thereof on request would not be inconsistent with 28 U.S.C. § 1861-1862:

(1) Persons over 70 years of age.

(2) Persons who have, within the past two years, served

56

on a federal grand or petit jury.

(3) Persons having active care and custody of a child or children under 10 years of age whose health and/or safety would be jeopardized by their absence for jury service; or a person who is essential to the care of aged or infirm persons.

(4) Any person whose services are so essential to the operation of a business, commercial, or agricultural enterprise that said enterprise must close if such person were required to perform jury duty.

(5) Volunteer safety personnel if they serve without compensation as firefighters or members of a rescue squad or ambulance crew for a "public agency." "Public agency" for this purpose means the United States, any state of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, Guam, American Samoa, or other territory of the United States, "or any unit of local government, department, or instrumentality of any of the foregoing."

### **(l)  Maintenance and Inspection of Records.**

(1) *Disclosure Prior to Emptying and Refilling a Master Jury Wheel*.  Pursuant to 28 U.S.C. § 1867(f), prior to the emptying and refilling of any master jury wheel, the contents of records and papers used by the clerk in connection with the juror selection process shall not be disclosed, except as provided elsewhere in this plan or upon written order of the court.

(2) *Disclosure After Emptying and Refilling a Master Jury Wheel*.  Pursuant to 28 U.S.C. § 1868, after any master jury wheel is emptied and refilled as provided in this rule, and after all persons selected to serve as jurors before the master wheel was emptied have completed such service, all of the records and papers compiled and maintained by the clerk before the master wheel was emptied shall be preserved in the custody of the clerk for 4 years or for such longer period as may be ordered by the court, and upon leave of the court, shall be available for public inspection at the office of the clerk of court during normal business hours for the purpose of determining the validity of the selection of any jury.  No one may copy any document or remove any document from the premises, without leave of the court.

\* \* \*

NOTE: Rule 38.1 is a mandated rule.

As amended 3/17/10, 3/17/09, 3/17/08, 3/17/06, 4/8/99, 2/28/97, 3/13/92.

57

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

      *Plaintiff,*

vs.

      Case No. 16-10141-01, 02, 03-EFM

CURTIS WAYNE ALLEN,

PATRICK EUGENE STEIN,

GAVIN WAYNE WRIGHT,

      *Defendants.*

### MEMORANDUM AND ORDER

This matter comes before the Court on Defendant Curtis Allen's motion seeking an order directing the Clerk of Court Jury Coordinator to issue summonses to prospective jurors from both the Wichita-Hutchinson and Dodge City jury divisions to report for jury service for Defendants' upcoming trial.  The motion was joined by Defendants Patrick Stein and Gavin Wright.  On January 3, 2018, the Court held a hearing on the motion.  Because the Court concludes that the current plan for selecting petit jurors does not infringe upon Defendants' statutory or constitutional rights, and Defendants lack standing to challenge the plan on behalf of citizens currently excluded from petit jury service, Defendants' Motion for Order to Have Prospective Jurors Summoned from Multiple Jury Divisions (Doc. 188) is denied.

Attachment B

# I.     Factual and Procedural Background

District of Kansas Local Rule 38.1 (also referred to as the "jury selection plan" or simply the "plan") governs the random selection of grand and petit jurors for the federal judicial District of Kansas.  The jury selection plan splits the District into six jury divisions: (1) Kansas City-Leavenworth; (2) Wichita-Hutchinson; (3) Topeka; (4) Dodge City; (5) Fort Scott; and (6) Salina.[1]  Under the plan, eligible jurors from all six jury divisions have the opportunity to serve on a grand jury panel.  The first grand jury panel sits at Kansas City, and consists of grand jurors from the Kansas City-Leavenworth and Fort Scott jury divisions.  The second panel sits at Topeka, and consists of grand jurors from the Topeka and Salina jury divisions.  And the third panel sits at Wichita, consisting of grand jurors from the Wichita-Hutchinson and Dodge City jury divisions.[2]

While the plan requires the Wichita grand jury panel to be composed of citizens from the Wichita-Hutchinson and Dodge City jury divisions, it does not impose the same requirement for petit juries.  Under the plan, the clerk must maintain a qualified jury wheel for each division, composed of names from the voter registration lists.[3]  When ordered to assign a petit jury panel, the clerk is directed to draw names from one of these divisional qualified jury wheels.[4]  The plan

---

[1] D. Kan. Rule 38.1(a).  The Wichita-Hutchinson jury division encompasses Butler, Cowley, Harper, Harvey, Kingman, Marion, McPherson, Reno, Rice, Sedgwick, and Sumner Counties.  The Dodge City jury division encompasses Barber, Barton, Clark, Comanche, Edwards, Finney, Ford, Grant, Gray, Greeley, Hamilton, Haskell, Hodgeman, Kearney, Kiowa, Lane, Meade, Morton, Ness, Pawnee, Pratt, Rush, Scott, Seward, Stafford, Stanton, Stevens, and Wichita Counties.

While it is unnecessary to list the Kansas counties encompassed by the other four jury divisions, it is worth noting that every single county in Kansas is included in one of the six jury divisions.

[2] D. Kan. Rule 38.1(h)(6)(B)(i)–(iii).

[3] D. Kan. Rule 38.1(f), (h)(1).

[4] D. Kan. Rule 38.1(h)(2).

-2-

does not, however, require the clerk to draw from multiple jury divisions when assembling a petit jury panel.

Consistent with this guidance, the jury coordinator only summons jurors from the Wichita-Hutchinson division when a jury trial is held at the Wichita federal courthouse. The same goes for jury trials held in Kansas City and Topeka: jurors are summoned from the Kansas-City Leavenworth division when a trial is held in Kansas City, and jurors are summoned from the Topeka division when a trial is held in Topeka.[5] Thus, in practice, citizens from the Dodge City, Fort Scott, and Salina jury divisions do not have the opportunity to serve as petit jurors in the District of Kansas.

This case was initiated after a grand jury returned an indictment charging Defendants— who resided within the Dodge City jury division—with one count of conspiracy to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332a on October 19, 2016. Then, on December 14, a grand jury returned a superseding indictment that added weapons-related charges against Allen, in violation of 18 U.S.C. § 922(g), and against Stein, in violation of 18 U.S.C. § 924(c). And on March 16, 2017, a grand jury returned a second superseding indictment that added a civil rights conspiracy charge against all three defendants, in violation of 18 U.S.C. § 241, and added a charge against Wright for lying to the FBI to obstruct its investigation into this matter, in violation of 18 U.S.C. § 1001.

All of the alleged events occurred in Western Kansas within the confines of the Dodge City jury division. Yet, as Defendants point out, the citizens who live in this jury division are

---

[5] Congress has authorized the U.S. District Court for the District of Kansas to hold court in Kansas City, Lawrence, Leavenworth, Salina, Topeka, Hutchinson, Wichita, Dodge City, and Fort Scott. 28 U.S.C. § 96. Throughout this Court's history, court has been held in Kansas City, Leavenworth, Salina, Topeka, Wichita, and Fort Scott. However, the only active federal courthouses are located in Kansas City, Topeka, and Wichita.

currently excluded from serving as petit jurors for the trial scheduled to take place in Wichita. Accordingly, Defendants filed this present motion asking the Court to order the Clerk of Court Jury Coordinator to issue summonses to prospective jurors from both the Wichita-Hutchinson and Dodge City jury divisions to report for service on the petit jury for the upcoming trial.

## II.      Discussion

Defendants make two primary arguments in this case: (1) that the jury selection plan employed by the District of Kansas violates Defendants' right to a jury trial before a fair cross-section of the community, as guaranteed by the Sixth Amendment and Jury Selection and Service Act of 1968 ("Jury Act"); and (2) by excluding Dodge City jury division citizens from petit jury service, the plan violates those citizens' rights under the Fifth and Sixth Amendments, as well as rights established under the Jury Act.  The Court will address each argument in turn.

## A.      Defendants' Right to a Jury Trial before a Fair Cross-Section of the Community Has Not Been Violated

Defendants first argue that the District of Kansas's method for selecting petit jurors violates their right to a jury that has been drawn from a fair cross-section of the community. More specifically, Defendants contend that they have a right to have citizens from the Dodge City jury division included in the petit jury pool.  According to Defendants, the citizens of these 28 counties "live in more rural areas and are more politically conservative."  As Defendants are alleging discrimination in the jury selection process, they have the burden of establishing the intentional exclusion of a legally cognizable group.[6]

---

[6] *See Rose v. Mitchell*, 443 U.S. 545, 565 (1979).

-4-

The Sixth Amendment guarantees the accused the right to an "impartial jury" of the "State and district wherein the crime shall have been committed . . . ."[7]  In *Taylor v. Louisiana*,[8] the U.S. Supreme Court declared that an essential characteristic of an impartial jury is that the jury be drawn from a fair cross-section of the community.[9]  The fair-cross-section requirement has also been legislatively mandated by Congress in the Jury Act.[10]  As the Jury Act codifies Defendants' Sixth Amendment rights, a statutory claim is evaluated under the same standards enunciated for the constitutional claim.[11]

*Taylor* mandated that "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude *distinctive groups* in the community and thereby fail to be reasonably representative thereof."[12]  This requirement, however, is a means of assuring "not a *representative* jury (which the Constitution does not demand), but an *impartial* one (which it does)."[13]

In *Duren v. Missouri*,[14] the Supreme Court set forth the criteria necessary to establish a prima facie violation of the fair-cross-section requirement.  A defendant must show: (1) the group alleged to be excluded is a "distinctive group" in the community; (2) the representation of

---

[7] U.S. Const. amend. VI.

[8] 419 U.S. 522 (1975).

[9] *Id.* at 530–31.

[10] *See* 28 U.S.C. § 1861 ("It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes.").

[11] *United States v. Shinault*, 147 F.3d 1266, 1270 (10th Cir. 1998).

[12] *Taylor*, 419 U.S. at 538 (emphasis added).

[13] *Holland v. Illinois*, 493 U.S. 474, 480 (1990) (emphasis in original).

[14] 439 U.S. 357 (1979).

-5-

this group in jury venires is not fair and reasonable in relation to the number of such persons in the community; and (3) the underrepresentation is due to systematic exclusion of the group in the jury selection process.[15]

Defendants' constitutional challenge fails because they cannot satisfy the first requirement of the *Duren* test—the group alleged to be excluded is not "distinctive." The Supreme Court has declined to "precisely define the term 'distinctive group,' " but has held that the exclusion of a particular group was unobjectionable where it did not contravene the three purposes of the cross-section requirement: (1) avoiding "the possibility that the composition of juries would be arbitrarily skewed in such a way as to deny criminal defendants the benefit of the common-sense judgment of the community"; (2) avoiding an "appearance of unfairness"; and (3) ensuring against deprivation of "often historically disadvantaged groups of their right as citizens to serve on juries in criminal cases."[16]

The Tenth Circuit, however, has provided a three-part test for determining whether a group is distinctive.[17]  A defendant must prove: (1) the group is defined by a limiting quality (i.e., the group has a definite composition such as race or sex); (2) a common thread or basic similarity in attitude, idea, or experience runs through the group; and (3) a community of interests exists among members of the group such that the group's interest cannot be adequately represented if the group is excluded from the jury selection process.[18]

---

[15] *Id.*; *see also United States v. Green*, 435 F.3d 1265, 1271 (10th Cir. 2006).

[16] *See Lockhart v. McCree*, 476 U.S. 162, 175 (1986).

[17] *See Green*, 435 F.3d at 1271–72.

[18] *Id.* at 1271 (citing *United States v. Raszkiewicz*, 169 F.3d 459, 463 (7th Cir. 1999); *United States v. Fletcher*, 965 F.2d 781, 782 (9th Cir. 1992); *United States v. Canfield*, 879 F.2d 446, 447 (8th Cir. 1989); *Ford v. Seabold*, 841 F.2d 677, 681–82 (6th Cir. 1988); *Barber v. Ponte*, 772 F.2d 982, 986–87 (1st Cir. 1985); *Willis v. Zant*, 720 F.2d 1212 (11th Cir. 1983)).

Courts addressing this issue have found that groups characterized by race, religion, ethnicity, and gender meet this distinctiveness standard.[19]  But that list is essentially exhaustive.[20]  Groups characterized by age, occupation, disability, education, and other characteristics are not distinctive under *Taylor*, and their exclusion does not run afoul of the Constitution.[21]  "Neither does a person's geographic location place that person in a distinct group."[22]  However, geographic location may be considered a distinctive group if the location is "profoundly culturally distinct."[23]

---

[19] *See, e.g.*, *Duren*, 439 U.S. at 364 (recognizing women as a distinctive group); *United States v. Gelb*, 881 F.2d 1155 (2d Cir. 1989) (recognizing Jews as a distinctive group); *United States v. Shinault*, 147 F.3d 1266, 1271–72 (10th Cir. 1998) (noting that the Government conceded on appeal that Asians, Blacks, and Hispanics are all distinctive groups); *United States v. Nelson*, 137 F.3d 1094 (9th Cir. 1998) (recognizing Hispanics as a distinctive group); *United States v. Yazzie*, 660 F.2d 422, 426 (10th Cir. 1981) (recognizing Native Americans as a distinct group).

[20] *See Holland*, 493 U.S. at 502, (Marshall, J., dissenting) ("To date, at least, this Court has found only women and certain racial minorities to have the sorts of characteristics that would make a group 'distinctive' for fair-cross-section purposes.").

[21] *See, e.g.*, *Johnson v. McCaughtry*, 92 F.3d 585, 592 (7th Cir. 1996) (noting that "age" had already been rejected by that circuit as a characteristic which can define a group for purposes of the fair-cross-section requirement); *Fletcher*, 965 F.2d at 782 (concluding that college students are not a distinct group); *Anaya v. Hansen*, 781 F.2d 1 (1st Cir. 1986) (concluding that blue collar workers are not a "sufficiently coherent group"); *United States v. Afflerbach*, 754 F.2d 866, 870 (10th Cir. 1985) ("Persons who choose not to register to vote do not comprise such a cognizable group."); *State v. Spivey*, 700 S.W.2d 812, 814 (Mo. 1985) (concluding that the exclusion of deaf persons was lawful, as they do not have "a community of attitudes or ideas").

[22] *Green*, 435 F.3d at 1272.  *See United States v. Watkins*, 691 F.3d 841, 851 (6th Cir. 2012) (concluding that "residents of a particular county are not a 'distinctive' group in the community for Sixth Amendment purposes") (internal quotations and citations omitted); *United States v. Canfield*, 879 F.2d 446, 447 (8th Cir. 1989) (concluding that residents of Minneapolis are not a distinct group); *United States v. Test*, 550 F.2d 577, 582 n.4 (10th Cir. 1976) ("[G]eographic imbalance . . . does not violate the statutory and constitutional requirement that the jury panel represent a 'fair cross section of the community.' ").  *See also United States v. Conant*, 116 F. Supp. 2d 1015 (E.D. Wis. 2000) ("Indeed, every court that has looked at the question of whether the residents of a geographic area may constitute a 'distinctive' group for Sixth Amendment purposes solely due to the location of their residence has answered negatively."); *contra Alvarado v. State*, 486 P.2d 891 (Alaska 1971) (concluding that defendant was not afforded an impartial jury because prospective jurors were summoned from an area within 15 miles of Anchorage, which excluded 55 native villages comprising 72% of the district's native population).

[23] *Zicarelli v. Dietz*, 633 F.2d 312, 320 (3d Cir. 1980) (citing *Alvarado*, 486 P.2d 891).  *Alvarado* is the only case this Court is aware of in which the court concluded that residents of a particular geographic location were excluded in violation of the cross-section requirement.  There, the jurors were chosen from an area within a radius of 15 miles of Anchorage, precluding residents of virtually all native villages from representation on the panel.  The Alaska Supreme Court held this was a fair-cross-section violation, but noted that "the problem of selecting juries in

-7-

In their motion, Defendants conflate a number of different arguments and struggled to define the precise group they assert is "distinctive."   Liberally interpreting Defendants' arguments, the Court identifies four groups Defendants consider to be "distinctive": (1) the entire Dodge City jury division population; (2) registered Republican voters; (3) voters who voted for President Trump in the 2016 general election; and (4) citizens who live in rural communities. The Court will address each group below.

    *1.    Citizens residing within the Dodge City jury division are not a distinctive group*

Here, the District of Kansas jury selection plan denies every citizen residing within the Dodge City jury division the opportunity to serve as a petit juror.  The question, then, is whether this "group" satisfies the distinctiveness requirement set forth in *Duren*.  It does not.  Turning to the factors enunciated in *Green*, the group first lacks a limiting quality; the group includes men and women of many different ages, races, ethnicities, religions, educations, and occupations.

Second, the group lacks a common thread or basic similarity in attitude, idea, or experience.  In support, Defendants cited recent voter data to argue that the entire population shares similar political opinions.   But the fact that voters in the Dodge City division preferred Donald Trump (the Republican Party nominee) over Hilary Clinton (the Democratic Party nominee) in the 2016 presidential election is unpersuasive.  True, Donald Trump received 75.5% of votes cast in the Dodge City jury division.  However, Defendants' statistic only accounts for eligible voters who actually cast a ballot.  Of the 113,896 registered voters in the Dodge City

---

Alaska is unique" due to the vast expanses of land, variety of cultural heritage, and the sparse population.  The court then suggested that selecting jurors from the senate election district in which the crime is alleged to have occurred would satisfy the constitutional requirement of impartiality.  *Alvarado*, 486 P.2d at 903–06.

-8-

division, 39.5% did not vote in the election.[24]   Thus, the 52,059 votes for Donald Trump only

accounted for 45.7% of registered voters in the division.   The fact that less than half of the

prospective jurors in the Dodge City division voted for a particular Presidential candidate does

not establish that a common thread or basic similarity in ideas runs through the group.   Neither

does the fact that 56% of registered voters within the division registered as Republican.   There is

simply too much disparity amongst these voters to conclude that the group shares a similar

attitude, idea, or experience.

Defendants also argue that the citizens in the Dodge City jury division tend to reside in

rural locations, which would suggest they share a similar attitude, idea, or experience.   However,

Defendants provided no evidence that tended to support their proposition.[25]   The Dodge City jury

division contains hundreds of individual and distinct communities across 28 counties.

Defendants were unable to explain how these citizens share similar attitudes, ideas, or

experiences.   Accordingly, Defendants have not been able to satisfy the second element.

Third, Defendants are unable to establish that a community of interests exists among

members of the Dodge City division such that the group's interest cannot be adequately

represented if the group is excluded from the jury selection process.[26]   In their motion,

Defendants did not identify a community of interests that exists among the members of the

---

[24] According to the statistics provided by Defendants, there are 113,896 registered voters in the Dodge City jury division, while only 68,919 votes were cast in the 2016 general election.   Thus, approximately 60.5% of eligible voters cast a ballot, while the other 39.5% abstained.

[25] Defendants simply stated: "Even passing knowledge of the State of Kansas confirms this to be true—the counties in western Kansas that encompass the Dodge City jury division are more rural."   Doc. 188, at 8.   Defendants did not provide the Court with the criteria necessary for a community to qualify as "rural," nor did Defendants provide any statistics regarding the number of citizens that reside in rural communities in each of the divisions.

[26] *See Green*, 435 F.3d at 1271.

-9-

Dodge City division.  So at the hearing, the Court asked Defendants to define the characteristics that distinguish citizens of the Dodge City division from citizens of the Wichita-Hutchinson division.  After all, the parties acknowledged that the Wichita-Hutchinson division contains many rural, conservative citizens as well.

Counsel for Wright argued that the difference between the two divisions is found in the groups' belief systems and ideologies.  Although conceding that the distinction may not be legally cognizable, counsel insisted the distinction was factually cognizable:

> I think the issue that we might have, if we don't [include the Dodge City division], is that there are, I believe, ideologies that are fundamental and strongly held ideologies about things that will govern people's approaches to the evidence. It doesn't mean they're right or wrong, but they are different.  And I believe there's a difference in southwest Kansas where these crimes are alleged to have been committed.

The Court is not persuaded that the distinction is even factually cognizable—Defendants did not present any facts.  Rather, counsel offered the bare assertion that citizens in southwest Kansas possess an ideology that fundamentally differs from the citizens immediately to their east. Without more, the Court rejects this argument.  There is no evidence to suggest that citizens of the Dodge City division would evaluate the evidence presented at trial differently than citizens of the Wichita-Hutchinson division.[27]   Defendants have therefore failed to establish the third element as well.

Thus, this group is not defined by a limiting quality, no common thread or basic similarity in attitude, idea, or experience runs through the group, and there are no interests unique to the group that would not be adequately represented if the group is excluded from the

---

[27] *Cf. Raszkiewicz*, <u>169 F.3d at 466</u> (requiring specificity in any argument that an excluded group is "distinct").

-10-

jury selection process.  The only common quality shared by all members of the group is the fact that they all reside within the same 28-county geographic location, and there are no facts that would suggest this location is "profoundly culturally distinct."  This single, shared characteristic is not legally cognizable.[28]  Accordingly, the citizens of the Dodge City jury division are not a "distinctive group."

> 2.    *Registered Republicans, those who voted for President Trump, and rural citizens are not "distinctive groups"*

As mentioned above, the "distinctive group" alleged to be excluded can be classified in other ways as well.  At times, Defendants seem to argue that the current jury selection plan discriminates against Republican voters, registered voters that voted for Donald Trump in the 2016 Presidential election, and rural citizens.  These characteristics were obviously considered above in determining whether the entire population of the Dodge City division was a "distinctive group."  But now, the Court will consider whether any of these groups, considered alone, can be considered "distinctive" in determining whether the current jury selection plan violates the fair-cross-section requirement.

> a.    Registered Republicans

Defendants submit that a greater percentage of voters in the Dodge City division are registered Republicans than the percentage of registered Republicans in the Wichita-Hutchinson division.  Therefore, Defendants argue, by excluding the Dodge City division from petit jury service, the jury selection plan discriminates against registered Republican voters.

---

[28] *See Green*, 435 F.3d at 1272 ("Neither does a person's geographic location place that person in a distinct group.").

-11-

Turning to the first factor, registered Republicans have one obvious limiting quality—the members of this group are all affiliated with the same political party. Because this group has a definite composition, the first element is satisfied.

Whether a common thread or basic similarity in attitude, idea, or experience runs through the group is a more difficult issue. At first glance, one would assume that members of the same political party share similar political beliefs. In their motion, Defendants represented that Republicans differ from Democrats "regarding the appropriate size and power of the federal government and the individual rights of its citizens."[29] At the hearing, however, Defendants seemed to argue that Republicans in the Dodge City division held ideologies and beliefs that were distinguishable from those held by Republicans in the Wichita-Hutchinson division. This suggests that Republicans, as a group, may possess differing attitudes or ideas. Regardless, Defendants offered no evidence that would allow the Court to make such a determination. Defendants merely provided a conclusory statement—that Republicans agree on "the appropriate size and power of the federal government and the individual rights of its citizens." Thus, Defendants have not met their burden of proving the second element.[30]

Defendants are also unable to establish the third element—that a community of interests exists among members of the Republican Party such that the group's interest cannot be adequately represented if the group is excluded from the jury selection process. Again, Defendants only offered vague conclusions about the shared interests of Republicans and how

---

[29] Doc. 188, at 8–9.

[30] *See Rose*, 443 U.S. at 590 (noting that the party alleging discrimination has the burden of proving the discrimination); *see also Green*, 435 F.3d at 1271 (declining to take judicial notice "that rural people who have a driver's license and are not registered to vote are 'anti-government' and, therefore, more friendly toward defendants.").

those interests would be represented on the jury.  Defendants represented in their motion that Republicans differ from Democrats "regarding the appropriate size and power of the federal government and the individual rights of its citizens."[31]  And, according to Defendants, "this case will require the jury to evaluate and weigh evidence regarding whether the alleged conduct constitutes the crimes charged or whether it was constitutionally protected speech, assembly, and petition, and/or the right to bear arms."[32]

Defendants appear to argue, then, that the exclusion of Republicans would make a difference in the assessment of the evidence by a jury.  While it is possible that members of one political party would assess evidence differently than members of another political party, Defendants have not proven so here.  Defendants' evidence only shows registered voters' political party affiliation; it does not speak to whether members of one political party would evaluate evidence differently than members of another political party.[33]  Nor have Defendants proven that Republican Party members' interests would not be adequately represented on the jury venire.[34]

Accordingly, Defendants have not shown that members of the Republican Party are a "distinctive group."  While this group may be defined by a limiting quality, Defendants have not

---

[31] Doc. 188, at 8–9.

[32] Doc. 188, at 9.

[33] *See Fay v. People of State of N.Y.*, 332 U.S. 261, 290 (1947) ("No significant difference in viewpoint between those allegedly excluded and those permitted to serve has been proved and nothing in our experience permits us to assume it.").

[34] Defendants neglected to address whether the members' interests could or could not be adequately represented if the members were excluded from the jury selection process.  However, it would seem that the interests of Republican Party members will be adequately represented under the current plan.  According to Defendants' statistics, 44.36% of those eligible to be summoned for jury service in the Wichita-Hutchinson division are Republicans.  Of the remaining groups, unaffiliated voters represent 32.7%, Democrats represent 22.18%, and Libertarians represent .76%.

shown that the group shares a basic similarity in attitude, or that there are interests unique to the group that would not be adequately represented if the group is excluded from the jury selection process.[35]

   b.   Those who voted for President Trump in the 2016 election

Defendants also submit that a greater percentage of voters in the Dodge City division voted for Donald Trump in the 2016 Presidential election than voters in the Wichita-Hutchinson division.  Therefore, Defendants argue, the jury selection plan discriminates against those who voted for President Trump.

Defendants are unable to establish any of the elements necessary to show that this group is "distinctive."  This group shared a single quality on one date in history—November 8, 2016—when the members of this group cast their ballots for the same presidential candidate.  "The only way to establish the present group, particularly in view of the absence of any scientific or expert evidence in this record, is by arbitrary fiat superimposed on intuition."[36]  Even assuming the Court can be flatly arbitrary, the Court cannot say that a grouping whose contours are rationally unsupportable is "distinctive."[37]

   c.   Rural citizens

Finally, Defendants argue that the current jury selection plan discriminates against rural voters.  As mentioned above, Defendants provided no evidence to suggest that this would be

---

[35] That is not to say that members of a political party would never be considered to be a "distinctive group," but that Defendants have simply failed to meet their burden here.  As one court has suggested, the outcome might have been different had Defendants shown, for instance, something specific about the purportedly shared values of Republicans as opposed to Democrats and unaffiliated voters which might have led to a different appraisal of the evidence at issue in this case.  *See Raszkiewicz*, 169 F.3d at 466.  *But see Lockhart*, 476 U.S. at 175 (stating that legally cognizable "distinctive groups" are "often historically disadvantaged").

[36] *Barber v. Ponte*, 772 F.2d 982, 998 (1st Cir. 1985).

[37] *Id.*

-14-

true.  Regardless, the courts that have confronted this issue are in agreement: the rural nature of a geographic area does not make its residents "distinct."[38]  Defendants were unable to cite any cases that have held a jury venire unconstitutional due to the rural or urban nature of an excluded segment of the population.  Accordingly, rural citizens are not a "distinctive group."

### 3.   Exclusion of the Dodge City division does not infringe upon Defendants' right to an impartial jury from a fair cross-section of the community

In sum, the Court rejects Defendants' fair-cross-section claim because they have not established the first prong of the *Duren* test—that the excluded group is a distinctive part of the community.[39]  The Constitution's guarantee to an impartial jury drawn from a fair cross-section of the community is not violated when certain jurors are excluded simply due to their geographic location.[40]  Defendants must show that the group is "distinctive," and they are unable to do so here.  Neither the fact that the Dodge City division citizens tend to be more "conservative," nor the fact that they tend to reside in "more rural" communities makes those citizens "distinctive."  Even if those characteristics were legally cognizable, it is clear that those interests will still be represented in Defendants' jury venire.

---

[38] *See, e.g.*, *United States v. Balistrieri*, 778 F.2d 1226, 1229 (7th Cir. 1985) ("[T]he fact that the Green Bay venire may have been more 'rural' than a Milwaukee venire might have been does not violate a defendant's right to a jury drawn from a cross-section of the community."); *Green*, 435 F.3d at 1271–72 ("[W]e cannot say that persons who live in rural counties and do not vote have a 'common thread in attitude' or that a common experience runs through the group."); *Conant*, 116 F. Supp. 2d at 1024 ("Indeed, every court that has looked at the question of whether the residents of a geographic area may constitute a 'distinctive' group for Sixth Amendment purposes solely due to the location of their residence has answered negatively.").

[39] While the parties largely neglected the remaining elements, it is worth noting that Defendants would not be able to satisfy the second element of the *Duren* test either.  Under the second element, Defendants would need to prove that the representation of the "distinctive group" in jury venires is not fair and reasonable in relation to the number of such persons in the community.  However, as discussed in more detail below, Defendants are not able to show disparity significant enough indicate a Sixth Amendment violation.  *See infra* Section II.B.2 (concluding that absolute disparity—the statistical underrepresentation of a group—under the current plan is at most 2.37%, which is insufficient to satisfy the second *Duren* element).

[40] *Green*, 435 F.3d at 1272; *Test*, 550 F.2d at 582 n.4.

The fair-cross-section requirement is a means of assuring "not a *representative* jury (which the Constitution does not demand), but an *impartial* one (which it does)."[41]   Under the current jury selection plan, Defendants' right to an impartial jury is guaranteed.   Accordingly, Defendants' constitutional challenge fails.

## B.     Defendants Do Not Have Standing to Make Equal Protection or Jury Act Challenges against the Plan as Applied to Dodge City Jury Division Citizens

Defendants next argue that by excluding citizens of three jury divisions from petit jury service, the jury selection plan violates *those citizens'* rights under the Fifth and Sixth Amendments, as well as rights established under the Jury Act.[42]   As Defendant's constitutional rights have not been infringed upon, the issue becomes whether Defendants have standing to challenge the plan as applied to those citizens.   However, "standing," in this sense, does not refer to the constitutional requirements for a case to be heard (which is not in question).   Rather, "standing" refers to a prudential restriction on Defendants' ability to assert the constitutional and statutory rights of others, when their rights are not at issue.[43]

"In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties."[44]   "This fundamental restriction on [the Court's] authority admits of certain, limited exceptions."[45]   The U.S. Supreme Court has recognized the right of litigants to bring challenges on behalf of excluded jurors,

---

[41] *Holland*, 493 U.S. at 480 (emphasis in original).

[42] *See* Doc. 188, at 13 ("Indeed, discrimination through systematic exclusion of a sector of otherwise qualified venire persons violates the Equal Protection Clause of the Fifth Amendment, the Sixth Amendment and the Jury Act.").

[43] *See Aid for Women v. Foulston*, 441 F.3d 1101, 1111 (10th Cir. 2006).

[44] *Powers v. Ohio*, 499 U.S. 400, 410 (1990)

[45] *Id.*

-16-

provided three important criteria are satisfied: (1) the litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute; (2) the litigant must have a close relation to the third party; and (3) there must exist some hindrance to the third party's ability to protect his or her own interests.[46]

1.      Defendants have not suffered an "injury in fact"

An example of "injury in fact" was provided in *Powers v. Ohio*.  In *Powers*, a white defendant challenged the prosecution's exclusion of black jurors from his petit jury through the use of peremptory strikes.  The defendant's claim rested on the third-party equal protection claims of the jurors excluded by the prosecution because of race.[47]  The Supreme Court determined that "[t]he discriminatory use of peremptory challenges by the prosecution causes a criminal defendant cognizable injury, and the defendant has a concrete interest in challenging the practice."[48]  The Court noted that this was "because racial discrimination in the selection of jurors 'casts doubt on the integrity of the judicial process,' and places the fairness of a criminal proceeding in doubt."[49]  This cloud of doubt deprives the defendant of the certainty that a verdict in his case "is given in accordance with the law by persons who are fair."[50]

In a similar case, *Campbell v. Louisiana*,[51] a white defendant sought to assert the equal protection rights of black persons not to be excluded from grand jury service on the basis of their

---

[46] *Id.* at 410–11 (internal citations omitted).

[47] *Id.* at 416.

[48] *Id.* at 411.

[49] *Id.* at 411 (quoting *Rose*, 443 U.S. at 556).

[50] *Id.* at 413.

[51] 523 U.S. 392 (1998).

-17-

race.  The Court, applying the *Powers* test, concluded that "the accused suffers a significant injury in fact when the composition of the grand jury is tainted by racial discrimination."[52] According to the Court, the integrity of the grand jury's decisions depends on the integrity of the process used to select the grand jurors.[53]  "If that process is infected with racial discrimination, doubt is cast over the fairness of all subsequent decisions."[54]

But here, Defendants have not suffered a cognizable injury.  Simply put, the exclusion of the three jury divisions that lack an active federal courthouse from petit jury service is not comparable to the systematic exclusion of black jurors.  The current plan has no effect on the integrity or the public perception of the court system.  It does not discriminate on the basis of race or any other legally cognizable characteristic that speaks to the core of one's identity.  This is not a case such as *Powers*, where the prosecution used peremptory strikes, in open court, to exclude jurors simply because they were black.  Of course the jurors who witnessed such blatant racial discrimination would question the fairness of the criminal proceeding, calling into question those jurors' eventual verdict.  However, there is no reason to believe that prospective jurors in Defendants' upcoming trial will notice that citizens of, say, Morton County[55] are not represented on the jury venire and question the fairness of the criminal proceeding.  Accordingly, Defendants are unable to establish an "injury in fact" as articulated in *Powers* and *Campbell*.

---

[52] *Id.* at 398.

[53] *Id.* at 399.

[54] *Id.*

[55] Morton County, located in the very southwestern corner of Kansas, falls within the Dodge City jury division.  The Court notes that from the county seat of Morton County, Elkhart, it is a 267.2 mile drive to Wichita via US-54E.  The drive would take approximately four and one-half hours.

-18-

Of course, Defendants are not required to rely on *Powers* and *Campbell* to prove "injury in fact," so long as Defendants show they have a "sufficiently concrete interest" in the outcome of the issue in dispute.[56]   Despite devoting an entire section in their motion to standing, Defendants have not been able to definitively state what such an injury might be.   That said, the Court is aware of Defendants' numerous allusions to the "fact" that citizens from the Dodge City division hold political ideologies distinct from citizens of the other divisions.   Or, at the very least, those citizens are more likely to identify as politically conservative than citizens of the other divisions.   Based on this premise, the Court assumes Defendants intended to argue that they are harmed because the prospective jury pool will contain fewer jurors that hold political ideologies Defendants believe would be favorable to their defense.

The Court rejects this argument.   For one, it is impossible to ascertain the "political ideology" or "belief system" that Defendants contend is so important.   The only evidence presented by Defendants concerns political affiliation amongst registered voters and the votes for each candidate in the 2016 Presidential election.   The Court is unable to derive from these statistics the "body of doctrine, myth, belief, etc., that guides" these groups.[57]   There are countless different reasons one may choose to register as a Republican, Democrat, Libertarian, or independent.   And there are just as many reasons to vote (or decline to vote) for a particular candidate.   Without being able to identify and quantify these ideologies, Defendants cannot show, with any degree of certainty, that a specific belief system or ideology will not be

---

[56] *Powers*, 499 U.S. at 410–11.

[57] *Ideology*, Dictionary.com, *available at* http://www.dictionary.com/browse/ideology (last visited January 10, 2018).

adequately represented on the jury venire.[58]  Therefore, this argument also fails to prove "injury in fact."

The Constitution requires that Defendants be tried by a jury from a fair cross-section of the community.  As the Court held in Section II.A., the current plan to summon jurors only from the Wichita-Hutchinson district ensures that Defendants will be afforded that right.  Whether the jury selection plan infringes upon the rights of the citizens of the three excluded divisions is an entirely separate issue.  And Defendants have been unable to establish a nexus between the two. Defendants therefore do not have a "sufficiently concrete interest" in challenging the current jury selection plan as applied to the citizens of the Dodge City, Fort Scott, and Salina jury divisions.

2.    *Defendants do not have a close relation to the third party*

In *Powers*, the Court held that the defendant had a close relation to the jurors because of the nature of voir dire, which "permits a party to establish a relation, if not a bond of trust, with the jurors . . . [that] continues throughout the entire trial and may in some cases extend to the sentencing as well."[59]  The Court identified two common interests between the defendant and the excluded jurors: (1) "[b]oth the excluded juror and the criminal defendant have a common interest in eliminating racial discrimination from the courtroom," and (2) the defendant has a vital interest in asserting the excluded jurors' rights because his conviction may be overturned as

---

[58] Even if Defendants could make such a showing, no Court has ever held that the ideological composition of a jury venire, without more, can violate the Constitution.

[59] *Powers*, 499 U.S. at 413.

-20-

a result.[60]  The *Campbell* Court acknowledged the same shared interests between defendants and excluded grand jurors.[61]

However, those two common interests are not present here.  Defendants and the excluded jurors do not have a common interest in eliminating racial discrimination from the courtroom because jury selection plan does not discriminate on the basis of race.   And even though Defendants assert that the current plan discriminates on the basis of political party, the Court is not so convinced.   Currently, the plan calls for jurors to be summoned at random from the official lists of registered voters in each of the counties comprising the Wichita-Hutchinson division.[62]   According to Defendants' statistics, 44.36% of these voters are registered Republicans, while 22.18% are registered Democrats.[63]   To prevent political discrimination, Defendants argue, the Court should summon jurors from both the Wichita-Hutchinson and Dodge City divisions.   Under Defendants' proposed plan, 46.73% of the prospective jury pool would be registered Republicans, compared to 21.18% registered Democrats.[64]

In other words, Republicans are slightly unrepresented under the current plan. "[A]bsolute disparity measures the difference between the percentage of a group in the general population and its percentage in the qualified wheel . . . ."[65]   It is determined by subtracting the percentage of Republicans in the jury pool (here, 44.36%) from the percentage of Republicans in

---

[60] *Id.* at 413–14.

[61] *Campbell*, 523 U.S. at 400.

[62] D. Kan. Rule 38.1(d).

[63] The statistics show that there are 445,434 total registered voters in the Wichita-Hutchinson division.  Of those, 197,579 (44.36%) are registered Republicans.  98,815 (22.18%) are registered Democrats.

[64] By including both divisions, the total number of registered voters becomes 559,330.  Of that total, 261,402 (46.73%) are registered Republicans. 118,487 (21.18%) are registered Democrats.

[65] *United States v. Orange*, 447 F.3d 792, 798 (10th Cir. 2006).

-21-

the local, jury-eligible population (here, 46.73%).[66]  By an absolute disparity measure, therefore, Republicans will be underrepresented by only 2.37%.  This is entirely insufficient to show political discrimination.[67]

Additionally, there is no risk that a conviction, if obtained, would be reversed if the excluded jurors' rights are not asserted in this case.  As the Court held above, the current plan, which excludes the Dodge City division from petit jury service, does not infringe upon Defendants' rights.  The issue of whether or not citizens from southwest Kansas have had their rights violated would have no bearing on the soundness of a conviction, if obtained.  Because Defendants' rights are not implicated, Defendants have no greater interest in whether citizens in the Dodge City division have been denied their right to serve on a jury than Defendants have an interest in whether citizens of a different state have been denied the right to serve on a jury.  Accordingly, Defendants do not have a close relation to the citizens excluded from petit jury service and are unable to satisfy the second element to invoke standing.

Because Defendants are unable to satisfy either of the first two elements, the Court need not reach the issue of whether the citizens excluded from petit jury service are likely or able to assert their own rights.

*3.    Conclusion*

The plan ensures that Defendants will be tried by a jury from a fair cross-section of the community as required by the Sixth Amendment and the Jury Act.  Although certain citizens are

---

[66] *Berghuis v. Smith*, 559 U.S. 314, 323 (2010).

[67] *See Orange*, 447 F.3d at 799 (concluding that 3.57% absolute disparity was insufficient to establish a prima facie case that the distinct group's representation was not fair and reasonable); *Yazzie*, 660 F.2d at 427 (upholding selection mechanism with 4.29% absolute disparity); *United States v. Gault*, 141 F.3d 1399, 1402–03 (10th Cir. 1998) (concluding that 7% absolute disparity was insufficient to establish a constitutional violation).

excluded from petit jury service, Defendants have not shown how this harms them or that they have a sufficiently close relationship to challenge the plan on those citizens' behalf. Accordingly, it would not be proper for the Court to address the issue of whether those citizens' rights have, in fact, been violated.[68]

This is especially true where "the applicable constitutional questions are ill-defined and speculative."[69]  Such is the case here.  Defendants assert that denying the citizens of some jury divisions the opportunity to serve as petit jurors violates those citizens' equal protection and Jury Act rights.  However, no court has ever held that every eligible citizen must be guaranteed the opportunity to serve as a petit juror.[70]  Moreover, neither the Supreme Court nor the Tenth Circuit has ever implicated equal protection to hold that the right to serve on a jury is a fundamental right.[71]  Resolution of this issue, then, would require the Court to evaluate arguments not based on precedent to implicate the rights of citizens that are not involved in this case.  The Court declines to do so.

---

[68] *Singleton v. Wulff*, 428 U.S. 106, 113–14 (1976) (plurality opinion of Blackmun, J.) ("[T]he courts should not adjudicate [the rights of third persons] . . . unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not.").  It very well may be that citizens of the Dodge City division do not want to assert their right to serve as jurors for trials in federal court.  Some citizens in the Dodge City division would be required to drive more than 250 miles from their homes to the federal courthouse.  Such a drive would be rather inconvenient for a juror sitting on a trial scheduled to last an entire month, as is the case here.

[69] *Craig v. Boren*, 429 U.S. 190, 193 (1976) (holding that rules against asserting the rights of others are "designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative.").

[70] *Cf. Ruthenberg v. United States*, 245 U.S. 480, 482 (1918) (concluding that the "plain text of the Sixth Amendment" and "continuous legislative and judicial practice from the beginning" permits jurors to be drawn from a single division as opposed to requiring jurors be drawn from the entire district).

[71] *See Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619 (1991) (classifying the denial of the right to serve as a juror as the denial of an "honor and privilege," without describing the right as fundamental); *Conant*, 116 F. Supp. 2d at 1020 ("No court that has considered the question of whether being eligible for jury service is a constitutional right has answered in the affirmative.").

-23-

### III.    Conclusion

The demographic differences between the Dodge City and the Wichita-Hutchinson divisions are not legally cognizable and will not reflect adversely on the ability of the jury panel to perform its jury function with impartiality, either in actuality or in appearance.[72]   Accordingly, the jury selection procedure employed by the District of Kansas does not violate Defendants' right to a jury trial before a fair cross-section of the community, as guaranteed by the Sixth Amendment and the Jury Act.

Furthermore, Defendants lack standing to challenge the jury selection plan on behalf of citizens residing within the Dodge City, Fort Scott, and Salina jury divisions.  "In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties."[73]  "This fundamental restriction on [the Court's] authority admits of certain, limited exceptions."[74]  But Defendants have not shown that this case fits within one of those exceptions.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Order to Have Prospective Jurors Summoned from Multiple Jury Divisions (Doc. 188) is hereby **DENIED.**

**IT IS SO ORDERED.**

Dated this 17th day of January, 2018.

*Eric F. Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[72] *See Zicarelli*, 633 F.2d at 320.

[73] *Powers*, 499 U.S. at 410.

[74] *Id.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff,* | |
| vs. | Case No. 16-10141-EFM-01, 02, 03 |
| CURTIS WAYNE ALLEN, | |
| PATRICK EUGENE STEIN, | |
| GAVIN WAYNE WRIGHT, | |
| *Defendants.* | |

## MEMORANDUM AND ORDER

On January 17, 2018, the Court denied Defendant Curtis Allen's Motion for Order to have Prospective Jurors Summonsed from Multiple Jury Divisions.[1]   In response to that Order, Defendant Allen has filed a motion seeking to dismiss the indictment or stay the proceedings due to a substantial failure to comply with the provisions of the Jury Selection and Service Act of 1968 ("Jury Act").   The motion is joined by Defendants Patrick Stein and Gavin Wright.   Because the Court concludes Defendants still lack standing to challenge the plan on behalf of citizens currently excluded from petit jury service, Defendants' Motion to Dismiss Indictment or Stay Proceedings for Substantial Failure to Comply with the Jury Act (Doc. 227) is denied.

---

[1] Doc. 213.

## I.    Factual and Procedural Background[2]

In Defendants' previous motion, Defendants noted that the jury selection plan employed by the District of Kansas does not permit eligible citizens residing in the Dodge City, Fort Scott, and Salina jury divisions ("excluded jurors") to serve on petit juries.  With that in mind, Defendants advanced two primary arguments: (1) the jury selection plan employed by the District of Kansas violates Defendants' right to a jury trial before a fair cross section of the community; and (2) the jury selection plan violates the excluded jurors' rights established under the Jury Act.  The Court denied Defendants' motion on January 17, 2018 Order.  There, the Court held that the jury selection plan did not violate Defendants' right to a jury trial before a fair-cross section of the community, and Defendants did not have standing to make Equal Protection or Jury Act challenges against the plan as applied to the excluded jurors.

## II.    Discussion

In the present motion, Defendants have renewed their argument that the jury selection plan violates the excluded jurors' rights established under the Jury Act.  Defendant Allen argues that he has standing to raise the statutory challenge to the jury selection process because he has: (1) submitted five declarations of excluded jurors who "want to assert their right to serve as jurors in federal court;" and (2) submitted an editorial from the *High Plains Daily Leader & Times* which purportedly demonstrates that some excluded jurors question the integrity of the federal court system that excludes them from ever serving on a petit jury.

The Court is not persuaded that these submissions are sufficient to now confer standing upon Defendants to challenge the jury selection plan on behalf of the excluded jurors in this current

---

[2] For a complete recitation of the relevant facts and legal background, *see* Doc. 213.

criminal proceeding.  "In the ordinary course, a litigant must assert his or her own legal rights and

interests, and cannot rest a claim to relief on the legal rights or interests of third parties."[3]  "This

fundamental restriction on [the Court's] authority admits of certain, limited exceptions."[4]   The

U.S. Supreme Court has recognized the right of litigants to bring challenges on behalf of excluded

jurors, provided three important criteria are satisfied: (1) the litigant must have suffered an "injury

in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in

dispute; (2) the litigant must have a close relation to the third party; and (3) there must exist some

hindrance to the third party's ability to protect his or her own interests.[5]

The Defendants' submissions do not change the Court's previous analysis; Defendants are

still unable to establish "injury in fact" and "close relation to the third party."  And although the

Court did not address the third element previously, the submitted declarations also fail to establish

"some hindrance" to the declarants' ability to protect their own interests.[6]  Rather, the declarants

merely grant Defendant Allen "permission to challenge on [the declarants'] behalf the jury

selection process . . . ."[7]  Defendants cite no authority for the proposition that such declarations

are sufficient to confer upon Defendants third-party standing.

---

[3] *Powers v. Ohio*, <u>499 U.S. 400, 410</u> (1990)

[4] *Id.*

[5] *Id.* at 410–11 (internal citations omitted).

[6] *See Terrell v. INS*, <u>157 F.3d 806, 809</u> (10th Cir. 1998) ("Third-party standing requires not only an injury in fact and a close relation to the third party, but also a hindrance or inability of the third party to pursue his or her own claims.").

[7] *See* Docs. 227-2, 227-4, 227-5, 227-6, 227-7.

-3-

### III.    Conclusion

Simply put, the jury selection procedure employed by the District of Kansas does not violate Defendants' constitutional or statutory rights.  Thus, to obtain the relief they seek, Defendants seek to invoke the rights of the excluded jurors.  This criminal proceeding is not the proper setting to do so.  If the excluded jurors truly wish to challenge the jury selection procedure, they are welcome to bring a separate action.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss Indictment or Stay Proceedings for Substantial Failure to Comply with the Jury Act (Doc. 227) is hereby **DENIED.**

**IT IS SO ORDERED.**

Dated this 27th day of February, 2018.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

| 14:50:12 | 1 | Mr. Stein or other events that caused any potential |
| 14:50:16 | 2 | change in Mr. Wright with respect to the predisposition |
| 14:50:19 | 3 | element of entrapment. |
| 14:50:21 | 4 | MS. SCHMIDT:  Your Honor, the first evidence |
| 14:50:23 | 5 | that's in the case of Mr. Wright actually -- any |
| 14:50:27 | 6 | functional, material evidence -- I hate to use that word |
| 14:50:30 | 7 | right now -- is around July 18th of 2016, and I don't -- |
| 14:50:37 | 8 | I think we could all have different opinions as to |
| 14:50:39 | 9 | whether that's sufficient, but the point is it is |
| 14:50:43 | 10 | evidence and Mr. Wright has the right to have the jury |
| 14:50:45 | 11 | weigh that evidence. |
| 14:50:46 | 12 | THE COURT:  I agree with the Government that the |
| 14:50:48 | 13 | threshold requirement for an entrapment offense is |
| 14:50:51 | 14 | relatively high, and I do not think it exists here.  I do |
| 14:50:55 | 15 | not think, frankly, either the inducement or the |
| 14:50:57 | 16 | predisposition standards were met.  I'm not going to give |
| 14:51:00 | 17 | the entrapment defense.  I do not think the evidence at |
| 14:51:05 | 18 | all warrants it. |
| 14:51:10 | 19 | Given that, Ms. Brannon, where do you want me to |
| 14:51:12 | 20 | put the First Amendment offense -- or instruction? |
| 14:51:17 | 21 | And would you retrieve that from the ELMO, |
| 14:51:19 | 22 | Mr. Cook. |
| 14:51:24 | 23 | MS. BRANNON:  I'm trying to think where the judge |
| 14:51:27 | 24 | had the withdrawal instruction.  Withdrawal is a defense, |
| 14:51:32 | 25 | that it would make sense to have the First Amendment |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

     *Plaintiff,*

vs.

      Case No. 16-10141-EFM

CURTIS WAYNE ALLEN, et al.,

     *Defendants.*

## MEMORANDUM AND ORDER

Defendants Curtis Allen, Gavin Wright, and Patrick Stein (collectively, "Defendants")
were convicted by a jury of conspiracy to use a weapon of mass destruction, conspiracy to interfere
with civil rights, and Wright was convicted on an additional count of obstruction of justice.
Defendants filed a number of objections to the United States Probation Office's Second Amended
Presentence Investigation Report ("PSR").  All three Defendants objected to the PSR's base
offense level calculation, to the application of a terrorism enhancement, and to a special condition
of post-release supervision.  Allen and Stein objected to the application of a hate crime
enhancement.  Stein objected to an enhancement for being an organizer of the conspiracy.  And
Wright objected to an enhancement for obstruction of justice.  Defendants also filed a motion to
exclude the Government's submission of approximately 20 victim impact statement videos.

Finally, Allen filed a motion to strike a Reply brief filed by the Government, and Stein filed a motion to join Allen's request.

For the following reasons, Defendants' objections to the base offense level calculation are overruled.  Allen and Stein's objections to the hate crime enhancement are overruled.  Defendants' objections to the terrorism enhancement are overruled.  Stein's objection to the organizer enhancement is sustained.  Wright's objection to the obstruction of justice enhancement is overruled.  Defendants' objections to the special conditions of supervision are sustained. Additionally, Defendants' Objection and Motion to Exclude "Victim" Impact Statements (Doc. 457.) is denied.  Finally Defendant Curtis Wayne Allen's Motion to Strike Government's Reply (Doc. 475) is denied on the merits, and Stein's Motion to Join (Doc. 476) Allen's Motion is denied as moot.

## I.    Factual and Procedural Background

In October 2016, following an extensive investigation, the Federal Bureau of Investigation ("FBI") arrested Defendants for their involvement in a plot to detonate multiple explosives at an apartment complex ("Mary Street Apartments") in Garden City, Kansas.  The FBI's investigation began in late 2015, with the assistance of an undercover informant, Dan Day.  Day had been invited to participate in a militia, and while attending the militia's meetings became concerned with the direction of the group's plans.  Day took those concerns to the local FBI office.  The FBI instructed Day to continue meeting with the militia and to monitor what the FBI considered a possible threat to public safety.  In February 2016, Day met Stein at one of the militia's meetings.  Stein expressed strong anti-Muslim views to Day, referring to Somali-Muslims as "cockroaches" and to himself as the "exterminator."  Eventually, Stein recruited Day into a separate militia, the Kansas Security Force ("KSF"), where Day was introduced to Allen and Wright.  Over the next several months,

Defendants and other members of the KSF frequently discussed targeting members of the Somali-Muslim community with violence, including the residents of the Mary Street Apartments.

In June 2016, shortly after the mass shooting at the Pulse nightclub in Orlando, Florida, Stein initiated a KSF meeting.  Prior to the meeting, Stein stated that following the nightclub shooting a "switch flipped" and he had gone into "organization mode" planning an attack against Muslims.  Stein also expressed frustration at the government's response to the attack.  Stein stated he was "sick and tired of seeing our own f*cking people get slaughtered by our own f*cking government" and that he was "more convinced than ever" that the government and law enforcement would do nothing to curtail Muslims from entering the United States, and that the group would need to take matters into their own hands.  At the meeting—which Day captured for the FBI on an audio-recording device—Stein blamed the federal government for what he perceived to be the Muslim problem.  Stein stated, "[t]he f*ckin' cockroaches in this country have got to go. Period. . . .  They are the f*cking problem in this country right now.  They are the threat that we have in the country right now. . . .  They're bringing them in by the f*ckin' plane load every god damn day.  That god d*mn n*gger in the f*ckin' White House is making sure of it."

The group held two more recruitment meetings with members of KSF in July 2016.  Stein called these meetings together, Allen participated at both meetings, and Wright participated only in the second meeting.  The purpose of these meetings was to determine which KSF members would be willing to participate in an attack against Muslims, and to brainstorm possible targets and methods of attack.  Allen told the other members of KSF that the group was planning a preemptive strike to kill Muslims, and it was likely the participants would go to prison for life for their actions.  None of the other KSF members ultimately decided to join Defendants.

Defendants and Day then began meeting at Wright's business, G&G Mobile Home Sales ("G&G"), in Liberal, Kansas.  Over the course of several meetings, the group continued to brainstorm possible targets and methods of attack.  In addition to targeting Somali-Muslims directly, the group considered targeting landlords who rented to Muslims, churches that were sympathetic to Somali-Muslims, and local government officials that the group blamed for bringing Muslims into the area.  Eventually, the group decided to detonate multiple explosives at the Mary Street Apartments; to inflict maximum casualties, the group planned to detonate the bombs during the apartment's mosque's prayer time.  Defendants also decided they would manufacture their own explosives at G&G, and each member of the conspiracy was charged with acquiring materials to be used for that purpose.

While the group continued to meet and plan, Allen suggested the group draft a manifesto explaining the group's reasons for the attack.  Defendants discussed the contents of the manifesto on multiple occasions.  Allen stated that the manifesto should "trigger [] like-minded people across the nation to f*cking stand up and start doing the same thing we're doing . . . [against] Muslims and [the] Government."  Stein stated that the manifesto should warn the government to stop bringing Muslims into the country and to reinstate its national borders.  Defendants discussed the most effective time and method of distributing the manifesto to reach the largest possible audience. Allen agreed to begin drafting the manifesto.

Now that Defendants had selected a target and were attempting to manufacture explosives, the FBI had Day introduce the group to an FBI undercover employee ("UCE"), who was posing as a black-market weapons dealer who could sell explosives to the group.  Day introduced the idea to Defendants during a meeting at G&G on September 2, 2016.  The group decided they would try

to acquire several materials from the UCE, including electronic blasting caps, C-4, and other smaller explosives.

About two weeks later, Wright and Allen informed the group that they had successfully manufactured and tested a small homemade explosive.  The group considered canceling the meeting with the UCE and completing their plan to bomb the Mary Street Apartments with homemade explosives.  Ultimately, the group decided to pursue both options.  Stein and Day would meet with the UCE to determine the feasibility of acquiring explosives from the UCE, and Allen and Wright would continue to manufacture explosives at G&G.  Stein and Day met with the UCE on September 25, and they were scheduled to meet again on October 12.

The day before Stein and Day's second meeting with the UCE, Allen's girlfriend, Lula Harris, reported Allen to the local police for domestic violence.  Harris also informed the police that she had witnessed Allen and Wright manufacturing explosives at G&G.  The police stopped and detained Allen and Wright as they were leaving G&G; Allen was taken into custody but Wright was released.  The police then secured G&G in anticipation of executing a search warrant on the premises.

The following day, Wright went to the police station to find out why he had been denied access to his business.  While there, Wright agreed to interview with agents from the FBI and the Kansas Bureau of Investigation.  During this interview, Wright denied any knowledge that Allen was manufacturing explosives at G&G, or that any explosives were located at G&G.  Wright also stated that he was not a member of any militia, that Allen had never invited Wright to a KSF meeting, and that Wright had provided the FBI with everything he knew about Allen.

That same day, Stein and Day met with the UCE as planned, and the parties agreed that Stein would provide the UCE with 300 pounds of fertilizer and cash, and in exchange the UCE

would construct an explosive for Defendants.  When Stein attempted to deliver the fertilizer to the UCE two days later, the FBI arrested him.

The FBI executed search warrants on G&G, Stein and Wright's home, Stein's vehicle, and two commercial storage units.  In addition to finding a variety of incriminating evidence, including materials and instructions for making explosives, the FBI found an unfinished draft of Defendants' manifesto at G&G.  Although each Defendant participated in discussing the manifesto's message, all evidence indicated that Allen composed this draft.  The unfinished manifesto was addressed to "the U.S. govt and [] the American people."  The manifesto stated that "with this document we are going to attempt a forced wake up call.  American people, you have to wake up while there still might be time to stop our govt from totally selling this country out."  The manifesto then listed a series of grievances against the government, including "not enforcing our borders" and "illegally bringing in Muslims by the thousands."  The document concluded by urging government officials and private citizens to act to save the country and warning that their families and businesses would be in danger if they continued to "sell out this country."

After a lengthy trial, a jury convicted all three Defendants of conspiracy to use a weapon of mass destruction and conspiracy to interfere with their intended victims' civil rights.  Wright was also convicted of obstruction of justice for lying to the FBI during his voluntary interview.  At this Court's instruction, the United States Probation Office prepared the PSR,[1] to which Defendants have filed a number of objections.  Additionally, the Government has submitted

---

[1] The Probation Office filed its original PSR on October 26, 2018.  Without the Court's foreknowledge, the Probation Office then filed an Amended PSR on November 13, 2018.  This version, although supposedly containing no substantive changes, altered the PSR's paragraph numbers.  The Court informed the parties that the Court would use the original PSR at the hearing on the sentencing objections and ordered the Probation Office to submit a Second Amended PSR that returned the paragraph numbers to be consistent with the original PSR.  To clarify, all references to the "PSR" in this opinion refer to the Second Amended PSR.

approximately 20 short videos from residents of the Mary Street Apartments giving victim impact statements for the Court's consideration in sentencing, and Defendants have filed a Motion to exclude those videos.

On November 19, 2018, the Court conducted a hearing on Defendants' objections to the PSR and Motion to exclude the victim impact statements submitted by the Government. During argument on Defendants' objection to a terrorism enhancement, the Government cited caselaw not contained in any of their briefs. The Court ordered the Government to file their additional authorities with the Court, and provided Defendants a week to file responsive briefing. After the Government filed its authorities and Defendants filed their response, the Government filed a Reply brief with more than 500 pages of attached materials. Allen and Stein filed motions requesting that the Court strike the Government's Reply.

## II.    Discussion

### A.    Base Offense Level

Defendants dispute the PSR's conclusion that U.S.S.G. § 2K1.4 is the correct guideline in determining Defendants' base offense level. To determine which guideline to apply, the Court undergoes a three-step process: "(1) identify the charge from the indictment and jury instructions, (2) find the substantive offense in the guidelines' statutory index, and (3) find the applicable guideline range."[2] Often times the statutory index references more than one guideline for a particular statute, and in those circumstances the Court must " 'use the guideline most appropriate for the offense conduct charged in the count of which the defendant was convicted.' "[3] To

---

[2] *United States v. Pawelski*, 651 F. App'x 750, 776 (10th Cir. 2016) (citations, alterations, and quotations omitted).

[3] *United States v. Neilson*, 721 F.3d 1185, 1187–88 (10th Cir. 2013) (quoting U.S.S.G. § 1B1.2, cmt. n. 1).

determine which guideline is the most appropriate, the Court considers "the language in the guideline itself, as well as the 'interpretative and explanatory commentary to the guideline' provided by the Sentencing Commission."[4]  The Guidelines' commentary "is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."[5]  Indeed, failing to follow the commentary "could constitute an incorrect application of the guidelines, subjecting the sentence to possible reversal on appeal."[6]  The guideline's commentary is inconsistent with its text when " 'following one will result in violating the dictates of the other.' "[7]

Here, Defendants were convicted of conspiracy to use a weapon of mass destruction in violation of 18 U.S.C. § 2332a.  Section 2332a(c)(2)(A)–(D) provides four definitions for the term "weapon of mass destruction."[8]  Subsection (A) defines weapon of mass destruction to include "destructive devices"—i.e., conventional weapons.[9]  Subsections (B)–(D) address chemical, biological, and nuclear weapons.  Defendants were convicted of using a "destructive device" pursuant to subsection (A).

---

[4] *United States v. Robertson*, 350 F.3d 1109, 1112–13 (10th Cir. 2003) (quoting *United States v. Frazier*, 53 F.3d 1105, 1112 (10th Cir.1995)).

[5] *Stinson v. United States*, 508 U.S. 36, 38 (1993).

[6] U.S.S.G. § 1B1.7 (Significance of Commentary) (citing 18 U.S.C. § 3742); *see also Stinson*, 508 U.S. at 43 (citing § 1B1.7).

[7] *United States v. Morris*, 562 F.3d 1131, 1135 (10th Cir. 2009) (quoting *Stinson* 508 U.S. at 43).

[8] 18 U.S.C. § 2332a(c)(2)(A)–(D).

[9] *See* 18 U.S.C. § 2332a(c)(2)(A) (defining a "weapon of mass destruction" to include "any destructive device as defined in section 921 of this title").  Section 921 defines "destructive device" to include, among other things, explosive, incendiary, or poison gas bombs, grenades, rockets, missiles, mines, or similar devices.

The statutory index provides three guidelines applicable to convictions under § 2332a. Those guidelines are § 2A6.1 (Threatening or Harassing Communications; Hoaxes; False Liens), § 2K1.4 (Arson; Property Damage by Use of Explosives), and. § 2M6.1 (Unlawful Activity Involving Nuclear Material, Weapons, or Facilities, Biological Agents, Toxins, or Delivery Systems, Chemical Weapons, or Other Weapons of Mass Destruction; Attempt or Conspiracy). All parties agree that § 2A6.1 is inapplicable.  The PSR determined that § 2M6.1 does not apply to Defendants because § 2M6.1's commentary specifically excludes destructive devices from its definition of "Weapon of mass destruction."[10] Thus, by process of elimination, the PSR stated that § 2K1.4 applied.

Defendants argue that the commentary to § 2M6.1 should be disregarded because it conflicts with the text of the guideline.  To support this contention, Defendants point to § 2M6.1's heading, which, after listing nuclear, biological, and chemical weapons, includes the phrase "or other weapons of mass destruction."  Defendants argue that "other weapons of mass destruction" must include "destructive devices," and that limiting § 2M6.1 to crimes involving the unlawful use of nuclear, chemical, and biological substances is contrary to a plain reading of the guideline.

This is a novel issue in the Tenth Circuit, and there is little caselaw from other circuits addressing the matter.  Defendants cite no cases where a court has held that § 2M6.1 applies to a crime involving a "destructive device" as defined by 18 U.S.C. § 2332a(c)(2)(A).  The Government relies primarily on an unpublished opinion from the United States District Court for the Northern District of New York, in which the court concluded that § 2M6.1 is inapplicable to

---

[10] See U.S.S.G. § 2M6.1, cmt. n. 1 (" 'Weapon of mass destruction' has the meaning given that term in 18 U.S.C. § 2332a(c)(2)(B), (C), and (D).")  Conventional "destructive devices" are covered in subsection (A).

crimes involving "destructive devices," but did not address the alleged conflict between the text and commentary that Defendants raise here.[11]

Based on a plain reading of the guideline, the Court concludes that § 2M6.1's text and commentary are not in conflict. Section 2M6.1's heading mirrors with specificity the nuclear, biological, and chemical materials covered in § 2332a(c)(2)(B), (C), and (D). But the heading does not extend the same treatment to subsection (A). If the intent was for § 2M6.1 to apply to all convictions under § 2332a, it would be unusual to explicitly include nuclear, biological, and chemical materials, but omit "destructive devices" from the heading. Indeed, the most obvious conclusion is that this omission was purposeful.

More importantly, absent an irreconcilable clash between the commentary and the text, the commentary is authoritative, and it would be error for the Court to set it aside. Section 2M6.1 does not define or explain the meaning of "other weapons of mass destruction." Certainly nothing in the text requires the guideline to apply to all "destructive devices." The heading's undefined phrase "other weapons of mass destruction" is simply insufficient to create an irreconcilable clash between the text and commentary. Accordingly, the Court will follow the commentary and hold that § 2M6.1 is inapplicable here. The correct guideline is therefore § 2K1.4.

As the PSR correctly stated, Defendants intended to cause death or serious bodily injury to their victims; so pursuant to § 2K1.4(c)(1), this guideline is cross-referenced to § 2A1.5. *See* U.S.S.G. § 2K1.4(c)(1) ("If death resulted, or the offense was intended to cause death or serious bodily injury, apply the most analogous guideline from Chapter Two, Part A (Offenses Against

---

[11] *See United States v. Aref*, 2007 WL 804814, at *3 (N.D.N.Y. 2007) ("A Guideline sentence for a violation of § 2332a is determined using either U.S.S.G. § 2K1.4 or § 2M6.1. Section 2M6.1, which is the higher guideline, does not apply because the definition of weapon of mass destruction in Application Note 1 excludes the subsection of § 2332a that is charged in the Superseding Indictment.").

-10-

the Person) if the resulting offense level is great than that determined above."). The most analogous guideline is U.S.S.G. § 2A1.5 (Conspiracy or Solicitation to Commit Murder), which carries a Base Offense Level of 33. Defendants' base offense level was correctly calculated at 33, and Defendants' objection is overruled.[12]

## B.    Hate Crime Enhancement

Defendants Allen and Stein object to the PSR's application of a hate crime enhancement.[13] There is some confusion in the PSR about who is responsible for deciding if the hate crime enhancement applies. The guidelines state:

> If the finder of fact at trial or, in the case of a plea of guilty or nolo contendere, the court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person, increase by 3 levels.[14]

The PSR stated that if the Court determines beyond a reasonable doubt that the Defendants selected their victims because of their race, religion, or national origin, the hate crime enhancement would apply. This conclusion, however, is contrary to the guideline, which allows the Court to make this determination only in cases involving a guilty plea or a plea of no contest. But in cases

---

[12] The Government at the November 19 hearing, and in its sentencing memorandum, argues that a calculation under Count 2 would also result in a Base Offense Level of 33. If the Government is correct on that matter, then even if Defendants were correct that § 2M6.1 can be applied to crimes involving "destructive devices" and that § 2M6.1 is the more appropriate guideline for their offense than § 2K1.4, Defendants would still carry a Base Offense Level of 33. Because the Court concludes 2M6.1 does not apply, it makes no ruling on the Government's contention.

[13] See U.S.S.G. § 3A1.1(a) (Hate Crime Motivation or Vulnerable Victim). Under this guideline Defendants Offense Level would be increased by 3 levels. The PSR applied this enhancement to all three Defendants, but Defendant Wright raised no objection to this enhancement.

[14] U.S.S.G. § 3A1.1(a). The commentary to § 3A1.1 instructs the Court to note that "special evidentiary requirements govern the application of [subsection (a)]. U.S.S.G. § 3A1.1(a), cmt. n. 1.

where criminal defendants put the government to its burden of proof, it is the prerogative of "the finder of fact at trial" to make this finding. The Court therefore has no role in deciding whether the Government carried its burden to prove Defendants committed a hate crime. That determination is instead left to the wisdom of the jury.

It is undisputed that when the jury convicted Defendants on Count 2, it found beyond a reasonable doubt that Defendants targeted their victims because of their race, religion, or national origin.[15] The Jury made no such specific finding with regards to Count 1. Allen and Stein argue that taking an enhancement that arises from Count 2 and applying it to an offense level calculation based on Count 1 is improper.[16] The Court disagrees. Count 1 and Count 2 are grouped together under § 3D1.2 because both counts "involve[ed] substantially the same harm."[17] This means that both counts necessarily involved the same victims, and both counts involved the same criminal act or multiple criminal acts based on a common criminal objective.[18] Defendants' common criminal objective was to detonate multiple bombs at an apartment complex, and this plan formed the basis

---

[15] The jury found that Defendants conspired to interfere with their victims' housing rights and that "the crime would not have occurred but-for the race, or the religion, or the national origin" of their intended victims.

[16] Defendant Allen also argues it was procedurally flawed for the PSR to forgo a calculation of the Base Offense Level under Count 2. The Court disagrees that a Count 2 calculation was necessary because it was clear that Count 1 would result in the highest possible offense level. *See* U.S.S.G. § 3D1.3, Application Note 2 ("Sometimes, it will be clear that one count in the Group cannot have a higher offense level than another . . . . The formal determination of the offense level for such a count may be unnecessary.").

[17] U.S.S.G. § 3D1.2.

[18] U.S.S.G. § 3D1.2(a)–(b) ("All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule: (a) When counts involve the same victim and the same act or transaction. (b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. . . .").

for Defendants' convictions under Count 1 and Count 2.  In fact, it is the similarity between the two counts that allows them to be grouped together for sentencing purposes.[19]

Because the underlying facts in these two counts are so intertwined—in particular, both counts involved targeting the same victims—when the jury found beyond a reasonable doubt that Defendants selected their victims because of their race, religion, or national origin in Count 2, that finding is sufficient to conclude that the jury also found beyond a reasonable doubt that Defendants targeted their victims based on their protected status in Count 1.  Thus, the Court concludes that the PSR properly increased Defendants offense level by three levels under § 3A1.1(a), and this objection is overruled.

**C.    Terrorism Enhancement**

Defendants object to the PSR's application of an enhancement pursuant to § 3A1.4 (Terrorism).  This enhancement is significant—Defendants' offense level would be raised 12 levels, and their criminal history would automatically be increased to Category VI.[20]  The terrorism enhancement applies "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism. . . ."[21]  Section § 3A1.4's commentary states that a "federal crime of terrorism" has the same meaning given the term in 18 U.S.C. § 2332b(g)(5),[22] which limits a "federal crime of terrorism" to offenses that are "calculated to influence or affect the conduct of

---

[19] *Id.*

[20] U.S.S.G. § 3A1.4(b).

[21] U.S.S.G. § 3A1.4(a).

[22] U.S.S.G. § 3A1.4, cmt. n. 1.

government by intimidation or coercion, or to retaliate against government conduct."[23]  Defendants

argue that their conspiracy was not calculated to influence the government or to retaliate against

government conduct.  Rather, the conspiracy was directed at, and intended to influence, a civilian

population.  The Government argues in response that targeting a civilian population is not mutually

exclusive with intending to influence or retaliate against the government.

It is surely uncontroversial that a crime can target civilians but be intended to provoke a

reaction from the government or be committed to retaliate against government conduct.  And the

Government has provided ample authority—albeit from jurisdictions outside the Tenth Circuit—

supporting the contention that the terrorism enhancement can apply to crimes targeting only

civilians.[24]  This does not, however, adequately resolve whether the enhancement applies here.  To

apply this enhancement the Court must find by a preponderance of the evidence that Defendants

intended to influence or affect the conduct of the government, or intended to retaliate against

government conduct.[25]

---

[23] 18 U.S.C § 2332b(g)(5)(A).  Subsection (B) also requires the crime to be a violation of one of several enumerated statutes, including 18 U.S.C. § 2332a, which is the statute Defendants were convicted of in Count 1.

[24] The Government provided some of this authority for the first time at the November 19 hearing.  The Court ordered the Government to file the additional authority and provided Defendants an opportunity to respond.  After Defendants' responded, the Government filed a Reply brief which consisted primarily of attachments.  Most of the attachments were relevant court documents pulled from the Government's additional authorities, as well as transcripts from Defendants' trial.  Allen and Stein filed a Motion to Strike the Government's Reply for being filed without leave of Court, citing a local rule pertaining to civil trials.  The Government's Reply is within the scope of Defendants' response, and the Court takes it into consideration in deciding whether the terrorism enhancement applies to Defendants.  Allen's Motion to Strike is denied, and Stein's Motion to Join Allen's Motion is denied as moot.

[25] Defendants object to this standard.  Defendants argue that the terrorism enhancement should apply only when the jury makes the necessary factual findings beyond a reasonable doubt.  Defendants note that the Tenth Circuit once observed, without ruling on the issue, that it is "questionable" whether "a district judge may . . . increase a defendant's sentence (within the statutorily authorized range) based on facts the judge finds without the aid of a jury or the defendant's consent."  United States v. Sabillon-Umana, 772 F.3d 1328, 1331 (10th Cir. 2014) (citation omitted) (declining to rule on the issue because the defendant "ha[d] not challenged the district court's power to find facts at sentencing").

The Tenth Circuit's speculation was based on a Justice Scalia dissent to a denial of certiorari, which was joined by two other Supreme Court justices.  See Jones v. United States, 135 S. Ct. 8, 190 L. Ed. 2d 279 (2014) (stating that the Supreme Court should grant certiorari to clarify whether it is constitutionally unreasonable for judges to

-14-

Defendants' objective with the conspiracy cannot be neatly distilled into a single purpose. Although bringing harm to the Muslim residents of the Mary Street Apartments was unquestionably a core goal of the conspiracy, the evidence shows that Defendants had bigger plans than simply killing local Muslims. Defendants sought to inspire like-minded citizens to engage in similar violent conduct nationwide, to discourage local landlords from leasing to Muslims, and to coerce government officials to change their conduct toward Muslims.

Throughout the conspiracy Stein expressed his frustration with the government and its role in bringing Muslims into the United States.[26] Both Allen and Stein suggested targeting local government officials and their families as a way of curtailing the presence of local Muslims.[27]

---

enhance a defendant's sentence based on judge-found facts, or whether all sentences below the statutory maximum are substantially reasonable). Importantly, in his dissent Justice Scalia recognized that "the Courts of Appeals have uniformly taken [the Supreme Court's] continuing silence to suggest that the Constitution does permit otherwise unreasonable sentences supported by judicial factfinding, so long as they are within the statutory range." *Id.* at 9 (citations omitted). And even more important to this Court's consideration, the Tenth Circuit is counted among the circuits that has adopted this position. *Id.* (citing *United States v. Redcorn*, 528 F.3d 727, 745–746 (10th Cir. 2008)); *see also United States v. Hall*, 473 F.3d 1295, 1312 (10th Cir. 2007). Absent binding authority contradicting the Tenth Circuit's prior decisions on this matter, the Court must conclude that it possesses the power to enhance Defendants' sentence based on its own findings of fact.

The Court also disagrees with Defendants' second contention: that the Court must employ a higher standard of proof than preponderance of the evidence. At the November 19 hearing, Defendants acknowledged that "the weight of the law is against us on this argument," but that they wished to preserve this issue for appeal. Although the Tenth Circuit has not weighed in on this issue, the majority of courts that have considered the issue have determined that preponderance of the evidence is the proper standard of proof for determining whether the terrorism enhancement applies, and the Court will apply that standard here. *See United States v. Fidse*, 778 F.3d 477, 481 (5th Cir. 2015); *United States v. Wright*, 747 F.3d 399, 407 (6th Cir. 2014); *United States v. Chandia*, 675 F.3d 329, 339 (4th Cir. 2012). *But see United States v. Tankersley*, 537 F.3d 1100, 1106 (9th Cir. 2008) (applying a "clear and convincing evidence" standard).

[26] Stein stated: "The f*ckin' cockroaches in this country have got to go. Period. . . . They are the f*cking problem in this country right now. They are the threat that we have in the country right now. . . . *They're bringing them in by the f*ckin' plane load every god damn day. That god damn n*gger in the f*ckin' White House is making sure of it.*" (emphasis added).

[27] Stein, who believed local officials were responsible for bringing Muslims to the area, stated, "Next [target] I got, city and county official who are [] directly involved with bringing these mother*ckers in here, they know [Muslims are] coming in, [and] they're helping facilitate it, make it happen. They're a f*cking target too in my mind." Allen also suggested that targeting city council members would more effectively stop Muslims from entering the community than targeting Muslims directly. At another time, Allen suggested committing extreme acts of violence against the mayor and his family to incentivize change at the local government level.

Then, when Defendants' final plan to bomb the Mary Street Apartments started to take shape, Defendants decided they should release a manifesto to ensure the purpose of their attack was clear and to encourage like-minded people to take similar actions against Muslims and the government. Although the evidence at trial showed that Allen drafted the manifesto, all three Defendants participated in crafting its message. Additionally, all three Defendants discussed how to release the manifesto in conjunction with the bombing to ensure it reached the most people.

The Government presented the jury with an unfinished draft of the manifesto recovered at G&G. The manifesto was addressed to the United States government and the American people. It provided a list of grievances against the government—including "not enforcing our borders" and "illegally bringing in Muslims by the thousands"—and stated multiple times that the purpose of the document was to force people to "wake up" and take a stand against the tyranny of the government. The document concluded by urging government officials and private citizens to act to save the country and warning that their families and businesses would be in danger if they continued to "sell out this country."

Additionally, when Stein called a meeting with certain members of KSF to discuss ways in which they could retaliate against Muslims for the mass shooting at the Pulse nightclub, Stein's frustration was not just with the shooter, but also with the government for its response to the shooting. Stein stated that he was "sick and tired of seeing our own f*cking people get slaughtered by our own f*cking government" and that Muslims were being brought into the country "by the plane load every day." The Orlando shooting and the government's response to it was the catalyst event that caused Stein to flip a switch and go into "organization mode," brainstorming ways to take matters into his own hands.

-16-

This is just some of the evidence demonstrating that Defendants' conspiracy was intended, at least in part, to influence, affect, or retaliate against the government. But, as the Court has already stated, the evidence suggests that Defendants had more than one purpose or goal with the conspiracy, including influencing the decisions of private citizens. The issue then becomes to what extent or degree influencing, affecting, or retaliating against the government needs to be Defendants' purpose for the terrorism enhancement to apply. Defendants ask the Court to adopt a standard that for the terrorism enhancement to apply, influencing the government must be Defendants' "primary intent" or "dominant purpose."

The degree to which a defendant must intend his crime to influence the government for the terrorism enhancement to apply is a novel issue in the Tenth Circuit. Indeed, only the Sixth Circuit has provided any guidance on this issue, stating that it is not necessary that influencing the government be Defendants' "ultimate or sole aim."[28] Since both the Government and Defendants rely heavily on the Sixth Circuit's *Wright* decision, the Court will give that opinion careful consideration.

In *Wright*, four defendants involved with the Occupy Cleveland movement were convicted of, among other charges, conspiracy to use a weapon of mass destruction.[29] At the planning stage, the defendants discussed a variety of possible actions, including bombing government buildings, bombing a bridge, bombing cargo ships, and assaulting police officers at a political rally.[30] The defendants asserted that their goal was to influence corporate behavior or disrupt the lives of the

---

[28] *See United States v. Wright*, <u>747 F.3d 399, 408</u> (6th Cir. 2014).

[29] *Id.* at 405.

[30] *Id.*

"one percent," and that they did not target the government specifically.[31]   Ultimately, the defendants settled on detonating explosives on a bridge that was part of the Ohio state highway system.[32]

The Sixth Circuit held that the district court did not err in applying the § 3A1.4 terrorism enhancement to three of the four defendants.[33]   In upholding the district court's application of the terrorism enhancement, the Sixth Circuit relied on the following facts.   Early in the planning stage the defendants planned to violently target law enforcement officers during a protest in Chicago; the defendants discussed targeting government buildings with explosives; the defendants considered their plan to be a terrorist act, or at least anticipated that it would be seen as such; the defendants discussed that bombing a bridge would likely prompt the government to take heightened security measures; and one defendant commented that this endeavor would be a "nice learning experience" for future actions.[34]   "Viewing this evidence cumulatively" the Sixth Circuit held that the defendants "were aware of the consequences of their acts and chose to act in ways that would bring about the consequences, even if they had other goals in mind, such as antagonizing the 'one percent.' "[35]

---

[31] *Id.* at 408.

[32] *Id.* at 405–06.

[33] The Sixth Circuit vacated the sentence of one defendant who was a latecomer to the conspiracy and remanded for resentencing because the district court did not adequately explain the basis for applying the terrorism enhancement to that defendant.

[34] *Id.* at 409–10.

[35] *Id.* at 410; *see also United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) (explaining that "calculation" concerns "the object that the [defendant] seeks to achieve through planning or contrivance").

Notably, the Sixth Circuit took into consideration the defendants' discussions planning the attack, even discussions relating to plans they ultimately decided not to pursue. For example, the Sixth Circuit relied on the defendants' conversations about assaulting police officers at a political rally in Illinois. Not only did the defendants in *Wright* not follow through with this plan, it was nothing like the offense they were convicted of: conspiracy to use a weapon of mass destruction in Ohio. Nevertheless, the Sixth Circuit found these discussions—as well as other conversations about abandoned plans to target government facilities—relevant to whether the defendants' offense was calculated to influence of affect government conduct.[36]

Here, the Court concludes that Defendants' conspiracy had a split purpose: in part to influence the government and in part to influence private citizens. If the terrorism enhancement only applied if influencing or retaliating against the government was a defendant's sole intent or principal purpose, the Court would sustain Defendants' objection, as the Court agrees that influencing the government was not Defendants' sole concern. But the Court is not convinced this is the correct standard. Indeed, there is nothing in the guideline, statutory definition, or caselaw supporting the Defendants' suggestion that influencing the government must be the primary intent or dominant purpose.[37] Concluding otherwise reads into the guideline something that is not there.[38]

---

[36] Defendants argue that *Wright* has one important distinguishing fact from their case. In *Wright*, the defendants were targeting a bridge that was part of the Ohio highway system. Defendants argue that this constitutes a government target, which would justify applying the terrorism enhancement. Yet it does not appear from *Wright* that the Sixth Circuit considered the bridge to be a government target. Neither was that a consideration the Court relied on in affirming the terrorism enhancement.

[37] *See Wright*, <u>747 F.3d at 408</u> ("Nor is it necessary that influencing the government be the defendant's ultimate or sole aim.").

[38] The Court notes that the commentary to § 3A1.4 states that if Defendants' conspiracy to use a weapon of mass destruction was intended to "intimidate or coerce a civilian population, rather than to influence of affect the conduct of government . . . an upward departure would be warranted" not to exceed the sentence Defendants' would

-19-

Furthermore, the Court disagrees with Defendants' factual characterization that influencing or retaliating against the government was not a significant purpose of the conspiracy. The Defendants initially considered assailing several government targets, including federal and local government officials. The Sixth Circuit's *Wright* decision informs this Court that such preliminary planning is relevant in determining the intent of the conspiracy, even if such plans were subsequently abandoned. Additionally, Defendants agreed to draft and disseminate a manifesto to be released in conjunction with the bombing. Defendants discussed that the purpose of the manifesto would be to inspire like-minded people to commit similar crimes against Muslims and the government; they also discussed that the manifesto should demand that the government change its policies on Muslim immigration and border security. Although Allen was the most vehement and outspoken about directing the manifesto toward the government, and he was the one who drafted the manifesto, Stein and Wright were both present for, and participated in, these discussions.

Finally, even if Stein and Wright gave no input into the manifesto and Allen was the only Defendant who intended to influence or retaliate against the government——a conclusion the Court rejects—the terrorism enhancement would still apply to all three Defendants. Allen intended for this conspiracy to influence or retaliate against the government, and he made that purpose abundantly clear to Stein and Wright. In a conspiracy, one Defendant is responsible for " 'all reasonably foreseeable acts and omissions of others in furtherance of [a] jointly undertaken

---

have received had the enhancement applied. U.S.S.G. § 3A1.4, cmt. n. 4. Neither the guideline nor the commentary indicate that influencing the government must be Defendants' primary purpose.

criminal activity.' "[39]   It was more than foreseeable to Stein and Wright that Allen intended to

influence government conduct by releasing the anti-government manifesto in conjunction with the

bombing.  Indeed, both Stein and Wright encouraged (and contributed to) Allen's plan.  Stein and

Wright are accountable for their co-conspirator's reasonably foreseeable actions.

As a final matter, Defendants highlight that prior to the trial, the Government provided a

bill of particulars at Defendants' request.   Defendants argue that the bill of particulars

demonstrated that the Government did not consider Defendants' actions to be a federal crime of

terrorism.   This argument does not ultimately persuade the Court.   Defendants asked the

Government for a bill of particulars on Count 1 because the original indictment included

"essentially a bare bones recitation of the [Use of weapons of mass destruction] statute."[40]

Specifically, Defendants asked the Government to identify which "people or property within the

United States" were the targets of Defendants' conspiracy.  Defendants also took issue with the

original indictment's recitation of all four elements under § 2332a(a)(2)(A)–(B),[41] and requested

that the Government identify which of the four subsections it would be relying on.   The

Government provided Defendants with answers to each of their questions.  The Court disagrees

---

[39]   *United States v. Figueroa-Labrada*, 720 F.3d 1258, 1265 (10th Cir. 2013) (quoting U.S.S.G. § 1b1.3(a)(1)(A), (B)).

[40]   To obtain a conviction under § 2332a, the Government was required to prove that Defendants conspired to use a weapon of mass destruction against any person or property within the United States, *and* one of the following four criteria must be met.
   (A) the mail or any facility of interstate or foreign commerce is used in furtherance of the offense;
   (B) such property is used in interstate or foreign commerce or in an activity that affects interstate or foreign commerce;
   (C) any perpetrator travels in or causes another to travel in interstate or foreign commerce in furtherance of the offense; or
   (D) the offense, or the results of the offense, affect interstate or foreign commerce, or, in the case of a threat, attempt, or conspiracy, would have affected interstate or foreign commerce.  18 U.S.C. § 2332a(a)(2)(A)–(B).

[41]  *Id.*

-21-

with Defendants that the bill of particulars demonstrated the Government never intended for Count 1 to be considered a federal crime of terrorism.

In sum, Defendants offense was calculated, at least in part, to influence, affect, or retaliate against government conduct. The Court concludes this is sufficient to trigger the terrorism enhancement, and Defendants' objection is thereby overruled.

## D.     Organizer Enhancement

Defendant Stein objects to the PSR's application of a two-level enhancement for his role as an organizer in the conspiracy.[42] The Probation Office concluded that Stein was an organizer because he recruited other militia members to participate in the bombing and because he was Defendants' primary representative in dealing with the FBI's undercover agent. The Tenth Circuit has held that "a defendant may be deemed an organizer under § 3B1.1 for 'devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy.' "[43] Additionally, the commentary to § 3B1.1 provides a list of factors to be considered when deciding if a defendant should be considered a leader or organizer:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.[44]

---

[42] *See* U.S.S.G. § 3B1.1(c) "If the defendant was an organizer, leader, manager, or supervisor in any criminal activity . . . increase by 2 levels." (emphasis omitted).

[43] *United States v. Wardell*, 591 F.3d 1279, 1304 (10th Cir. 2009) (quoting *United States v. Valdez-Arieta*, 127 F.3d 1267, 1272 (10th Cir. 1997)).

[44] U.S.S.G. 3B1.1, cmt. n. 1.

While considering these factors, the Court remains conscious that "the gravamen of this enhancement is control, organization, and responsibility for the actions of others."[45]   The enhancement is not triggered simply because a defendant is an "important" or "essential" member of the conspiracy.[46]   Furthermore, a person "who merely suggests committing the offense" is not an organizer by virtue of making that suggestion.[47]   Unlike a leader, an organizer need not exercise hierarchical control over his co-conspirators for the enhancement to apply.[48]   The key to determining whether a defendant qualifies as an organizer is not "direct control" over his co-conspirators, but "relative responsibility" within the criminal enterprise.[49]

Stein played a pivotal role in the conspiracy.  He was an intermediary between Defendants and the FBI's undercover operative.  He initiated meetings and attempted to recruit others to join the conspiracy.  He provided some of the materials used to build the explosives.  Furthermore, he was often the most verbose conspirator in expressing his ill feelings toward Muslims and calling for action.  That said, the only § 3B1.1 factor that weighs in favor of concluding that Stein was an "organizer" is the recruitment of accomplices, a role in which Stein proved to be largely ineffectual, as most of his targeted recruits declined to join the conspiracy.  He was not solely responsible for devising the plan and he did not provide any more "wherewithal" when compared to his co-Defendants.  Neither did he exercise greater decision-making authority than the other

---

[45] *United States v. Thompson*, 866 F.3d 1149, 1163–64 (10th Cir. 2017) (citations and quotations omitted), *vacated on other grounds* 138 S. Ct. 2706, 201 L. Ed. 2d 1093 (2018).

[46] *Id.*

[47] U.S.S.G. 3B1.1, cmt. n. 4.

[48] *Wardell*, 591 F.3d at 1304 (citations omitted).

[49] *Id.* (citation and quotation omitted).

Defendants.  Stein was an essential member of the conspiracy, but the Court concludes he does not fall within 3B1.1's definition of an "organizer."  The Court sustains Stein's objection.  Stein's offense level is not increased by two increments under § 3B1.1 for being an organizer of the conspiracy.

**E.     Obstruction of Justice Enhancement**

Defendant Wright objects to the application of a two-level enhancement for obstruction of justice.  U.S.S.G.  § 3C1.1, which provides the basis for this enhancement, states:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

Wright's objection tied this issue to his Renewed Motion for Judgment of Acquittal (Doc. 476), which the Court denied in an oral ruling on April 16, 2018.  During the hearing held on November 19, 2018, regarding Defendants' objections to the PSR, Wright requested the Court clarify its reasons for denying his Motion for purposes of appealing this matter to the Tenth Circuit.

Wright's Rule 29 motion[50] for acquittal sought dismissal of Count 3, where the jury ultimately found Wright guilty of "knowingly and willingly making materially false, fictitious, and fraudulent statements" to the FBI "during the FBI's investigation of a domestic terrorism offense" in violation of 18 U.S.C. § 1001(a).  The crux of Wright's argument is that the Government presented the jury with zero evidence on the issue of materiality, and that the

---

[50] Under Fed. R. Crim. P. 29(a), "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  The "relevant question" for the Court "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citation omitted).

Government represented to the jury that such evidence was not required, which was a misstatement of law. The Government disputes Wright's contention that it provided no evidence of materiality, and the Government argues that Wright incorrectly asserts that there must be direct testimony from FBI witnesses that Wright's false statements were material.

The Supreme Court has noted that a conviction under § 1001 "requires that the statements be 'material' to the Government inquiry, and that 'materiality' is an element of the offense that the Government must prove."[51] To be material, a statement "must have a 'natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed."[52] Whether a statement is material is a mixed question of law and fact.[53]

The issue before the Court is whether there must be direct evidence that Wright's false statements were material to the FBI's investigation. Wright argues that "[m]ateriality is demonstrated when the Government actually examines its witnesses on the issue." To support this contention, Wright cites *United States v. Kingston*,[54] as well as persuasive authorities from other circuits. The relevant takeaway from *Kingston*, however, is that government officials *can* testify on materiality, not that such testimony is required.[55] Likewise, the authority Wright relies on from outside jurisdictions all involve instances where the jury was presented with testimony on materiality, but they involve no discussion that would suggest such testimony is a baseline

---

[51] *United States v. Gaudin*, 515 U.S. 506, 509 (1995).

[52] *Gaudin*, 515 U.S. at 509.

[53] *See Gaudin*, 515 U.S. at 511–12.

[54] 971 F.2d 481 (10th Cir. 1992).

[55] *Id.* at 486–87.

-25-

requirement.[56]   Finally, Wright also cites a "Criminal Resource Manual" the U.S. Department of

Justice prepared for federal prosecutors, which states that "[m]ateriality is best shown by the

testimony of a witness, generally those who make the decisions on the application or statements

in the particular case, concerning the influence that defendant's allegedly false statement might

have had on the ultimate result of the transaction."[57]   That the DOJ considers using witness

testimony to be the "best" way to show materiality is not determinative here.   "Best" practice is

not synonymous with "only acceptable" practice.

Wright's position that his false statements are not material unless an FBI agent testified to

that directly is unpersuasive.   The Court concludes that circumstantial evidence is sufficient for

the jury to find materiality beyond a reasonable doubt.[58]   The question then becomes, was there

sufficient circumstantial evidence for *any* rational juror to find beyond a reasonable doubt that

Wright's false statements were material?   The Government cites a Third Circuit case in which the

FBI's investigation into the defendant was "essentially complete" when they interviewed the

defendant, and the defendant's false statements had no actual influence on the FBI's decisions.[59]

The Third Circuit focused on the "natural tendency to influence" language in the Supreme Court's

---

[56] *See United States v. Samuels*, 874 F.3d 1032, 1035 (8th Cir. 2017); *United States v. Wolf*, 860 F.3d 175, 195–96 (4th Cir. 2017); *United States v. Litvak*, 808 F.3d 160, 171 (2d Cir. 2015)

[57] *See* Office of the United States Attorneys, *911. Materiality*, Criminal Resource Manual, United States Department of Justice (https://www.justice.gov/jm/criminal-resource-manual-911-materiality).

[58] The Government relies on authority from the D.C. Circuit for the proposition that direct evidence is not required for a jury to find a false statement was material. *See United States v. Verrusio*, 762 F.3d 1, 20–21 (D.C. Cir. 2014) ("Nor must the government present any testimony or other evidence specifically for the purpose of establishing the materiality of the defendant's false statement.   Rather, the jury can infer from other evidence that the false statement was capable of affecting the agency's functions.") (citations, alterations, and quotations omitted); *see also United States v. Cox*, 150 F. App'x 204, 205 (4th Cir. 2005)("This court 'must consider circumstantial as well as direct evidence, and allow the Government the benefit of all reasonable inferences from the facts proven to those sought to be established.' ").

[59] *United States v. McBane*, 433 F.3d 344, 350 (3d Cir. 2005).

materiality test, concluding that "the phrase 'natural tendency' connotes qualities of the statement in question that transcend the immediate circumstances in which it is offered and inhere in the statement itself."[60]  On this basis the Third Circuit concluded that the defendant's false statements were material because they were a type of false statement that "would normally be capable of influencing a criminal investigation."[61]

In a similar case, the Seventh Circuit held that a defendant's false statements to the FBI were material despite the FBI being in possession of incriminating and contradictory recordings of the defendant that made the statements unlikely to have any effect on the FBI's investigation.[62] The Seventh Circuit held that the defendant's false statements were designed "to cast suspicion away from him, which *in the ordinary course would have an intrinsic capability—a 'natural tendency'—to influence an FBI investigation*."[63]

The Court concurs that "materiality" is an objective inquiry that is divorced from whether the false statement had any actual influence on the FBI's investigation.  Here, the jury found beyond a reasonable doubt that Wright made at least one of five false statements, each pertaining to Wright's role in, and knowledge of, the conspiracy to use a weapon of mass destruction.[64]  A

---

[60] *Id.* at 351 (citing *Gaudin*, 515 U.S. at 509).

[61] *Id.* at 352.

[62] *United States v. Turner*, 551 F.3d 657, 664 (7th Cir. 2008)

[63] *Id.* (emphasis added); *see also United States v. Mehanna*, 735 F.3d 32, 55 (1st Cir. 2013) ("[T]he defendant's mendacity was undertaken for the purpose of misdirecting the ongoing FBI investigation (or so the jury could have found).  This is an important datum: where a defendant's statements are intended to misdirect government investigators, they may satisfy the materiality requirement of section 1001 even if they stand no chance of accomplishing their objective.").

[64] The five statements presented to the jury were: (1) "that Defendant Wright did not know anything about Defendant Allen manufacturing explosive devices at Defendant Wright's business, G&G Homes;" (2) that Defendant Wright had no knowledge of any explosives being located on the premises of his business, G&G Homes;" (3) "that Defendant Wright was not a member of a militia;" (4) that Defendant Allen had not invited Defendant Wright to a

reasonable juror could conclude that any of Wright's false statements would have the "natural tendency" to influence the FBI's investigation into Defendant's bombing conspiracy, even if no such influence occurred.

As a final matter, Wright also argues that the Government misrepresented the law to the jury, pointing to the following statement made by the Government during its closing argument rebuttal:

> [Defense Counsel] also mentioned to you that there's no evidence on this issue of materiality.  Folks, the Government has no obligation to provide you evidence of what's obvious.  And what's obvious or what should be obvious to you after you watch that video is how differently things would have gone on October 12th, if Gavin Wright, when given the opportunity, had told the truth.  That's what's material.  That's what makes that statement material, is how—how differently that day would have gone."

Wright argues that "the Government stated unequivocally to the jury that it had no obligation to admit evidence on an element of the offense" and that the Government implied that the jury could substitute its own common sense in place of actual evidence.

Assuming, without deciding, that the Government misstated the law, this error would not be grounds for acquittal.  The jury is presumed to have followed the instructions given by the Court, even when the Government makes a misleading argument or misstatement of law.[65]  The jury instructions expressly stated that to convict Wright on Count 3 the Government must prove beyond a reasonable doubt every element of the crime, including that Wright's false statement "was material to the FBI's investigation."  The jury was also instructed that "[a] fact is 'material'

---

meeting of the Kansas Security Force;" and (5) that Defendant Wright had provided the FBI with all of his personal knowledge about Defendant Allen during the interview."

[65] *United States v. Currie*, 2018 WL 6712339, at *6 (10th Cir. 2018); *Bland v. Sirmons*, 459 F.3d 999, 1015 (10th Cir. 2006).

-28-

if it has a natural tendency to influence or is capable of influencing a decision of the FBI to which

it was made." As such, the Court presumes the jury followed the instructions and found that every

element—including materiality—was proved beyond a reasonable doubt.

These are the reasons the Court denied Wright's Renewed Motion for Judgment of

Acquittal, and the Court leaves that ruling undisturbed. Because Wright's Rule 29 Motion also

formed the basis for his objection to the PSR's application of § 3C1.1's enhancement, that

objection is overruled.[66]

## F.      Special Condition of Supervision

The Probation Office recommended that as a special condition of post-release supervision,

Defendants be prohibited from participating in "any anti-government or tax protesting activities,

or associate with individuals who are known members of these groups, or possess any literature

advocating or supporting these groups during the term of supervision." Defendants objected to

this condition of supervision. The Government then volunteered to modify the condition to the

following.

> [Defendants are prohibited from] participating in any groups (including online
> groups) espousing anti-Muslim or anti-immigrant beliefs/ideologies, or in any
> militias or other groups that advocate engaging in criminal activity or overthrowing
> the United States government; or associating with individuals who are known
> members of such groups; or possessing any literature advocating or supporting
> these groups; or possessing any documents or paraphernalia indicating membership
> in a militia or a group that espouse violence against or hatred for Muslims or
> immigrants; or posting any comments on social media or other electronic media
> espousing violence against or hatred for Muslims or immigrants.

---

[66] The Court holds that the PSR properly applied the obstruction of justice enhancement to Wright based on
his false statements to the FBI. Accordingly, the Court makes no ruling on the Government's alternative argument
that the enhancement would apply because Wright concealed evidence of the conspiracy.

At the November 19 hearing, Defendants stated that they objected to the first part of the Government's modified condition: "participating in any groups (including online groups) espousing anti-Muslim or anti-immigrant beliefs or ideologies." Defendants argue that "anti-Muslim" and "anti-Immigrant" beliefs or ideologies is so broad that it fails to adequately give Defendants notice about the types of groups they can associate with while on supervision, including non-violent political groups. Defendants do not object to the conditions that prohibit Defendants from participating in groups that advocate criminal activity or violence against the United State or from "espousing violence against or hatred for Muslims or immigrants" on social media.

The Court agrees with Defendants that a prohibition from participating in any groups espousing "anti-Muslim" or "anti-immigrant" beliefs is vague and unnecessarily broad. The Court therefore sustains the objection. The Court will impose the following special condition of supervision: "Defendants are prohibited from participating in any groups, (including online groups) that advocate engaging in criminal activity or overthrowing the United States government; or associating with individuals who are known members of such groups; or participating in a militia or a group that espouses violence against Muslims or immigrants."

## G. Miscellaneous Objections

Defendants also raised a variety of miscellaneous objections to the PSR. These objections were either so minor or entirely irrelevant for sentencing purposes, or they rely on Defendants' theories of the case at trial which were implicitly rejected by the jury's verdict, that all such objections are overruled.

## H. Victim Impact Statements

-30-

The Government submitted about 20 short videos containing victim impact statements by residents of the Mary Street Apartments and attendees of the Mary Street Apartment mosque. The Government argues that these individuals are entitled to have their testimony heard under the Crime Victims' Rights Act ("CVRA").[67]  The CVRA guarantees every victim of a federal crime the right to be reasonably heard at sentencing.[68]  The CVRA defines a "crime victim" as "a person directly and proximately harmed" by a federal crime.[69]

Defendants filed a Motion to exclude these victim impact statements, contesting the residents' status as "victims."  Defendants first argue that the CVRA is inapplicable because § 3771—unlike some other federal statutes[70]—does not specifically state that it applies to inchoate crimes, like conspiracy.  This argument is unavailing.  The CVRA uses extraordinarily broad language—applying to any "Federal offense"—and the statute gives no indication that conspiracies, or any other federal crime, is excluded from that definition.  Neither is the Court convinced by Defendants' slippery-slope argument that allowing these individuals to testify as victims would open the floodgates to testimony from individuals with a miniscule connection to the Mary Street Apartments.[71]  The Government has not submitted any such testimony, and

---

[67] 18 U.S.C. § 3771.

[68] 18 U.S.C. § 3771(a)(4).

[69] 18 U.S.C. § 3771(e)(2)(A).

[70] *See* 18 U.S.C. § 3663(a)(2) (defining a "victim" for restitution purposes as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern").

[71] Defendants warn that allowing this testimony would by extension "open the theoretical door to anyone: 1) residing close to the apartment complex who might have been in fear once the United States held its press conference and may not be Somali and/or Muslim; 2) who regularly walked or drove by the complex who might have been in fear following the government's press conference; 3) who conducted business with any of the defendants, ad infinitum."

allowing these individuals to give victim impact statements does not eliminate judicial discretion in excluding dubious claims of victimhood, should any subsequently arise.

Defendants also argue that these videos would be unduly prejudicial, and they note that the Court in a pretrial order excluded all residents of the Mary Street Apartments from testifying at trial for just that reason. The Court does not consider its pretrial order to be of great relevance here. Victim impact statements have a different purpose than trial testimony, which the jury relies on in determining Defendants' guilt. Because the Mary Street Apartments residents learned everything about Defendants' conspiracy from the Government or the media, their testimony would not have been helpful to the jury in determining whether Defendants were guilty of the crime. However, their testimony is relevant at sentencing to determine the overall impact of Defendants' crimes. Having heard all the evidence at trial, the Court at sentencing will not be unduly influenced by these statements in determining the appropriate sentence, but the statements of the intended victims are nonetheless entitled to be heard. The Court concludes that this testimony is not so unduly prejudicial to require exclusion at this stage.[72]

Much of the parties' argument on this issue revolves around whether the Court is *required* under the CVRA to hear the testimony submitted by the Government. But this question does not ultimately drive the Court's ruling on this matter. Defendants have not demonstrated that, even if the residents are not *entitled* to testify, that the Court is stripped of its discretion to hear the testimony. The Court will allow the Government to present this evidence at sentencing, and Defendants' Motion to Exclude is denied.

---

[72] *See United States v. King*, 229 F.3d 1165 (10th Cir. 2000) (citing *Payne v. Tennessee*, 501 U.S. 808, 824-827 (1991)).

IT IS THEREFORE ORDERED that Defendants' objections to the base offense level calculation are **OVERRULED**.

IT IS FURTHER ORDERED that Allen and Stein's objections to the hate crime enhancement are **OVERRULED**.

IT IS FURTHER ORDERED that Defendants' objections to the terrorism enhancement are **OVERRULED**.

IT IS FURTHER ORDERED that Defendant Curtis Wayne Allen's Motion to Strike Government's Reply (Doc. 475) is **DENIED**.

IT IS FURTHER ORDERED that Stein's Motion to Join (Doc. 476) Allen's Motion to Strike is **DENIED AS MOOT**.

IT IS FURTHER ORDERED that Stein's objection to the organizer enhancement is **SUSTAINED**.

IT IS FURTHER ORDERED that Wright's objection to the obstruction of justice enhancement is **OVERRULED**.

IT IS FURTHER ORDERED that Defendants' objections to the special conditions of supervision are **SUSTAINED**.

IT IS FURTHER ORDERED that Defendants' Objection and Motion to Exclude "Victim" Impact Statements (Doc. 457.) is **DENIED.**

**IT IS SO ORDERED**.

Dated this 15th day of January, 2019.


ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

AO 245C    (Rev. 02/18 - D/KS 02/18) Amended Judgment in a Criminal Case                    (NOTE: Identify Changes with Asterisks (*))

# United States District Court

### District of Kansas

| | |
|---|---|
| UNITED STATES OF AMERICA | **AMENDED JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| Curtis Wayne Allen | Case Number:  6:16CR10141 - 001 |
| | USM Number:  28343-031 |
| | Defendant's Attorney:  Richard Federico |
| **Date of Original Judgment:**  1/25/2019 | Melody J. Brannon |
| (Or Date of Last Amended Judgment) | |

**Reason for Amendment:**

[ ]  Correction of Sentence on Remand (18 U.S.C. 3742(f)(1) and (2))
[ ]  Reduction of Sentence for Changed Circumstances (Fed. R.Crim.P.35(b))
[ ]  Correction of Sentence by Sentencing Court (Fed.R.Crim.P.35(a))
[X]  Correction of Sentence for Clerical Mistake (Fed.R.Crim.P.36)

[ ]  Modification of Supervision Conditions (18 U.S.C. § 3563(c) or 3583(e))
[ ]  Modification of Imposed Term of Imprisonment for Extraordinary and Compelling Reasons (18 U.S.C. §3582(c)(1))
[ ]  Modification of Imposed Term of Imprisonment for Retroactive Amendment(s) to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))
[ ]  Direct Motion to District Court Pursuant to  [ ]  28 U.S.C. § 2255, or
        [ ]  18 U.S.C. § 3559(c)(7)
[ ]  Modification of Restitution Order (18 U.S.C. § 3664)

## THE DEFENDANT:

☐    pleaded guilty to count(s):  ___ .

☐    pleaded nolo contendere to count(s) ___ which was accepted by the court.

☒    was found guilty on counts 1 and 2 of the Second Superseding Indictment after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 2332a(a)(2)* | CONSPIRACY TO USE A WEAPON OF MASS DESTRUCTION, a Class A Felony | 10/14/2016 | 1 |
| 18 U.S.C. § 241 | CONSPIRACY AGAINST CIVIL RIGHTS, a Class C Felony | 10/14/2016 | 2 |

The defendant is sentenced as provided in pages 1 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐    The defendant has been found not guilty on count(s) ___ .

☐    Count(s) ___ is dismissed on the motion of the United States.

IT IS ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States attorney of material changes in economic circumstances.

02/01/2019*
Date of Imposition of Judgment

s/   Eric F. Melgren
Signature of Judge

Honorable Eric F. Melgren, U.S. District Judge
Name & Title of Judge

2/4/2019
Date

AO 245C    (Rev. 02/18 - D/KS 02/18) Amended Judgment in a Criminal Case          (NOTE: Identify Changes with Asterisks (*))
Judgment – Page **2** of **7**

DEFENDANT:       Curtis Wayne Allen
CASE NUMBER:   6:16CR10141 - 001

# IMPRISONMENT

     The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total controlling term of <u>300 months</u> .

     Count 1: 300 months;
     Count 2: 120 months, concurrent to Count 1.

☒    The Court makes the following recommendations to the Bureau of Prisons:

     The defendant be designated to either the facility at FCI Seagoville, Texas or FCI Three Rivers, Texas, to facilitate family visitation with his daughter.

☒    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant shall surrender to the United States Marshal for this district.

     ☐ at ___ on ___.

     ☐ as notified by the United States Marshal.

☐    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

     ☐ before ___ on ___.

     ☐ as notified by the United States Marshal.

     ☐ as notified by the Probation or Pretrial Services Officer.

# RETURN

I have executed this judgment as follows:

_____

_____

  Defendant delivered on _____   to _____

at _____, with a certified copy of this judgment.

                            _____
                                  UNITED STATES MARSHAL

                    By _____
                                  Deputy U.S.  Marshal

AO 245C     (Rev. 02/18 - D/KS 02/18) Amended Judgment in a Criminal Case     (NOTE: Identify Changes with Asterisks (*))
          Sheet 3 — Supervised Release

Judgment — Page **3** of 7

DEFENDANT:     Curtis Wayne Allen
CASE NUMBER:   6:16CR10141 - 001

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of <u>ten (10) years</u> .

Count 1: 10 years;
Count 2: 3 years, both counts to run concurrently

# MANDATORY CONDITIONS

1.   You must not commit another federal, state, or local crime.

2.   You must not unlawfully possess a controlled substance.

3.   You must refrain from any unlawful use of a controlled substance.  You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

     ☐   The above drug testing condition is suspended based on the court's determination that you pose a low risk of future substance abuse.  *(Check if applicable.)*

4.   ☐   You must make restitution in accordance with <u>18 U.S.C. §§ 3663</u> and <u>3663A</u> or any other statute authorizing a sentence of restitution. *(Check if applicable.)*

5.   ☒   You must cooperate in the collection of DNA as directed by the probation officer. *(Check if applicable.)*

6.   ☐   You must comply with the requirements of the Sex Offender Registration and Notification Act (<u>34 U.S.C. § 20901</u>, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(Check if applicable.)*

7.   ☐   You must participate in an approved program for domestic violence. *(Check if applicable.)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245C    (Rev. 02/18 - D/KS 02/18) Amended Judgment in a Criminal Case    (NOTE: Identify Changes with Asterisks (*))

Judgment – Page **4** of **7**

DEFENDANT:      Curtis Wayne Allen
CASE NUMBER:   6:16CR10141 - 001

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.   You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2.   After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3.   You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4.   You must answer truthfully the questions asked by your probation officer.

5.   You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6.   You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7.   You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8.   You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9.   If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or Tasers).

11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12.  If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

13.  You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. I understand additional information regarding these conditions is available at the www.uscourts.gov.

Defendant's Signature _____    Date _____

AO 245C    (Rev. 02/18 - D/KS 02/18) Amended Judgment in a Criminal Case    (NOTE: Identify Changes with Asterisks (*))

Judgment – Page **5** of 7

DEFENDANT:      Curtis Wayne Allen
CASE NUMBER:   6:16CR10141 - 001

# SPECIAL CONDITIONS OF SUPERVISION

1.    You must not participate in any groups, (including online groups) that advocate engaging in criminal activity or overthrowing the United States government; or associating with individuals who are known members of such groups; or participating in a militia or a group that espouses violence against Muslims or immigrants during the term of supervision.

2.    You must participate in an approved program for mental health treatment, and follow the rules and regulations of that program, which may include psychological counseling. If mental health medication is deemed appropriate by mental health staff or your treating physician, you must take prescribed medication as directed, and you must contribute toward the cost, to the extent you are financially able to do so, as directed by the U.S. Probation Officer.

3.    You must submit your person, house, residence, vehicle(s), papers, business or place of employment and any property under your control to a search, conducted by the United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. Failure to submit to a search may be grounds for revocation. You must warn any other residents that the premises may be subject to searches pursuant to this condition.

4.    You must successfully participate in and successfully complete an approved program for substance abuse, which may include urine, breath, or sweat patch testing, and/or outpatient treatment, and share in the costs, based on the ability to pay, as directed by the Probation Office. You must abstain from the use and possession of alcohol and other intoxicants during the term of supervision.

AO 245C     (Rev. 02/18 - D/KS 02/18) Amended Judgment in a Criminal Case      (NOTE: Identify Changes with Asterisks (*))
Sheet 5 — Criminal Monetary Penalties

DEFENDANT:      Curtis Wayne Allen
CASE NUMBER:   6:16CR10141 - 001

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the Schedule of Payments set forth in this Judgment.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| **Totals:** | Count 1: $100<br>Count 2: $100 | Not applicable | Waived | Not Applicable |

☐      The determination of restitution is deferred until ___. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐      The defendant shall make restitution (including community restitution) to the following payees in the amounts listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss**** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| **Totals:** | $ | $ | |

☐      Restitution amount ordered pursuant to plea agreement $___ .

☐      The defendant shall pay interest on any fine or restitution of more than $2,500, unless the fine or restitution is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options set forth in this Judgment may be subject to penalties for delinquency and default, pursuapnt to 18 U.S.C. § 3612(g).

☐      The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

☐ the interest requirement is waived for the ☐ fine and/or ☐ restitution.

☐ the interest requirement for the ☐ fine and/or ☐ restitution is modified as follows:

1319

*Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
**Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses commited on or after September 13, 1994, but before April 23, 1996.

AO 245C    (Rev. 02/18 - D/KS 02/18) Amended Judgment in a Criminal Case        (NOTE: Identify Changes with Asterisks (*))
           Sheet 6 — Schedule of Payments

DEFENDANT:      Curtis Wayne Allen
CASE NUMBER:   6:16CR10141 - 001

# SCHEDULE OF PAYMENTS

Criminal monetary penalties are due immediately. Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows, but this schedule in no way abrogates or modifies the government's ability to use any lawful means at any time to satisfy any remaining criminal monetary penalty balance, even if the defendant is in full compliance with the payment schedule:

A    ☐    Lump sum payment of $___ due immediately, balance due
          ☐ not later than ___, or
          ☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

B    ☒    Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☒ F below); or

C    ☐    Payment in monthly installments of not less than 5% of the defendant's monthly gross household income over a period of ___ years to commence ___ days after the date of this judgment; or

D    ☐    Payment of not less than 10% of the funds deposited each month into the inmate's trust fund account and monthly installments of not less than 5% of the defendant's monthly gross household income over a period of ___ years, to commence ___ days after release from imprisonment to a term of supervision;  or

E    ☐    Payment during the term of supervised release will commence within ___ (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F    ☒    Special instructions regarding the payment of criminal monetary penalties:

If restitution is ordered, the Clerk, U.S. District Court, may hold and accumulate restitution payments, without distribution, until the amount accumulated is such that the minimum distribution to any restitution victim will not be less than $25.

Payments should be made to Clerk, U.S. District Court, U.S. Courthouse - Room 204, 401 N. Market, Wichita, Kansas 67202.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐    Joint and Several

Defendant and Co-Defendant Names and Case Numbers (*including defendant number*), Total Amount, Joint and Several Amount and corresponding payee, if appropriate.

| **Case Number**<br>**Defendant and Co-Defendant Names**<br>**(including defendant number)** | **Total Amount** | **Joint and Several**<br>**Amount** | **Corresponding Payee,**<br>**if appropriate** |
|---|---|---|---|

☐    The defendant shall pay the cost of prosecution.

☐    The defendant shall pay the following court cost(s):

☐    The defendant shall forfeit the defendant's interest in the following property to the United States.  Payments against any money judgment ordered as part of a forfeiture order should be made payable to the United States of America, c/o United States Attorney, Attn: Asset Forfeiture Unit, 1200 Epic Center, 301 N. Main, Wichita, Kansas 67202.

1320

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.