**ORAL ARGUMENT REQUESTED**

Nos. 19-3030, 19-3034, 19-3035

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

———————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

PATRICK EUGENE STEIN; CURTIS WAYNE ALLEN;
GAVIN WAYNE WRIGHT,

Defendants-Appellants

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
THE HONORABLE ERIC F. MELGREN, NO. 6:16-CR-10141-EFM

———————————————

CONSOLIDATED BRIEF FOR THE UNITED STATES AS APPELLEE

———————————————

STEPHEN R. MCALLISTER
 United States Attorney

ANTHONY W. MATTIVI
 Assistant United States Attorney
 District of Kansas
 290 Carlson Federal Building
 444 SE Quincy Street
 Topeka, KS  66683
 (785) 295-7698

ERIC S. DREIBAND
 Assistant Attorney General

ALEXANDER V. MAUGERI
 Deputy Assistant Attorney General

THOMAS E. CHANDLER
ERIN H. FLYNN
ALISA C. PHILO
 Attorneys
 Department of Justice
 Civil Rights Division
 Appellate Section
 Ben Franklin Stn., P.O. Box 14403
 Washington, D.C.  20044-4403
 (202) 514-5361
 Erin.Flynn@usdoj.gov

# TABLE OF CONTENTS

**PAGE**

GLOSSARY

STATEMENT OF PRIOR OR RELATED CASES

STATEMENT OF JURISDICTION..........................................................................1

INTRODUCTION AND STATEMENT OF THE ISSUES ...................................2

STATEMENT OF THE CASE................................................................................4

    1.    *Facts* ...............................................................................................4

        a.    *Dan Day Meets Patrick Stein While Monitoring A Southwest Kansas Militia For Potential Violence And Immediately Raises Concerns To The FBI That Stein Is A Threat To Local Muslims*........................................................4

        b.    *After The Pulse Nightclub Shooting In June 2016, Stein Vows To "Take Action" And Assembles A Splinter Group That Includes Allen, Wright, And Ostensibly Day* .........9

        c.    *Defendants Develop An Increasingly Detailed Plot To Blow Up A Somali Apartment Complex And Mosque To "Wake Up" Citizens To A Perceived Muslim Takeover*...........16

        d.    *The FBI Introduces An Undercover Officer In An Attempt To Steer Defendants Away From Manufacturing Their Own Explosives, But Defendants Continue Making HMTD While Also Pursuing Explosives From The Undercover Officer* ................................................................24

        e.    *Defendants' Plot Intensifies But Soon Unravels After Police Arrest Allen For Domestic Violence*.............................31

**TABLE OF CONTENTS (continued):**                              **PAGE**

        *f.*     *Law Enforcement Authorities Seize Evidence Of Defendants' Planned Bombing From Defendants' Homes And Trucks, G&G, And Two Storage Lockers*..............35

    *2.*    *Procedural History*................................................................38

        *a.*     *Indictment And Relevant Pre-Trial Motions*............................38

        *b.*     *Trial*......................................................................................40

        *c.*     *Sentencing And Appeal* ...........................................41

SUMMARY OF ARGUMENT ........................................................43

ARGUMENT

    I     DEFENDANTS ARE NOT ENTITLED TO JUDICIAL RELIEF UNDER THE JURY SELECTION AND SERVICE ACT OF 1968 BASED ON THE METHOD OF PETIT JUROR SELECTION USED FOR THEIR TRIAL ..........................47

        *A.*     *Standard Of Review* .................................................47

        *B.*     *Defendants' Challenge To Summoning Only Within-Division Petit Jurors* ..................................................47

            *1.*     *The Jury Selection And Service Act Of 1968*.................47

            *2.*     *The District Of Kansas's Jury Plan*...............................50

            *3.*     *Defendants' Challenge To The Method Of Petit Juror Selection*..............................................................53

        *C.*     *The District Court Properly Rejected Defendants' Statutory Challenge* ................................................56

            *1.*     *Defendants' Challenge Is Procedurally Barred*.............57

**TABLE OF CONTENTS (continued):**                                      **PAGE**

2.    *Defendants Are Not Entitled To Reversal Based
On An Alleged Violation Of The Act's Policy
Statement That Is Neither Independently
Enforceable Nor A Substantial Failure To
Comply With The Act* ..................................................... 61

II     THE DISTRICT COURT PROPERLY DECLINED TO
INSTRUCT THE JURY ON ENTRAPMENT .................................. 69

A.    *Standard Of Review* ................................................ 69

B.    *Background* ........................................................ 69

1.    *Defendants Have The Burden To Show Entrapment
Is A Triable Issue* ........................................... 69

2.    *Proceedings Below* ......................................... 72

C.    *The District Court Correctly Declined To Give An
Entrapment Instruction* ............................................ 74

1.    *Defendants Failed To Show A Triable Issue As To
Inducement* ................................................. 75

2.    *Defendants Failed To Show A Triable Issue As To
Lack Of Predisposition* .................................... 86

III    THE DISTRICT COURT CORRECTLY APPLIED
THE TERRORISM ENHANCEMENT ............................................. 92

A.    *Standard Of Review* ................................................ 92

B.    *The District Court Finds That The Terrorism
Enhancement Applies But Varies Downward From
Defendants' Recommended Life Sentences* .............................. 93

1.    *Section 3A1.4's Terrorism Enhancement* ...................... 93

**TABLE OF CONTENTS (continued):**                          **PAGE**

2.    *The Court Finds Section 3A1.4 Applies Given Defendants' Conduct* ...................................................... 96

3.    *The Court Varies Downward At Sentencing* ............... 101

C.    *The District Court Properly Applied The Terrorism Enhancement* ........................................................... 104

1.    *The Court Properly Found The Facts Supporting Section 3A1.4's Application By A Preponderance Of The Evidence* ........................................................... 104

2.    *Influencing, Affecting, Or Retaliating Against Government Conduct Does Not Have To Be An Offense's "Sole" Or "Primary" Purpose For Section 3A1.4 To Apply* ......................................... 111

D.    *Any Error In Applying The Terrorism Enhancement Was Harmless* ........................................................ 120

IV    THERE WAS NO PROSECUTORIAL MISCONDUCT (WRIGHT ONLY) ............................................................ 121

A.    *Standard Of Review* ................................................ 121

B.    *The Government Did Not Act In Bad Faith Or Knowingly Present False Evidence To The District Court Or To The Jury* ........................................... 122

1.    *Wright Had Ample Opportunity To Compare The Contents Of The FBI's Audio Recordings With The Government's Transcripts Of Those Recordings* ................................................................ 123

2.    *The Government Did Not Present False Evidence* ....... 130

**TABLE OF CONTENTS (continued):**                              **PAGE**

V    THE MANNER IN WHICH THE DISTRICT COURT
      RULED ON THE ADMISSIBILITY OF DEFENDANTS'
      RECORDED STATEMENTS UNDER RULE 801(d)(2)(E)
      WAS NOT AN ABUSE OF DISCRETION (WRIGHT
      ONLY) ............................................................................136

      A.    Standard Of Review ...............................................136

      B.    *The District Court Did Not Abuse Its Discretion At The*
            *James Hearing*......................................................136

            1.    *Rule 801(d)(2)(E)*...........................................137

            2.    *The District Court's Determinations Under Rule*
                  *801(d)(2)(E)*.................................................138

            3.    *The District Court Did Not Abuse Its Discretion*.........142

VI   THE DISTRICT COURT CORRECTLY DENIED
      WRIGHT'S MOTION FOR A JUDGMENT OF
      ACQUITTAL ON HIS FALSE-STATEMENTS CHARGE
      (WRIGHT ONLY) ............................................................148

      A.    Standard Of Review ...............................................148

      B.    Background ...........................................................149

      C.    *The District Court Correctly Denied Wright's Motion* ..........152

VII  THERE IS NO CUMULATIVE ERROR (WRIGHT ONLY).........158

      A.    Standard Of Review ...............................................158

      B.    *There Is No Cumulative Error* .................................158

CONCLUSION ....................................................................168

**TABLE OF CONTENTS (continued):**

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSION

CERTIFICATE OF SERVICE

ADDENDUM

ATTACHMENT (Email Ruling from March 23, 2018, Supp.3R.2-3)

# TABLE OF AUTHORITIES

**CASES:**                                                                                          **PAGE**

*Apprendi* v. *New Jersey*, 530 U.S. 466 (2000) ....................................................104

*Association of Am. R.R.s* v. *Costle*, 562 F.2d 1310 (D.C. Cir. 1977) .....................62

*Bourjaily* v. *United States*, 483 U.S. 171 (1987) ...................................137, 143, 145

*Burke* v. *Regalado*, 935 F.3d 960 (10th Cir. 2019) ...................................... 119-120

*Burrage* v. *United States*, 571 U.S. 204 (2014) ....................................................114

*Davis* v. *Michigan Dep't of Treasury*, 489 U.S. 803 (1989) ...................................63

*Gall* v. *United States*, 552 U.S. 38 (2007) ....................................................105, 110

*Holmes* v. *South Carolina*, 547 U.S. 319 (2006).......................................... 166-167

*Hughes Tool Co.* v. *Meier*, 486 F.2d 593 (10th Cir. 1973) .....................................62

*In re Terrorist Bombings of U.S. Embassies in East Africa*,
    552 F.3d 93 (2d Cir. 2008) ................................................................................114

*Kimbrough* v. *United States*, 552 U.S. 85 (2007) ..................................................110

*Kungys* v. *United States*, 485 U.S. 759 (1988) ......................................................152

*Mathews* v. *United States*, 485 U.S. 58 (1988)......................................69, 71, 76, 83

*Sherman* v. *United States*, 356 U.S. 369 (1958).........................................71, 81, 83

*Sorrells* v. *United States*, 287 U.S. 435 (1932)................................................71, 76

*Taylor* v. *Louisiana*, 419 U.S. 522 (1975).........................................................48, 63

**CASES (continued):**                                                    **PAGE**

*Tesone* v. *Empire Mktg. Strategies*,
    942 F.3d 979 (10th Cir. 2019) ...................................... 93, 106, 108, 164, 166

*United States* v. *Alcorta*, 853 F.3d 1123 (10th Cir. 2017),
    cert. denied, 138 S. Ct. 1306 (2018).....................................................136, 143

*United States* v. *Arnaout*, 431 F.3d 994 (7th Cir. 2005)...............................109, 112

*United States* v. *Atwell*, 766 F.2d 416 (10th Cir. 1985)........................................167

*United States* v. *Awan*, 607 F.3d 306 (2d Cir. 2010)................................. 94-95, 109

*United States* v. *Bader*, 678 F.3d 858 (10th Cir. 2012) ........................................121

*United States* v. *Bearden*, 659 F.2d 590 (5th Cir. Unit B 1981) ................ 48, 66-67

*United States* v. *Benkahla*, 530 F.3d 300 (4th Cir. 2008)............................. 115-116

*United States* v. *Booker*, 543 U.S. 220 (2005).......................................................105

*United States* v. *Caballero*,
    277 F.3d 1235 (10th Cir. 2002) ................................... 121, 123, 129-130, 133

*United States* v. *Calabrese*, 942 F.2d 218 (3d Cir. 1991) .......................................48

*United States* v. *Carmichael*, 560 F.3d 1270 (11th Cir. 2009).......................... 65-67

*United States* v. *Chandia*, 675 F.3d 329 (4th Cir. 2012) ......................................109

*United States* v. *Christianson*, 586 F.3d 532 (7th Cir. 2009) ..................................95

*United States* v. *Christy*, 916 F.3d 814 (10th Cir. 2019) .......................................152

*United States* v. *Collins*, 859 F.3d 1207 (10th Cir. 2017) .......................................63

*United States* v. *Conant*, 116 F. Supp. 2d 1015 (E.D. Wis. 2000) .........................64

**CASES (continued):**                                                                **PAGE**

*United States* v. *Contreras*, 108 F.3d 1255 (10th Cir. 1997) ...........................47, 57

*United States* v. *Craig*, 808 F.3d 1249 (10th Cir. 2015) .................................94, 110

*United States* v. *Cromitie*, 727 F.3d 194 (2d Cir. 2013).........................................85

*United States* v. *Fadel*, 844 F.2d 1425 (10th Cir. 1988) ...................................72, 88

*United States* v. *Faulkner*, 439 F.3d 1221 (10th Cir. 2006) ..................................147

*United States* v. *Fidse*, 862 F.3d 516 (5th Cir. 2017)......................................95, 109

*United States* v. *Fisher*, 502 F.3d 293 (3d Cir. 2007)  .........................................108

*United States* v. *Fleming*, 667 F.3d 1098 (10th Cir. 2011) ...................................122

*United States* v. *Gaudin*, 515 U.S. 506 (1995) ............................. 152, 154-155, 157

*United States* v. *Gordon*, 710 F.3d 1124 (10th Cir. 2013) ...................148, 154, 157

*United States* v. *Graham*, 275 F.3d 490 (6th Cir. 2001) .................................95, 109

*United States* v. *Green*, 435 F.3d 1265 (10th Cir. 2006)............. 55, 58, 65, 122-123

*United States* v. *Hall*, 473 F.3d 1295 (10th Cir. 2007).......................... 104-105, 110

*United States* v. *Harlow*, 444 F.3d 1255 (10th Cir. 2006)....................................158

*United States* v. *Harry*, 816 F.3d 1268 (10th Cir. 2016) ......................................160

*United States* v. *Hasan*, 526 F.3d 653 (10th Cir. 2008) .......................................113

*United States* v. *Hassan*, 742 F.3d 104 (4th Cir. 2014)...........................................95

*United States* v. *Hillman*, 642 F.3d 929 (10th Cir. 2011)......................................157

*United States* v. *Irvin*, 682 F.3d 1254 (10th Cir. 2012) .........................................153

**CASES (continued):**                                                                     **PAGE**

*United States* v. *Jayyousi*, 657 F.3d 1085 (11th Cir. 2011).....................................95

*United States* v. *Johnson*, 732 F. App'x 638 (10th Cir. 2018) .......................94, 118

*United States* v. *Jordi*, 418 F.3d 1212 (11th Cir. 2005) ............................... 117-118

*United States* v. *Kamahele*, 748 F.3d 984 (10th Cir. 2014)..............................47, 65

*United States* v. *Kennedy*, 548 F.2d 608 (5th Cir. 1977).......................................57

*United States* v. *Khan*, 938 F.3d 713 (5th Cir. 2019) ........................................ 95-96

*United States* v. *Kingston*, 971 F.2d 481 (10th Cir. 1992) ...................................156

*United States* v. *Leffler*, 942 F.3d 1192 (10th Cir. 2019) ........................................93

*United States* v. *Lopez-Medina*, 596 F.3d 716 (10th Cir. 2010)................... 159-160

*United States* v. *Lucero*, 747 F.3d 1242 (10th Cir. 2014) ......................92, 112, 119

*United States* v. *Lupton*, 620 F.3d 790 (7th Cir. 2010) .........................................154

*United States* v. *Mandhai*, 375 F.3d 1243 (11th Cir. 2004) .............. 95-96, 109, 112

*United States* v. *Martinez*, 825 F.2d 1451 (10th Cir. 1987) ......................... 137-138

*United States* v. *McBane*, 433 F.3d 344 (3d Cir. 2005).......................................153

*United States* v. *Mehanna*, 735 F.3d 32 (1st Cir. 2013) ......................................154

*United States* v. *Meskini*, 319 F.3d 88 (2d Cir. 2003) ...........................................114

*United States* v. *Mohamed*, 757 F.3d 757 (8th Cir. 2014)..............................95, 109

*United States* v. *Montgomery*, 439 F.3d 1260 (10th Cir. 2006) ...........................120

*United States* v. *Moore*, 612 F.3d 698 (D.C. Cir. 2010)........................................157

**CASES (continued):**                                          **PAGE**

*United States* v. *Nguyen*, 413 F.3d 1170 (10th Cir. 2005) .......................................86

*United States* v. *Nichols*, 169 F.3d 1255 (10th Cir. 1999).....................................105

*United States* v. *O'Brien*, 560 U.S. 218 (2010) .................................................94, 110

*United States* v. *Oldbear*, 568 F.3d 814 (10th Cir. 2009) .....................................157

*United States* v. *Olsen*, 519 F.3d 1096 (10th Cir. 2008) .............................. 109-111

*United States* v. *Ortiz*, 804 F.2d 1161 (10th Cir. 1986)............. 69-72, 76, 83, 88, 92

*United States* v. *Owens*, 70 F.3d 1118 (10th Cir. 1995)........................ 137-138, 143

*United States* v. *Patton*, 927 F.3d 1087 (10th Cir. 2019) .......................................92

*United States* v. *Pauler*, 857 F.3d 1073 (10th Cir. 2017)........................................39

*United States* v. *Perez*,
    989 F.2d 1574 (10th Cir. 1993) (en banc) ........................... 137, 143-144, 146

*United States* v. *Pillado*, 656 F.3d 754 (7th Cir. 2011) ...........................................85

*United States* v. *Porter*, 928 F.3d 947 (10th Cir. 2019) .......................................114

*United States* v. *Radeker*, 664 F.2d 242 (10th Cir. 1991) .....................................146

*United States* v. *Rascon*, 8 F.3d 1537 (10th Cir. 1993) .................................138, 145

*United States* v. *Redcorn*, 528 F.3d 727 (10th Cir. 2008) .....................................105

*United States* v. *Redifer*, 631 F. App'x 548 (10th Cir. 2015)................................109

*United States* v. *Rivera*,
    900 F.2d 1462 (10th Cir. 1990) (en banc) .................................................158

*United States* v. *Roberts*, 14 F.3d 502 (10th Cir. 1993) ........................136, 143, 147

- xi -

**CASES (continued):**                                              **PAGE**

*United States* v. *Robinson*, 809 F.3d 991 (8th Cir. 2016).......................................154

*United States* v. *Rodgers*, 466 U.S. 475 (1984)....................................................157

*United States* v. *Russell*, 411 U.S. 423 (1973)...........................................69, 71, 76

*United States* v. *Sabillon-Umana*, 772 F.3d 1328 (10th Cir. 2014) .....................107

*United States* v. *Scull*, 321 F.3d 1270 (10th Cir. 2003)..............................70, 72, 88

*United States* v. *Siddiqui*, 699 F.3d 690 (2d Cir. 2012)..........................................95

*United States* v. *Snowden*, 806 F.3d 1030 (10th Cir. 2015) ......................... 120-121

*United States* v. *Strohm*, 671 F.3d 1173 (10th Cir. 2011) .....................................162

*United States* v. *Tankersley*, 537 F.3d 1100 (9th Cir. 2008) ........................107, 109

*United States* v. *Taylor*, 514 F.3d 1092 (10th Cir. 2008) .....................................131

*United States* v. *Test*, 550 F.2d 577 (10th Cir. 1976) ............................ 55, 63, 66-67

*United States* v. *Thunder*, No. CR 13-10015,
     2014 WL 1698423 (D.S.D. Apr. 29, 2014) ....................................................65

*United States* v. *Urena*, 27 F.3d 1487 (10th Cir. 1994)........................................138

*United States* v. *Verrusio*, 762 F.3d 1 (D.C. Cir. 2014) .......................................155

*United States* v. *Vincent*, 611 F.3d 1246 (10th Cir. 2010)............... 69-71, 76, 81, 83

*United States* v. *Williams*, 827 F.3d 1134 (D.C. Cir. 2016) ..................................156

*United States* v. *Williams*, 865 F.3d 1302 (10th Cir. 2017) ......................... 153-155

*United States* v. *Williams*, 934 F.3d 1122 (10th Cir. 2019) ......................... 152-154

*United States* v. *Windrix*, 405 F.3d 1146 (10th Cir. 2005).....................................58

**CASES (continued):**                                              **PAGE**

*United States* v. *Wright*, 747 F.3d 399 (6th Cir. 2014)............. 94-95, 100, 109, 118

*United States* v. *Wright*, 826 F.2d 938 (10th Cir. 1987)...............................159, 162

*United States* v. *Young*, 954 F.2d 614 (10th Cir. 1992)........................ 69-70, 72, 84

*Zicarelli* v. *Dietz*, 633 F.2d 312 (3d Cir. 1980) .......................................................65

**STATUTES:**

Jury Selection and Service Act of 1968,
    28 U.S.C. 1861 *et seq.* .............................................................................. 3, 47
        1861 ...............................................................49, 54-57, 61-65, 67
        1862 ................................................................... 49, 61, 63-64
        1863 .................................................................. 49, 61, 63, 66
        1863(a) ................................................................... 49, 67-68
        1863(b)(2) ................................................................. 63-64
        1863(b)(3) .........................................................................63
        1863(b)(5)(A) ...................................................................64
        1863(b)(6) ............................................................ 63-64, 67
        1864 .................................................................. 49, 61, 63, 66
        1865 ............................................................... 49, 61, 63, 66-67
        1865(b) ................................................................... 63-64
        1866 .................................................................. 49, 61, 63, 66
        1866(c) ................................................................... 63-64
        1867 .......................................................................... 49, 57-59
        1867(a) ................................................................49-50, 57-58, 60, 65
        1867(d) ................................................................. 50, 65
        1867(e) ................................................................. 49, 58
        1869(e) .........................................................................67

18 U.S.C. 2 .....................................................................................39

18 U.S.C. 241 ............................................................... 2, 39, 79, 113

**STATUTES (continued):** **PAGE**

18 U.S.C. 844(i) ................................................................ 117-118

18 U.S.C. 921 ...................................................................39

18 U.S.C. 922(g)(9) ...........................................................39

18 U.S.C. 924(a)(2) ...........................................................39

18 U.S.C. 924(c)(1)(A) ......................................................39

18 U.S.C. 1001 ........................................................... 39, 154

18 U.S.C. 1001(a) ...................................................... 150-151

18 U.S.C. 1001(a)(1) .................................................. 150-151

18 U.S.C. 1001(a)(2) ...............................2, 150-152, 156-157

18 U.S.C. 2332a ........................................ 79, 93, 101, 114, 118

18 U.S.C. 2332a(a) ...................................................... 104-105

18 U.S.C. 2332a(a)(2) ..................................... 2, 39, 113, 118

18 U.S.C. 2332b(g) ...........................................................115

18 U.S.C. 2332b(g)(5)................... 41, 93-94, 96, 112-113, 115-116, 118

18 U.S.C. 2332b(g)(5)(A) ................................. 93-94, 100, 113

18 U.S.C. 2332b(g)(5)(B) ................................. 93, 96, 116

18 U.S.C. 3231 ...................................................................1

18 U.S.C. 3553(a) .....................................42, 44-45, 101, 110, 120-121

18 U.S.C. 3742(a) ...............................................................2

**STATUTES (continued):**                                                    **PAGE**

28 U.S.C. 96 ................................................................................. 50, 67

28 U.S.C. 1291 ...................................................................................2

**PUBLIC LAWS:**

Antiterrorism and Effective Death Penalty Act of 1996,
     Pub. L. No. 104-132, § 730, 110 Stat. 1303 .................................115

Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy
     Act of 1986, Pub. L. No. 99-554, § 141, 100 Stat. 3096...............................50

USA PATRIOT Act of 2001,
     Pub. L. No. 107-56, 115 Stat. 272. .............................................117

Violent Crime Control and Law Enforcement Act of 1994,
     Pub. L. No. 103-322,
          Title VI, § 60023(a), 108 Stat. 1980 .................................114
          Title XII, § 120004, 108 Stat. 2022 .................................114

**LEGISLATIVE HISTORY:**

*Civil Rights Pt. 2:  Hearings Before the Subcomm. on Constitutional Rights,*
     *Senate Comm. on the Judiciary*, 89th Cong., 2d Sess. (1966) ................ 50-51

H.R. Rep. No. 1076, 90th Cong., 2d Sess. (1968)....................................................48

S. Rep. No. 891, 90th Cong., 1st Sess. (1967)..................................47-48, 58, 66-67

**GUIDELINES:**

Sentencing Guidelines § 1B1.3(a) .........................................................................118

Sentencing Guidelines § 3A1.4..................41-42, 93, 95-97, 100, 104-106, 110-120

Sentencing Guidelines § 3A1.4, comment. (n.1)..............................................41, 93

## GUIDELINES (continued):                                    PAGE

Sentencing Guidelines § 3A1.4, comment. (n.4) ............................ 96, 102, 116-117

Sentencing Guidelines § 3A1.4(a) .................................................... 93, 112

Sentencing Guidelines § 3A1.4(b) ........................................................ 93

Sentencing Guidelines § 5K2.15 ......................................................... 114

Sentencing Guidelines § 6A1.3, comment ............................................. 94

Sentencing Guidelines, App. C.,
      amend. 526 .......................................................................... 114
      amend. 539 .......................................................................... 115
      amend. 565 .......................................................................... 115
      amend. 637 .......................................................................... 117

## RULES:

Federal R. Crim. P. 29(a) ............................................................... 150

Federal R. Evid.
      Rule 104(a) ......................................................................... 143
      Rule 106 ....................................................................... 159-165
      Rule 403 ........................................................................ 160, 167
      Rule 608(b) ................................................................... 166-167
      Rule 613 ............................................................................. 166
      Rule 801 ............................................................................. 163
      Rule 801(d)(2)(A) ............................................................... 146
      Rule 801(d)(2)(E) ........ 3, 40, 45, 123, 125, 130, 136-138, 140, 143, 145, 147
      Rule 803(3) ................................................................... 163, 165
      Rule 1101(d)(1) .................................................................. 143

D. Kan. Local Rules

      Rule 38.1 .............................................................................. 51
      Rule 38.1(a) ..................................................................... 50, 67

**RULES (continued):**                                                    **PAGE**

Rule 38.1(b) ...............................................................................52

Rule 38.1(c) .........................................................................51, 58

Rule 38.1(d) ...............................................................................51

Rule 38.1(g) ...............................................................................51

Rule 38.1(h)(1) ..........................................................................51

Rule 38.1(h)(2) ..........................................................................51

Rule 38.1(h)(6)(A) .....................................................................52

Rule 38.1(h)(6)(B) .....................................................................51

Rule 40.2....................................................................................52

**GLOSSARY**

| | |
|---|---|
| FBI | Federal Bureau of Investigation |
| HMTD | Hexamethylene Triperoxide Diamine |
| ISIS | Islamic State of Iraq and Syria |
| KSF | Kansas Security Force |
| PSR | Presentence Investigation Report |
| SSA | Social Security Administration |
| SSI | Supplemental Security Income |
| SWAT | Special Weapons And Tactics |

## STATEMENT OF PRIOR OR RELATED CASES

This Court has consolidated for all procedural purposes the appeals of defendants-appellants Patrick Eugene Stein (No. 19-3030), Curtis Wayne Allen (No. 19-3034), and Gavin Wayne Wright (No. 19-3035).  The government filed an interlocutory appeal from the district court's pre-trial dismissal of one count against defendant Allen (No. 17-3200), which this Court dismissed on the government's motion.  The government filed a cross-appeal to challenge defendants' sentences (No. 19-3053), which this Court dismissed on the government's motion.

Defendant Stein has another pending appeal under submission in this Court (No. 19-3043).  While some of the facts and procedural history of Stein's two cases overlap, the issues on appeal do not.

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

―――――――――――――

Nos. 19-3030, 19-3034, 19-3035

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

PATRICK EUGENE STEIN; CURTIS WAYNE ALLEN;
GAVIN WAYNE WRIGHT,

Defendants-Appellants

―――――――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
THE HONORABLE ERIC F. MELGREN, NO. 6:16-CR-10141-EFM

―――――――――――――

CONSOLIDATED BRIEF FOR THE UNITED STATES AS APPELLEE

―――――――――――――

**STATEMENT OF JURISDICTION**

This is a consolidated appeal from final judgments entered in a criminal

case.  The district court had jurisdiction under 18 U.S.C. 3231.  After defendants

were convicted and sentenced, the court entered final judgments, which it later

amended.  3R.1314-1335.[1]  Defendants filed timely notices of appeal challenging

―――――――――――――

[1]  We use the following abbreviations:  "_R.___" refers to the volume and
page number of the record on appeal.  For defendant-specific volume 7, we also
include the defendant's name (*e.g.*, "7R/Allen.___").  "Supp._R.___" refers to the
volume and page number of the supplemental record on appeal.  "GX.__" and
"DX.__" refer to the government's and defendants' trial exhibits included in

(continued…)

- 2 -

their convictions and sentences.  3R.1336-1341.  This Court has jurisdiction under

18 U.S.C. 3742(a) and 28 U.S.C. 1291.

## INTRODUCTION AND STATEMENT OF THE ISSUES

Defendants Patrick Stein, Curtis Allen, and Gavin Wright were convicted of

plotting to use fertilizer bombs to blow up an apartment complex and mosque in

Garden City, Kansas, because the people who lived and worshipped there were

Muslim immigrants from Somalia.  If successful, they would have maimed or

killed more than 100 people.  The Federal Bureau of Investigation (FBI) foiled

defendants' plot thanks to a confidential informant, who provided much of the

government's evidence at trial in the form of audio recordings of defendants' own

words.  A jury convicted defendants of conspiring to use a weapon of mass

destruction, in violation of 18 U.S.C. 2332a(a)(2), and conspiring to violate civil

rights, in violation of 18 U.S.C. 241.  Wright also was convicted of making false

statements to the FBI, in violation of 18 U.S.C. 1001(a)(2).  Defendants were

sentenced to prison terms ranging from 25 to 30 years, well below their

Guidelines-recommended life sentences.

The appeal raises the following issues:

_____

(…continued)
Supp.1R; for defendants' trial exhibits, we also include the defendant's name.
"Allen Br. __," "Stein Br. __," and "Wright Br. __" refer to pages in defendants'
opening briefs.

- 3 -

1. Whether defendants are entitled to judicial relief under the Jury Selection and Service Act of 1968 (Jury Act or Act), 28 U.S.C. 1861 *et seq.*, based on the method of petit juror selection that the District of Kansas used at the time of their trial.

2. Whether the district court properly declined to instruct the jury on entrapment.

3. Whether the district court correctly applied the terrorism enhancement based on its finding, by a preponderance of the evidence, that defendants' offense was calculated, at least in part, to influence, affect, or retaliate against government conduct.

4. Whether the government committed prosecutorial misconduct. **(Wright only)**

5. Whether the manner in which the district court determined the admissibility of defendants' recorded statements under Federal Rule of Evidence 801(d)(2)(E) was an abuse of discretion. **(Wright only)**

6. Whether the district court abused its discretion in denying Wright's motion for a judgment of acquittal on his false-statements charge. **(Wright only)**

7. Whether there is cumulative error. **(Wright only)**

- 4 -

# STATEMENT OF THE CASE

*1.    Facts*

The evidence at trial established the following facts.  Necessarily
abbreviated here, they are drawn primarily from the testimony of the confidential
informant (Dan Day), an undercover officer ("Brian"), an FBI case agent (Amy
Kuhn), a militia member who refused to join defendants' plot (Brody Benson), and
Allen's former girlfriend (Lula Harris).  The majority of cited exhibits are from
audio recordings of defendants' in-person meetings, texts between Stein and Brian,
and audio-video recordings of Stein's meetings with Brian.[2]

> *a.    Dan Day Meets Patrick Stein While Monitoring A Southwest Kansas
> Militia For Potential Violence And Immediately Raises Concerns To
> The FBI That Stein Is A Threat To Local Muslims*

i.  In summer 2015, Dan Day, a resident of Garden City, Kansas, noticed an
anti-Israel flyer depicting a Palestinian flag at the local library.  Day removed the
flyer and gave it to a friend whom Day knew would be interested in it.  The friend
responded by inviting Day to a cookout at his home, which Day attended with his
son.  Day was surprised that the cookout was primarily a gathering of a dozen or so
members of a Kansas-based militia and their leader, Jason Crick.  During the
cookout, Crick circulated the flyer Day had found and the militia discussed it

---

[2]  We have included a chart in the Addendum that reflects each series of
exhibits that correspond to defendants' recorded in-person meetings.

excitedly, with some members adding that they had seen Somalis standing guard over Islamic State of Iraq and Syria (ISIS) recruiting flyers at the same library. The members discussed their theory that the Somalis were terrorists or providing support to terrorist groups.  6R.2646-2651, 3396, 5012-5015.

After Day left the cookout, his friend called him and asked him to return. Upon doing so, Day was greeted by two FBI agents, including Special Agent Amy Kuhn.  6R.2652.  The agents inquired about the flyer Day had removed from the library and any knowledge he had of terrorism-related flyers.  Day was caught off guard but answered the FBI's questions.  6R.2652, 4820-4822.

Soon after, Day spoke with Special Agent Kuhn again and shared his impression of Crick's militia as "trigger-happy" in how they handled their weapons and talked about surveilling Somalis.  6R.2654, 4566-4567.  Kuhn asked Day to notify her if he heard anything more about either terrorism-related activity or the group's surveillance of local Somalis.  Day said he would and decided to join Crick's militia, primarily to keep an eye on its activities.  6R.2652-2657, 4568-4570, 4686-4687, 5015-5016.  By October 2015, Day had signed a confidential-informant agreement, with the understanding that he would monitor Crick's militia and inform the FBI of any concerns.  6R.2651-2657, 2661, 4573-4574.

ii.  In February 2016, Crick organized an outing to conduct armed nighttime surveillance of predominantly Somali locations in Garden City, including certain

- 6 -

stores, apartment complexes, and mosques.  6R.2665-2666; see 6R.2657-2661.

Before the outing, defendant Patrick Stein, a member of Crick's militia whom Day

had met weeks earlier at another Crick-sponsored event, contacted Day.  6R.2662-

2665, 4700, 4718.  Day was wary of Stein, given that he had mentioned surveilling

Somalis elsewhere by himself and expressed an extreme hatred of Muslims, whom

he referred to as "cockroaches."  6R.2664; see 6R.2702, 3423-3424.  Stein, who

did not live in Garden City, asked Day to show him the Crick-selected locations in

daylight.  6R.2666-2667, 4700.  These included an apartment complex at 312 West

Mary Street that was occupied predominantly by Somali immigrants and refugees

and that also contained a mosque.  6R.2670-2671; see also 6R.1710-1714.

As soon as Day met Stein the afternoon of the outing to visit that night's

locations, Stein launched into an anti-Muslim rant.  Stein also pulled a handgun

from the console of his truck and shouted at two Muslim women he called

"raghead bitches" that he would kill them.  6R.2667-2670.  Day became very

concerned; he grabbed his own gun and was prepared to shoot Stein in order to

prevent him from killing the women.  6R.2668-2669.  The moment passed and

Stein and Day began to drive around Garden City to the different locations Crick

had selected, including the 312 West Mary Street apartment complex.  6R.2670-

2671.

- 7 -

When Stein and Day drove through the complex's parking lot, Stein started "cussing" about "so many 'fucking cockroaches' living right there." 6R.2671. Stein said that "Muslims are like cockroaches" because you cannot "just kill one of them." 6R.2672. Rather, he explained, "you had to exterminate 'em all" or they would "keep on coming back." 6R.2672; see also 6R.1743, 1840; GX.22o. Stein's statements shocked Day, who feared that Stein would start shooting Somalis that night. 6R.2672.

When Stein dropped Day back to his car, Stein placed his handgun where it was visible and told Day that he actually belonged to a different militia, Kansas Security Force (KSF), of which Crick was unaware. Stein was actively recruiting members and wanted Day to join. Uncomfortable, Day responded that they could talk after that night. 6R.2673-2674.

Once alone, Day contacted Agent Kuhn and shared his concerns that, unlike Crick, Stein seemed like a "real radical" (6R.2675) and an actual threat to Somalis. 6R.2701, 3284-3285, 3426-3427, 4700. At Kuhn's request, Day joined Stein that night on Crick's outing, where he noticed other items in Stein's truck, including rifles, a tactical vest, a night-vision scope, and night-vision binoculars. 6R.2701-2703, 3285-3286, 4700-4701. Stein also mentioned explosives to Day, saying that an ammonium nitrate and diesel fuel bomb could flatten a building and that, as a farmer, Stein had ready access to such materials. 6R.2707.

About a month later, Stein contacted Day and asked him to take him back to the surveillance sites.  When Day did so, Stein tried to mark predominantly Muslim locations on his iPhone's map.  6R.3450-3452.  Unsuccessful, Stein asked Day to print maps of the area for him, which Day did with the FBI's help.  6R.2798-2800, 4662-4663; see p. 13, *infra* (providing maps to Stein).  During this time too, Stein was enraged upon seeing Somalis and gestured with his finger that he wanted to shoot a young child in her mother's arms, stating "[t]here's another little fucking baby cockroach motherfucker."  6R.2801-2803; see 6R.4705-4709.

iii.  At the FBI's request, Day remained in contact with Stein and joined KSF.  Stein designated Day as the "vetting" and "intelligence officer" for KSF's "[f]irst division," which covered western Kansas.  6R.2709-2711; see 6R.1737, 3430-3431.  Defendant Curtis Allen was the division's "Command[er]," and Stein its "executive officer."  Defendant Gavin Wright also belonged to KSF.  6R.2711-2712, 2716.  KSF's ostensible purpose was "defens[ive]"—*i.e.*, to provide security in the event of natural disasters or civil unrest.  6R.1734-1735, 1744.  Some KSF members were also "preppers," meaning that they gathered materials, including food and ammunition, in case they had to retreat to safety.  6R.1902-1908; see 6R.1753, 2781-2782.

Defendants, Day, and other KSF members met in person every few weeks and spoke each night by smartphone over an invitation-only, walkie-talkie

application called Zello.  During these meetings and calls, which Stein usually ran, KSF members discussed recent news and shared their distrust and hatred for Muslim immigrants and refugees, including local Somalis.  6R.2713-2714, 2719-2722, 2892, 3299-3301; see 6R.1738-1743, 1864-1865, 3294-3295, 3447-3450.  The group used pseudonyms, with Allen going by "CO" for "Commanding Officer"; Stein by "XO" for executive officer, or "Orkinman," a nickname he gave to himself; and Wright by "Sparky," given his electrical know-how.  6R.2715-2717, 2719; see also 6R.2825-2826.  Day went by "Minuteman."  6R.2744.  Stein also called Day almost daily to talk about different KSF-related ideas Stein had on recruitment, planning, and preparedness.  6R.2712-2713, 2892, 3301.

Day grew increasingly concerned that, unlike other militia members who expressed hatred of Muslims but did not actually intend to harm them, some of KSF's members were serious about killing local Somalis.  The FBI started having Day record defendants' Zello calls and in-person meetings.  6R.2717, 2724-2725, 2744-2745, 2839-2841, 3295-3298, 3307-3309, 3570-3571.

    *b.*    *After The Pulse Nightclub Shooting In June 2016, Stein Vows To "Take Action" And Assembles A Splinter Group That Includes Allen, Wright, And Ostensibly Day*

i. On June 12, 2016, an American citizen of Afghani descent shot and killed 49 people at Pulse nightclub in Orlando, Florida.  KSF members were outraged, particularly because the shooter was Muslim.  6R.2746.  Two days later, on **June**

- 10 -

**14, 2016**, Day received an early morning telephone call from Stein saying that he

was "ready to take action" and was convening an in-person meeting that night to

determine who was "with him."  6R.2745-2746, 2751; see 6R.1751.  Although in-

person KSF meetings normally occurred in public, Stein scheduled the meeting to

take place in an open field on KSF member Brody Benson's private property, a

remote location near Hutchinson, Kansas.  6R.2745, 2752-2753, 2761-2762, 2766;

see 6R.1751-1752.

 Day told the FBI about the meeting, and the agents outfitted him with a

recording device.  6R.2747.  Day and Stein then traveled together to Benson's

property.  During the drive, Stein explained that Benson, Allen, and two other KSF

members would be at the meeting, but that Allen might be late.  6R.2751-2752,

2761; GX.13c, 13e.  On a telephone call that Stein had while driving (6R.2754),

Stein stated, "I'm more convinced now than ever there is absolutely nobody—

nobody going to do anything to change anything in terms of government  *  *  *

until somebody or somebodies finally say fuck it we're gonna take care of it

ourselves."  GX.13f.  Stein continued, "I'm sick and tired of seeing our own

fucking people get slaughtered by our own fucking government  *  *  *  and it's

gotta come to a stop somewhere, sometime, somehow, someway."  GX.13f.

"[T]his morning," Stein stated, a "switch flipped and I went into organization

mode."  GX.13f.

When Stein and Day arrived at Benson's property, they met with Benson

and KSF member Shelby Lewis in a covered shed.  6R.2761-2762; see 6R.1751,

1777, 2504.  The group began talking about Muslim-related violence and the influx

of Muslim immigrants and refugees.  6R.1755-1758, 1760-1766, 2752; GX.13g-

13h.  Benson, who was vocal about his distrust of Muslims and his disagreement

with immigration policies that allowed Muslims into the country, assumed that

Stein had called the meeting to oust KSF's statewide leadership.  6R.1752, 1784-

1785; see also 6R.1732.  He soon realized that it was "a recruitment to carry out an

offensive action" against Muslims.  6R.1752; see 6R.1758, 1780.

Stein began discussing how the then-Obama administration was bringing

Muslims into the country "by the plane load" (GX.13g-13h), and how "Garden

City is a main fuckin' hub that they're bringing them in to – dispersing them from

there" (GX.13h).  6R.1763, 1766.  Stein said that "[t]he fuckin' cockroaches in this

country have got to go" (GX.13h), and mentioned apartment complexes in Garden

City filled with "Fuckin' Goddamn cockroaches" that he would blow up if he

could obtain rocket-propelled grenades (GX.13j).  6R.1763, 1766.  Although he

offered no specifics, Stein said that he had considered but abandoned executing an

attack six to eight months earlier (6R.1767; GX.13n) and now wanted to know if

Benson and Lewis were with him on his idea to "start kicking things off."

6R.2764.  At that point, Day, who looked and felt sick throughout the meeting

(6R.1782-1783), passed out from heat stroke and left by ambulance. 6R.1768-1769, 2764-2766. Lewis also left. 6R.1769.

Shortly thereafter, Allen arrived and the meeting continued in Benson's workshop. 6R.1769, 2463. With Benson still present, Stein reviewed everything he had just talked about, even though Stein had been in "complete communication" with Allen by telephone during the meeting. 6R.1769, 2464-2465. Benson became increasingly concerned as Stein "talk[ed] about using high explosives on the Somali[s] * * * in Liberal or Garden City." 6R.1770. Based on Stein's statements, including his specific mention of fertilizer bombs, Benson suspected that Stein had started acquiring items for an attack. 6R.1770-1771. Allen acted unsurprised (6R.1770) and discussed "cooking or making an explosive substance to use as a catalyst" (6R.2460-2461). Ultimately, the meeting ended. 6R.1771-1772. For Benson, things had turned from "banter" and "ranting and venting" to "something a little bit more serious and more concrete as far as a plan." 6R.2460. The next day, Benson called Lewis to say that he wanted nothing to do with what was going on; he resigned from KSF later that week. 6R.1772.

ii. Stein made at least two more attempts to recruit KSF members to join him in a plan to kill Muslims before they usurped the government. 6R.2768-2770. Day played along during these meetings in order to monitor defendants' activities. He agreed with defendants and parroted their views about needing to do something

about "[t]he Muslims," whom defendants felt "already had taken over the White House," "were taking over the government," and would be "taking over the whole country pretty soon." 6R.2770; see 6R.2771-2773. At the same time, Day was careful not to plant ideas in defendants' heads, given the FBI's repeated instruction that he could only raise ideas that defendants themselves had already discussed. 6R.2775-2777, 3060-3061, 4840-4841.

At the first of these meetings, on **July 9, 2016**, Stein and Allen attempted to recruit KSF members Trish Burch and Daniel Reever to help with "the cockroach situation" (GX.22h). 6R.2780-2785. Stein stated that he was ready to start taking action and killing Muslims, and that he needed to know who was with him and who was against him. 6R.2782; GX.22h. Stein and Allen pressed Burch and Reever to join them in killing Muslims, but Burch and Reever refused because they viewed militias as defensive only. 6R.2783-2785, 2788-2791, 2797; GX.22h-22k; see also 6R.1855, 3527-3528. Stein and Allen emphasized violent action was necessary to awaken people to the Muslim threat. 6R.2789. When it was clear Burch and Reever opposed an unprovoked killing spree, Stein and Allen told them that, in order to safeguard and conceal their attack, they would not share their final plans with them. 6R.2792-2796; GX.22*l*-22m. After the meeting, Day provided Stein with the aerial maps depicting Somali areas of Garden City that Stein had requested, which Stein placed in his truck. 6R.2797-2800.

Stein called a second recruitment meeting on **July 18, 2016**, where he tried to enlist KSF members Nathan and Janina Spooner.  Day, Allen, and Wright also attended.  6R.2808.  For close to an hour, defendants described their plan to preemptively strike and kill the "cockroaches" before Muslims took over the country, and told Janina, who had children at home, that she would have to be ready to act whenever, even if it meant going door-to-door shooting people at 2 a.m. (GX.14c, 14m, 14aa).  6R.2810-2823.  Defendants added that they needed to act before Muslims fully infiltrated the country (GX.14j-14k), likening the threat to the next Crusades (GX.14h-14i).  6R.2817-2818.  Janina became increasingly nervous and visibly scared, at which point Day told her that others had disagreed and stepped back and that she could too.  6R.2819-2820; GX14*l*.  Stein and Allen pressed Janina on whether she could and would kill, to which she responded nervously that she might be better positioned for behind-the-scenes work.  6R.2820-2823; GX.14x, 14aa.  Stein and Allen then called for a break so that everyone could put their phones away.  When they reconvened, Janina was gone.  6R.2823-2824; GX.14bb-14cc.

Defendants returned to planning.  6R.2823-2824.  Stein had each person name his pertinent skills—*e.g.*, electrical know-how for Wright; planning, leadership, and military expertise for Allen; intelligence gathering and coordination for Day; and welding, planning, design, and interrogation for Stein.

- 15 -

6R.2824-2825; GX.14dd, 14mm, 14uu, 14ww.  Stein also listed a series of

potential targets, including newly arrived refugees,[3] Muslims already residing here,

Muslim-owned businesses, landlords in Garden City who rented to Muslims,

organizations and churches that aided Muslim refugees, and businesses employing

Muslim immigrants.  6R.2826-2828; GX.14aaa, 14ccc, 14*lll*, 14mmm, 14ppp.

Defendants also discussed how to avoid surveillance and evade law enforcement

authorities.  6R.2829-2830; GX.14kk, 14hhh, 14iii.  Nathan was present for this

discussion, but neither he nor Janina stayed involved with KSF.  6R.2830.

Defendants, for their part, committed to meeting in person "[a]s much as

possible."  6R.2830.  When Stein and Allen indicated that they should meet at least

weekly but lacked a private space to do so, Wright offered his business, G&G

Mobile Homes, as a place to plan their attack.  6R.2834-2835; GX.14rrr-14sss.

Wright said the group could use G&G's offices in Liberal or Garden City

(GX.14rrr-14sss); defendants ended up meeting in Liberal, where Wright, not his

brother, oversaw the office and they had round-the-clock access (6R.5150-5152).[4]

---

[3]  Earlier, in June 2016, Stein asked Day to get a volunteer position at the
International Rescue Committee in Garden City, so that defendants would know
when refugees were arriving and where they were living.  Day submitted a
volunteer application but never actually obtained a position.  6R.2777-2779, 3000-
3002; GX.127m-127n; see also 6R.1858-1859, 3302-3306; GX.13h.

[4]  Allen took on a second job at G&G later that summer.  6R.1847-1848,
5155-5156.

iii.  A few days later, Stein, Allen, and Day reconvened at a fair in Lakin, Kansas, where KSF had a recruiting booth.  6R.2830-2831; see 6R.1853-1857.[5] There, Stein and Allen talked with KSF members and other militias about cutting a pig's throat and running it through a mosque to signal to Muslims that they were unwelcome.  6R.1857, 2047.  When the fair ended, Stein and Allen met briefly with Day by their cars.  6R.2831; see 6R.1854-1855, 1859-1860.  Stein turned up the music in his truck, and Day and Allen placed their phones aside to avoid surveillance.  6R.1859-1860, 2832.  When Stein's phone rang, Allen leaned over to Day and told him that if defendants' activities ever got out, he would "put a bullet in [Day's] fucking head."  6R.2833-2834.

c.    *Defendants Develop An Increasingly Detailed Plot To Blow Up A Somali Apartment Complex And Mosque To "Wake Up" Citizens To A Perceived Muslim Takeover*

By early August 2016, defendants had shifted from recruitment to planning. 6R.2768-2769.  To that end, they met in person for six or more hours at a time at G&G, where they would blast music and place their phones in another room to avoid surveillance.  6R.1884, 1887, 2126, 2835, 2845-2846, 2900.  Over the course of several meetings in August and September, they narrowed their potential targets to specific locations in Garden City—the city they perceived as having the greatest

---

[5]  The meeting was not recorded because of an equipment malfunction. 6R.2832.

concentration of Muslim immigrants and where Wright grew up, Day lived, and Stein twice had surveilled.  6R.2835-2837, 2855-2858; GX.15e.  Ultimately, defendants decided that they would strike during prayer time at the Somali apartment complex and mosque located at 312 West Mary Street.  6R.2837-2838, 2856-2857, 2861; GX.15j, 15x.  Defendants also planned to issue a manifesto addressed to "the U.S. govt." and "the American people" that warned of subsequent attacks if the government did not change its immigration policies and people did not stand up to the government and respond to the perceived Muslim threat.  GX.101-a-004 to 101-a-007 (draft manifesto).

   i. On **August 8, 2016**, defendants and Day met at G&G, pulled up Google Earth on Wright's computer, and discussed possible targets in Garden City. 6R.2844, 2847-2849, 3318; GX.15h-15o.  They dropped pins labeled "cockroach" on apartment buildings, mosques, and shopping centers used by Somalis, as well as organizations and churches that aided Muslim immigrants; Wright was familiar with many of the locations and Stein had seen others during Crick's outings. 6R.2847-2852; GX.15aa-15cc.  Defendants centered the map on Mary Street, where Allen and Stein said most of the Somali apartment complexes and businesses existed.  6R.2853-2854; GX.15aa, 15dd.  They then discussed how they could destroy the apartments and mosque at 312 West Mary Street, with Allen suggesting a homemade fertilizer bomb.  6R.2858-2859; GX.15ddd.

Allen, who with Wright knew the most about explosives (6R.2886, 2920;
GX.15t-15u), mentioned that he already had a detonator and that defendants should
construct a bomb that would obliterate the complex, not just maim or kill its
inhabitants.  6R.2870-2872; GX.15s.  Allen and Wright felt that making their own
explosives would be cheaper and present less of a risk of detection.  6R.2885-2886;
GX.15iii.  Both had started researching how to make explosives and had
downloaded to G&G's computer over 1000 pages from the Internet as a guide.
6R.2886-2889; GX.15fff.  Day saw a foot-high stack of printouts sitting across the
room.  6R.2887.

Allen also raised the possibility of a manifesto (GX.15p-15q), which he said
defendants could demand media outlets publish.  6R.2860-2867; GX.15kk, 15ss.
Allen wanted the attack to wake people up to what was going on in the country
(6R.2861) and inspire like-minded people to take similar action against Muslims
(6R.2870).  GX.15q, 15x.  Defendants discussed the manifesto's contents, with
Allen saying they should avoid mentioning killing "cockroaches" and instead focus
on big-picture issues like retaking the government and stopping Muslim
immigration.  6R.2864-2866; GX.15pp.  Defendants pondered publishing the
names and home addresses of landlords who rented to Muslims, and those of
governors, mayors, city council members, and judges who, in defendants' view,
had been too lenient toward Muslim immigration.  GX.15uu-15vv.  Allen

volunteered to draft the manifesto, which he started immediately.  6R.2866-2867,

2869; GX.15w, 15rr, 15kkk.  Defendants, excited at the prospect of inciting the

"Crusades 2.0" (GX.15zz), left the meeting with self-assigned homework to

identify a target.  6R.2889-2890, 2970-2972; GX.15ggg, 15kkk.

ii.  Defendants regrouped at G&G on **August 14, 2016**.  6R.2899-2900.  Day

attended again, hoping that his involvement would help the FBI prevent hundreds

of deaths, even though it made him uncomfortable to suggest a target.  6R.2895-

2898, 2971.  He decided that he would suggest the apartment complex and mosque

at 312 West Mary Street, both because defendants already knew about it from

Crick's outing and repeatedly referenced targeting it, and because the FBI would

be well positioned to intercept any threat because of the location's proximity to its

field office.  6R.2897-2899, 3563-3565.

After securing their cell phones and locking G&G's entrance, defendants

discussed how to divvy up buying the materials and equipment they still needed to

make explosives.  6R.2900-2902, 2927-2929; GX.16a, 16s, 16kkk.  Wright, who

said he would buy a chemistry set, offered to have purchases sent to G&G,

believing that it would make the items harder to trace to defendants.  6R.2903-

2904, 2928, 2978; GX.16rr, 16kkk.  Stein offered what he understood to be

ammonium nitrate fertilizer, which he already possessed, and Allen offered up

aluminum powder, another necessary ingredient.  6R.2928-2929; GX.16s-16t.

Defendants also discussed potential targets.  Stein proposed ambushing a convention of Muslims in Chicago—an idea Allen and Wright rejected as too impractical (GX.16b)—before suggesting a drive-by shooting with .50 caliber rifles (GX.16n).  6R.2904-2906.  Defendants refocused their attention on western Kansas, and Day—seeking to participate in the conversation and maintain his persona—suggested two Garden City targets that defendants previously had discussed, *i.e.*, the Somali mall and the apartment complex and mosque.  6R.2906; GX.16i, 16m.

Stein pulled out printed maps he had requested from Day, and defendants homed in on Garden City, this time marking the maps.  6R.2907-2909, 2916; GX.94.  Defendants revisited killing a landlord well known for renting to Muslims but decided they would bomb only his property—312 West Mary Street—for their initial attack.  6R.2909-2918; GX.16z, 16tt, 16uu.  Defendants liked the complex's U-shape, which Stein had seen during Crick's outing, because it would be easier to place explosives there and get away.  6R.2915-2917, 2972-2974, 2976; GX.16o, 16q-16r, 16ee.  They also discussed whether to bomb the apartment complex and Burmese mosque across the street.  6R.2917-2918; GX.16jj.  Wright warned that executing simultaneous attacks would be too risky, and so they decided that, for now, they would strike only 312 West Mary Street.  6R.2918-2919; GX.16ppp.

Defendants would detonate the bombs at prayer time to maximize the carnage. 6R.2919, 2974-2975, 2978-2979; GX.16r, 16mm, 16oo.

Defendants then returned to the topic of explosives. 6R.2919-2920; GX.16bb. Day asked how they would deliver the explosives, to which Allen responded they would use car bombs. 6R.2920-2921, 2974-2977; GX.16u, 16w, 16kk. When another defendant suggested using trash cans or dumpsters, defendants debated each approach. 6R.2925-2926; GX.16ff, 16*ll*, 16ss. Regardless, they agreed that they would need to test any explosives before the attack to ensure they worked. 6R.2926-2927; GX.16ttt.

By the meeting's end, Allen reported on the manifesto, which defendants decided to circulate at the same time as the bombing to inspire similar attacks and warn that more attacks would follow if Americans continued to allow Muslims to usurp the government. 6R.2929-2931; GX.16aaa-16bbb, 16jjj, 16*lll*.

After Day briefed the FBI on defendants' August 14, 2016, meeting, the agents decided to introduce an undercover officer into the investigation to gain better insight into defendants' activities and divert them from making their own explosives. 6R.2932-2936, 2985-2986, 4640-4642; see 6R.3711-3715. An officer with specialized training also could help verify how grave and immediate a risk existed. 6R.4798-4802. Day and the agents agreed that, in order to bring an undercover officer into the investigation, Day would raise the idea of using a

purported black-market contact as a way for defendants to obtain explosives that, unbeknownst to defendants, would be fake.  6R.2932-2936, 2985-2988, 3055-3056, 3380-3384, 4654.

iii.  Defendants met again at G&G on **September 2, 2016** (6R.2936-3039), at which point Day raised the idea of using his contact to obtain explosives. 6R.2937-2938, 2987-2988; GX.127a.  Defendants were receptive to the idea, though Wright suggested trading meth for explosives as a way to pay for the explosives and avoid a setup.  6R.2938-2940, 2996; GX.127b, 127g.  Day wrote down a list of items defendants wanted him to get from his contact, including electric blasting caps, C4 (an explosive), hand grenades, and mortar rounds. 6R.2940-2943, 2992-2996, 3039-3040, 3362-3363; GX.127e, 127oooo; GX.187-a. Allen and Wright questioned if they should risk using an outsider for these additional materials or incur the associated expense where they were confident they could make their own explosives; they decided to see what Day's contact could get them.  6R.2988-2990, 2995, 3040-3041; GX.127e.

Defendants returned to the specifics of their attack.  They made a drawing of the apartment complex at 312 West Mary Street by hand, indicating where Day said its mosque was located, and marked where they would put their explosives. 6R.2996-3000; GX.127k.  Wright, in addition, suggested blowing up buses of refugees as they crossed into Kansas and bombing a local transportation hub in

Garden City, but he agreed that the apartment complex and mosque was an attractive first target.  6R.3002-3006; GX.127m, 127q, 127t-127u, 127yyy.

Allen explained the specifics of the explosives defendants would need, including their size and how to construct and position them to cause the most damage and casualties.  6R.3006-3010; GX.127x.  It was clear to Day that Allen had everything he needed to make a blasting cap and that, once he did so, Allen intended to—and would—construct a fertilizer bomb.  6R.3010-3011; GX.127uu-127vv, 127bbb.  Although Allen could build his own blasting caps once he made a highly volatile and explosive compound known as HMTD (for hexamethylene triperoxide diamine), he also wanted to pursue getting electric blasting caps from Day's contact, because it would be easier than making them and they would be more reliable.  6R.3011-3016; GX.127y, 127uu-127vv, 127zz, 127mmm, 127fffff.

By this time, Allen had determined that defendants would detonate their bombs remotely using prepaid cell phones.  6R.3018-3019; GX.127nnn, 127qqq.  Allen and Wright explained that they could place the bombs in industrial-sized trash cans that they could modify to explode toward the apartments and mosque.  6R.3022-3023, 3025-2026; GX.127bb-127cc, 127uuu.  Stein and Wright suggested including ball bearings, nails, and razor blades in each bomb, with Stein saying that such shrapnel would allow defendants to "have some more fun" (GX.127www).  6R.3023-3024; GX.127dd; see also GX.97a-012.  Defendants

again committed to testing the explosives to ensure they had their desired effect.
6R.3028-3035; GX.127aaa-127bbb, 127ooo.

Defendants also reviewed Allen's draft manifesto and discussed what more
to include, such as specifically mentioning illegal immigrants and refugees and
warning landlords and city councilmembers that they would be targeted if they
continued bringing Muslims "into town" (GX.127*ll*).  6R.3004, 3035-3037;
GX.127pp.  To avoid scrutiny that would make executing subsequent attacks more
difficult, defendants decided not to take responsibility for the Mary Street bombing
in their manifesto.  6R.4994-4995, 4997; GX.127dddd.  They repeated their hope
that the manifesto would be a "call to action" (GX.127qq).  6R.3037-3039;
GX.127ffff; see also 6R.1921-1922.

> d.    *The FBI Introduces An Undercover Officer In An Attempt To Steer*
> *Defendants Away From Manufacturing Their Own Explosives, But*
> *Defendants Continue Making HMTD While Also Pursuing Explosives*
> *From The Undercover Officer*

Because defendants wanted to explore using Day's contact to obtain
explosives, the FBI now needed to introduce the undercover officer.  The case
agents expected this process would take some time, but events the next month
unfolded quickly as Allen and Wright succeeded in making HMTD, a volatile
explosive they could use to set off a larger bomb.  See 6R.3045-3047, 3053-3060,
3719, 4655-4656, 4862-4863; GX.130/9:55-12:48.

    i.  Defendants and Day reconvened at G&G on **September 11, 2016**.[6]

6R.3078.  Day arrived with a mortar and pestle defendants had requested he

purchase.  6R.3079; GX.144.  Wright placed them in the closet, and he and Allen

announced that they now had everything they needed to make component

materials.  6R.3081-3082.  They intended to begin doing so immediately, but the

meeting ended abruptly when Allen's girlfriend showed up unexpectedly.

6R.1884, 3082-3086.

    ii.  Defendants and Day regrouped on **September 18, 2016**, at a truck stop in

Sublette, Kansas.  Day called the meeting at the FBI's request in order to pursue

using his purported contact.  6R.3086-3087.  Before Day could say anything, Allen

and Wright announced that they had successfully tested an explosive at G&G.

Excitedly, they said that when they ignited only a gram of the substance, it went

"whoosh" and burned the hair off of Allen's finger.  6R.3087-3090; GX.17a.  Once

they calmed down, Day told defendants that he had heard from his contact, who

might be able to get them what they wanted provided he could meet them in

person.  6R.3090-3091.  Defendants still wanted the items but, having now made

explosives, questioned whether anyone but Day should risk an in-person meeting.

6R.3091-3093; GX.17b-17c.

---

    [6]  The meeting was not recorded because of an equipment malfunction.
6R.3078.

Day grew concerned that the FBI would not be able to divert defendants' attention away from making explosives and that defendants might proceed without him and cut him out of their plans. 6R.3093-3094, 4806-4807. He again asked defendants if they wanted to work with his contact. 6R.3094. They suggested that Day first try to meet his contact alone, or that Day and Stein pair up, but made clear that they would join him if necessary to do business. 6R.3095-3097; GX.17k.

iii. Day separately called each defendant over the next few days in an attempt to persuade defendants to meet with his contact. 6R.4912-4915, 4954-4955. On **September 25, 2016**, Stein and Day met with a team of undercover officers acting as black-market weapons dealers. 6R.3105-3107, 3509-3511, 3720-3723, 4803-4805. Day's only role was to guide Stein to the meeting. 6R.3106, 3749. When Stein and Day arrived at a remote field, Brian, the lead undercover officer, met with Stein alone in Brian's truck. 6R.3108, 3746-3749. This way, Day could not influence the conversation, which was important to Brian in establishing rapport with Stein and assessing how far defendants' plans had progressed. 6R.3751. Stein immediately shared his disdain for Muslims and desire to "eradicate[]" them (GX.18b), telling Brian that he soon may see "news coming out of western Kansas" (GX.18c). 6R.3751-3753; see also GX.18q. In order to gather information on defendants' plans and position the FBI to mitigate any threat, Brian told Stein that he might be willing to help them. 6R.3753-3754.

Brian and Stein discussed defendants' wish list. Among other things, Stein shared defendants' plan to detonate bombs remotely by cell phone using electric blasting caps (6R.3755-3756; GX.18d, 18e) and sought to price various items. 6R.3754-3760; GX.18f-18g, 18i-18j. Stein also asked Brian whether he could get defendants fully automatic weapons. 6R.3760; GX.18m. When Brian asked about Allen and Wright's involvement, Stein assured him that they were fully committed to the attack and would not snitch on them. 6R.3762-3764; GX.18k. Stein and Brian agreed to stay in touch over encrypted smartphone applications. 6R.3763-3764; GX.18s.

Based on defendants' detailed plans and Stein's eagerness to work with him, Brian concluded that Stein was serious about an attack and recommended that the FBI expedite its investigation. 6R.3765. When Stein spoke with Day afterwards, he reported excitedly that Brian shared defendants' beliefs and could get them almost anything they wanted. 6R.3108-3109; see 6R.3717.

iv. Stein and Brian next communicated directly via WhatsApp and Signal. 6R.3732-3736, 3768-3769. Two days after the meeting (6R.3796), Stein texted Brian with more information concerning defendants' plans. 6R.3768-3769; GX.108-002. Stein stated that it was nice to find like-minded people looking "to address the infestation of these fucking cockroaches!!," and that "the other[s]" felt "exactly the same way" about doing something and were "ready to take action."

6R.3773-3774; GX.108-006.  Stein also solicited Brian's input, writing that he and

defendants were "just country hicks  *  *  *  willing to do anything that it takes to

get our country back."  6R.3775; GX.108-007, 108-008.  He added that, "We have

a war coming directly at us and myself and my guys will be some of the first ones

out doing some housecleaning."  6R.3775; GX.108-008.  When Brian asked what

defendants wanted, Stein responded, "No. 8 blasting caps" and "[a]ny advice or

input you have that would benefit the cause."  6R.3776-3778; GX.108-009.

Stein then texted Brian that he was emotionally prepared to carry out an

attack.  6R.3779-3782.  He stated that he had never been "more ready and willing

to defend this country, the Constitution and the citizens at all cost."  GX.108-012.

He also stated that he had wanted "to do something for a long long time" and that it

was "getting very close to the right time."  GX.108-014.  When Brian responded

that he could "build [defendants] something that would take out most of [Garden

City]," Stein replied "music to my ears!"  GX.108-019; 6R.3800-3803.

Stein further texted about his displeasure with the country's growing Muslim

population.  As for the federal government, Stein wrote, referring to then-President

Barack Obama:

> We are literally being run by a terrorist organization at the highest
> level being the oval office.  He is their leader there organization is
> called the Muslim brotherhood his cabinet is almost exclusively
> Muslim brotherhood and of course it filters down through every other
> department and branch of the federal government hell it's even getting

down into the local governments now it's at a point where it is got to
be stopped or there is going to be no stopping it[.]

GX.108-020, 108-021.  Stein then wrote that although defendants were part of a

militia, the militia had "absolutely nothing to do with" the planned attack.

GX.108-025.

When Stein mentioned that defendants continued to make their own

explosives, Brian tried to dissuade them from doing so.  GX.108-027, 108-028;

6R.3783, 3805-3806, 3808.  Stein then wrote, "I will just tell you the game plan"

(GX.108-31), and shared the grisly details of defendants' plan:

> We are going to blow up a mosque when they are at their prayer time
> and they are packed in there like sardines.  This is in a location where
> a select few pieces of shit property owners in this town are housing
> these bastards.  They have taken some of the apartments and
> converted them into their mosques.  * * * So we were going to use
> trashcan's that were modified on the inside to make a directional blast
> and set them on the outside of the mosque both sides of the building
> set them off at the same time and throw a fucking party!  LOL[.]

GX.108-032, 108-034.  To slow defendants down, Brian asked whether Stein

might be able to show him the apartment complex and mosque; Stein replied

"[t]hat would be wonderful man absolutely."  GX.108-039, 108-040; see also

6R.3812-3820.

v.  Stein called another meeting with Day and defendants at the Sublette

truck stop on **October 5, 2016**.  6R.3109-3110; GX.129a.  Before Stein could say

anything, Allen and Wright announced that they had done further explosives

testing at G&G.  6R.3110-3112.  This time, Allen described setting off an HMTD-powered blasting cap in G&G's parking lot that left an inch-deep hole in the ground.  6R.3111-3113; GX.129b, 129i.  Allen and Wright said they could use fertilizer to have a "two-pounder" ready that weekend to test the strength of an HMTD-powered bomb.  GX.129i.  Allen earlier had explained that their actual bombs would be over 100 pounds each.  GX.127u, 127x, 127uu.

Stein then talked about his dealings with Brian (GX.129d), relaying that he had told Brian that he wanted to focus on blowing up 312 West Mary Street. 6R.3113-3114.  Wright agreed that they should focus on the bombing (GX.129g), though he and Allen felt that working with Brian could leave them open to a setup and would be too expensive.  6R.3114-3115; GX.129m-129n.  In the end, Wright and Allen agreed that defendants should use Brian but decided that only Stein and Day should meet with him.  6R.3115-3116; GX.129j, 129q.  Allen confirmed that he still wanted blasting caps (GX.129o), and Allen and Wright asked the others to find out exactly what kind of bomb, with what sort of materials, Brian could construct.  6R.3118; GX.129q.  In the meantime, they would continue making explosives.  6R.3116-3120; GX.129n, 129s-129t.  Defendants decided they would strike right after the presidential election.  6R.3120-3121; GX.129u-129v.

e.    *Defendants' Plot Intensifies But Soon Unravels After Police Arrest Allen For Domestic Violence*

i.  On **October 11, 2016**, before Stein and Day could meet with Brian again (GX.113a-113e), Day received an unexpected call from Stein saying that Allen had been arrested.  6R.3131, 3390, 4876.  Because Stein had little information, Day called Wright.  6R.3131-3132.  Wright explained that he and Allen were stopped by local police, and that Allen had been taken into custody.  According to Wright, Allen's girlfriend had called 911 earlier that day after Allen had threatened her; when police responded, she also reported that Allen and Wright were making explosives at G&G.  6R.3132-3133, 4876-4879.  Wright, in a strange voice and seemingly paranoid, told Day that he knew nothing about Allen making explosives at G&G and that he was leaving KSF.  6R.3133-3135, 3580-3584, 3634-3635; GX.287-288.

In fact, Allen's long-time girlfriend, Lula Harris, called police after she and Allen had an argument in which Allen threatened to kill her.  6R.1833-1837, 1910-1915.  Harris had returned to Kansas in June 2016 and was living with Allen until his arrest.  She had recently overcome cancer and spent most of her time at home.  6R.1850-1853.  There, she observed Allen repeatedly watching a series of videos on making explosives.  6R.1867-1872, 1998, 2132-2133.  Harris also saw Allen collecting materials referenced in the videos and heard him confirm by phone that Wright had a beaker delivered to G&G.  6R.1872-1875.  She also watched Allen

bring a large crate of binders to and from G&G each night; they contained bomb-

making recipes that Allen and Wright had printed at G&G and which Allen studied

after dinner.  6R.1875-1878, 1882-1883, 2148.  Allen likewise played a CD of *The*

*Anarchist Cookbook* so many times that even Harris knew its recipes.  6R.1945-

1947.

Harris also overheard Allen's nightly Zello calls, as well as his separate

telephone calls with Stein, all of which Allen placed on speakerphone.  6R.1864-

1866, 2001-2002, 2079.  She also heard Allen speak with Wright by telephone, but

never Day.  6R.1866.  In addition, Allen told Harris that defendants were planning

an attack against Muslims to "wake people up" to what would happen if the

government continued to accept Muslim immigrants and refugees.  6R.1886-1887.

One day in September or October 2016, when Harris brought Allen lunch at G&G,

Harris saw a beaker of thick white fluid in G&G's kitchen alongside bomb-making

materials, such as a mortar and pestle, burner, stir rod, scale, and cheesecloth.

6R.1889-1891, 1894-1897, 1911, 1934-1935, 2111.  Based on the videos Allen

watched at home, Harris immediately knew that Allen and Wright were cooking

explosives at G&G.  6R.1889, 2110-2111.  Harris told police about the explosives

when she reported Allen for domestic violence.  6R.1911, 1915-1923, 2110-2111.

She also told police that defendants planned to kill Muslims to make a point.

6R.2135-2136.

ii.  Despite Allen's arrest, Stein and Day met with Brian and his undercover

team the next day **(October 12, 2016)**; the FBI proceeded with the meeting, which

took place approximately 45 minutes outside of Garden City, to ensure that Stein

and Wright did not strike alone.  6R.3135-3136, 3856-3858, 3865.  In response to

Stein's earlier request (6R.3822-3825; GX.110h-110j, GX.18m), Brian brought

fully automatic weapons for Stein to shoot.  6R.3517, 3850-3853.  Doing so

bolstered his credibility with Stein and also established grounds to arrest Stein if he

presented an immediate danger to public safety.  6R.3851-3852, 4022-4023, 4666-

4669, 4870-4871.  As Stein shot the weapons, he said that he would love for the

target "to be a fuckin' rag head."  6R.3861-3862; GX.21d.  Afterwards, Stein

assured Brian that neither Allen nor Wright would talk to the police about the plot

despite Allen's arrest.  6R.3863-3864; GX.21k, 21n.

Stein then took Brian and his team to see the apartment complexes and

mosques on West Mary Street (6R.3864-3865; GX.21o).  See 6R.3828-3829,

3839-3840; GX.110i, 111g.  When Stein, Brian, and the other undercover officers

reached Garden City in their separate vehicles, they all pulled into a parking lot

and Stein joined Brian and other undercover officers in Brian's vehicle to drive to

West Mary Street.  6R.3879-3880.  Brian's vehicle was wired with audio and video

recording equipment.  GX.49.  As they drove to West Mary Street, Stein confirmed

that he still wanted to attack that November and could provide 300 pounds of

fertilizer to Brian for a bomb. GX.49/5:35, 8:20, 10:30, 19:45. Brian asked if Stein still needed blasting caps; Stein responded yes, especially now that Allen was arrested. 6R.3882; GX.49/10:54. Before Stein exited Brian's car, he mentioned that he might start kicking in doors and shooting Muslims, to which Brian responded "let's focus on this one" to rein in Stein. 6R.3882-3883; GX.49/27:25. By that time, Brian had no doubt that Stein wanted to blow up the apartment complexes and mosques at 305 and 312 West Mary Street. 6R.3884.

iii. In the meantime, **also on October 12, 2016**, Wright went to the local police department to speak with state and federal agents after he was not allowed to enter G&G. 6R.4269-4270, 4307, 4322; GX.138/02:08, 16:05. The agents told him that they were getting a search warrant, and conducted a voluntary interview of Wright about his relationship with Allen and what he knew about explosives-making at G&G. GX.138/16:27-17:27. Wright stated that he had no knowledge of explosives being made or located at G&G; that he was not a KSF member and had not attended KSF meetings; and that he had provided the agents with all of his personal knowledge about Allen, which was limited to meeting Allen 18 months earlier when Allen installed a security system for him and employing Allen at G&G for the last month or so. 6R.4275-4276; GX.138/17:27.

iv. To expedite the FBI's investigation and ensure defendants did not have access to bomb-making ingredients, Brian texted Stein the next day to get the 300

pounds of fertilizer.  6R.3884-3886, 3890; GX.113f-113g, 113*l*.  On **October 14,**
**2016**, Stein delivered the fertilizer to Brian at a McDonald's parking lot.  6R.3892-
3900, 3914-3915, 3976; GX.19/0:24, 113n.  He and Brian went inside to discuss
defendants' payment and how Brian would deliver to defendants the constructed
bombs, which Brian stated would destroy both apartment complexes and mosques.
6R.3900-3902, 3915-3916; GX.19/1:05, 2:45, 5:56.  Stein seemed pleased and did
not hesitate at moving forward, even after Brian asked whether children lived at
either location (GX.19/7:32).  6R.3902-3904, 3917-3921; GX.19/5:59.

　　　When Stein returned to his truck, an FBI SWAT team arrested him.
6R.4029; GX.19/13:10.  Wright was arrested later the same day.  6R.4883.

　　　f.　　*Law Enforcement Authorities Seize Evidence Of Defendants' Planned*
　　　　　*Bombing From Defendants' Homes And Trucks, G&G, And Two*
　　　　　*Storage Lockers*

　　　After defendants' arrests, state and federal authorities obtained and executed
search warrants for, among other places, defendants' homes and trucks, G&G, and
two storage lockers that Wright had accessed early in October 2016 and again after
Allen's arrest.  6R.1925-1926, 4412-4424, 4540; GX.1-4, 6-9, 134.

　　　At G&G, authorities seized telephone and Internet records, copies of *The*
*Anarchist Cookbook*, goggles, a thermometer, notes on making methamphetamine
and HMTD, a detonator, a solid white substance that was in the detonator and in a

kitchen drawer, a prepaid cellphone, cans of fertilizer prills, hydrogen peroxide, and a draft manifesto. 6R.4541, 4884-4888; GX.26-a, 46, 58-60, 62-63, 65-66, 99-a to 101-a, 103-a, 134; see 2R.741-761. FBI lab tests confirmed that the solid white substance was HMTD, a highly volatile explosive that, when used with the type of fertilizer bomb defendants planned to make, would detonate the bomb. 6R.4054-4058, 4142, 4175-4176; GX.181.

From a storage locker, authorities recovered the crate of binders and recipes that Harris saw Allen studying (GX.9, 72-a, 104, 105-a to 107-a), and hobby fuse similar to that used in the detonator seized from G&G (GX.71). Authorities also seized a digital scale, guns, holsters, ammunition pouches, and ceramic plates. GX.196-197, 199-200, 202, 304. In addition, authorities seized several bags of aluminum powder, a common ingredient for explosives (6R.4162-4163), and a CD of *The Anarchist Cookbook* from Allen's home. GX.78, 203; see 2R.741-761.

From Stein's truck, authorities seized handwritten notes, marked maps and satellite images of West Mary Street, and a legend of code words. GX.29, 31-32, 34, 92-94. Authorities found similar code in a notebook in Allen's truck (GX.37-a, 174) and additional maps and notes at Stein's home (GX.38, 39-a, 95a to 97-a). They recovered a magnetic stirrer, hot plate manual, and over $3000 cash from Wright's truck (GX.80) and another $10,000 in cash and coins, in addition to various firearms, from Wright's home. 6R.4888-4891; see 2R.741-761.

Finally, authorities found portions of defendants' manifesto in notebooks

seized from Allen's home (GX.35-a), his truck (GX.36-a), and his desk at G&G

(GX.101-a).  6R.4828-4833.  The most comprehensive version of Allen's draft

(GX.101-a-004 to 101-a-007) stated (as read into the record in full):

> This manifest is for the U.S. government and for the American people.
> For the last several years many people and groups throughout the
> country has tried to "wake up" the American people!!  Wake them up
> to our tyranny – tyrannical government.  Most of this has gone to no
> avail.  With this document we are going to attempt a forced wake up
> call.  American people, you have to wake up while there still might be
> time to stop our government from totally selling this country out.  We
> must come together as a people and nation and not just demand but
> reinstate our Constitution.  It must be understood by all just what our
> government is up to.  Don't be fooled by the words "conspiracy
> theory" or "domestic terrorist."  All this is a word game, brainwashing
> by our government.  Standing up for the Constitution is not domestic
> terrorism.  It's actually government terrorism.  Not enforcing our
> borders, illegally bringing in Muslims by the thousands, top U.S.
> officials being above the law, top officials in our government taking
> donations of bribes from foreign nations.  The U.S. government
> passing laws and executive orders that go directly against the
> Constitution, allowing U.S. companies to 'pack up' and move totally
> overseas, destroying our manufacturing and job base.  The current
> administration is even giving jobs to overseas companies and
> importing the labor.

6R.4828-4829.  The manifesto then called Americans to action to take back their

government and save their nation:

> We have to take a stand, take a stand before it's too late too [sic]!!  It
> might already be.  We are trying to do just that with this manifest.  We
> know what's going on.  This is a wake-up call to everyone else.  All
> the people who care about this country, everyone who knows
> something's wrong but have been afraid to admit it, any groups that
> believe in the Constitution, it's time.  The government, media and all

the different social media platforms have brainwashed this country
into a lullness  *  *  *  making foreign treatises that the people,
including our representatives, cannot even see, signing agreements
and laws with the UN, completely stripping U.S. of our constitutional
freedoms, current Congressmen being above the law.  [E]uphoria that
could care less what the government does.  Well, the time has come
for us that do care to take a stand.  It's time to do what the
government hopes we will never do, that's come together as a nation,
as a people.  We must begin to make our voices heard while we still
can.  Remember, a divided people have no voice.  And that's exactly
what we are now, divided.  This is a call to action by all Americans.
Please do not just sit idle until we lose this once great nation.

6R.4829-4830.  The manifesto concluded by threatening individuals, including

government officials, who aided immigrants and refugees and by pleading with

Americans to "take action now":

Many things this Government has and is doing to this country right
now.  If you have anything to do with the sellout of this country, a
government official, a landlord of refugees/illegal immigrants, your
homes, your businesses and your families are at risk.  You have been
warned.  Stop your actions now.  Take a stand now.  Any individual,
any group, anyone that cares about this country, take action now.  It's
your duty as an American, as a citizen, a vet, a public official, take
action now!!

6R.4830-4831; GX.101-a.

2.    *Procedural History*

    a.    *Indictment And Relevant Pre-Trial Motions*

    i.  As relevant here, the government prosecuted Stein, Allen, and Wright for

two separate but related conspiracies that took place in the District of Kansas and

elsewhere between approximately June 14, 2016, and October 14, 2016:

(1) conspiring to use a weapon of mass destruction (*i.e.*, a destructive device as defined by 18 U.S.C. 921) against people and property within the United States, in violation of 18 U.S.C. 2332a(a)(2) and 2; and (2) knowingly and willfully conspiring to injure, oppress, threaten, and intimidate the civil rights (*i.e.*, fair housing rights) of the residents of 312 West Mary Street, in violation of 18 U.S.C. 241.  1R.335-337; 2R.535-539, 704-711; 6R.4437-4438.

The government also prosecuted Wright for knowingly and willfully making materially false statements in a matter within the FBI's jurisdiction, in violation of 18 U.S.C. 1001.  1R.339-340.  The government alleged that on October 12, 2016, Wright made the following false statements to the FBI in connection with its investigation into an offense involving domestic terrorism:  (1) that Wright did not know anything about Allen manufacturing explosive devices at G&G; (2) that Wright had no knowledge of any explosives being located at G&G; (3) that Wright was not a member of a militia; (4) that Allen had not invited Wright to a KSF meeting; and (5) that Wright had provided the FBI with all of his personal knowledge about Allen during the interview.  1R.339-340, 2R.712-716.[7]

---

[7]  Allen also was charged with violations of 18 U.S.C. 922(g)(9) and 924(a)(2), but the district court dismissed these charges based on this Court's intervening decision in *United States* v. *Pauler*, 857 F.3d 1073, 1074-1075 (10th Cir. 2017).  See 6R.26.  In addition, Stein was charged with two counts of violating 18 U.S.C. 924(c)(1)(A), but the court dismissed those charges after the government's case-in-chief.  6R.4505-4506; see 1R.337-339.

ii.  In advance of trial, and before the district court issued questionnaires to potential jurors, defendants twice sought under the Jury Act to summon jurors from both the Dodge City and Wichita/Hutchinson jury divisions, as opposed to the usual practice of summoning petit jurors from only the Wichita/Hutchinson division for Wichita-based trials.  1R.801-821, 1166-1187.  The court denied both motions.  1R.1041-1064, 1295-1298.

Defendants also moved for a pre-trial hearing to determine the admissibility of out-of-court statements that the government intended to offer as coconspirator statements under Federal Rule of Evidence 801(d)(2)(E).  1R.1022-1030.  The court granted the motion.  1R.1284-1285; 3R.141-161.  Over the course of three days, the court ruled that the majority of these statements qualified as coconspirator statements under Rule 801(d)(2)(E).  2R.467-468, 473-474, 505; 6R.661-785, 1533-1632; Supp.2R.45-136.

b.    *Trial*

The case proceeded to an 18-day trial.  6R.867-5561.  The government called 15 witnesses—including Dan Day, Brian, Brody Benson, and Lula Harris— and admitted over 500 exhibits, of which approximately 400 were audio or video recordings.  Defendants called 10 witnesses and admitted close to 40 exhibits. 6R.1673-5186; see 2R.741-770 (exhibit list); Supp.1R (trial exhibits).

At the jury charge conference, defendants requested an entrapment instruction.  2R.594-595.  The court denied the request based on defendants' insufficient showing both that the government induced defendants to commit the charged conspiracies and that they were not otherwise predisposed to committing those crimes.  6R.5317-5325; see also 2R.132-139, 623-624.

The jury convicted on all counts, finding Stein, Allen, and Wright guilty of both conspiracies and Wright, in addition, guilty of lying to the FBI.  2R.738-740.

c.    *Sentencing And Appeal*

As relevant here, the Probation Office calculated defendants' recommended Guidelines sentences as life imprisonment.  7R/Stein.163-238; 7R/Allen.128-185; 7R/Wright.209-263.  The Guidelines calculation included the application of the terrorism enhancement, which imposes a 12-level increase and criminal history category of VI where a defendant commits a felony that "involved, or was intended to promote, a federal crime of terrorism."  Sentencing Guidelines § 3A1.4 & comment. (n.1) (incorporating 18 U.S.C. 2332b(g)(5)).

On November 19, 2018, the court held a hearing on defendants' objection to the application of the terrorism enhancement (and other issues they had raised).  6R.5580-5772; see also 3R.313-334; 7R/Stein.200-238; 7R/Allen.162-185; 7R/Wright.240-263.  The court later ruled that the terrorism enhancement applied

because defendants' conspiracy was calculated, at least in part, to influence, affect, or retaliate against government conduct.  Supp.2R.23-32.

On January 25, 2019, the court sentenced defendants.  6R.5773-6088.  The court explained that even though the Probation Office had correctly calculated each defendant's Guidelines sentence to be life imprisonment, it would rely primarily on the Section 3553(a) factors to impose non-Guidelines sentences.  6R.5866, 5986-5987, 6070-6071.  The court also stated that, even if it had not applied the terrorism enhancement, it still would have reached the same sentences because, instead of varying downward, it would have departed upward, consistent with Section 3A1.4's commentary.  6R.5866, 5987-5988, 6072.  The court sentenced Allen to 300 months' imprisonment; Wright to 312 months' imprisonment; and Stein to 360 months' imprisonment.  6R.5871-5888, 5991-6002, 6075-6087.

The court entered judgment against Allen and Stein on January 31, 2019, and against Wright on February 1, 2019.  3R.1289-1309.  On February 4, 2019, the court amended the judgments to correct clerical errors.  3R.1314-1335.

Defendants filed timely notices of appeal to challenge their convictions and sentences.  3R.1336-1341.  The government filed a timely cross-appeal, which this Court later dismissed on the government's motion.  See *United States* v. *Allen*, No. 19-3053 (10th Cir. Jan. 3, 2020).

# SUMMARY OF ARGUMENT

1.  Defendants are not entitled to reversal based on the method of petit juror selection that the District of Kansas used at the time of their trial.  Defendants argue that the district's practice of summoning petit jurors from only three of its six geographic jury divisions violated the second policy declaration of the Jury Act.  Yet, their statutory challenge is procedurally barred because defendants failed to comply with the Act's strict procedural requirements.  Regardless, Congress's policy statement in support of expansive jury selection is not by itself enforceable absent a substantive or procedural violation of the Act.  Moreover, even if the policy statement were independently enforceable, the procedures defendants challenge, which were neither discriminatory nor arbitrary, did not amount to a substantial failure to comply with the Act, as required for judicial relief.

2.  The district court properly declined to instruct the jury on entrapment. To raise a triable issue as to entrapment, defendants had to offer sufficient evidence both that the government induced them to enter the conspiracy and that they otherwise lacked the predisposition to do so.  Defendants did neither.

Although defendants paint themselves as unwary innocents whose hatred would not have amounted to action without Day and Brian's involvement, the undisputed evidence shows otherwise.  Defendants' plan to take violent action against local Muslims originated with Stein, not Day or Brian.  Indeed, it was Stein

who recruited Day into defendants' militia and, again, into defendants' splinter group and who sought to exploit whatever Day and Brian could offer defendants, not the other way around.  Allen and Wright also actively participated in defendants' plot, including by assembling the knowledge and materials necessary to manufacture homemade explosives, which they made together at G&G outside of Day's presence and unbeknownst to him.  In fact, all three defendants forged ahead without hesitation, pausing only to consider how best to avoid getting caught.  Based on the undisputed evidence showing that defendants were ready, willing, and eager participants in their plan to kill innocent Muslims, the court correctly decided that there was no entrapment as a matter of law.

        3.  The court properly applied the terrorism enhancement at sentencing because defendants' conspiracy was calculated, at least in part, to influence, affect, or retaliate against government conduct.  Binding precedent allowed the district court to find the facts supporting the enhancement, and the court properly used the preponderance-of-the-evidence standard to do so.  Moreover, the court correctly interpreted the enhancement to conclude that defendants' purpose to influence, affect, or retaliate against government conduct (*i.e.*, what defendants deemed to be unacceptable border security, immigration, and refugee policies that fostered what they perceived to be a growing Muslim threat) need not be their primary or sole purpose for the enhancement to apply.  In any event, upon considering the Section

3553(a) factors, the court varied downward from defendants' Guidelines sentences of life imprisonment and imposed prison terms ranging from 25 to 30 years. The court stated that it would have imposed the same final sentences even if it had not applied the terrorism enhancement, because it would have departed upward under such circumstances, which defendants concede would have been warranted. Thus, even if the court erred in applying the terrorism enhancement, which it did not, any error was harmless.

    4. Wright alone raises four additional arguments, all of which fail.

    First, Wright alleges prosecutorial misconduct. Yet, he mischaracterizes the record regarding the nature and purpose of the recording transcripts, which were not themselves evidence, that the government prepared and provided to defense counsel well in advance of trial to facilitate their trial preparations. There was no misconduct related to the government's use, either before or during trial, of these transcripts, which corresponded to the actual recordings of defendants' in-person meetings that the government had given to defense counsel over a year before trial.

    Second, Wright takes issue with the manner in which the court determined the admissibility of defendants' recorded statements as non-hearsay coconspirator statements under Rule 801(d)(2)(E). But the court did not abuse its discretion and, moreover, any error did not affect Wright's substantial rights.

Third, Wright argues that the court erred in denying his motion for a judgment of acquittal on his false-statements conviction because, he claims, the government presented no evidence of materiality.  But the court properly denied the motion given Wright's patently false and material statements during his voluntary FBI interview, the video of which the jury saw and heard.

Fourth, Wright argues that three alleged evidentiary errors not raised elsewhere in his brief, if deemed harmless and taken together with any other harmless error, amount to cumulative error.  But there was no error, let alone cumulative error.

# ARGUMENT

# I

## DEFENDANTS ARE NOT ENTITLED TO JUDICIAL RELIEF UNDER THE JURY SELECTION AND SERVICE ACT OF 1968 BASED ON THE METHOD OF PETIT JUROR SELECTION USED FOR THEIR TRIAL

A.   *Standard Of Review*

This Court reviews questions of statutory interpretation, including "whether the jury selection process failed to substantially comply with the Jury Selection and Service Act," de novo.  *United States* v. *Contreras*, 108 F.3d 1255, 1265 (10th Cir. 1997).  Any underlying factual determinations are reviewed for clear error.  *United States* v. *Kamahele*, 748 F.3d 984, 1022 (10th Cir. 2014).

B.   *Defendants' Challenge To Summoning Only Within-Division Petit Jurors*

1.   *The Jury Selection And Service Act Of 1968*

The Jury Act governs the selection of grand and petit juries in federal courts.  See 28 U.S.C. 1861, *et seq.*  Until the Act, Congress had "never specified the sources from which the names of prospective jurors should be obtained, the methods by which these names should be selected, or the bases upon which otherwise qualified jurors should be eliminated from jury service."  S. Rep. No. 891, 90th Cong., 1st Sess. 10 (1967) (Senate Report).  As a result, jurisdictions followed their own haphazard procedures that often "undermine[d] the representative quality of juries."  Senate Report 10.

Of particular concern to Congress, most jurisdictions used a version of the "key man" system, so called because "'key men' thought to have extensive contacts throughout the community, suppli[ed] the names of prospective jurors." Senate Report 10; see also *Taylor* v. *Louisiana*, 419 U.S. 522, 529 n.8 (1975).  In addition, jury officials were "add[ing] [their] own subjective notions of the characteristics a good juror should possess."  Senate Report 9; see also *United States* v. *Calabrese*, 942 F.2d 218, 221 (3d Cir. 1991).

With the Jury Act, Congress intended "to provide improved judicial machinery for the selection, without discrimination, of Federal grand and petit juries."  H.R. Rep. No. 1076, 90th Cong., 2d Sess. 3 (1968) (House Report); see also *United States* v. *Bearden*, 659 F.2d 590, 609 (5th Cir. Unit B 1981) (noting this "fundamental purpose of the law").  Congress was explicitly guided by two principles—"(1) random selection of juror names from the voter lists of the district or division in which court is held; and (2) determination of juror disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only"— which it explained "provide the best method for obtaining jury lists that represent a cross section of the relevant community and for establishing an effective bulwark against impermissible forms of discrimination and arbitrariness."  House Report 4; Senate Report 15; see also *Bearden*, 659 F.2d at 600.

These intertwined priorities—namely, ensuring that jurors are selected from a fair cross-section of the community and protecting against discrimination and arbitrariness—are made explicit in the Act. Section 1861, the "[d]eclaration of policy," states: (1) "all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes"; and (2) "all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose." 28 U.S.C. 1861. Section 1862, the substantive anti-discrimination provision, states that "[n]o citizen shall be excluded from service as a grand or petit juror in the district courts of the United States * * * on account of race, color, religion, sex, national origin, or economic status." 28 U.S.C. 1862. "[T]o achieve the objectives of [S]ections 1861 and 1862," the Act requires each district court to devise a written plan that complies with the detailed jury selection procedures set forth in Sections 1863 through 1866. 28 U.S.C. 1863(a).

Section 1867 provides the "exclusive means" by which a litigant can challenge deviations from the Act's substantive or procedural provisions. 28 U.S.C. 1867(e). As relevant here, a criminal defendant "may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure

to comply with the provisions of this title in selecting the grand or petit jury." 28

U.S.C. 1867(a). To be timely and complete, the defendant must file his motion

"before the voir dire examination begins, or within seven days after [he]

discovered or could have discovered, by the exercise of diligence, the grounds

therefor, whichever is earlier," and include "a sworn statement of facts which, if

true, would constitute a substantial failure to comply with" the Act. 28 U.S.C.

1867(a) and (d).

### 2.    The District Of Kansas's Jury Plan

Kansas constitutes one federal judicial district, in which "[c]ourt shall be

held at Kansas City, Lawrence, Leavenworth, Salina, Topeka, Hutchinson,

Wichita, Dodge City, and Fort Scott." 28 U.S.C. 96. Consistent with the original

court locations that Congress designated in 1948,[8] the District of Kansas's jury

plan includes six geographic jury divisions: (1) Kansas City/Leavenworth;

(2) Wichita/Hutchinson; (3) Topeka; (4) Dodge City; (5) Fort Scott; and (6) Salina.

D. Kan. L.R. 38.1(a).[9]

------

[8] Congress added Lawrence to the list of court locations in 1986. Pub. L.
No. 99-554, § 141, 100 Stat. 3096 (1986). Lawrence is in Douglas County, within
the Kansas City/Leavenworth division.

[9] In 1966, before the Act's passage, the then-Chief Judge for the District of
Kansas explained that "[m]ost of the jury work is in the three principal cities –
Wichita, Kansas City and Topeka. Court sessions are held twice yearly in Fort
Scott; once yearly in Dodge City and in Salina, in both of which we use state court

(continued…)

- 51 -

The local rules set forth the procedures for calling jurors. See D. Kan. L.R.

38.1. The clerk selects names at random from the official lists of registered voters

in each county within a division to create a division-specific master jury wheel. D.

Kan. L.R. 38.1(c)-(d). From each master wheel, the clerk draws individuals at

random to receive and complete a juror qualification form. D. Kan. L.R. 38.1(g).

Based on the answers submitted, the clerk maintains a division-specific qualified

jury wheel of individuals who are qualified, not exempt, and not excused. D. Kan.

L.R. 38.1(h)(1). From each divisional qualified jury wheel, the clerk draws

individuals at random for assignment to grand and petit jury panels. D. Kan. L.R.

38.1(h)(2).

For grand juries, the clerk calls potential jurors from paired divisions. D.

Kan. L.R. 38.1(h)(6)(B). Thus, the six divisions act as three grand jury wheels:

(1) Kansas City/Leavenworth and Fort Scott; (2) Topeka and Salina; and

(3) Wichita/Hutchinson and Dodge City. D. Kan. L.R. 38.1(h)(6)(B).

---

(…continued)
facilities; and occasionally in Leavenworth." *Civil Rights Pt. 2: Hearings Before the Subcomm. on Constitutional Rights, Senate Comm. on the Judiciary*, 89th Cong., 2d Sess. 1839-1840 (1966) (Statement of Arthur Stanley, Jr.).

For petit juries, until recently,[10] the plan instructed the clerk only to "place the names or numbers of available petit jurors drawn from the divisional qualified jury wheel, as provided in this rule, and who are not excused, in a jury wheel."  D. Kan. L.R. 38.1(h)(6)(A).  By default, if not otherwise stated, the rules "appl[y] separately to each division designated herein."  D. Kan. L.R. 38.1(b).  The jury coordinator thus summoned petit jurors from the division in which court was being held.  1R.1043.

Of the six divisions, however, only three—Kansas City/Leavenworth, Topeka, and Wichita/Hutchinson—have active federal courthouses.  1R.1043 n.5.  Absent a court-approved request to hold trial in a different location (see D. Kan. L.R. 40.2), the qualified jury wheels for the divisions lacking a federal courthouse—Fort Scott, Salina, and Dodge City—were not used for petit juries, and therefore individuals residing in those divisions did not sit as federal petit jurors.  See R1.1043.  That is the factual basis for the statutory claim here.

---

[10]  On March 4, 2020, the Chief Judge for the District of Kansas issued Administrative Order No. 2020-1, which amended the court's petit jury selection practice in response to numerous Jury Act motions that the Federal Public Defender filed in pending criminal cases.  See Defs.' Supp. Authority (Mar. 10, 2020).  "[A]s soon as practicable but no later than June 2020," the jury coordinator, on a quarterly basis, will draw a petit jury venire from the paired grand-jury divisions at each active courthouse.  The order further states that "nothing in this order prohibits the court from creating petit jury panels from a single division or from a combination of any of the six divisions, where a trial is held in a location other than Kansas City, Wichita, or Topeka or to address other practicalities as may * * * exist."

### 3.    Defendants' Challenge To The Method Of Petit Juror Selection

The apartment complex and mosque defendants planned to attack is located in Garden City, which is in Southwest Kansas in the Dodge City jury division, which lacks a federal courthouse. Defendants' trial was held in Wichita, with petit jurors pulled from only the Wichita/Hutchinson division.[11]

At a status conference on November 16, 2017, the parties and the district court discussed the geographic area from which prospective jurors would be drawn. 6R.54, 84. In response to defendants' concerns about prejudicial media coverage in Southwest Kansas, the court reassured counsel that, "[f]or our jury trials, we tend not to pull that far [west]." 6R.84. The jury coordinator, who was present to discuss the timing of juror questionnaires (6R.69), confirmed that, under the jury plan, the court pulled petit jurors only from Wichita/Hutchinson. 6R.84.

Twenty-two days later, on December 8, 2017, defendants moved to order the jury coordinator to issue summonses to prospective jurors from the Dodge City division in addition to the Wichita/Hutchinson division. 1R.801, 822, 824. Defendants argued that the district court's method of selecting petit jurors systematically excluded Dodge City voters, who were more likely to live in rural

---

[11]  If petit jurors were pulled from the paired divisions, as now will be done on a quarterly basis, the pool for defendants' trial would have consisted of one juror from Dodge City for every four jurors from Wichita/Hutchinson because "the Wichita-Hutchinson district is about four times the population of the Dodge City district." 6R.246.

areas and hold different political ideologies regarding "the appropriate size and power of the federal government and the individual rights of its citizens." 1R.808-809. Thus, according to defendants, the exclusion of potential Dodge City jurors violated defendants' right to be tried before a fair cross-section of the community under the Sixth Amendment and the Jury Act. 1R.819. Defendants also argued that they had standing to raise the equal protection rights of excluded citizens. 1R.816-817.

After defendants' motion was fully briefed, the court heard oral argument on January 3, 2018. 6R.222-284. At the hearing, defendants acknowledged that their position had "evolved" since briefing to focus on the statutory argument. 6R.272-273; see also 6R.238-239, 242, 247. Defendants admitted they were "retreating a little bit" from their constitutional claim and "look[ing] at the language of [Section] 1861" of the Act to "invok[e] the rights of those particular jurors." 6R.238-239.

On January 17, 2018, the court denied defendants' motion. 1R.1041. First, it held that the district's method of petit juror selection did not violate defendants' constitutional or statutory fair cross-section rights. 1R.1064; see also 1R.1044-1056. "The only common quality shared by all members of the [Dodge City] group," the court explained, is "that they all reside within the same 28-county geographic location, and there are no facts that would suggest this location is

'profoundly culturally distinct.'" 1R.1051. Accordingly, the court denied

defendants' fair-cross-section claim, because "[t]he Constitution's guarantee to an

impartial jury drawn from a fair cross-section of the community is not violated

when certain jurors are excluded simply due to their geographic location."

1R.1055 & n.40 (citing *United States* v. *Green*, 435 F.3d 1265, 1272 (10th Cir.

2006), and *United States* v. *Test*, 550 F.2d 577, 582 n.4 (10th Cir. 1976)).

Second, the court held that defendants "lack[ed] standing to challenge the

jury selection plan on behalf of citizens residing within the Dodge City, Fort Scott,

and Salina divisions." 1R.1064; see also 1R.1056-1063. Invoking the prudential

standing doctrine, the court held that "it would not be proper for the Court to

address the issue of whether those citizens' rights have, in fact, been violated."

1R.1063; see also 1R.1056. The court stated that this "is especially true" where, as

here, "the applicable constitutional questions are ill-defined and speculative."

1R.1063 (internal quotation marks and citation omitted).

Six days later, on January 23, 2018, defendants moved to dismiss the

indictment or stay the proceedings for a substantial failure to comply with the Jury

Act. 1R.1166-1187. Whereas "the[ir] prior motion was a challenge to the fair

cross section requirement," defendants claimed, "the current challenge is to the

structural error of the jury selection process violating the plain language of

[Section 1861's] second sentence." 1R.1171 n.21. In other words, in this second

motion, defendants argued only that the exclusion of Dodge City voters violated

those citizens' "opportunity to be considered for service on grand and petit juries,"

as set forth in the Act's policy declaration.  1R.1171 (emphasis omitted).

The court denied defendants' second motion on the same basis as the first

motion.  1R.1295-1298.  "Simply put," the court explained, "the jury selection

procedure employed by the District of Kansas does not violate Defendants'

constitutional or statutory rights."  1R.1298.  Instead, defendants "seek to invoke

the rights of the excluded jurors."  1R.1298.  The court held that "[t]his criminal

proceeding is not the proper setting to do so."  1R.1298.

## C.    *The District Court Properly Rejected Defendants' Statutory Challenge*

On appeal, defendants have abandoned their claims that the District of

Kansas's method of jury selection violated their statutory right to an impartial jury

selected from a fair cross-section of the community, their Sixth Amendment right

to the same, and their equal protection claim on behalf of citizens in the Dodge

City division.  Allen Br. 21 n.3.  They raise only a statutory challenge on behalf of

citizens in "courthouse-adjacent divisions" who, before the March 4, 2020,

Administrative Order, see note 10, *supra*, were not called for petit jury service.

Defendants argue that this method of petit juror selection violated Section 1861's

- 57 -

policy goal for citizens to have the opportunity to be considered for petit juries.

This statutory claim is both procedurally barred and without merit.[12]

### 1.    *Defendants' Challenge Is Procedurally Barred*

As an initial matter, defendants' challenge under the Jury Act is procedurally

barred.  This Court has made clear that "[s]trict compliance with [the Act's]

procedural requirements is essential."  *Contreras*, 108 F.3d at 1266.  "As a price

for [the] remedy" of granting a new trial without a showing of prejudice,

"Congress was entitled to exact strict compliance with formal procedural rules"

governing statutory challenges.  *Ibid.* (quoting *United States* v. *Kennedy*, 548 F.2d

608, 613 (5th Cir. 1977)).  Failure to comply with Section 1867's procedural

requirements therefore precludes a defendant's claim.  *Id.* at 1267-1268.

Here, defendants attempted to cure the procedural defects of their first

motion by filing a second motion, but that motion, too, was untimely.  The Act

requires defendants to raise a statutory challenge to jury selection "before the voir

dire examination begins, or within seven days after the defendant discovered or

could have discovered, by the exercise of diligence, the grounds therefor,

*whichever is earlier*."  28 U.S.C. 1867(a) (emphasis added).  This Court has

---

[12]  Because defendants have abandoned their constitutional claim, this Court
need not decide whether they would have had standing as to that claim.  The
government does not contest on appeal defendants' standing to bring a statutory
challenge to the jury plan under 28 U.S.C. 1867(a).  Defendants' challenge,
however, is procedurally barred and fails on the merits.

strictly enforced Section 1867's timing requirement, barring a defendant's claim because the defendant "could have discovered, by the exercise of diligence, the ground of his [Jury Act challenge] long before his motion was filed." *United States* v. *Windrix*, 405 F.3d 1146, 1157 (10th Cir. 2005) (internal quotation marks and citation omitted); see also *Green*, 435 F.3d at 1269 n.2. This interpretation is consistent with Section 1867's text, which reflects Congress's choice to make "fatal" a defendant's "[f]ailure to make the challenge at the earliest possible time." Senate Report 34.

At the latest, defendants discovered the ground for their statutory challenge at the November 16, 2017, status conference.[13] There, the jury coordinator, who oversees grand and petit juror selection under the district's plan (D. Kan. L.R. 38.1(c)), confirmed that "[w]e pull from our Wichita/Hutchinson division just for regular petit juries." 6R.84. As a result, defendants' "exclusive means" to argue that their jury "was not selected in conformity with [the Act]" expired seven days later, on November 23, 2017. 28 U.S.C. 1867(a) and (e). Defendants nevertheless filed two motions after this deadline.

---

[13] Because the challenged method of selecting petit jurors had been in place for decades, it seems unlikely that defense counsel first became aware of it at this status conference. See *Green*, 435 F.3d at 1269 n.2 ("Because defense counsel's knowledge of the local rules, including the rules regarding the manner in which jury pools are selected, is imputed to Defendant, he had seven days from the time his first attorney was appointed to raise his objection to the jury pool composition.").

Defendants filed their first motion on December 8, 2017, making a fair cross-section argument under the Sixth Amendment, Equal Protection Clause, and Jury Act. 1R.801. At a hearing on this motion, held on January 3, 2018, defendants first mentioned the Jury Act challenge now at issue. See 6R.242, 272-273. Yet, they acknowledged that they discovered the basis for their challenge on November 16: "[W]hen we looked at [Rule 38.1] originally, it wasn't clear to us whether or not jurors or prospective jurors from other jury divisions are summonsed  *  *  *  for trials in Wichita *until that was disclosed at the status conference*." 6R.224 (emphasis added). Defendants did not explain why they waited until 22 days *after* that conference to file their motion. The government noted that the motion failed to adhere to Section 1867's procedural requirements. 6R.251-253, 257-259; see also 1R.1171 n.20. The court denied this motion on January 17, 2018. 1R.1041.

Defendants filed their second challenge under the Jury Act on January 23, 2018. 1R.1166. In this motion, defendants attempted to cure the procedural defects from their first motion, as well as shift the focus entirely to their statutory challenge. They attached a sworn statement of facts, and they argued that their second motion was timely because it was filed within seven days of the court's order denying their first motion. 1R.1170-1171 & n.20, 1180-1181. Defendants asserted that "[b]ecause [they] discovered with certainty the grounds for raising a

statutory violation when the Court denied [their] prior motion, this motion is now ripe to be raised and decided." 1R.1169. The government, in turn, cited Section 1867(a) and noted that the "information from the jury coordinator [on November 16] concerning the summoning of jurors formed the basis for the defendants' initial challenge to the jury pool." 1R.1274-1275.

On appeal, defendants reassert that the grounds for their second Jury Act motion (filed January 23, 2018) did not exist until the court "settl[ed] the method by which it would summon the jury panel in this case" by denying their first motion (on January 17, 2018) rather than when the jury coordinator confirmed the method of selecting jurors (on November 16, 2017). Allen Br. 32. But defendants' attempt to re-start the clock has no basis in the statute. The Act does not wait for defendants to "discover[] with certainty the grounds for raising a statutory violation" (see 1R.1169) or for the district court to "settl[e] the method" of jury selection (Allen Br. 32). To the contrary, the Act starts the clock as soon as "the defendant discovered or *could have discovered*, by the exercise of diligence, the grounds" for their statutory challenge. 28 U.S.C. 1867(a) (emphasis added). Here, at the very latest, that date was November 16, 2017.

This Court should reject defendants' attempt to cure the procedural defects of their first motion by relying on their still-untimely second motion. The factual basis for their challenge—*i.e.*, that the court drew petit jurors only from

Wichita/Hutchinson—did not change between defendants' first and second

motions.  Indeed, the jury plan had been in place, unchanged, for years, and was

explained in no uncertain terms on November 16, 2017.  The denial of defendants'

first motion did not start the clock anew.  To hold otherwise would permit

defendants to seek a second bite at the apple, as happened here, and pursue relief

despite the Act's strict procedural requirements.  Accordingly, this Court should

hold that defendants' challenge is procedurally barred.

2.    *Defendants Are Not Entitled To Reversal Based On An Alleged Violation Of The Act's Policy Statement That Is Neither Independently Enforceable Nor A Substantial Failure To Comply With The Act*

Even if this Court considers the merits of defendants' challenge, it should

reject their attempt to fashion from Section 1861 a standalone right for all citizens

to have the opportunity to be called as petit jurors.  Although Congress declared

two overarching policy goals in Section 1861, it effectuated those policies through

the statute's non-discrimination provision (Section 1862) and subsequent

procedures (Sections 1863 through 1866).  The policy statement of Section 1861 is

not enforceable independent of a substantive or procedural violation of the Act.

Even if this Court interprets Section 1861's policy declaration to be

independently enforceable, the drastic remedy of reversal is not warranted unless

this Court finds a substantial failure to comply with the Act.  To rise to this level,

the jury plan must not only deviate from the Act's requirements, but also must

- 62 -

frustrate the Act's fundamental principles.  In other words, this Court's

intervention in an individual case is warranted only to remedy discrimination or

arbitrariness in juror selection or qualification.  The district's prior method of

summoning only within-division petit jurors was not discriminatory or arbitrary

and does not warrant reversal.

a.  Defendants' primary complaint (Allen Br. 29-30) is that the district's

method of selecting jurors at the time of their trial ran afoul of the second policy

declaration in Section 1861, which aspires "for all citizens to have the opportunity

to be considered for service on [federal] grand and petit juries."  28 U.S.C. 1861.

That provision is a policy goal, which Congress chose to effectuate through the

Act's substantive and procedural provisions, not an enforceable "right."  Cf. Allen

Br. 33.  See generally *Hughes Tool Co.* v. *Meier*, 486 F.2d 593, 596 (10th Cir.

1973) (noting that "a preamble merely setting forth the [statute's] purpose" was

"neither essential nor controlling in the construction of" that statute "where the

operative sections are clear and unambiguous"); *Association of Am. R.R.s* v.

*Costle*, 562 F.2d 1310, 1316 (D.C. Cir. 1977) ("A preamble no doubt contributes to

a general understanding of a statute, but it is not an operative part of the statute.").

As the district court recognized, "no court has ever held that every eligible citizen

must be guaranteed the opportunity to serve as a petit juror."  1R.1063.

The Act, when considered in its entirety, makes clear that defendants'

reading of Section 1861 is incorrect. See *Davis* v. *Michigan Dep't of Treasury*,

489 U.S. 803, 809 (1989) ("the words of a statute must be read in their context and

with a view to their place in the overall statutory scheme"); see also *United States*

v. *Collins*, 859 F.3d 1207, 1213 (10th Cir. 2017) (same). Section 1861 merely

declares the congressional goals that are achieved through the substantive and

procedural provisions that follow. See *Taylor*, 419 U.S. at 529 (citing Sections

1862 through 1866 as the "machinery by which the stated policy was to be

implemented"). Section 1861's first sentence, which is framed as a "right" to a fair

cross section, is implemented by Section 1862 and incorporated into Section

1863(b)(3). See *Test*, 550 F.2d at 584 (noting that Section 1861's policy is

implemented by Section 1862's nondiscrimination requirement); 28 U.S.C.

1863(b)(3). Section 1861's second sentence, which is framed as a "policy" in

support of expansive jury selection, similarly is effectuated by the substantive and

procedural provisions that follow.

Moreover, the Act's procedural provisions demonstrate that Congress did

not intend for the "all citizens" policy to be applied literally. Indeed, by instructing

judicial districts to populate their jury wheels from registered voter lists and to

exclude, disqualify, exempt, and excuse other individuals or groups from jury

service, Congress did not include all citizens in federal jury service. See, *e.g.*, 28

U.S.C. 1863(b)(2) and (6), 1865(b), 1866(c). The Act recognizes that, in some

circumstances, courts may have to expand their sources for juror names and require

service by otherwise excluded persons. But such steps are required only when

necessary to secure the protections of *both* Sections 1861 and 1862. See, *e.g.*, 28

U.S.C. 1863(b)(2) (requiring an additional source for names "where necessary to

foster the policy and protect the rights secured by [S]ections 1861 and 1862"); 28

U.S.C. 1863(b)(5)(A) (permitting excusal of certain groups or occupational classes

so long as not "inconsistent with [S]ections 1861 and 1862"); 28 U.S.C. 1866(c)

(permitting excusal of jurors on specific bases if not "inconsistent with [S]ections

1861 and 1862"). Such provisions would be nonsensical if the Act were violated

any time citizens were excluded from potential jury service, as opposed to

*discriminatorily* excluded (whether purposefully or in effect).

A contrary understanding of Section 1861 would throw jury plans into

disarray whenever a division has a dearth of jury trials, and thus, the lack of

opportunity for its citizens to be considered for petit jury service. This could occur

if Congress did not fund a statutorily mandated seat of court. See, *e.g.*, *United

States* v. *Conant*, 116 F. Supp. 2d 1015, 1023 (E.D. Wis. 2000) (noting a failure to

fund an operating court in the Green Bay Division). But, the same problem would

arise if there were a judicial vacancy in a division with only one judge, if the only

courthouse in a division were undergoing extensive renovations, or even if there

was simply a lull in a division's trial docket.  See, *e.g.*, *United States* v. *Thunder*, No. CR 13-10015, 2014 WL 1698423, at *3 (D.S.D. Apr. 29, 2014) (noting that Northern Division trials could not be held in Aberdeen because of renovations). Defendants' reading of the Act would require districts to adjust their jury plans to ensure that all citizens have an ever-present opportunity to be called as petit jurors.

b.  Even if Section 1861's policy statement could be the basis for a statutory violation, the alleged defect that defendants identify does not constitute a "substantial failure to comply" with the Act, as required for judicial relief.  28 U.S.C. 1867(a) and (d).  A "substantial failure to comply" must "'frustrate[] one of the three principles underlying the Act':  (1) the random selection of jurors, (2) culling of the jury from a fair cross-section of the community, and (3) determination of disqualifications, exemptions, and exclusions based on objective criteria."  *Kamahele*, 748 F.3d at 1022 (quoting *United States* v. *Carmichael*, 560 F.3d 1270, 1277 (11th Cir. 2009)).  Defendants suggest only that the first and third principles are at issue, but fail to explain how the prior plan frustrated either.[14]

---

[14]  For good reason, defendants have abandoned their fair-cross-section claim and make no attempt to argue that the plan violated this principle.  This is because geography alone, unless the location is "profoundly culturally distinct," does not form the basis for such a claim.  See *Zicarelli* v. *Dietz*, 633 F.2d 312, 320 (3d Cir. 1980); *Green*, 435 F.3d at 1272.

"The randomness principle  *  *  *  requires a 'system of selection that affords no room for impermissible discrimination against individuals or groups.'" *Carmichael*, 560 F.3d at 1277 (quoting *Bearden*, 659 F.2d at 602).  Critically, "random selection [from voter lists] eliminates the key man system and ensures that jurors will be selected without regard to race, wealth, political affiliation, or any other impermissible criterion."  Senate Report 15-16.

Defendants contend (Allen Br. 36) that the prior plan somehow impeded random selection because individuals in three divisions did not sit as petit jurors. Yet, geographic location is simply not a suspect class on its own.  See *Test*, 550 F.2d at 581 n.4.  Within each division, the plan followed the Act's careful steps for selecting and disqualifying jurors.  Defendants can claim no error under Sections 1863 to 1866 in the source of juror names, the creation of the master jury wheel, the use of the juror qualification form, or the composition of each division's qualified jury wheel.  The prior plan left "no room for impermissible discrimination against individuals or groups," *Carmichael*, 560 F.3d at 1277 (quoting *Bearden*, 659 F.2d at 602).

"The objectivity principle prohibits selection based on subjective criteria." *Carmichael*, 560 F.3d at 1277-1278 (quoting *Bearden*, 659 F.2d at 608).  "[T]his principle" essentially "prohibit[s] the widespread [contemporaneous] practice of imposing qualifications above and beyond those specified by Congress."  Senate

Report 18.  "The types of subjective criteria that are prohibited are, for example, 'good character, approved integrity, sound judgment and fair education.'" *Carmichael*, 560 F.3d at 1277-1278 (quoting *Bearden*, 659 F.2d at 607).

Defendants argue that the prior plan violated the objectivity principle because the district "creat[ed] new exemptions or disqualifications" by excluding citizens in "courthouse-adjacent divisions" from a neighboring jury wheel.  Allen Br. 35-37 (citing 28 U.S.C. 1863(b)(6), 1865).  The use of divisions, however, cannot be characterized as a new "exemption."  The Act specifically contemplates the use of divisions so long as every county is included in some such division.[15] As this Court recognized in *Test*, "the partitioning of a district into jury divisions is sanctioned by the statute  *  *  *  and is clearly not unconstitutional, absent evidence that some cognizable group has been systematically excluded by 'gerrymandering' the division lines."  550 F.2d at 594 (citations omitted).  Here, the jury plan created six geographic divisions, encompassing every county in Kansas, surrounding the cities where Congress mandated federal court to be held. Compare D. Kan. L.R. 38.1(a), with 28 U.S.C. 96; see 1R.1042 n.1.

---

[15]  "[I]n judicial districts where there are no statutory divisions," such as Kansas, the Act defines a "division" as "such counties, parishes, or similar political subdivisions surrounding the places where court is held as the district court plan shall determine."  28 U.S.C. 1869(e); see also, *e.g.*, 28 U.S.C. 1861 (requiring a fair cross section of the community "in the district or division wherein the court convenes"); 28 U.S.C. 1863(a) (allowing separate plans for "each division or combination of divisions within a judicial district").

Accordingly, the jury plan that was used for defendants' trial, and for decades before that, does not "frustrate" the Act's randomness, fair-cross-section, or objectivity principles. As a result, there is no "substantial failure to comply" with the Act that warrants reversal.

c. Finally, under the Act, "[t]he district court may modify a plan at any time and it shall modify the plan when so directed by the reviewing panel," which "consist[s] of the members of the judicial council of the circuit and either the chief judge of the district whose plan is being reviewed or such other active district judge of that district as the chief judge of the district may designate." 28 U.S.C. 1863(a). Pursuant to this authority, the District of Kansas has modified its plan going forward to pair divisions together on a quarterly basis to draw a petit jury venire at the active seats of court that includes citizens from the three courthouse-adjacent divisions. See note 10, *supra*. This modification, which goes into effect by June 2020 for all cases tried in the district, as opposed to individual cases in which a litigant raises a Jury Act challenge, illustrates a district's ability to modify its plan if it so chooses without imposing the drastic remedy of reversal where there is no substantial violation of the Act. Given that the prior plan did not frustrate the Act's purposes, and had no effect on defendants' own rights to a fair trial, the remedy of reversal is unwarranted here.

## II

## THE DISTRICT COURT PROPERLY DECLINED TO INSTRUCT
## THE JURY ON ENTRAPMENT

*A.    Standard Of Review*

"Whether there is evidence sufficient to constitute a triable issue of

entrapment is a question of law" reviewed de novo.  *United States* v. *Vincent*, 611

F.3d 1246, 1249 (10th Cir. 2010) (quoting *United States* v. *Ortiz*, 804 F.2d 1161,

1164 (10th Cir. 1986)).  "Just as a court may find entrapment 'as a matter of law'

when the evidence satisfying the elements of entrapment is uncontradicted, it also

may conclude 'as a matter of law' that the evidence is insufficient to create a

triable issue."  *Ortiz*, 804 F.3d at 1164 (citation omitted).

*B.    Background*

*1.    Defendants Have The Burden To Show Entrapment Is A Triable Issue*

"[E]ntrapment is a relatively limited defense," *United States* v. *Russell*, 411

U.S. 423, 435 (1973), that raises "whether the criminal intent originated with the

defendant or with government agents," *Ortiz*, 804 F.2d at 1165.  "To raise a valid

entrapment defense, a defendant must show two elements:  'government

inducement of the crime, and a lack of predisposition on the part of the defendant

to engage in the criminal conduct.'"  *Vincent*, 611 F.3d at 1249 (quoting *Mathews*

v. *United States*, 485 U.S. 58, 63 (1988)).  These elements are "closely related"

and "the same evidence and arguments" often relate to both.  *United States* v.

*Young*, 954 F.2d 614, 616 (10th Cir. 1992).  The primary difference is that "inducement focuses on the government's conduct while predisposition focuses on a defendant's attitude or condition."  *Ibid.*  To determine whether there is sufficient evidence from which a reasonable jury could find entrapment, courts accept the testimony most favorable to the defendant.  *Vincent*, 611 F.3d at 1250.  Yet, "the defendant must point to evidence that is more than flimsy or insubstantial," and "conclusory and self-serving statements, standing alone, will not suffice."  *Ortiz*, 804 F.2d at 1165-1166 (citations omitted).

a.  A defendant establishes government inducement "only when the government conduct is such that a reasonable jury could find that it 'creates a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense.'"  *Vincent*, 611 F.3d at 1251 (quoting *United States* v. *Scull*, 321 F.3d 1270, 1275 (10th Cir. 2003)).  This showing "implicates the obvious question of whether the defendant was eager or reluctant to engage in the charged criminal conduct."  *Ortiz*, 804 F.2d at 1165.

Inducement "may take the form of persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship."  *Vincent*, 611 F.3d at 1250 (citation omitted).  This Court has never held, however, that when law enforcement "employs any degree of persuasion, any use of coercive tactics, any promise of reward, or any plea based

on friendship the defendant is entitled to an entrapment jury instruction." *Ibid.* To

the contrary, this Court has recognized that the use of informants and undercover

officers—even those who ingratiate themselves to defendants through "deceit and

offering things of value"—is vital to thwarting crime. *Id.* at 1250-1251 (citing

*Russell*, 411 U.S. at 432). Likewise, the Supreme Court has permitted "[a]rtifice

and stratagem * * * to catch those engaged in criminal enterprises." *Sorrells* v.

*United States*, 287 U.S. 435, 441 (1932) (citations omitted).

Evidence that "the government initiated the contact with the defendant,

proposed the crime, or solicited or requested the defendant to engage in criminal

conduct, standing alone, is insufficient to constitute inducement." *Vincent*, 611

F.3d at 1250; see *Ortiz*, 804 F.2d at 1163, 1165 (evidence insufficient even where

undercover agent actively involved in various aspects of drug transaction). "[T]he

fact that government agents merely afford opportunities or facilities for the

commission of the offense does not constitute entrapment." *Sherman* v. *United*

*States*, 356 U.S. 369, 372 (1958) (internal quotation marks and citation omitted);

see *Mathews*, 485 U.S. at 66 (same).

b. A defendant also must point to evidence showing a lack of predisposition

to commit the crimes charged. Indeed, predisposition is "the principal element" of

entrapment, as it distinguishes between the "unwary innocent" and "unwary

criminal." *Mathews*, 485 U.S. at 63 (citations omitted). "Predisposition" means "a

defendant's inclination to engage in the illegal activity for which he has been charged" and focuses on "the defendant's state of mind before government agents suggest that he commit a crime." *Scull*, 321 F.3d at 1276 (citation omitted).

A defendant's predisposition "may be inferred from [his] history of involvement in the type of criminal activity for which he has been charged, combined with his ready response to the inducement offered." *Scull*, 321 F.3d at 1276 (quoting *Ortiz*, 804 F.2d at 1165). It also may be shown by "a defendant's desire for profit, his eagerness to participate in the transaction, his ready response to the government's inducement offer, or his demonstrated knowledge or experience in the criminal activity under investigation." *United States* v. *Fadel*, 844 F.2d 1425, 1433 (10th Cir. 1988). "The fact that a defendant has not previously engaged in the specific crime alleged does not conclusively establish no predisposition to commit the crime." *Young*, 954 F.2d at 617 (collecting cases).

2.    *Proceedings Below*

Before the jury charge conference, defendants submitted an entrapment instruction. 2R.594-595. The government objected, noting that defendants had offered no evidence in support of it and could not rely on self-serving statements to establish either government inducement or lack of predisposition. 2R.623-624.

The court addressed the requested instruction at the jury charge conference, stating, "I don't know  *  *  *  that you've got a factual predicate in the evidence in

this case to give an entrapment instruction." 6R.5317. Defendants responded that

they only needed to offer some evidence of entrapment to get the instruction, not

enough evidence for the jury to agree with them. 6R.5317. Defendants then

attempted to argue that Day, the confidential informant, proposed the apartment

complex and mosque at 312 West Mary Street as their target. 6R.5317. The court

countered that the record reflected that Day suggested the location only after

defendants already had discussed it. 6R.5317.

At that point, defendants tried to argue that Day was the person who first

showed Stein the apartment complex and mosque and proposed the site "as part of

his homework." 6R.5317. Defendants conceded "that's not perfect and a jury may

not say that's complete entrapment," but argued that the evidence was enough for

them to present the defense. 6R.5318. The court again corrected defendants on the

trial record, emphasizing that Day clearly and consistently testified that he raised

no new ideas with defendants. 6R.5318-5320. Finally, defendants argued that Day

pressured them to meet with the undercover officer, again conceding that "none of

this is a perfect entrapment defense." 6R.5318-5319.

The government responded that defendants had to "establish two separate

things," and so "get[ting] this instruction is a pretty high bar." 6R.5320-5321. The

government agreed with the court's characterization of Day's testimony, noting

that it was undisputed that Stein first had received the Mary Street address from

Jason Crick, as part of a surveillance outing with Crick's militia; that Stein had
asked Day to show him the location; and that Day had proposed the location as a
target only after defendants already had discussed it.  6R.5321.  The government
also noted that by the time of the "homework assignment" to identify targets,
defendants already had agreed to carry out an attack and that Day's suggestion of
that target therefore could not have induced their agreement to strike.  6R.5322.

The court also questioned defendants about predisposition.  They responded
"there wasn't any."  6R.5323.  When the court asked for "something more,"
defendants argued that they became "more radicalized after spending a few months
with Dan Day."  6R.5323-5324.  Wright pressed this theory in particular, to which
the court responded, "that's a theory but there's no evidence that it was Dan Day,
as opposed to Mr. Allen or Mr. Stein or other events that caused any potential
change in Mr. Wright with respect to the predisposition element."  6R.5324-5325.

Based on defendants' inability to offer sufficient evidence on either prong,
the court declined to give an entrapment instruction, stating "I do not think the
evidence at all warrants it."  6R.5325.

C.    *The District Court Correctly Declined To Give An Entrapment Instruction*

Defendants argue that the district court erred by not instructing the jury on
entrapment.  Allen Br. 41-54; Stein Br.19-27; Wright Br. 26-31.  To establish a
triable issue on entrapment, defendants had to offer sufficient evidence for a jury to

find both that the government induced them to enter the charged conspiracies and that they otherwise lacked the predisposition to commit those crimes. They did neither, as the district court correctly determined. Although defendants have to establish both prongs to show they should have received the instruction, this Court can reject their argument if insufficient evidence existed as to either.

### 1.     *Defendants Failed To Show A Triable Issue As To Inducement*

Even viewing the evidence in the light most favorable to defendants, there was insufficient evidence to raise a genuine issue as to whether the government induced defendants to enter the conspiracies. Defendants point to aspects of Day's involvement, as well as that of Brian (the undercover officer), in support of their argument. Allen Br. 46-51; see Stein Br. 20-24; Wright Br. 27-29. But as the court correctly concluded, the undisputed evidence showed that defendants—not Day or Brian—hatched a plan to take violent action against Muslims and were eager and willing participants in advancing that plot.[16]

a. First, defendants rely on Day's involvement to argue that there was a genuine issue as to inducement. Allen Br. 46-50; Stein Br. 20-22; Wright Br. 27-

---

[16]     Allen (Br. 45-46) disputes the point at which he entered the conspiracy. The government charged that the conspiracies began on or about June 14, 2016, the day Stein convened a meeting on Benson's property and Allen and Stein discussed using fertilizer bombs against local Muslims. Even if the jury doubted whether Allen and Stein formed an agreement by then, no reasonable juror could find that a conspiracy did not exist as of July 9, 2016, when Allen and Stein pressed Burch and Reever to join them in attacking local Muslims. See pp. 10-13, *supra*.

29.  But nothing about Day's use of artifice to help the FBI infiltrate defendants'

activities amounts to government inducement.  Rather, it equals good law

enforcement.  See, *e.g.*, *Vincent*, 611 F.3d at 1250-1251; *Russell*, 411 U.S. at 432;

*Sorrells*, 287 U.S. at 441-442.  Indeed, Day's successful involvement shows that

defendants were "unwary criminal[s]," *Mathews*, 485 U.S. at 63 (citation omitted),

"eager" to engage in the charged conduct, *Ortiz*, 804 F.2d at 1165.  Defendants

engaged in criminality because they wanted to, not because Day induced them to

do so.

As an initial matter, defendants cannot offer sufficient evidence of

inducement because their plan to go on the offensive and start killing Muslims

originated with Stein, not Day.  Indeed, it was Stein who recruited Day, not the

other way around.  Cf. Stein Br. 23.  Yes, Day drove Stein around Garden City and

through 312 West Mary Street's U-shaped apartment complex in connection with

Crick's surveillance outing.  But that was only because Stein called him and asked

him to do so, after Stein received the list of surveillance locations, including the

Mary Street building, from Crick.  Yes, Day joined KSF and became its vetting

and intelligence officer under false pretenses.  But that was only because Stein

recruited Day and assigned him that role.  Yes, Day printed out maps of Garden

City for Stein, but that was only because Stein requested that he do so after Stein

could not mark the locations on his iPhone.  Indeed, defendants made it Day's "job

to get information for them." 6R.2049. Yes, Day joined defendants' splinter group, but he did so at Stein's behest and primarily as a way to monitor defendants' activities. See pp. 6-9, *supra*.

In fact, defendants sprang into action not because of Day, but because a "switch flipped" in Stein after the Orlando, Florida Pulse nightclub shooting. Stein explained in a contemporaneous recording that he "went into organization mode" because of the government's perceived inaction in response to the shooting, its willingness to welcome Muslims "by the plane load," and its policies permitting Muslims to "infiltrate" the country. On Benson's property, and outside of public view, Stein expressed his eagerness to assemble a team to kill Muslim immigrants and refugees. Stein, who ran the meeting, wanted to know "who was with him." Day, for his part, spoke little, and was on the verge of passing out. Indeed, by the time Allen arrived, Day had left by ambulance. Benson, who was the only person present for Stein and Allen's discussion, described how he felt a noticeable shift to something "more concrete" when Stein and Allen talked about making explosives and using them against local Muslims. Notably, Day was absent from this pivotal discussion. See pp. 9-12, *supra*.

The next time Day saw Allen, at the July 9, 2016, recruitment meeting, Allen and Stein were pressing Burch and Reever to abandon their defensive strategy and join them in attacking Muslims. See p. 13, *supra*. Similarly, Day did

not see Wright until July 18, 2016, when Wright, Stein, and Allen tried to recruit the Spooners.  As Janina became visibly nervous and scared in response to defendants' statements that she needed be ready to kill whenever and wherever upon their orders, it was Day who told her that she could step away.  Defendants, on the other hand, sought assurances both that those who joined them and those who broke from them would not reveal their plan or identity to law enforcement. GX.14r-14t, 14z; see also GX.16fff-16hhh.  Stein then brainstormed potential targets and elicited information on defendants' pertinent skills.  Fully on board, Wright offered up his electrical know-how.  By the meeting's end, Wright, not Day, also offered up G&G as a secure location to plan defendants' attack.  See pp. 14-15, *supra*.

By the time of the group's meetings in August, Allen and Wright already had begun amassing the materials and knowledge they needed for making explosives.  Day knew little about explosives, and provided little input during defendants' conversations about what materials they still had to acquire or make, what compounds they would use, and the proportions they would need to use to maximize the damage and casualties.  Wright, not Day, offered to have everything shipped to G&G to avoid linking defendants to their purchases.  And Allen, not Day, took on the job of drafting defendants' manifesto.  See pp. 16-21, *supra*.

As defendants' plans rapidly advanced, the government tried to steer them clear of making their own explosives. Yet, each time Day attempted to discuss using the undercover officer to obtain explosives, Allen and Wright announced that they were one step closer to making their own bomb. Between the group's meetings in September and October, for example, Allen and Wright manufactured HMTD and succeeded in making and testing an HMTD-filled blasting cap, which they soon planned to test with a small fertilizer bomb. They did all of this outside of Day's presence and unbeknownst to him. Any hesitation defendants expressed about using Day's contact was not hesitation about using a bomb, but rather suspicion about leaving themselves open to the risk of detection just as they were on the cusp of making a bomb. See pp. 22-23, 25-26, 29-30, *supra*.

In sum, defendants could not adduce sufficient evidence of government inducement in support of an entrapment instruction because it was defendants at each step, not Day, who forged ahead and took critical steps to advance their plot after responding to Stein's call to action.[17]

b. Defendants argue (Allen Br. 47) that Day drew their "attention to the existence of Muslims in Garden City as often as possible," "proposed the Garden City apartments and mosque as the focal point of an attack," and "urged [them] to

---

[17] Neither conspiracy required the government to show an overt act in furtherance of the conspiracy. See 18 U.S.C. 241, 2332a. Accordingly, no particular step defendants took has heightened relevance for their convictions.

use a weapon of mass destruction for the attack, specifically, by using an explosive or explosive parts provided by Brian." The undisputed evidence shows otherwise.

Day participated in defendants' repeated, multi-hour discussions of where best to strike in southwestern Kansas, and, with defendants, debated striking in Garden City as opposed to, for example, Dodge City or Liberal. He participated in these discussions to avoid raising defendants' suspicions that he was an informant, and to preclude them from cutting him out of the group. But Day by no means directed the conversations or was defendants' sole source of information. Stein already was aware of densely populated areas of Muslims in Garden City because of his own surveillance and his outing with Crick's militia. See pp. 5-8, *supra*. Indeed, at the June 14, 2016, meeting on Benson's property, Stein talked about how Garden City was a hub for Muslim refugees and how he wanted to use "high explosives" on local Somalis (6R.1770). Stein and Allen also met separately, outside of Day's presence, to discuss possible targets and the use of explosives. See 6R.2003-2004, 2091-2092, 2460-2461. Although Wright downplays his role, he grew up in Garden City and personally knew the family who owned 312 West Mary Street. 6R.1719-1720; GX.14ttt-14uuu. He suggested killing the female property manager in order to punish her father, who owned the property, for renting to Muslims. GX.16tt-16uu.

As for pushing defendants to obtain explosives, Stein and Allen separately suggested blowing up 312 West Mary Street with fertilizer bombs long before the FBI ever introduced Brian into the investigation.  Stein mentioned blowing up the complex the first time Day drove through Garden City with him.  And Allen and Wright manufactured HMTD, with the goal of making their own bomb, irrespective of Brian's involvement.  See pp. 7, 12, 25, 29-30, *supra*.

c.  Defendants also argue (Allen Br. 48) that Day induced them because he participated under the guise of a "carefully constructed 'persona' sympathetic to the defendants."  But an informant's use of a persona, feigned friendship, or things of value to secure access to a defendant's criminal activity does not, by itself, raise a triable issue as to inducement.  See *Vincent*, 611 F.3d at 1250-1251 (citations omitted).  Indeed, it is precisely these things that enable informants to gain insight into possible criminality.  See *ibid.*  Moreover, unlike the entrapment cases defendants cite (see, *e.g.*, Allen Br. 48), Stein invited Day into defendants' inner circle and splinter group, not the other way around.  Day's carefully maintained persona resembles nothing of the sort of appeals to friendship and sympathy that this Court or the Supreme Court has found to raise a triable issue as to government inducement.  See, *e.g.*, *Sherman*, 356 U.S. at 371-372 (informant befriended and repeatedly solicited former narcotics user to provide him with drugs, which the defendant repeatedly avoided until finally caving to the requests).

d.  Defendants further argue (Allen Br. 48-49) that the duration and intensity of Day's involvement supported an entrapment instruction.  Day met Stein in February 2016 through Crick's militia and soon after joined KSF at Stein's urging, through which he met Allen and Wright.  6R.2009-2010 (estimating Day met Allen in March 2016).  But when Day joined KSF, it already had nightly Zello calls that he was expected to join, which he did, and Stein quickly enlisted him for other KSF-related matters.  Allen and Stein, not Day, ran these Zello calls and likewise scheduled defendants' in-person meetings.[18]  See pp. 5-9, *supra*.  It was not until four months later, after the Pulse nightclub shooting, that Stein announced that a "switch flipped" and he "went into organization mode."  Once defendants sprang into action, the duration and intensity of Day's involvement was a creature of defendants' making, not Day's.  It was defendants, not Day, who wanted to meet as often as possible in a private location.  And it was defendants who ploughed ahead even after numerous others—Benson, Lewis, Burch, Reever, and the Spooners—refused to join their plot, despite having participated in the same KSF calls and meetings in which Day partook.  See pp. 9-15, *supra*.

---

[18]  The exception was the September 18, 2016, meeting that Day called at the Sublette truck stop regarding the FBI's attempt to introduce the undercover officer.  There, before Day could raise that idea, Allen and Wright excitedly announced that they had made HMTD.  See p. 25, *supra*.

- 83 -

Given defendants' eagerness to hatch a plan to kill local Muslims, assemble
a team, nail down specifics, and make explosives, they cannot credibly claim that
Day induced them to enter the conspiracies. Indeed, no reasonable juror could find
that Day's involvement "create[d] a substantial risk that an undisposed person or
otherwise law-abiding citizen would commit the offense." *Vincent*, 611 F.3d at
1251 (citation omitted); see *Ortiz*, 804 F.2d at 1165 (inducement "implicates" a
defendant's "eager[ness] or reluctan[ce]" to act).

e. Defendants also rely on the actions of Brian, the undercover officer, to
argue inducement. In particular, they cite to Brian's offer to help them finance
their attack, as well as Day's repeated attempts to have them meet with Brian.
Allen Br. 49-50; Stein Br. 22-23. Defendants' argument here also fails.

"[T]he fact that government agents merely afford opportunities or facilities
for the commission of the offense does not constitute entrapment." *Sherman*, 356
U.S. at 372 (internal quotation marks and citation omitted); see also *Mathews*, 485
U.S. at 66; *Vincent*, 611 F.3d at 1250. Here, the FBI placed Brian into its
investigation to verify the seriousness of defendants' plans and protect the public
by dissuading defendants from building homemade explosives. Although Day
pitched the idea of working with Brian, defendants happily pursued obtaining
materials from Brian because they believed that those materials, in addition to the
explosives Allen and Wright were making, would solidify their ability to carry out

an attack.  Although Allen and Wright were reluctant to meet personally with

Brian, that reluctance—which was based on a desire to avoid detection, as opposed

to second thoughts about a bombing—did not slow their plans.  Rather, they

compiled a list of items that they wanted and told Day to meet with Brian alone so

that they could feign ignorance in the event of a setup.  See pp. 21-22, 24-26, 30,

*supra*.

To be sure, given the public safety need to derail defendants' bomb-making

efforts, Day encouraged defendants to meet with Brian.  Day did not usually speak

with Allen and Wright by telephone but repeatedly called each of them before his

first meeting with Brian.  6R.4912-4915, 4954-4955.  Allen and Wright, for their

part, were not persuaded and continued work on homemade explosives.  Day's

failed attempt to divert their attention away from constructing a homemade bomb

does not equal government inducement.  If anything, their refusal to meet Brian

shows that Allen and Wright were confident in their bomb-making abilities and did

what they wanted regardless of Day.  6R.2137-2139; see *Young*, 954 F.2d at 617

(examining whether defendant-informant relationship would compel the defendant

to respond affirmatively to the informant).  Here, Allen and Wright's hesitation at

meeting Brian bears no resemblance to the cases on which defendants rely, which

involved defendants who largely sought to avoid involvement in the crime

altogether.  See Allen Br. 49-50.

As for Stein, his decision to meet Brian in person and explore what help he could offer was simply another act in furtherance of an already formed conspiracy. Indeed, when Stein met Brian in late September 2016, Brian intentionally let Stein direct the conversation and simply mirrored his views. Stein shared his disdain of Muslims, requested pricing on items defendants needed for their attack, and sought additional items, like fully automatic weapons. Far from rethinking defendants' attack, Stein was giddy at the prospect of Brian's help and sought to assure *Brian* that he faced no risk in working with defendants. Throughout their exchanges, Brian gave Stein ample opportunity to express doubt over defendants' planned attack. Yet Stein never hesitated, even after Brian asked whether Stein had seen children at either target. See pp. 26-29, 33-35, *supra*.[19]

f. Finally, defendants cite (Allen Br. 50-51) the FBI's "efforts" to "build chargeable offenses" against them, *i.e.*, by having Stein shoot fully automatic weapons. But the record is undisputed both that Brian gave Stein the opportunity

---

[19] Defendants argue (Allen Br. 50; Stein Br. 23) that Brian's willingness to help finance their attack supported an entrapment instruction. Yet, unlike the facts in the cases they rely on, Brian told Stein that defendants would need to come up with specific amounts of money for items they wanted to purchase, and offered a generous price on the bombs only because Stein was providing 300 pounds of fertilizer. Significantly, Brian did not offer Stein automatic weapons at anything approaching "one penny per piece." *United States* v. *Pillado*, 656 F.3d 754, 765 (7th Cir. 2011) (discussing "extraordinary inducement"); cf. *United States* v. *Cromitie*, 727 F.3d 194, 211 (2d Cir. 2013) (informant offered the defendant money, a discounted barber shop, a BMW, and a lavish vacation).

to shoot fully automatic weapons only after Stein raised the subject of possibly obtaining such weapons, and that the FBI did so to bolster Brian's credibility and to provide an immediate basis to arrest defendants if necessary.  See pp. 27, 33, *supra*.  Regardless, anything related to the fully automatic weapons is irrelevant to defendants' entrapment defense to entering the charged conspiracies.

     2.     *Defendants Failed To Show A Triable Issue As To Lack Of Predisposition*

Because defendants cannot offer sufficient evidence of government inducement, this Court need not reach whether they lacked the predisposition to join the charged conspiracies.  But defendants cannot satisfy this prong either.  Although predisposition "is viewed at the time the government agent first approaches the defendant," "inferences about that predisposition may be drawn from events occurring after the two parties came into contact."  *United States* v. *Nguyen*, 413 F.3d 1170, 1178 (10th Cir. 2005) (citations omitted).

     a.  Defendants argue that there is a genuine issue of fact with respect to their predisposition to enter the charged conspiracies before meeting Day.  Allen Br. 51-53; Stein Br. 24-27; Wright Br. 29-30.  But undisputed evidence of defendants' actions and attitudes shows otherwise.

     First, consider Stein.  From the moment Day met Stein in early 2016, Day was scared that Stein was on the brink of killing Muslims.  In fact, when Day drove Stein around Garden City in February 2016 and surveilled local Somalis

with him, Day thought that Stein was going to start killing people that day and

immediately notified the FBI of his concerns.  See pp. 5-7, *supra*.  Similarly,

Benson testified (6R.1745-1746) that Stein talked about exterminating Muslims as

early as spring 2016.  And Stein himself stated on June 14, 2016, that he had

considered but later abandoned executing an attack on Muslims six to eight months

earlier—*i.e.*, before he knew Day.  See pp. 11-12, *supra*.

     Benson described Stein as so vocal and adamant about the need to kill

Muslims that he thought *Stein*, not Day, was an informant pushing others toward

criminal conduct.  6R.1774-1775.  Likewise, Lula Harris described how Stein was

"ranting and raving each time [she] saw him," and constantly saying on phone calls

with Allen that not enough action was being taken against Muslims.  6R.2080-

2081; see also 6R.1840-1841.  But the evidence was not limited to Stein's violent

rhetoric.  Apart from calling Stein "poison all the time" (6R.2002-2003), Harris

recounted a specific instance in which Allen handed her the telephone to speak

with Stein while he answered the door.  6R.1965.  Stein, in earnest, asked Harris

whether she would become a suicide bomber if her cancer scans were not clear.

6R.1965-1966, 2093-2094.  Stein also revealed his predisposition when he talked

about using fertilizer bombs to flatten Muslim buildings and about previously

making, and dealing in, methamphetamine—something Wright also did and which

they sought to capitalize on by trading methamphetamine to obtain explosives (GX.127b).[20]

Second, consider Allen. Admittedly, Allen was a military veteran never before convicted of terrorism-related charges. Cf. Allen Br. 52. But like Stein, his strong anti-Muslim and anti-immigrant views long predated his meeting Day. 6R.1848-1849. Harris started dating Allen in 2006, ten years before Allen met Day, and she lived with him from 2010 to 2015. 6R.1834. She described how, even then, Allen disliked the direction of the American government; had concerns that illegal immigrants and Muslims were taking over the country; perceived a growing Muslim threat, including the potential imposition of Sharia law in America; and openly shared his hostility toward Muslims. 6R.1848-1849.

---

[20] Stein asserts (Br. 24-27) that the relevant question is whether he was predisposed to commit *this particular* crime without the government's involvement, not whether he would have engaged in any such conspiracy. But that argument goes more to inducement than predisposition, which looks to the defendant's state of mind before an agent's involvement and any suggestion of the particular crime. See *Scull*, 321 F.3d at 1276 (quoting *Ortiz*, 804 F.2d at 1165).

Indeed, to accept Stein's position would mean that a defendant would be entitled to an entrapment instruction regardless of his preexisting state of mind so long as the particular crime, *e.g.*, a certain drug sale, would not have occurred but for an agent's involvement, *e.g.*, making a drug purchase. That has never been the test for entrapment, nor should it be. Cf. *Fadel*, 844 F.2d at 1433 (in a narcotics case, stating that "the government is not required to show that the defendant has engaged in prior acts or prior violations of the narcotics laws"). Regardless, the undisputed evidence shows that Stein, not Day, invited KSF members to Benson's property to recruit them to kill Muslims by, among other things, detonating high explosives where they lived, *i.e.*, the particular crimes for which he was convicted.

When Harris returned to live with Allen in June 2016 (6R.1835-1836), Allen was in debt, regularly tuning into conspiracy theorists, angry about how the then-Obama administration was running the government, convinced that the then-President would declare martial law rather than leave office, and increasing his "prepper" activities (6R.1910, 1976-1979, 1990). According to Harris, Allen also had boycotted the local Walmart after he encountered a Muslim employee in religious garb at the store. 6R.1850. That summer, Harris heard Allen and other KSF members talking at the fair about cutting a pig's throat and running it through a mosque to signal to Muslims that they were unwelcome. 6R.1857, 2047-2048. Allen himself told Harris that they could get people to stop bringing in Muslims to the area by killing the head of the refugee center or the mayor's wife. 6R.1858-1860. Day prompted neither these long-standing beliefs nor Allen's newly hatched boycott and plans to intimidate others. Allen argues (Br. 52-53) that his reluctance to meet Brian shows a lack of predisposition, but that evidence simply shows that he was acutely aware that meeting Brian could leave him exposed to a setup, and that he was increasingly confident that he and Wright could build their own bombs.

Finally, consider Wright, who, importantly, offered his business space and electrical know-how to ensure defendants' success. Wright points to his lack of criminal history and his business dealings, on one occasion, with a Muslim couple to assert there was a triable issue as to whether he lacked the predisposition to enter

the conspiracies. Wright Br. 14, 29-30; see 6R.5100-5103. But the fact that Wright sold a home to Muslims for a profit does not mean that he harbored no racial or religious animosity before meeting Day.

Indeed, a defense witness who testified to Wright's respectful business demeanor conceded that he heard Wright say negative things about Muslims that "coincided with  *  *  *  current events," including "the San Bernardino incident" (in December 2015) and "the nightclub incident" (in June 2016). 6R.5110-5111. Notably, Wright's negative comments about Muslims after the San Bernardino shooting occurred well before he ever knew Day. The same witness testified about Wright's business interactions with the Muslim couple but conceded that he did not know how the couple felt about Wright. 6R.5115-5118. He also conceded that he heard Wright used the term "[r]aghead" to refer to Muslims. 6R.5123-5124. At defendants' meetings, Wright also used the term "sand niggers" to refer to Muslims. GX.15h, 15tt, 127k.

b. Defendants' eager participation in and enthusiasm for planning their attack also belies their arguments that they lacked the necessary predisposition. Much of the same evidence that undisputedly shows that neither Day nor Brian induced defendants to enter the conspiracies also establishes that defendants were otherwise predisposed to commit those crimes.

The record is clear that defendants were ready, willing, and eager participants who pressed ahead without hesitation with their plot to kill as many innocent Muslims as possible. No defendant paused when numerous other KSF members, all of whom openly shared defendants' hatred of Muslims and suspicion of what they perceived to be a growing Muslim threat, declined to join defendants in an unprovoked attack. When defendants discussed the bombing, they spoke for hours about the best way to ensure maximum casualties, with Stein and Wright separately advocating for using fragmentation in the bomb to increase the amount of death and destruction it would cause. See GX.127dd. And, of course, all three defendants agreed to strike at prayer time, when the mosque would be "jam-packed" (GX.16oo) and "chock-full" (GX.16pp) with innocent victims. See GX.108-032 (Stein texting Brian that defendants would strike when worshippers were "packed in there like sardines").

Nor did any defendant ever withdraw from the conspiracy. See 6R.5256-5257. Indeed, rather than disclose their activities to law enforcement after Allen was arrested, Stein and Wright each took additional steps to further the conspiracy. Stein pursued blasting caps and bombs, assured Brian that Allen and Wright would not snitch on them, took Brian to the target locations so that he could build an effective bomb, and delivered 300 pounds of fertilizer to Brian for that bomb. Rather than confess to law enforcement, Wright hid bomb-making ingredients,

equipment, and binders of recipes and instructions in a storage locker and then met

voluntarily with state and federal agents to try to feign ignorance of the conspiracy

and derail the investigation. See pp. 33-36, *supra*; see also GX.17a (Wright stating

he would feign ignorance if ever questioned about Allen).

* * * * *

In sum, because defendants failed to offer sufficient evidence of both

government inducement and lack of predisposition, there was no factual issue for

the jury to decide and the court properly held there was no entrapment as a matter

of law. See *Ortiz*, 804 F.2d at 1164.

### III

### THE DISTRICT COURT CORRECTLY APPLIED
### THE TERRORISM ENHANCEMENT

A.    *Standard Of Review*

This Court reviews "procedural aspects of a district court's sentencing

decision for abuse of discretion." *United States* v. *Lucero*, 747 F.3d 1242, 1246

(10th Cir. 2014) (citation omitted). Under this standard, the Court reviews the

district court's interpretation of the Sentencing Guidelines de novo, but limits its

review of any factual findings for clear error, giving due deference to the district

court's application of the Guidelines to the facts. See *ibid.*; see also *United States*

v. *Patton*, 927 F.3d 1087, 1100-1101 (10th Cir. 2019) (citations omitted).

This Court deems waived and refuses to consider arguments that were intentionally relinquished or abandoned below. See *Tesone* v. *Empire Mktg. Strategies*, 942 F.3d 979, 991-992 (10th Cir. 2019) (citation omitted); *United States* v. *Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019).

B.     *The District Court Finds That The Terrorism Enhancement Applies But Varies Downward From Defendants' Recommended Life Sentences*

    *1.     Section 3A1.4's Terrorism Enhancement*

Section 3A1.4 of the Sentencing Guidelines states: "If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism," a 12-level increase (or an increase to a minimum of 32) shall be applied to the defendant's base offense level and the defendant's criminal history category shall be Category VI. Sentencing Guidelines § 3A1.4(a) and (b).

A "'federal crime of terrorism' has the meaning given that term in 18 U.S.C. § 2332b(g)(5)." Sentencing Guidelines § 3A1.4, comment. (n.1). That statute, in turn, defines a "[f]ederal crime of terrorism" as an offense that (A) "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and (B) is a violation of one of several enumerated statutory provisions. 18 U.S.C. 2332b(g)(5)(A) and (B). Because the enumerated list includes 18 U.S.C. 2332a (relating to use of weapons of mass destruction), which defendants were convicted of violating beyond a reasonable doubt, the second prong of the definition is not at issue.

The district court here had to find that defendants' offense satisfied Section 2332b(g)(5)'s intent prong before applying the terrorism enhancement. This Court has made clear that the facts supporting a sentencing enhancement "need be determined by only a preponderance of the evidence." *United States* v. *Craig*, 808 F.3d 1249, 1259 (10th Cir. 2015) (citing *United States* v. *O'Brien*, 560 U.S. 218, 224 (2010)); see also, *e.g.*, *United States* v. *Johnson*, 732 F. App'x 638, 660 (10th Cir. 2018) (adhering to this approach even for uncharged and acquitted conduct, so long as the defendant's sentence is within the statutory range); Sentencing Guidelines § 6A1.3, comment. ("[A] preponderance of the evidence standard is appropriate" to resolve "disputes regarding application of the guidelines to the facts.").

This Court has not addressed the meaning of the phrase "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. 2332b(g)(5)(A). Other circuit courts have interpreted it as imposing a specific intent requirement. The Sixth Circuit has explained that "[a] defendant has the requisite intent if he or she acted with the purpose of influencing or affecting," or retaliating against, "government conduct and planned his or her actions with this objective in mind." *United States* v. *Wright*, 747 F.3d 399, 408 (6th Cir. 2014) (citations omitted). The Second Circuit likewise has stated that "[c]alculation * * * is concerned with the object

- 95 -

that the actor seeks to achieve through planning or contrivance." *United States* v.
*Awan*, 607 F.3d 306, 317 (2d Cir. 2010) (internal quotation marks and citation
omitted); accord *United States* v. *Mohamed*, 757 F.3d 757, 760 (8th Cir. 2014).
The Eleventh Circuit agrees:  the requisite intent "focuses on the intended outcome
of the defendants' unlawful acts—i.e., what the activity was calculated to
accomplish, not what the defendants' claimed motivation behind it was." *United
States* v. *Jayyousi*, 657 F.3d 1085, 1115 (11th Cir. 2011).[21]

Also, the purpose to influence, affect, or retaliate against government
conduct need not be the defendant's "ultimate or sole aim." *Wright*, 747 F.3d at
408.  Rather, the enhancement is triggered if the defendant has "as one purpose"
that intent.  *United States* v. *Fidse*, 862 F.3d 516, 526 n.7 (5th Cir. 2017) (quoting
*United States* v. *Graham*, 275 F.3d 490, 516 (6th Cir. 2001)); see *Jayyousi*, 657
F.3d at 1114-1115 (upholding enhancement in a material support case in which
defendants' claimed goal was to assist oppressed Muslims); *Awan*, 607 F.3d at
317-318 (explaining that Section 3A1.4 would apply to a defendant motivated "by
greed rather than politics," so long as his actions were calculated to influence
government conduct); cf. *United States* v. *Khan*, 938 F.3d 713 (5th Cir. 2019)

---

[21]  See also, *e.g.*, *United States* v. *Hassan*, 742 F.3d 104, 148-149 (4th Cir.
2014); *United States* v. *Siddiqui*, 699 F.3d 690, 709 (2d Cir. 2012) (citing *Awan*,
607 F.3d at 317); *United States* v. *Christianson*, 586 F.3d 532, 539-540 (7th Cir.
2009); *United States* v. *Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004).

(rejecting that "degrees of terrorism" exist, some of which are insufficient to satisfy Section 2332b(g)(5)).  The requisite intent also "does not hinge upon a defendant's ability to carry out specific terrorist crimes or the degree of separation from their actual implementation."  *United States* v. *Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004).

The commentary to Section 3A1.4 explains that the enhancement applies only to "federal crimes of terrorism."  Sentencing Guidelines § 3A1.4, comment. (n.4).  Yet, the Sentencing Commission recognized that offenses may be calculated to influence, affect, or retaliate against government conduct even where they do not involve, or are not intended to promote, one of the offenses enumerated in Section 2332b(g)(5)(B).  It also recognized, conversely, that an offense may involve or be intended to promote an enumerated offense but have a terrorist motive to intimidate or coerce a civilian population and not the government.  The commentary instructs that in both scenarios an upward departure (not to exceed the top of the guideline range that would have resulted if Section 3A1.4 had applied) would be warranted.  Sentencing Guidelines § 3A1.4, comment. (n.4).

*2.     The Court Finds Section 3A1.4 Applies Given Defendants' Conduct*

a.  The Probation Office calculated defendants' offense levels on the conspiracy counts as follows:

*base offense levels* of 33 under Section 2K1.4(c) after applying the cross-reference to Section 2A1.5; *increased by* a three-point hate

crimes enhancement under Section 3A1.1(a), a 12-level terrorism enhancement under Section 3A1.4, a two-level organizer role enhancement under Section 3B1.1 (Stein only), and a two-level obstruction enhancement under Section 3C1.1 (Wright only), *yielding adjusted offense levels* of 48 for Allen and 50 for Stein and Wright; *resulting in total offense levels* of 43, because any offense level over 43 is treated as 43 under the Guidelines.

7R/Allen.146-148; 7R/Stein.181-183; 7R/Wright.228-231.  Under Section 3A1.4,

defendants were assigned criminal history categories of VI.  7R/Allen.150;

7R/Stein.187; 7R/Wright.231.  Based on defendants' total offense levels of 43 and

criminal history categories of VI, Probation recommended life imprisonment.

7R/Allen.158; 7R/Stein.196; 7R/Wright.236.

   b.  On November 19, 2018, the court held a hearing on defendants'

objections to their presentence investigation reports (PSRs), including to the

application of Section 3A1.4.  6R.5654-5725; see 3R.313-334; 7R/Allen.162-174;

7R/Stein.209-218; 7R/Wright.249-255.  At the hearing, defendants pressed two

legal arguments:  (1) the jury, and not the court, had to find the facts that supported

Section 3A1.4's application (6R.5654-5658); and (2) the evidence had to show that

defendants' sole or predominant intent in conspiring to use a weapon of mass

destruction was to influence, affect, or retaliate against government conduct, as

opposed to violating the civil rights of Muslims (6R.5658-5685).  See 3R.320-328.

   Defendants conceded that, as to their first argument, "the weight of the law"

was against them and they raised the objection "to preserve it."  6R.5657-5658.

The crux of their second argument, defendants explained, was that any evidence

that defendants sought to influence, affect, or retaliate against government conduct

was "far outweighed by" their immediate purpose to injure and intimidate

Muslims.  6R.5664.  The government responded that both arguments lacked merit

and, moreover, that the enhancement clearly applied based on defendants' repeated

statements showing that they sought to stop Muslim immigration—and, therefore,

influence, affect, or retaliate against government conduct—through a series of

murderous attacks (both theirs and those of whom they hoped to inspire).

6R.5685-5717; see 3R.396-411, 583-585, 672-673, 761-772.

　　　c.  On January 15, 2019, the court overruled defendants' PSR objections,

apart from Stein's objection to an organizer-role enhancement.  Supp.2R.11-34.  In

a written ruling, the court found by a preponderance of the evidence that the

terrorism enhancement applied because defendants' conspiracy was calculated, at

least in part, to influence or affect government conduct by intimidation or coercion,

or to retaliate against government conduct.  Supp.2R.24, 32.

　　　In so finding, the court rejected defendants' legal arguments.  First, it stated

that it was well-settled that the district court has the power to enhance defendants'

sentences based on its own factfinding, as long as the sentences imposed are

statutorily authorized.  Supp.2R.24-25 & n.25.  The court stated that, consistent

with the majority of circuit courts that have addressed the issue, it would use a

preponderance-of-the-evidence standard to determine whether defendants acted with the requisite intent.  Supp.2R.24-25 & n.25.

Second, as for the purpose of defendants' conspiracy, the court stated that it "cannot be neatly distilled into a single purpose."  Supp.2R.25.  The court found that defendants sought to kill Muslims living and worshipping at the Mary Street complex—indeed, that was "unquestionably a core goal of the conspiracy"—but that defendants "had bigger plans than simply killing local Muslims."  Supp.2R.25. Specifically, the court explained, "[d]efendants sought to inspire like-minded citizens to engage in similar violent conduct nationwide, to discourage local landlords from leasing to Muslims, and to coerce government officials to change their conduct toward Muslims."  Supp.2R.25.

To support this conclusion, the court pointed to Stein's repeated statements reflecting his anger with the then-Obama Administration for bringing the "cockroaches" into the country by the "plane load", and additional statements by Stein and Allen regarding violent action they should take against local officials who facilitated Muslim immigration.  Supp.2R.25 & nn.26-27.  Moreover, although Allen penned defendants' draft manifesto, the court found that all three defendants crafted its message.  Supp.2R.26.  Defendants addressed their manifesto to both "the United States government" and "the American people," and included specific grievances against the government, such as "not enforcing our

borders" and "illegally bringing in Muslims by the thousands," things that had

caused Stein to spring into "organization mode" after the Pulse nightclub shooting.

Supp.2R.26; see GX.101-a.  Defendants also warned government officials and

private citizens that they risked danger if they continued to "sell out this country."

Supp.2R.26; GX.101-a.  The court emphasized that this was "just some of the

evidence" showing that the conspiracy "was intended, at least in part, to influence,

affect, or retaliate against the government."  Supp.2R.27.

The court next determined what weight to give such evidence in light of

defendants' other purposes or goals, including "influencing the decisions of private

citizens."  Supp.2R.27.  The court adopted the Sixth Circuit's holding in *Wright*

that influencing government conduct need not be a defendant's "ultimate or sole

aim" for Section 3A1.4 to apply.  Supp.2R.27 (quoting *Wright*, 747 F.3d at 408);

see also Supp.2R.29-30 (discussing *Wright*).

The court agreed with defendants that influencing or retaliating against the

government was not their "sole intent or principal purpose," but it concluded that

no such showing was required.  Supp.2R.29.  To conclude otherwise, the court

stated, would be inconsistent with the text of Section 3A1.4 and 18 U.S.C.

2332b(g)(5)(A) and applicable cases.  Supp.2R.29-30 & n.38.  Accordingly, the

court determined that defendants' offense simply needed to be calculated, in part,

to influence, affect, or retaliate against government conduct, a showing the court

found satisfied.  2R.24, 27, 32.  The court disagreed with defendants that

"influencing or retaliating against the government was not a significant purpose of

the conspiracy."  Supp.2R.30 (citing defendants' draft manifesto and their

discussions about targeting government officials).

The court also found that, to the extent Allen drafted the manifesto without

Stein and Wright's input (a conclusion the court rejected), Allen's intent for the

conspiracy to influence or retaliate against government conduct was "abundantly

clear" to Stein and Wright, who therefore were "accountable for their co-

conspirator's reasonably foreseeable actions."  Supp.2R.30-31.

### 3.    *The Court Varies Downward At Sentencing*

On January 25, 2019, the court sentenced defendants.  6R.5773-6088.  It

held a combined hearing to resolve administrative issues and hear victim impact

statements (6R.5776-5795), before conducting defendant-specific hearings to

consider the factors set forth under 18 U.S.C. 3553(a) and impose final sentences

(6R.5795-5888, 5913-6002, 6025-6087).

At each hearing, the court discussed factors common to defendants.

6R.5863-5871, 5985-5991, 6069-6075.  The court explained, for example, that

even though defendants' properly calculated Guidelines sentences were life

imprisonment (and Section 2332a permitted that sentence), it would rely primarily

on Section 3553(a) to fashion individualized sentences that, in its view, better

reflected defendants' relative culpability.  The court also stated that even if it had

not applied the terrorism enhancement, it still would have imposed the same final

sentences by departing upward from defendants' otherwise applicable Guidelines

ranges, consistent with Section 3A1.4's commentary.  6R.5866, 5986-5988, 6070-

6072.[22]

The court also discussed several factors it found significant in determining

defendants' sentences.  *First*, defendants planned a "significant terroristic attack"

that, if successful, "would have rivalled Oklahoma City in terms of our nation's

consciousness."  6R.5867.  Because defendants were convicted of conspiracy, the

court found it unimportant that the attack did not occur.  6R.5867-5869, 5988-

5890, 6072-6074.

*Second*, the court found that, even when compared to Oklahoma City, this

planned bombing had the additional feature of being "motivated by an incredible

animus towards race[,]" "national origin[,]" and "religion"—a feature "antithetical

to the very principles that this country holds dearest with respect to the equality of

which we hold individuals of all variations."  6R.5867-5868; *see* 6R.5989, 6073.

---

[22]  Without the terrorism enhancement and before applying any upward
departure, Stein and Allen's advisory sentences would have been 188-235 months
(*i.e.*, roughly 15½ to 19½ years) and Wright's advisory sentence would have been
235-293 months (*i.e.*, roughly 19½ to 24½ years).

*Third*, the court found that defendants' planning lasted months, and yet "there were really no creditable second thoughts or hesitation or strikes of conscience on the defendants." 6R.5868. Rather, "the hours of conversations that exist give no indication that there were any senses of remorse or hesitation." 6R.5868; see 6R.5989, 6073-6074.

*Finally*, the court found that, despite defendants' arguments to the contrary, nothing about "the involvement of Dan Day and the FBI in general serve to reduce the defendants' culpability in this case." 6R.5870; see 6R.5990, 6074-6075.

After explaining other defendant-specific factors that it also considered, the court varied downward and sentenced Allen to 300 months' imprisonment (*i.e.*, 25 years), Wright to 312 months' imprisonment (*i.e.*, 26 years), and Stein to 360 months' imprisonment (*i.e.*, 30 years). 6R.5871-5888, 5991-6002, 6075-6087. The court reiterated that it would have imposed these same sentences even if it had sustained defendants' objection to the terrorism enhancement. 6R.5884; see 6R.5988, 5996. It also stressed the utmost consideration it had given defendants' sentences: "I've spent more time thinking about today's sentences than I have for any one individual case I've had before, and appropriately so, because of the complexity and the severity of the charges." 6R.6069.

- 104 -

C.    *The District Court Properly Applied The Terrorism Enhancement*

1.    *The Court Properly Found The Facts Supporting Section 3A1.4's
      Application By A Preponderance Of The Evidence*

Defendants first argue that the district court erred because it found the facts

supporting Section 3A1.4's application by a preponderance of the evidence.  In

particular, defendants argue that (a) the jury had to find the requisite intent for

Section 3A1.4 beyond a reasonable doubt, and (b) to the extent the court could find

such intent, it had to do so by clear and convincing evidence.  Both arguments fail.

a.  Defendants correctly acknowledge (Stein Br. 38) that binding precedent

forecloses their argument that the jury had to find that they acted with the requisite

intent for purposes of applying Section 3A1.4.

To convict a defendant in accordance with the Fifth and Sixth Amendments,

the jury must find each element of the offense proven beyond a reasonable doubt.

See *Apprendi* v. *New Jersey*, 530 U.S. 466, 476-478 (2000).  At that point, a judge

permissibly may exercise his discretion to impose a sentence within the statutory

range, "taking into consideration various factors relating both to offense and

offender."  *Id.* at 481 (citations omitted).  Given the jury's guilty verdict and the

maximum statutory penalty of life, see 18 U.S.C. 2332a(a), the district court could

find the relevant sentencing facts by a preponderance of the evidence so long as it

treated the Guidelines as discretionary.  See *United States* v. *Hall*, 473 F.3d 1295,

1312 (10th Cir. 2007) (discussing treatment of the Guidelines post-*United States* v.

*Booker*, 543 U.S. 220 (2005)).

Defendants argue (Stein Br. 37) that because their offense "was a conspiracy

and not a completed offense," their final sentences could be "upheld as reasonable

only because of the existence of judge-found facts," *i.e.*, the requisite intent under

Section 3A1.4.  But defendants raise a distinction without a difference:  Section

2332a(a) subjects to the same penalty anyone who "uses, threatens, or attempts or

conspires to use, a weapon of mass destruction."  18 U.S.C. 2332a(a).  See *United*

*States* v. *Nichols*, 169 F.3d 1255, 1273-1274 (10th Cir. 1999) (emphasizing that

Congress did not "distinguish between using an explosive weapon of mass

destruction or conspiring to do so in determining the proper punishment").  In any

event, this Court has rejected the argument "that it is unconstitutional for the

sentencing judge to rely upon a fact not found by the jury or admitted by the

defendant in determining a sentence, where the sentence would not be reasonable

in the absence of that fact."  *United States* v. *Redcorn*, 528 F.3d 727, 745-746

(10th Cir. 2008); see also *Gall* v. *United States*, 552 U.S. 38, 46-47, 49-51 (2007)

(recognizing the court's discretion to reasonably impose a statutorily authorized

sentence that varies from the guideline range).

b.  Defendants next argue that the district court should have required clear and convincing evidence of the requisite intent before applying Section 3A1.4. Stein Br. 33-36.  Defendants waived this argument.  It also fails on the merits.

i.  As an initial matter, defendants intentionally relinquished this argument below and therefore waived it.  See *Tesone,* 942 F.3d at 991.  To be sure, defendants argued that a standard higher than preponderance-of-the-evidence should apply at sentencing.  Stein Br. 36.  But their argument concerned only whether the *jury* must find (or the defendant must admit) the requisite intent under Section 3A1.4 (and therefore establish that fact beyond a reasonable doubt for sentencing purposes), not whether the *judge* must find such intent by clear and convincing evidence.  See 3R.320; 6R.5654-5658.

Indeed, when the district court questioned defendants about the scope of their argument, they expressly disavowed the argument they now make:

THE COURT:  *  *  *  *  So I think I'm looking at paragraph 183.

I took that – and that's why I wanted to look at it.  I took that as more as an *Apprendi*-type argument, not that you thought that the standard of proof was not preponderance but that you questioned the ability of the Court to actually make findings of fact beyond what the verdict was at all that would impact this determination.

[DEFENSE]:  Yes, Your Honor.  Our position is the Constitution requires a jury to make findings beyond a reasonable doubt any fact in which the Court then uses to enhance the sentence.

> THE COURT:  Okay.  So this isn't a position I can make that finding
> of fact by a preponderance of the evidence.  This is a question of
> whether I can make that finding of fact at all.
>
> [DEFENSE]:  Correct.

6R.5657; see 6R.5654-5655, 5658.  Thus, defendants intentionally chose to forego

arguing that the applicable evidentiary standard for any judge-found facts was

clear-and-convincing-evidence.

Defendants primarily relied below on *United States* v. *Sabillon-Umana*, 772

F.3d 1328 (10th Cir. 2014), but that case does not help them here.  See 3R.320

n.20; 7R/Allen.169, at ¶183; 7R/Stein.213, at ¶234.  *Sabillon-Umana* concerned

only whether the district court may base sentencing decisions "on facts the judge

finds without the aid of a jury or the defendant's consent."  772 F.3d at 1331.  It

does not address defendants' argument whether a court finding such facts must do

so based on clear and convincing evidence.  Indeed, to the extent defendants ever

referenced the clear-and-convincing-evidence standard, they did so only in passing

while making their "primary motivation" argument.  Compare 3R.320-322 & n.20

with 3R.324 n.33 (quoting *United States* v. *Tankersley*, 537 F.3d 1100 (9th Cir.

2008)); see also 7R/Allen.169-171; 7R/Stein.212-215; 7R/Wright.249-251; 3R.397

(government response stating defendants raised two legal arguments, *i.e.*, under

*Apprendi* and for a "primary intent" standard).

The court addressed both whether it could engage in judicial factfinding at all and what evidentiary standard applied (Supp.2R.24-25 & n.25), but that also does not help defendants on appeal.  See *Tesone*, 942 F.3d at 991-992 (explaining that a party that has waived an argument cannot seek appellate relief on that issue even where the court below addresses it).

ii.  If this Court reaches the issue, the district court properly applied the preponderance standard to find that defendants had the requisite intent under the terrorism enhancement.

There is no reason for this Court, post-*Booker*, to apply anything other than a preponderance-of-the-evidence standard for judge-found facts where sentencing enhancements no longer result in increased Guidelines sentences that are mandatory.  See *United States* v. *Fisher*, 502 F.3d 293, 302, 305-308 (3d Cir. 2007) (overruling circuit precedent requiring clear and convincing evidence where a departure acts as "a tail which wags the dog of the substantive offense," because the same due process concerns do not exist under an advisory-Guidelines system). Not surprisingly, the two post-*Booker* cases defendants rely on to argue that this Court has "reserved the question of whether, in some extraordinary or dramatic case, due process might require a higher standard of proof," cite only pre-*Booker* cases decided under the then-mandatory system.  See Stein Br. 33-34 (citing

*United States* v. *Olsen*, 519 F.3d 1096, 1105-1106 (10th Cir. 2008), and *United States* v. *Redifer*, 631 F. App'x 548, 562-563 (10th Cir. 2015)).

Indeed, to adopt defendants' approach would put this Court in conflict with the vast majority of circuit courts. Every circuit that has addressed the issue of what evidentiary standard applies to the terrorism enhancement has rejected defendants' argument. Five circuits (the Second, Fourth, Fifth, Sixth, and Seventh) have expressly held that sentencing courts should use the preponderance-of-the-evidence standard and two more (the Eighth and Eleventh) have upheld a district court's application of the enhancement under that standard.[23] The Ninth Circuit assumed without deciding in *Tankersley*, 537 F.3d at 1106 & n.5, that the district court in that case properly required clear and convincing evidence before applying the terrorism enhancement to the appellant's co-defendants. But *Tankersley* merely reflects the Ninth Circuit's anomalous approach to require clear and convincing evidence in support of an enhancement where it "has an extremely disproportionate effect on the sentence relative to the offense of conviction." See *id.* at 1106 (citation omitted).

---

[23] See, *e.g.*, *Awan*, 607 F.3d at 317; *United States* v. *Chandia*, 675 F.3d 329, 339 (4th Cir. 2012); *Fidse*, 862 F.3d at 523; *Wright*, 747 F.3d at 407; *Graham*, 275 F.3d at 517 & n.19; *United States* v. *Arnaout*, 431 F.3d 994, 1002 (7th Cir. 2005); see also *Mohamed*, 757 F.3d at 760; *Mandhai*, 375 F.3d at 1247-1248.

Thus, the district court here undertook the inquiry that the Supreme Court, this Court, and most other circuit courts envision. That is, the district court may find facts that increase or decrease a defendant's sentence by a preponderance of the evidence, so long as the sentence is within the statutory range and the court treats the Guidelines as discretionary. See, *e.g.*, *O'Brien*, 560 U.S. at 224; see also *Gall*, 552 U.S. at 46-51; *Craig*, 808 F.3d at 1259; *Hall*, 473 F.3d at 1312.

Defendants assert that this Court "should be wary of" Section 3A1.4's significant effect on a defendant's Guidelines sentence, and that a heightened standard therefore should apply. Stein Br. 33. But as this case shows, no good reason exists to impose a heightened evidentiary standard for the terrorism enhancement alone. Just because a sentencing court finds that Section 3A1.4 applies does not mean that it will impose a within-Guidelines sentence, even where the government advocates for one. Under such a scenario, the resulting sentence still may be reasonable where the Section 3553(a) factors demonstrate that it is sufficient, but not greater than necessary, to accomplish sentencing objectives. See *Kimbrough* v. *United States*, 552 U.S. 85, 100-101, 107-110 (2007); *Gall*, 552 U.S. at 52.

iii. Finally, even if this Court determines that defendants did not waive this argument and that clear and convincing evidence is required, any error in using the preponderance-of-the-evidence standard was harmless. See *Olsen*, 519 F.3d at

1105-1106 (citation omitted).  The extensive record here—including defendants'

manifesto addressed to "the U.S. govt." and "the American people" and

defendants' repeated statements linking their plot to perceived border,

immigration, and refugee policies—compels a finding that, even under a clear-and-

convincing-evidence standard, defendants' conspiracy was calculated to influence,

affect, or retaliate against government conduct.  See 3R.396 (government's

sentencing memorandum arguing "it is clear, under any evidentiary standard, that

the defendants' purpose for the bombing falls squarely within" Section 3A1.4); see

also 3R.401-411, 763-772 (same, discussing relevant evidence).

> ### 2. Influencing, Affecting, Or Retaliating Against Government Conduct Does Not Have To Be An Offense's "Sole" Or "Primary" Purpose For Section 3A1.4 To Apply

Defendants next argue (Stein Br. 39) that the district court incorrectly

applied Section 3A1.4 because it did not require the government to show that the

"primary intent or dominant purpose" of their conspiracy was to influence, affect,

or retaliate against government conduct.  In other words, defendants ask this Court

to interpret the terrorism enhancement so that it is inapplicable where the

"government-related motive" was a "secondary or ancillary purpose of the crime,"

even though the court found that was not the case here.  Stein Br. 39.  But Section

3A1.4 does not depend on the degree of a defendant's government-related purpose.

In interpreting the Guidelines, this Court begins with the applicable text, giving words their ordinary meaning.  *Lucero*, 747 F.3d at 1247.  The Court also looks to the guideline's "interpretative and explanatory commentary," which is "authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."  *Ibid.* (citation omitted).  "When the language of the guideline is clear and unambiguous, it must be followed except in the most extraordinary situation where the language leads to an absurd result contrary to clear legislative intent."  *Ibid.* (internal quotation marks and citation omitted).

a.  First, the legal standard defendants urge is inconsistent with the text of Section 3A1.4 and, by incorporation, 18 U.S.C. 2332b(g)(5).  Section 3A1.4(a) applies "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism."  Significantly, the guideline does not speak in terms of an offense that "*primarily* involved," or "*primarily* was intended to promote," a federal crime of terrorism.  Rather, the unencumbered use of the terms "involve," which means to "include," and "promote," which means "to bring or help to bring . . . into being," signals the guideline's broad scope.  See, *e.g.*, *Mandhai*, 375 F.3d at 1247-1248 (citations omitted); *United States* v. *Arnaout*, 431 F.3d 994, 1001-1002 (7th Cir. 2005) (same).

- 113 -

Likewise, to be a "[f]ederal crime of terrorism" under Section 2332b(g)(5), the offense must be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  18 U.S.C. 2332b(g)(5)(A).  The statutory language does not speak in terms of an offense "that *primarily* is calculated," or "that is calculated *solely*," to influence, affect, or retaliate against government conduct.  Defendants cite *United States* v. *Hasan*, 526 F.3d 653, 666 (10th Cir. 2008), to argue that their interpretation of the terrorism enhancement is correct, but *Hasan* demonstrates that Congress includes the word "primarily" in a statute when it wants to do so.  Cf. Stein Br. 41.

Accordingly, nothing in Section 3A1.4 or Section 2332b(g)(5) delineates between defendants "primarily" or "solely" motivated by terrorism and those whose terrorism is "secondary or ancillary" to another goal.  Indeed, as the district court found here, such distinctions are artificial, as many offenses, like this one, "cannot be neatly distilled into a single purpose."  Supp.2R.25.  Nor is there any suggestion in the text to insulate defendants, such as here, who act for a dual purpose, *i.e.*, to influence, affect, or retaliate against government conduct and to inflict harm on certain civilians.[24]

---

[24]  Defendants argue (Stein Br. 42 n.6) that their conviction for conspiring to violate civil rights, in violation of 18 U.S.C. 241, supports not applying the enhancement to their Section 2332a(a)(2) offense because, to establish a Section 241 violation, the government had to prove defendants acted "because of" their

(continued…)

Indeed, the absence of limiting language in both the guideline and statute reflects Congress's intent for Section 3A1.4 to apply broadly. Originally, in 1994, Congress directed the Sentencing Commission to create an enhancement for crimes that did not have terrorism as an element, but which involved or were intended to promote international terrorism. See Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, Title XII, § 120004, 108 Stat. 2022.[25] The Sentencing Commission responded by adding Section 3A1.4 in place of the upward departure then at Section 5K2.15. See *United States* v. *Meskini*, 319 F.3d 88, 92 (2d Cir. 2003); Sentencing Guidelines, App. C, amend. 526. From its inception, Section 3A1.4 reflected a decision by Congress and the Commission to enhance sentences across an array of criminal statutes where the offense conduct involved, or promoted, international terrorism.

─────────────────

(…continued)

victims' religion or national origin. But one conviction does not preclude applying the terrorism enhancement to the other. Accord *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 152-153 (2d Cir. 2008). Nor do the words "because of" mean "solely because of"; indeed, an event may have multiple but-for causes. See *Burrage* v. *United States*, 571 U.S. 204, 211, 214 (2014); *United States* v. *Porter*, 928 F.3d 947, 956 (10th Cir. 2019) ("because of" means "race must have been a necessary motivation but not the sole motivation").

[25] This Act also led to the codification of 18 U.S.C. 2332a—defendants' offense here—which authorized a penalty of "any term of years or for life" against persons who used or attempted or conspired to use a weapon of mass destruction against a U.S. national or property within the United States. See Pub. L. No. 103-322, Title VI, § 60023(a), 108 Stat. 1980.

After the 1995 Oklahoma City bombing, Congress directed the Commission to apply Section 3A1.4 more broadly to "federal crime[s] of terrorism," as defined in the newly enacted 18 U.S.C. 2332b(g).  Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 730, 110 Stat. 1303.  The Commission, in turn, amended Section 3A1.4 to refer to "federal crime[s] of terrorism" and revised the commentary to incorporate Section 2332b(g)(5)'s definition.  Sentencing Guidelines, App. C, amend. 539 & 565.  Thus, since 1996, the terrorism enhancement has applied to conduct such as defendants'—*i.e.*, conspiring to use a weapon of mass destruction against people or property within the United States in order to influence, affect, or retaliate against government conduct.

Accordingly, defendants here cannot avoid Section 3A1.4's application by claiming that their offense had the "primary intent or dominant purpose" of killing innocent Muslims and sought only as a "secondary or ancillary" goal to influence, affect, or retaliate against government conduct.  Stein Br. 39.  Even if the trial record supported their argument, which it does not, that result would be absurd in light of Section 3A1.4's text and Congress and the Commission's intent for the guideline to apply broadly.  See *United States* v. *Benkahla*, 530 F.3d 300, 313 (4th Cir. 2008) (Section 3A1.4 "is doing just what it ought to do:  Punishing more

harshly than other criminals those whose wrongs served an end more terrible than other crimes.").

b.  Second, defendants rely (Stein Br. 40-41) on the commentary to Section 3A1.4 to argue that the terrorism enhancement applies only where the defendant's purpose primarily involves influencing, affecting, or retaliating against government conduct, as opposed to coercing or intimidating civilians.  Application Note 4 counsels an upward departure where the defendant's motive "was to intimidate or coerce a civilian population, rather than to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  Sentencing Guidelines § 3A1.4, comment. (n.4).

As Section 3A1.4's commentary makes clear, the upward departure in Application Note 4 permits sentencing courts to apply like sentences to offenses that resemble "federal crime[s] of terrorism" but are not encompassed by the enhancement because they do not meet one of Section 2332b(g)(5)'s two prongs. That is, the departure is warranted when:  (1) the offense was calculated to influence, affect, or retaliate against government conduct but "involved, or was intended to promote, an offense other than one of the offenses specifically enumerated in" Section 2332b(g)(5)(B); or (2) the offense involved, or was intended to promote, one of the enumerated offenses "but the terrorist motive was to intimidate or coerce a civilian population."  Sentencing Guidelines § 3A1.4,

comment. (n.4). Thus, the upward departure has the effect of broadening, not limiting, Section 3A1.4's reach.

Notably, the Commission added the upward departure to Section 3A1.4's preexisting commentary in response to the USA PATRIOT Act of 2001. See Pub. L. No. 107-56, 115 Stat. 272. As the Commission explained, it "provide[d] an upward departure, rather than a specified guideline adjustment, because of the expected infrequency of these terrorism offenses [that do not qualify as 'federal crimes of terrorism'] and to provide the court with a viable tool to account for the harm involved during the commission of these offenses on a case-by-case basis." Sentencing Guidelines, App. C, amend. 637. In other words, the upward departure fills a gap where the enhancement unexpectedly falls short. It is not a mechanism to distinguish between "federal crimes of terrorism" that are only about the government and those that are mostly or partly about the government.

Defendants rely on *United States* v. *Jordi*, 418 F.3d 1212 (11th Cir. 2005), to argue that Section 3A1.4's upward departure applies "[w]here the primary target or object of an underlying offense is civilian rather than government-related." Stein Br. 40-41. But *Jordi* simply demonstrates why the enhancement, *and not the upward departure*, applies here. There, the defendant pleaded guilty to attempted arson, in violation of 18 U.S.C. 844(i), based on his plan to firebomb abortion clinics. *Jordi*, 418 F.3d at 1214. During recorded meetings with a confidential

source, the defendant "explained that his actions would be justified to prevent the deaths of unborn children" and that he did not have the means to kill providers, but could bomb clinics to dissuade doctors from performing abortions. *Ibid.* That offense fits squarely within Application Note 4: it involves an enumerated offense under Section 2332b(g)(5) (*i.e.*, 18 U.S.C. 844(i)), but reflects the intent only to coerce a civilian population.

While defendants seek to ascribe (Stein Br. 41) a government-related purpose to the defendant's actions in *Jordi*, the evidence did not show that his offense was calculated to influence, affect, or retaliate against government conduct. Rather, it showed only that he wanted to stop providers from performing abortions. See *Jordi*, 418 F.3d at 1213-1214. The facts did not evince any goal of changing abortion laws by, for example, threatening pro-choice lawmakers or seeking to inspire copycat conduct for policymaking reasons. See *id.* at 1216.[26]

---

[26] Defendants seemingly argue (Stein Br. 43) that their physical target had to be a federal target for the enhancement to apply. Not so. See 3R.583-585, 672-673, 761-763 (citing cases involving parades and commercial airlines, for example). Indeed, Congress included 18 U.S.C. 2332a among Section 2332b(g)(5)'s enumerated offenses even though it does not always have as an element the use of (or attempt or conspiracy to use) a weapon of mass destruction against government persons or property. See 18 U.S.C. 2332a(a)(2). Defendants also argue incorrectly (Stein Br. 44-45) that their discussions about other targets and future attacks (against, *e.g.*, a transportation hub and county and local officials) are irrelevant. See, *e.g.*, *Wright*, 747 F.3d at 405-410; Sentencing Guidelines § 1B1.3(a); *Johnson*, 732 F. App'x at 660.

c.  As discussed above, the district court correctly interpreted Section 3A1.4's intent requirement.  The court also correctly found that the facts warranted applying the enhancement here, where defendants channeled their anger with the government into their planned bombing of civilians, in part to influence, affect, and retaliate against government conduct.

Defendants take issue with the "weight" the court placed on their recorded statements, manifesto, and planned future attacks (Stein Br. 44-46), but that is merely another attempt to show that influencing, affecting, or retaliating against government conduct was not their "dominant goal."  Stein Br. 46.  But the court correctly concluded that whether defendants' government-related intent was "dominant" is not dispositive, and that, regardless, such intent was a "significant purpose" of the conspiracy.  Supp.2R.29-30.  In other words, defendants' objective to change federal policy—especially as it related to border security, immigration, and Muslim refugees—was inextricably linked with their anticipated bombing, manifesto, and future attacks.  See 2R.23-30; 3R.401-411, 763-772 (government sentencing memorandum discussing relevant facts for purposes of applying Section 3A1.4).  Defendants do not challenge the court's factual findings as clearly erroneous, as they must where the court correctly interpreted the guideline.  See *Lucero*, 747 F.3d at 1246 (clear-error review applies); cf. *Burke* v. *Regalado*, 935

F.3d 960, 1014 (10th Cir. 2019) (deeming arguments not raised and inadequately

presented waived).

D.    *Any Error In Applying The Terrorism Enhancement Was Harmless*

Even if this Court were to conclude that the district court incorrectly

interpreted and applied Section 3A1.4, any error would be harmless.  The court

could not have been clearer that it would have imposed the same final sentences

under 18 U.S.C. 3553(a) in the absence of the terrorism enhancement because, in

that scenario, it would have applied the upward departure.  Defendants concede

(Stein Br. 16) that an upward departure would have been warranted.  See also Stein

Br. 40-46; 6R.5669, 5720.

"Harmless error is that which did not affect the district court's selection of

the sentence imposed."  *United States* v. *Montgomery*, 439 F.3d 1260, 1263 (10th

Cir. 2006) (internal quotation marks and citations omitted).  This is true even

where the guideline range, absent any miscalculation, would have been much

lower than what the court actually calculated.  See *United States* v. *Snowden*, 806

F.3d 1030, 1033-1034 (10th Cir. 2015).  A court is not required to impose a

sentence within the guideline range; rather, the court can vary from that range to

impose a sentence that better accounts for the Section 3553(a) factors.  *Ibid.*  Thus,

where the court makes clear that it would have imposed the same sentence under

Section 3553(a) "even if it had miscalculated the guideline range as higher than it should have been," the error is harmless. *Ibid.*

Such is the case here. The district court carefully considered defendants' sentences and repeatedly stated that it would have imposed the same sentences even if it had not applied the terrorism enhancement. Indeed, because the court imposed below-Guidelines sentences, it explained in detail its justifications for those sentences under Section 3553(a) and stated unequivocally that it had decided they were appropriate under any calculation. 6R.5866, 5884, 5987-5988, 6072; cf. *Snowden*, 806 F.3d at 1035 (affirming the sentence even where the district court was not as precise). Accordingly, this Court should affirm defendants' sentences regardless of whether the terrorism enhancement applied to their conduct because any error was harmless.

## IV

## THERE WAS NO PROSECUTORIAL MISCONDUCT (WRIGHT ONLY)

*A.    Standard Of Review*

An allegation of prosecutorial misconduct presents a mixed question of fact and law that this Court reviews de novo. *United States* v. *Caballero*, 277 F.3d 1235, 1248 (10th Cir. 2002). Where the allegation is raised for the first time on appeal, this Court reviews for plain error. *Id.* at 1243-1244; see *United States* v. *Bader*, 678 F.3d 858, 884-885 (10th Cir. 2012).

B.　　*The Government Did Not Act In Bad Faith Or Knowingly Present False*
　　*Evidence To The District Court Or To The Jury*

Wright alone claims (Br. 6-8, 18-21) prosecutorial misconduct arising from

the government's preparation and use, before and during trial, of agent-verified

transcripts of defendants' recorded in-person meetings.  Wright seemingly presses

two arguments (Br. 18-21)—one concerning his allegedly belated receipt of

transcripts identifying the specific recorded statements that the government sought

to offer as non-hearsay coconspirator statements at trial, and the other related to the

contents of those transcripts.  For both, he argues that a handful of immaterial

errors identified at trial rendered all 1800 pages of recording transcripts unverified,

inaccurate, and untrustworthy, and that the government, therefore, knowingly

presented false evidence to the district court and to the jury, even though the

transcripts themselves were not in evidence.

To determine whether a due process violation based on prosecutorial

misconduct exists and warrants reversal, this Court examines (1) whether the

prosecution acted improperly, and (2) whether any improper conduct was harmless

beyond a reasonable doubt.  *United States* v. *Fleming*, 667 F.3d 1098, 1103 (10th

Cir. 2011).  Misconduct is harmless "unless there is reason to believe it influenced

the jury's verdict." *United States* v. *Green*, 435 F.3d 1265, 1267-1268 (10th Cir.

2006) (citation omitted).  To evaluate harmlessness, this Court considers "the trial

as a whole, including the curative acts of the district court, the extent of the

misconduct, and the role of the misconduct within the case." *Id.* at 1268 (citation omitted); *Caballero*, 277 F.3d at 1248.

Here, there was no improper conduct by the government, let alone improper conduct warranting reversal. Wright mischaracterizes the record, including the timing of his receipt of the audio recordings of defendants' in-person meetings and their corresponding transcripts, the purpose of the transcripts, and the nature and scope of any transcript errors. The record reflects that the government neither acted in bad faith nor presented false evidence to the jury. Nor were the limited transcript errors Wright now complains of material to the outcome at trial.[27]

1.  *Wright Had Ample Opportunity To Compare The Contents Of The FBI's Audio Recordings With The Government's Transcripts Of Those Recordings*

Wright first claims (Br. 6, 19) that the government violated due process notice requirements by waiting until the "eve of trial" to provide him with 1800 pages of "supposedly-verified transcripts" of defendants' recorded conversations that identified the particular statements the government intended to offer under Federal Rule of Evidence 801(d)(2)(E).[28] Wright asserts that he had no way to

---

[27] The relevant transcripts are included in Supp.1R, in a folder labeled "Motions Exhibits."

[28] Rule 801(d)(2)(E) provides that a statement that "is offered against an opposing party" and "was made by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay.

verify the accuracy of the transcripts (Br. 7-8), and that a handful of later-identified errors in some transcripts rendered all of the transcripts "unverified, inaccurate, and untrustworthy" (Br. 19-20). Wright's allegation fails.

a. Because of the nature of Wright's allegation, we set forth the procedural history in some detail.

i. After defendants' arrests in October 2016, the government provided defense counsel with the complete recordings of defendants' in-person meetings and telephone calls. By May 11, 2017, defense counsel had received not only those recordings but also "draft transcripts" the government gave counsel to "facilitate [their] trial preparations." 1R.491; see 6R.46-47. Because the drafts were "not final, court-ready transcripts," the government asked counsel to notify it of "issues with or corrections for our attributions of statements." 1R.491.

At three subsequent status conferences, the parties and the court discussed the transcripts. On October 4, 2017, the government reiterated that it had provided rough transcripts to defendants as a courtesy while the case agents, among other tasks, reviewed the transcripts to correct errors; it again encouraged defendants to bring perceived errors to its attention. 6R.48-51. On November 16, 2017, the government confirmed that the case agents were continuing to verify the transcripts as prosecutors determined the subset of recordings they expected to use at trial, and it offered to prioritize particular transcripts that defense counsel wanted. 6R.98-

101.  On December 1, 2017, the government reiterated that it was verifying the transcripts by priority for use in its case-in-chief.  6R.115-116.  The same day, it sent defense counsel a letter describing the evidence it would seek to introduce under Rule 801(d)(2)(E).  6R.115-116; see 1R.1128-1131 & n.7.  Because the government had not yet identified the individual statements it would rely on at trial, it notified defense counsel "of the information by category," so that this information could inform their pre-trial motions.  6R.116.

ii.  On January 11, 2018, defendants filed their pre-trial motions, including a motion for a pre-trial hearing (commonly known as a *James* hearing) to determine the admissibility of alleged coconspirator statements under Rule 801(d)(2)(E). 1R.1022-1030.  Defendants stated that the parties had "worked together to narrow and identify the categories of contested statements" and that a hearing would "allow [them] to identify the controverted statements and the [district court] to determine [their] admissibility."  1R.1022.  The government responded that, given the volume of recordings, the court should admit ten categories of statements that the government identified as falling within Rule 801(d)(2)(E), and that defendants could object to specific statements as inadmissible once the government finalized its exhibit list.  1R.1125-1133.

On February 21, 2018, after a two-day hearing on nine different motions, the court granted defendants' request for a *James* hearing and discussed its intended

scope.  3R.141-161.  Defendants anticipated that the government would offer

"several hundred statements" as coconspirator statements, that a number of them

would be "obviously admissible" based on the court's threshold rulings, and that

the court would need to rule on those statements defendants disputed they made in

in furtherance of the conspiracy.  3R.147-148, 153.  Because many of defendants'

recorded statements occurred in multi-hour planning meetings, the government

stated that it would identify the excerpts of those recordings on which it intended

to rely in its case-in-chief by March 8, 2018, *i.e.*, by the exhibit-list deadline.

3R.156-157.  The court calendared the *James* hearing for March 19, 2018, and

stated that it would proceed by making the necessary threshold findings and

turning, as appropriate, to the contested statements.  1R.1285; 3R.158-161.

On March 8, 2018, the government (1) docketed its proposed exhibit list

reflecting the subset of recordings it would rely on at trial (2R.70-89), and

(2) provided the court with an electronic copy of its anticipated exhibits, including

specific excerpts (*i.e.*, audio clips) of defendants' recorded statements (2R.835).

On March 15, 2018, the government gave counsel for each defendant an electronic

copy of this submission, including the audio clips of defendants' statements that it

had excerpted from the full recordings.  2R.835, 838 n.5.

iii.  The *James* hearing proceeded on March 19, 2018, but progressed

slowly.  6R.661-784.  In particular, the parties disagreed as to how the court should

determine whether certain statements were admissible—*i.e.*, by categories of statements or by specific statements.  6R.684-685, 698-700; see also 6R.769-775 (using manifesto-related statements as an example).  The court concluded it would proceed "statement by statement."  6R.701; see also 6R.763, 767.  For efficiency's sake, it preferred to review the corresponding transcripts for the proposed audio exhibits, as opposed to listening to the actual clips that would be played at trial. 6R.756.

Although defendants acknowledged that they already possessed "the entire transcripts and recordings," as well as the clipped audio exhibits, they asked the government to identify within the hard-copy transcripts the specific excerpts that corresponded to the audio clips the government planned to offer into evidence. 6R.777.  The government agreed to do so, even though defendants, by that time, had both the verified transcripts and the audio clips.  6R.778-782.  The court suspended the hearing until after jury selection, which began the next day. 6R.784-785.

Two days later, on March 21, 2018, the government provided defense counsel and the court with binders that contained printed, marked transcripts that reflected in highlighting or brackets the contents of each audio clip the government intended to use at trial.  6R.1577, 1585.  Defense counsel divvied up the transcripts, identifying who would handle defendants' objections for each recorded

meeting.  6R.1533, 1576, 1585.  The next day, the hearing resumed.  6R.1532-

1632.  The parties and the court moved statement by statement through the

transcripts; no defendant objected on the basis of unfair surprise or inadequate time

to prepare.  6R.1577-1629; see 6R.1617 (Wright's counsel noting the progress

made under the marked transcripts).  Wright's counsel handled defendants'

objections to the exhibits from defendants' September 4, 2018, meeting.  6R.1627-

1628.  When Wright's counsel indicated they had not yet completed their review of

the statements from two other meetings, the court agreed to continue the hearing a

few days later.  6R.1629-1632.  The court completed the hearing on March 26,

2018.  Supp.2R.49-132.

     b.  As these events make clear, the government did not engage in any

improper conduct regarding its preparation and pre-trial use of transcripts

reflecting defendants' recorded statements.  Nor did Wright lack any opportunity

to compare the transcripts to the actual recordings or raise any perceived errors.

Because Wright never objected that he was unable to proceed on the basis of the

marked transcripts, this Court reviews his prosecutorial-misconduct allegation for

plain error.  There was no error, let alone plain error, that violated due process.

     More specifically, Wright had months to review the audio recordings of

defendants' in-person meetings, compare them to draft and verified transcripts of

the recordings, and notify the government of any perceived errors—which he never

did.  See 6R.48.  Moreover, at least ten days before the *James* hearing began, the government narrowed the universe of recordings it intended to use at trial to a subset of those recordings, as reflected on its exhibit list.  Four days before the hearing, it further provided defendants with the actual audio clips it would use at trial.  Finally, at defendants' request, the government provided defendants with a hard-copy set of transcripts that marked and labeled the contents of each corresponding audio clip.  The parties used these marked transcripts at the pre-trial hearing, with no defendant objecting on the basis of unfair surprise or inadequate time to prepare.  Wright cannot claim any due process violation.

Wright relies on *Caballero* to support his allegation (Br. 18-19), but that case demonstrates why his argument fails.  Just as in *Caballero*, where this Court rejected the defendants' claim of unfair surprise because they "possessed the actual recording several months in advance of trial" and "could have generated their own transcript," 277 F.3d at 1248, Wright had copies of the FBI's audio recordings for over a year before trial and could have made his own transcripts or, at a minimum, brought any perceived errors in the government's transcripts to its attention.  He never did so, despite repeated invitations to identify any transcription errors before trial and even though he himself attended the meetings he now claims were inaccurately transcribed (see Br. 7).  Moreover, just as in *Caballero*, Wright does not identify "which changes caught [him] unprepared or how such changes

prejudiced" him.  277 F.3d at 1248.  Accordingly, this Court should reject Wright's

claim that the government violated due process notice requirements by giving him

a hard-copy set of marked transcripts—indeed, the version of the transcripts that

defendants requested to facilitate their review—shortly before the *James* hearing.[29]

### 2.    The Government Did Not Present False Evidence

Wright next claims (Br. 7-8, 18-21) that the government presented false

evidence by relying at both the pre-trial hearing and at trial on transcripts that later

proved to contain a handful of non-material errors.  To establish a due process

violation based on an alleged presentation of false evidence, the defendant must

show that the disputed evidence was in fact false, that the prosecution knew it to be

false, and that the testimony was material.  See *Caballero*, 277 F.3d at 1243.

Here, Wright cannot establish any violation because the audio clips, not the

transcripts, were in evidence, as the district court repeatedly instructed the jury.

Even if this Court considers the transcripts as evidence, Wright cannot show that

the information the government presented to the court or to the jury was in fact

false, that it knew it to be so, and that the information was material.

---

[29]  For the same reasons, Wright's allegation of "bad faith" (Br. 19) fails.
Neither the district court nor Wright ever accused the government of bad faith
when it sought to have the court apply Rule 801(d)(2)(E) to categories of recorded
statements, as opposed to individual statements.  6R.1617; see also 6R.697-700,
780-785.

a.  As an initial matter, the transcript errors Wright complains of cannot

constitute false evidence.  Only the audio clips of defendants' recorded statements,

and not the transcripts that accompanied those clips played at trial, were admitted

as evidence.  2R.741-770.

The court explicitly instructed the jury that "the transcripts [were] not

evidence," and that only "[t]he recordings themselves are the evidence."  2R.726.

If the jury "noticed any differences between what [it] heard on the recordings and

what [it] read in the transcripts," the court explained that the jury must rely on

what it heard.  7R.726.  And if the jury "could not hear or understand certain parts

of the recordings," the court stated that the jury "must ignore the transcript as far as

those parts are concerned."  2R.726; see also 6R.2883-2884, 4564-4565.  The jury

is presumed to have followed these instructions.  See *United States* v. *Taylor*, 514

F.3d 1092, 1100-1101 (10th Cir. 2008).  Moreover, when the audio clips went to

the jury room with the other admitted exhibits for the jury's deliberations, they did

not contain any accompanying transcripts.  6R.2876-2877.[30]

b.  Even if this Court considers the recording transcripts to be evidence,

Wright cannot credibly claim that the transcript errors he identifies constitute false

---

[30]  At trial, both Harris and Day identified the sound of defendants' voices
before any transcripts were displayed to the jury.  6R.1837-1843, 2722-2724; see
also 6R.1789 (Benson identifying his own voice), 3752 (Brian identifying his own
voice and Stein's voice).  Thus, throughout the trial and during deliberations, the
jury could evaluate what it heard on the clips even without the transcripts.

information that the government knowingly presented to the district court or to the jury that was material to the verdict.

i. Wright first relies on (Br. 6-8) a handful of misattributions that defendants identified in the corresponding transcripts for *three* audio clips played at trial. But these misattributions, which did not concern Wright, merely demonstrate that the transcripts were not perfect and that the parties and the court promptly cured any discrepancies between the clips and the transcripts upon noticing them.

More specifically, during a break in the government's direct examination of Day, defendants raised concerns that the transcripts associated with a few audio clips that the government had just played misattributed statements to Allen that he, in fact, had not made. 6R.2873. Yet, Allen's counsel did not question the overall veracity of the transcripts. Rather, counsel stated that "for the vast majority of the transcripts[,] I think those of us who have listened to these recordings would agree they're accurate but the[re] are some inaccuracies," and that "thus far [Exhibit 15 is] the only offender." 6R.2873. The government reviewed the alleged errors and agreed that the corresponding transcripts for three clips contained misattributions. 6R.2876, 2879. Defendants asked the court to instruct the jury that the audio clips, and not the transcripts, were in evidence, and that what the jury heard on the clips, rather than what they saw displayed on the transcript, controlled. 6R.2873-2882.

The government agreed to the instruction, and the court instructed the jury accordingly.  6R.2882-2884.

Wright's argument that the government presented false evidence to the jury, that it did so knowingly, or that any falsehood was material clearly fails.  Indeed, because Wright never objected that the government presented false evidence by attributing statements to him that he did not actually make, this Court reviews his allegation only for plain error.  Even on appeal, Wright identifies no such misattributions.  There was no violation, let alone plain error.  See *Caballero*, 277 F.3d at 1243-1244.[31]

ii.  Wright also cites (Br. 7-8) testimony that he, not the government, elicited that reflected a separate transcript error.  On cross-examination, Wright's counsel asked Day about a July 31, 2016, meeting at G&G that, Wright asserted, a person named Ernest Lee had attended.  6R.3531-3532.  During Day's direct examination, the government had not published any portion of the July 31, 2016, transcript to the jury because it did not play audio clips from that meeting.  In response to defense counsel's question, Day denied that Lee was at G&G, and further testified

---

[31]  Later in Day's testimony, when the government prepared to play an audio clip for which it noticed a corresponding error in the transcript, it played the clip without displaying the transcript.  6R.2973.  Contrary to Wright's malfeasance claim, the government conscientiously presented its evidence and sought to avoid displaying any transcripts to the jury that differed from the actual evidence on the government's audio clips.

that he did not know whether Lee had been present before he arrived.  6R.3532-3533.  Day's response conflicted with the recording transcript, which indicated Lee was present and reflected him as speaking twice in the first six pages of the 81-page transcript.  Supp.1R/MotionsExhibits.Ex24.  On re-cross, Wright's counsel again asked Day whether Lee was present after refreshing Day's recollection with the transcript.  6R.3694-3695.  Day again denied that Lee was at the meeting.  6R.3695.

Days later, defendants called the FBI case agent, Amy Kuhn, as a witness. As relevant here, Wright's counsel questioned Kuhn about the FBI's transcript-verification process before using the July 31, 2016, transcript to challenge Day's testimony.  6R.4777-4780.  After Kuhn confirmed that she remembered Day testifying that Lee was not at the July 31, 2016, meeting (6R.4780), the court permitted Wright to use the corresponding transcript for the limited purpose of challenging Day's testimony (6R.4784).  When Wright's counsel asked Kuhn about the transcript, Kuhn testified that although it showed Lee as present, that was "a mistake in the transcript."  6R.4785.  Kuhn explained that the statements of another person, not a defendant, were mistakenly attributed to Lee for that meeting, whom Kuhn did not think was present.  6R.4786.  Kuhn testified that she had tried to correct all of those misattributions while verifying the transcripts, but apparently

had missed some errors.  6R.4786.  Kuhn further stated that "[i]t's very possible

that there are other errors in the verified transcripts."  6R.4786.

Again, Wright cannot show either that the government knowingly presented

evidence that was in fact false or that the testimony was material.  The jury never

saw the July 31, 2016, transcript until *Wright* introduced it, and both Day and

Kuhn testified truthfully that Lee was not at the meeting.  Kuhn admitted that Lee's

inclusion in that transcript was a mistake and that other errors likely existed in the

transcripts, which the court repeatedly instructed the jury were not in evidence.

Given that both witnesses testified truthfully, the transcripts themselves were not in

evidence, and the jury did not even see this transcript until Wright's counsel

introduced it, the government presented no false evidence.  Nor does Wright

explain, in any event, how the evidence was material given the scores of recorded

statements, actually in evidence, that demonstrated he was an eager participant in

defendants' plan to blow up the apartment complex and mosque at 312 West Mary

Street during prayer time.[32]

---

[32]  Given that Day testified truthfully about the meeting, and that the
evidence was immaterial in any event, the government did not act improperly in
failing to clarify for defense counsel, before Kuhn testified, that the July 31, 2016,
transcript misattributed statements to Lee.  This is especially so where the
prosecutor stated during the pertinent bench conference:  "Frankly, Your Honor,
I'm not sure that [Lee] was there."  6R.3694; see 6R.3692-3697.

V

**THE MANNER IN WHICH THE DISTRICT COURT RULED ON THE
ADMISSIBILITY OF DEFENDANTS' RECORDED STATEMENTS
UNDER RULE 801(d)(2)(E) WAS NOT AN ABUSE OF DISCRETION
(WRIGHT ONLY)**

*A.    Standard Of Review*

This Court reviews the district court's decision to admit coconspirator

statements, and the method it uses for doing so, for an abuse of discretion.  *United*

*States* v. *Alcorta*, 853 F.3d 1123, 1137-1138 (10th Cir. 2017), cert. denied, 138 S.

Ct. 1306 (2018); *United States* v. *Roberts*, 14 F.3d 502, 514 (10th Cir. 1993).

"[P]reliminary foundational determinations, such as whether statements offered

under Rule 801(d)(2)(E) were made during the course of and in furtherance of a

conspiracy, are factual findings, reviewed for clear error."  *Alcorta*, 853 F.3d at

1138 (citation omitted).

*B.    The District Court Did Not Abuse Its Discretion At The* James *Hearing*

Wright alone argues (Br. 21-26) that the district court improperly conducted

the pre-trial *James* hearing to determine whether certain recorded statements that

defendants made during their in-person meetings were admissible as coconspirator

statements.  Wright alleges that the court abused its discretion by:  (1) permitting

the government to proffer evidence and considering only the recorded statements

themselves before deeming the statements admissible; and (2) treating excerpts of

defendants' recorded conversations to be part of the same statement for

admissibility purposes, instead of evaluating each excerpt sentence-by-sentence.

Both arguments fail.

### 1.    Rule 801(d)(2)(E)

Under the Federal Rules of Evidence, out-of-court statements offered against

an opposing party are not hearsay if "made by the party's coconspirator during and

in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E).  Where a defendant

objects to the statements' admissibility, the government must prove by a

preponderance of the evidence "that there was a conspiracy involving the declarant

and the [defendant], and that the statement was made 'during the course and in

furtherance of the conspiracy.'"  *United States* v. *Perez*, 989 F.2d 1574, 1577 (10th

Cir. 1993) (en banc) (quoting *Bourjaily* v. *United States*, 483 U.S. 171, 175

(1987)).

To determine whether there was a conspiracy, and whether the declarant and

the defendant participated in it, a court considers the contents of the out-of-court

statements, but the statements do not by themselves establish "the existence of the

conspiracy or participation in it."  Fed. R. Evid. 801(d)(2).  Yet, the showing is not

"rigorous."  *Perez*, 989 F.2d at 1580.  "[A]t most," there must be "some

independent evidence linking the defendant to the conspiracy," which can be

anything other than the proffered statements themselves.  *United States* v. *Owens*,

70 F.3d 1118, 1124-1125 (10th Cir. 1995) (quoting *United States* v. *Martinez*, 825

F.2d 1451, 1453 (10th Cir. 1987)).  This evidence need not be "substantial." *Id.* at

1125 (quoting *United States* v. *Rascon*, 8 F.3d 1537, 1541 (10th Cir. 1993)).

"[D]irect observations and contacts with defendant," for example, "qualifies as

independent evidence." *Ibid.* (citation omitted).  The court, moreover, "has the

discretion to consider any evidence not subject to a privilege, including both the

coconspirator statements the government seeks to introduce at trial and any other

hearsay evidence, whether or not that evidence would be admissible at trial." *Id.* at

1124 (citation omitted).

The court may make the required preliminary findings using either of two

procedures.  First, the "strongly preferred" procedure is "to hold a '*James* hearing,'

\* \* \* outside the presence of the jury to determine by a preponderance of the

evidence the existence of a predicate conspiracy." *United States* v. *Urena*, 27 F.3d

1487, 1491 (10th Cir. 1994) (citations omitted).  But that is only a "*preference*"

and the "court retains some discretion" to determine the best procedure for the

case.  *Ibid.* (citation omitted).  Second, the court "may provisionally admit the

evidence with the caveat that the evidence must 'connect up' during trial." *Owens*,

70 F.3d at 1123 (citation omitted).

### 2.     *The District Court's Determinations Under Rule 801(d)(2)(E)*

As already explained, the district court granted defendants' motion for a pre-

trial *James* hearing.  1R.1285.  As relevant here, on the first day of the hearing,

March 19, 2016, the government provided the following evidence to support the

predicate findings that a conspiracy existed and that defendants were members of

the conspiracy:

- Stein's recorded statements from the June 14, 2016, meeting on Benson's property;

- Stein and Allen's recorded statements from their July 9, 2016, recruitment meeting with Burch and Reever;

- Stein, Allen, and Wright's recorded statements from their July 18, 2016, recruitment meeting with the Spooners;

- the evidence underlying the court's factual findings supporting its decision to deny Stein and Wright release pending trial;[33] and

- facts that Benson and Day would testify to at trial regarding their direct observations of and contacts with defendants, including Benson's dealings with Stein and Allen on June 14, 2016, as reflected in Benson's sworn grand jury testimony.

6R.697, 705-726, 741-749, 751-760; see also 6R.1543-1547, 1563-1566.

The court found that this evidence established that a conspiracy existed and

that defendants were members of the conspiracy.  6R.764-767, 769.  Specifically, it

found that Stein and Allen had formed a conspiracy to take violent action against

Muslim immigrants as of June 14, 2016, and that Wright had joined the conspiracy

---

[33]  As to Wright, this evidence included Day's observations of and contacts with Wright; Wright's gathering of equipment, chemicals, and other materials to make explosives; defendants' use of Wright's business computer to identify potential targets and download bomb-making manuals; and Wright and Allen's manufacturing and testing of HMTD.  1R.610-616, 769-780.

by at least July 18, 2016. 6R.764-766. The court stated, however, that it was open
to revisiting those dates subject to the record's development at trial. 6R.766.

On March 22, 2018, when the *James* hearing resumed, defendants asked the
court to revisit its preliminary ruling that a conspiracy existed as early as June 14,
2016, as opposed to sometime that August. 6R.1536-1537. Allen and Wright, in
particular, argued that Benson's grand jury testimony did not support the earlier
date. 6R.1541-1542, 1550-1552, 1555-1562, 1566-1571. The court stated that its
finding was contingent on Benson's trial testimony (6R.1540-1541, 1566-1567),
but asked the government whether further independent evidence supported that
date. The government responded that it would check what other evidence existed
as of June 2016, but that, under applicable precedent, the evidence did not have to
be contemporaneous to the conspiracy's start date. 6R.1542-1550, 1563-1566.

In order to proceed with the hearing, the court turned to whether the
recorded statements defendants made as of August 2016 were admissible under
Rule 801(d)(2)(E). 6R.1574-1575. Given the court's threshold findings that a
conspiracy existed and that defendants participated in it, defendants primarily
disputed whether they made certain statements in furtherance of the conspiracy.
Defendants did not contest the admissibility of the majority of statements.
6R.1533-1534, 1576-1577. Where they objected to an exhibit, the court reviewed
the contents of the corresponding audio clip to determine whether it comprised

statements made in furtherance of the conspiracy.  6R.1575-1612, 1618-1629
(objections to audio clips from GX.16-19, 21, 23).

The next day, in an email to counsel, the court reaffirmed its preliminary
determinations.  Supp.3R.2-3.  The court stated that, under Supreme Court and
Tenth Circuit precedent, the independent-evidence requirement is not demanding.
Supp.3R.2-3.  The court found Benson's grand jury testimony sufficient both to
satisfy the requirement and establish a June 14, 2016, start date for the conspiracy.
The court explained that Benson testified that Allen showed up that night to meet
with Stein, that Stein raised the idea of using explosives against Muslims in
Garden City, and that Benson believed Stein and Allen were "planning something"
and that "concerned Mr. Benson greatly."  Supp.3R.2-3.  The court further found
that by July 18, 2016, all three defendants were "talking about the skills they could
offer in support of the plan" and seeking to recruit others.  Supp.3R.2.  "While this
evidence may not be 'substantial,'" the court explained, "it does not need to be."
Supp.3R.2.

When the *James* hearing resumed on March 26, 2018, the court ruled on
whether certain recorded statements from defendants' remaining in-person
meetings were made in furtherance of the conspiracy.  Supp.2R.50-132 (objections
to audio clips from GX.14-15, 22, 24, 127, 129).

Before any coconspirator statements actually were admitted into evidence at trial, the government had elicited evidence supporting the court's preliminary findings. By the time Day first was asked about the statements addressed at the *James* hearing, Benson had testified about the June 14, 2016, kick-off meeting and his observations of Stein and Allen that night. Harris also had testified about her contacts with and observations of defendants, as well as physical items related to explosives-manufacturing that she saw while living with Allen and visiting G&G. See pp. 11-12, 31-32, *supra*. In addition, local and federal authorities had testified about evidence seized from G&G, defendants' homes and trucks, and storage units registered to Wright's brother. See, *e.g.*, 6R.2163-2172, 2181-2184, 2196-2205, 2265-2271, 2291-2298, 2320-2326, 2330-2349, 2377-2390, 2516-2532, 2562-2564, 2573, 2585-2595. The government then moved during Day's direct examination to admit into evidence those audio clips that the court had deemed admissible at the *James* hearing, which the court allowed. 6R.2740-2743.

### 3.    *The District Court Did Not Abuse Its Discretion*

a.    Wright first argues (Br. 22-23) that the district court abused its discretion in permitting the government to proceed by proffer at the *James* hearing and in not requiring "evidence extraneous to the transcripts themselves." Wright is incorrect. Regardless, any abuse of discretion was harmless.

    i.  First, in making Rule 801(d)(2)(E)'s threshold determinations, courts are "not bound by the rules of evidence except those with respect to privileges." *Bourjaily*, 483 U.S. at 177-178 (citing Fed. R. Evid. 104(a) and 1101(d)(1)).  Thus, "courts may consider hearsay in making these factual determinations."  *Id.* at 178; see *Owens*, 70 F.3d at 1125.  Further, although this Court prefers for district courts to make such determinations at a *James* hearing, a court may provisionally admit the offered coconspirator evidence at trial subject to it "connect[ing] up" later. *Owens*, 70 F.3d at 1123; see *Perez*, 989 F.2d at 1582 ("In many cases, the trial court allows coconspirator hearsay into evidence" based "upon the government's representation that such proof will be forthcoming later in the trial.").  Thus, this Court has upheld the district court's discretion, in light of the circumstances, to proceed under Rule 801(d)(2)(E) based on proffered or summary evidence.  See *Roberts*, 14 F.3d at 509, 513-514 (upholding the district court's reliance on a written proffer); cf. *Alcorta*, 853 F.3d at 1141-1142 (ruling preliminarily based on summary evidence); *Owens*, 70 F.3d at 1123-1125 (same).

    Here, the manner in which the court deemed certain recorded statements admissible was not an abuse of discretion.  The court did not make preliminary findings based solely on an attorney proffer, but rather based on Benson's sworn

grand jury testimony about his observations of Stein and Allen on June 14, 2016.[34]

Before any coconspirator statements were admitted at trial, the government

introduced evidence that supported the court's preliminary findings, and Benson,

in particular, testified consistently with his earlier grand jury testimony.  Indeed, in

light of the entire record, it would be clearly erroneous for the court to reach a

contrary finding either that a conspiracy did *not* exist or that defendants were *not*

members of the conspiracy.  Cf. *Perez*, 989 F.2d at 1582 n.3 (noting that such a

record would obviate the need for relief).

ii.  Second, Wright incorrectly argues (Br. 23) that the court "did not require

any evidence extraneous to the transcripts themselves."  But the court's findings

were based on the recorded statements *and* independent evidence of defendants'

agreement to attack Muslim immigrants.

Indeed, because defendants argued that the government needed to offer

independent evidence not only of the conspiracy, but also of its June 14, 2016, start

date, the court focused its attention at the *James* hearing on the independent-

evidence requirement and found Benson's grand jury testimony sufficient to

corroborate that a conspiracy existed as of June 14, 2016.  In addition, the

---

[34]  Indeed, defendants primarily took issue with whether this evidence
suffced as independent evidence and whether their statements were made in
furtherance of the conspiracy, not with how the evidence was presented.  See
6R.700, 750, 762-763; see also 1R.1028, 1188-1192; 2R.204-214, 266-273.

government pointed to Day's observations and contacts with defendants, physical

items that defendants gathered to make explosives, and the 300 pounds of fertilizer

that Stein delivered to Brian.  See 6R.1548-1549, 1563 (recognizing the wealth of

independent evidence in the case); *Bourjaily*, 483 U.S. at 181 (defendant's

presence with a "significant sum of money" at "the prearranged spot at the

prearranged time" corroborated alleged coconspirator statements indicating his

involvement in the conspiracy).  Taken together, this evidence more than satisfied

the threshold showing.  *Id.* at 179-180 ("[I]ndividual pieces of evidence,

insufficient in themselves to prove a point, may in cumulation prove it."); *Rascon*,

8 F.3d at 1541 ("[W]e cannot say that, when the hearsay statements themselves are

included, there is such a dearth of evidence that no court could find against the

defendant on these matters by a preponderance of the evidence.").[35]

    iii.  Finally, even if the court abused its discretion, which it did not, any error

was harmless.  Non-constitutional harmless error analysis applies to abuses of

discretion involving preliminary determinations under Rule 801(d)(2)(E) to which

---

[35]  Wright asserts (Br. 23) that he objected to facts on the face of the
transcripts, such as "declarant attributions," but provides no record cite for this
objection.  See Wright Br. 8-11, 22-23.  Even if this Court considers this assertion,
the district court was not required to demand testimony at the *James* hearing
connecting defendants with their voices on hundreds of hours of recordings.
Defendants possessed the recordings for months, Wright failed to identify a single
misattribution of his voice, and the court stated it was "not forestalling any during-
trial objection" (6R.775).

- 146 -

the defendant objected.  See *Perez*, 989 F.2d at 1581-1584 (overruling *United States* v. *Radeker*, 664 F.2d 242, 244 (10th Cir. 1991)).

Here, Wright cannot show any abuse of discretion, much less one affecting the trial outcome.  Indeed, he challenges the court's procedures, but identifies no statement that, based on its substance, was improperly admitted.  Regardless, the evidence of Wright's guilt was overwhelming even without attributing Stein and Allen's statements to him.  Wright's own words implicated him in the conspiracy and were admissible against him as party-opponent statements under Rule 801(d)(2)(A), Day and Harris testified to actions Wright took that evinced his participation in defendants' plot, and physical evidence and purchase receipts linked Wright to the crimes.  Even as to the coconspirator statements, Wright had ample opportunity to question Day about the declarant's identity, the content of the statements, and the factual context for the statements.

b.  Wright also argues (Br. 23-26) that the court abused its discretion in evaluating audio clip excerpts of defendants' recorded statements as a whole, rather than reviewing those excerpts sentence-by-sentence.  He asserts that in some instances an excerpt contained multiple declarations, and that the court failed to analyze each declaration separately.  Because Wright never raised this objection below, his argument is reviewed for plain error.  In any event, there was no abuse of discretion.

To be sure, all three defendants objected to proceeding by categories of statements—*e.g.*, "*[r]ecorded in-person planning meetings that included all defendants*" (1R.1128)—and sought to have the government identify the specific statements from defendants' in-person meetings that it was offering under Rule 801(d)(2)(E).  See pp. 124-127, *supra*.  But those objections did not encompass Wright's argument here.  See Wright Br. 10-11 (citing 6R.684, 698-699, 772).  To the contrary, Allen's counsel, for example, stated:  "We do not intend to parse every statement during the recordings.  Context is important to all parties." 2R.273; see also 3R.148.

Regardless, the district court did not abuse its discretion or plainly err in considering defendants' recorded statements by clipped exhibit.  District courts regularly admit as single exhibits coconspirator statements containing multiple declarations and of varying lengths, and this Court has affirmed those determinations.  See, *e.g.*, *United States* v. *Faulkner*, 439 F.3d 1221, 1222 (10th Cir. 2006) (upholding the admission of five telephone conversations as coconspirator "statements"); *Roberts*, 14 F.3d at 514-516 (upholding the admission of 34-minute and 55-minute conversations as coconspirator "statements").  The district court was not required to make sentence-by-sentence rulings to stitch together excerpts of defendants' conversation clearly aimed at furthering the conspiracy.

Even for the two statements Wright identifies (Br. 9-10), he does not explain why they are inadmissible.  The government offered Exhibit 13c against Stein only as a party-opponent statement (*i.e.*, not as a coconspirator statement against Wright or Allen) and the jury was instructed to consider the exhibit for that purpose only. 6R.2739-2740; see also Supp.2R.108; Supp.3R.3.  Wright's counsel handled defendants' objections to Exhibit 22 but never challenged Exhibit 22h (Supp.2R.50-56), which concerned defendants' attempts to recruit others and therefore comprised statements made in furtherance of the conspiracy.

## VI

## THE DISTRICT COURT CORRECTLY DENIED WRIGHT'S MOTION FOR A JUDGMENT OF ACQUITTAL ON HIS FALSE-STATEMENTS CHARGE (WRIGHT ONLY)

*A.     Standard Of Review*

Denials of motions for judgment of acquittal are reviewed de novo, "viewing the evidence in the light most favorable to the government" to determine whether "any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt."  *United States* v. *Gordon*, 710 F.3d 1124, 1141 (10th Cir. 2013) (citation omitted).  In making this determination, this Court "considers the entire record, including both direct and circumstantial evidence, together with the reasonable inferences to be drawn from it."  *Ibid.* (citation omitted).

*B.     Background*

On October 12, 2016, after law enforcement officers denied Wright entrance to G&G, Wright traveled to the local police department and voluntarily spoke to state and federal agents for approximately 25 minutes. 6R.4269, 4271, 4275; see also 6R.4307-4308. The agents warned Wright that "providing the FBI with false information is, in and of itself, a whole separate federal crime." 6R.4324.

The state agent present for Wright's interview, Special Agent Adam Piland, testified during the government's case-in-chief. 6R.4261-4277, 4288-4336. During his direct examination, the government played the fully admitted audio-video recording of Wright's interview. 6R.4274; GX.138. The jury thus saw and heard Wright make five false statements to state and federal investigators. In particular, Wright stated that:

> (1) he did not know anything about Allen manufacturing explosive devices at G&G;
>
> (2) he had no knowledge of any explosives being located on G&G's premises;
>
> (3) he was not a member of a militia;
>
> (4) Allen had not invited him to a meeting of the KSF; and
>
> (5) he had provided the FBI with all of his personal knowledge about Allen during the interview.

See 1R.339-340 (Second Superseding Indictment); see also 6R.4275-4276.

- 150 -

On cross-examination, Agent Piland confirmed that his involvement with the federal investigation after this interview was limited to writing reports.  6R.4306. As a result, when asked if "anything changed in the investigation of this matter based on what happened in that interview," Agent Piland responded:  "I do not know.  I couldn't comment on that."  6R.4333.

After the government rested, Wright moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29(a) as to his false-statements charge under 18 U.S.C. 1001(a)(2).  2R.556-569.  Wright argued that, even assuming his statements were knowingly and willfully false (which he contested), they were immaterial because the government provided no evidence that they resulted in a change in the investigation or its outcome.  2R.558; 6R.4495-4500.  The district court denied the motion, explaining that Wright was "quite disingenuous" during his interview about "critical evidence" and that "reliance is not required [for] a false statement to be material."  6R.4506-4507.

Wright renewed his motion after the close of all evidence.  2R.603-611.  He again argued that his statements were immaterial, and added that the government erred in charging him under Section 1001(a)(2), rather than Section 1001(a)(1),[36]

---

[36]  As relevant here, Section 1001(a) prohibits knowingly and willfully, in any matter within the federal executive branch's jurisdiction:  (1) "falsif[ying], conceal[ing], or cover[ing] up by any trick, scheme, or device a material fact;" or,

(continued...)

- 151 -

because his statements were not made to influence a discrete decision.  2R.606-611; see also 6R.5219-5236.  The court found the evidence sufficient to submit the charge to the jury.  6R.5236; see 2R.Supp.34-39 (leaving this ruling undisturbed post-trial).

The court then instructed the jury that, for each crime, the government must prove each element beyond a reasonable doubt.  6R.5383.  For Wright's false-statements charge, this included finding that the statement was material to the FBI's investigation.  6R.5376.  The court explained that "[a] fact is 'material' if it has a natural tendency to influence or is capable of influencing a decision of the FBI to which it was made," and that "[i]t is not necessary that the FBI was in fact influenced in any way by the statement."  6R.5376-5377.

In his closing argument, Wright argued that his statements were not material because "there is zero evidence that anything Gavin Wright would have done or said that day was capable of influencing the FBI."  6R.5516.  The government argued in rebuttal that "what should be obvious to you after you watch that video [of the voluntary interview] is how differently things would have gone on October 12th if Gavin Wright, when given the opportunity, had told the truth."  6R.5526.

---

(…continued)
as charged here, (2) "mak[ing] any materially false, fictitious, or fraudulent statement or representation."  18 U.S.C. 1001(a)(1)-(2).

The jury found Wright guilty of all counts, including the false-statements charge.  2R.739-740.

C.    *The District Court Correctly Denied Wright's Motion*

1.  To support a conviction under 18 U.S.C. 1001(a)(2), "the government must prove five elements beyond a reasonable doubt:  (1) the defendant made a statement; (2) the statement was false, fictitious, or fraudulent as the defendant knew; (3) the statement was made knowingly and willfully; (4) the statement was within the jurisdiction of the federal agency; and (5) the statement was material." *United States* v. *Williams*, 934 F.3d 1122, 1128 (10th Cir. 2019) (internal quotation marks and citation omitted).  As to Wright's blatant lies to the FBI about the nature and extent of his relationship with Allen and their explosives-manufacturing at G&G, the government proved each of these elements beyond a reasonable doubt.

The fifth element, *i.e.*, materiality, is the only element at issue here.  The Supreme Court has defined materiality as "a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which [the statement] was addressed."  *United States* v. *Gaudin*, 515 U.S. 506, 509 (1995) (quoting *Kungys* v. *United States*, 485 U.S. 759, 770 (1988)).  This standard, which "is a mixed question of law and fact," *Williams*, 934 F.3d at 1128 (citing *Gaudin*, 515 U.S. at 512-514), requires an "objective inquiry," *United States* v. *Christy*, 916 F.3d 814, 853 (10th Cir. 2019).  As this Court has explained, "in referring to

natural tendencies and capabilities," the Supreme Court's definition "establishes materiality  *  *  *  as an *objective* quality, unconcerned with the subjective effect that a defendant's representations actually had upon the [relevant] decision." *United States* v. *Irvin*, 682 F.3d 1254, 1267 (10th Cir. 2012).

Under this standard, the pertinent inquiry is "whether the falsehood was of a type that one would normally predict would influence the given decisionmaking body." *United States* v. *Williams*, 865 F.3d 1302, 1310 (10th Cir. 2017) (quoting *United States* v. *McBane*, 433 F.3d 344, 351 (3d Cir. 2005)).  "Stated another way," this Court explained, "the objective materiality test focuses on 'the intrinsic capabilities of the statement itself.'"  *Id.* at 1311 (citation omitted).  As a result, it is irrelevant whether the decisionmaker even considered, let alone was influenced by, the relevant falsehood.  See *Williams*, 934 F.3d at 1129-1130.  Indeed, a statement can be material "even if the decisionmaker had already arrived at her conclusion before the statement is made."  *Id.* at 1130.

Here, Wright's falsehoods are clearly "of a type" capable of influencing the course of the FBI's investigation.  Wright lied about the nature of his relationship with Allen and feigned ignorance about explosives-manufacturing at G&G.  As the district court found, this was "critical evidence" to the FBI's investigation into terrorism-related activity.  Any rational juror applying the legal standard to the evidence could conclude that Wright's statements were material to the federal

- 154 -

investigation.  See, *e.g.*, *Gordon*, 710 F.3d at 1145 (finding false statement regarding an investigation's target to be material).

Other circuits have more explicitly held that false statements seeking to affect an investigation by turning the FBI's focus away from the defendant, as Wright sought to do here, are inherently material.  See, *e.g.*, *United States* v. *Robinson*, 809 F.3d 991, 999-1000 (8th Cir. 2016); *United States* v. *Mehanna*, 735 F.3d 32, 54-55 (1st Cir. 2013); *United States* v. *Lupton*, 620 F.3d 790, 806-807 (7th Cir. 2010).  For example, in *Lupton*, the Seventh Circuit recognized that "a frequent aim of false statements made to federal investigators is to cast suspicion away from the declarant," which, "in the ordinary course would have an intrinsic capability  *  *  *  to influence an FBI investigation."  620 F.3d at 806 (internal quotation marks and citation omitted).  "When statements are aimed at misdirecting agents and their investigation, even if they miss spectacularly or stand absolutely no chance of succeeding, they satisfy the materiality requirement of 18 U.S.C. § 1001."  *Id.* at 806-807.[37]  This makes sense.  Statements, like Wright's, whose very purpose is to derail an investigation have a "natural tendency" or intrinsic capability to influence the investigation.

_____

[37]  Wright criticizes (Br. 34) *Lupton* as "dispens[ing] entirely with *Gaudin*'s 'natural tendency or capability' requirement," contrary to "black-letter law of *this* circuit."  Not so.  *Lupton*'s conclusion is in line with *Gaudin* and this Court's decisions interpreting the objective materiality standard.  See *Williams*, 865 F.3d at 1316 (citation omitted); *Williams*, 934 F.3d at 1130 n.9.

- 155 -

2.  Despite this straightforward analysis, Wright advances two arguments for why the court erred in denying his motion.  Both fail.

First, ignoring that the jury saw and heard his interview with state and federal authorities, Wright argues that the government presented "zero evidence" that his statements were material.  Wright Br. 31-34.  Wright acknowledges (Br. 32, 34) that the standard for materiality considers a statement's "natural tendency or capability" to influence the decisionmaker.  Yet, he seems to argue (Br. 34) that the government needed to offer direct testimony of an agent that the statements Wright made to divert the FBI's investigation had the theoretical potential to do so.

Under this Court's materiality standard, however, the statements can speak for themselves.  See *Williams*, 865 F.3d at 1311 (focusing on the "intrinsic capabilities of the statement itself") (citation omitted).  Whether Wright's statements were material was a conclusion for the jury to reach after applying the legal standard, which the district court correctly articulated, to the statements in evidence.  Cf. *Gaudin*, 515 U.S. at 512 ("The ultimate question  *  *  *  requires applying the legal standard of materiality  *  *  *  to the[] historical facts."); see also *United States* v. *Verrusio*, 762 F.3d 1, 20-21 (D.C. Cir. 2014) (holding that the government need not "present any testimony or other evidence specifically for the purpose of establishing the materiality of [the defendant's] false statement") (citation omitted).  The jury's finding that Wright's statements were material is

amply supported by even a cursory review of Wright's falsehoods. Designed to

deflect suspicion from defendants and evade law enforcement, the statements were

inherently capable of influencing the FBI's investigation into defendants' bomb-

making activities and planned attack.[38]

Second, challenging the statute itself, Wright argues (Br. 34-38) that the

FBI's investigation is not a sufficiently discrete decision for purposes of charging

him under Section 1001(a)(2). Wright suggests (Br. 35-36) that applying Section

1001(a)(2) to false statements made during an interview with the FBI would render

the statute unconstitutionally overbroad or vague. As a result, he attempts to limit

Section 1001(a)(2)'s application to only those statements "made in the context of a

discrete transaction between the defendant and the Government," such as "an

application that must be either approved or denied." Wright Br. 38. But Section

1001(a)(2)'s plain language and cases interpreting it permit the statute's

application to exactly the facts here—*i.e.*, a false statement made voluntarily to the

---

[38] Wright primarily relies (Br. 32-33) on *United States* v. *Kingston*, 971 F.2d 481 (10th Cir. 1992), and a Department of Justice criminal resource manual for his argument that the government *must* elicit testimony on materiality. But both sources merely recognize, rather than require, that testimony can be helpful to explain why a statement was material in the context of an agency's decision, such as the processing of a loan application. See *Kingston*, 971 F.2d at 486-487 ("Government witnesses are permitted * * * to testify as to whether certain truths, if known, would have influenced their decisionmaking."); cf. *United States* v. *Williams*, 827 F.3d 1134, 1152 n.7 (D.C. Cir. 2016) (noting the criminal resource manual "is not judicially enforceable").

FBI during its investigation.  Accord *United States* v. *Rodgers*, 466 U.S. 475, 478-479 (1984) (holding that a predecessor statute covered false statements to the FBI).

To be sure, the standard for materiality is often phrased in the context of a single decision that a defendant is capable of affecting through his statement.  See *Gaudin*, 515 U.S. at 509 (referring to "the decision of the decisionmaking body").  Other circuits have made clear, however, that "a statement is material if it has a natural tendency to influence, or is capable of influencing, either a discrete decision *or any other function of the agency to which it was addressed*."  *United States* v. *Moore*, 612 F.3d 698, 701 (D.C. Cir. 2010) (collecting cases) (emphasis added).  Meanwhile, this Court has simply characterized the focus of a criminal investigation as the operative decision.  See *Gordon*, 710 F.3d at 1145 (finding falsehoods "could have influenced the agency's decision on how to craft its investigative focus").  And, although not directly addressing the issue, there are plenty of cases in which this Court has upheld a defendant's conviction under Section 1001(a)(2) for making false statements to the FBI.  See, *e.g.*, *United States* v. *Hillman*, 642 F.3d 929, 932, 938-939 (10th Cir. 2011); *United States* v. *Oldbear*, 568 F.3d 814, 818 (10th Cir. 2009).

In sum, Wright's affirmative lies to the FBI about his involvement in and knowledge of defendants' planned bombing were material to the federal investigation.  As evidenced by the statements themselves, they were of a type that

could have influenced investigative decisions.  No more is required to uphold the jury's verdict.

## VII

## THERE IS NO CUMULATIVE ERROR
## (WRIGHT ONLY)

A.    *Standard Of Review*

Cumulative-error analysis aggregates errors that individually have been found to be harmless and analyzes whether their cumulative effect on the trial outcome means that collectively they no longer can be deemed harmless.  *United States* v. *Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc).  Harmlessness in this context is the same as that for individual error, *i.e.*, courts "look to see whether the defendant's substantial rights were affected."  *United States* v. *Harlow*, 444 F.3d 1255, 1269 (10th Cir. 2006) (citation omitted).  This Court "evaluate[s] only the effect of matters determined to be error, not the cumulative effect of non-errors."  *Ibid.* (citing *Rivera,* 900 F.2d at 1471).

B.    *There Is No Cumulative Error*

Wright asserts (Br. 39-47) that the district court abused its discretion each time it ruled against him on three different evidentiary issues.  Wright argues that even if this Court deems the alleged errors harmless, taken together with any other harmless error, they amount to cumulative error.  But there are no errors to aggregate, let alone cumulative error affecting Wright's substantial rights.

1.  Wright's first two alleged errors concern the district court's application of the "rule of completeness" under Federal Rule of Evidence 106.  Wright Br. 39-44.  Wright argues that the court abused its discretion in denying his request to play the complete audio recording of each of defendants' multi-hour in-person meetings, while later permitting the government to play two brief telephone recordings in full.  As to the first of these claimed errors, the court ruled that Wright had invoked Rule 106 in bad faith and treated his objection as waived.  As to the second, the court correctly applied Rule 106 to permit the government to supplement audio exhibits that Wright introduced into evidence.  For both, the court properly exercised its discretion and, regardless, did not commit a clear abuse of discretion.  See *United States* v. *Wright*, 826 F.2d 938, 945 (10th Cir. 1987) ("[T]he admission and exclusion of evidence is left to the trial court's discretion" and will stand absent "a clear abuse of discretion.") (citation omitted).

a.  Rule 106 states:  "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."  Fed. R. Evid. 106; see *United States* v. *Lopez-Medina*, 596 F.3d 716, 734-737 (10th Cir. 2010) (discussing Rule 106 before it was restyled in 2011).  Given the district court's discretion in applying Rule 106,

"[a] defendant seeking reversal" under the rule "faces a high bar." *United States* v. *Harry*, 816 F.3d 1268, 1280 (10th Cir. 2016).

Rule 106 "prevent[s] a party from misleading the jury" by permitting the opposing party to introduce "relevant portions of a writing or recorded statement which clarify or explain the part already received." *Lopez-Medina*, 596 F.3d at 735 (citation omitted). Yet, the rule does not require that an *entire* statement or recording be admitted. *Id.* at 735, 737. Instead, a court may admit *further portions* of a statement or recording where it finds that the proffered evidence should, in fairness, be considered at the same time as the admitted evidence because it is relevant to an issue and necessary to clarify or explain what the jury has heard. *Id.* at 735-737. Rule 106 "connects with" Federal Rule of Evidence 403, however, in that the court is not required to admit additional evidence where its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.* at 736-737 (internal quotation marks and citation omitted).

b. Wright first argues (Br. 39-42) that the court abused its discretion when it denied his mid-trial request to play the complete audio recordings of defendants' in-person meetings—over a hundred hours of recordings—that corresponded to the government's clipped audio exhibits from those meetings. See 6R.2727-2738,

2741.  The court ruled that the objection was made in bad faith and deemed it waived.  6R.2737-2738.  There was no abuse of discretion.

Before trial, the court held a lengthy *James* hearing to determine the admissibility of defendants' recorded statements as non-hearsay coconspirator statements.  See pp. 126-128, *supra*.  Wright never requested, either before or during that hearing, that the jury hear the entirety of the recorded in-person meetings—which, in any event, would have been impossible during what was already scheduled to be a six-week trial.  Accordingly, the court ruled that: (1) Wright invoked Rule 106 in bad faith and not because the evidence ought to be considered; and (2) Wright had waived his objection.  6R.2737-2738.  At the same time, the court stated that defendants could object to specific audio clips as irrelevant, cumulative, or unduly prejudicial, and invoke Rule 106 to proffer other, specific portions of a recording as necessary.  6R.2741-2743.

The court did not abuse its discretion by not allowing Wright to introduce the full recordings of defendants' meetings.  Given the lengthy *James* hearing, the many hours of recordings Wright sought to introduce, and the mid-trial timing of Wright's request, the court understandably ruled that Wright had invoked Rule 106 in bad faith and treated his objection as waived.  Indeed, other defendants objected during the *James* hearing that certain audio clips were taken out of context and, in fairness, should include additional portions of a recording; the court sustained

several of the objections.  See, *e.g.*, Supp.2R.75-76, 94, 124-125; see also, *e.g.*, 6R.3904-3909, 3340-3342 (granting midtrial objections).  Instead of doing the same, Wright made a mid-trial request to supplement audio clips that the court had deemed admissible at the *James* hearing with the full, hours-long recordings, without any attempt to limit the material to those portions that would clarify the government's specific excerpts.  Given the circumstances, the court did not abuse its discretion.  See *Wright*, 826 F.2d at 945.

Moreover, even if this Court were to conclude that the district court erred, any error would be harmless.  Wright was permitted to object to specific audio clips as irrelevant, cumulative, unduly prejudicial, or taken out of context. 6R.2741-2743.  Cf. *United States* v. *Strohm*, 671 F.3d 1173, 1182-1183 & n.6 (10th Cir. 2011) (no error where the district court denied the defendant's request to admit certain evidence in its entirety but permitted her to cite specific portions for admission, which she never did).  Even now, Wright provides no example of an audio clip that was misleading to the jury and, under Rule 106, should have been supplemented by additional portions of that recording.

c.  Wright also argues (Br. 42-44) that the court abused its discretion by allowing him, during his cross-examination of Day, to play only clips of two back-to-back telephone calls between Wright and Day following Allen's arrest (see DX/Wright.1107-1108), but permitting the government to play both calls in full on

Day's redirect (see GX.287-288).  Wright waived this challenge when he stated

below that he had no objection to the government invoking Rule 106.  6R.3351,

3579.  Even if the Court reaches this argument, the district court correctly applied

Rule 106 and, therefore, did not abuse its discretion.

i.  Toward the end of its direct examination of Day, the government asked

Day how he had learned about Allen's arrest.  6R.3131.  Day testified that Stein

called him, but that he obtained further details by calling Wright.  6R.3131-3133.

Day testified that Wright acted strange on their telephone call, and that Wright lied

during the call when he stated he knew nothing about explosives-making at G&G.

6R.3133-3135.  On cross-examination, Wright sought to introduce the recordings

of both telephone calls to challenge Day's impressions; the government argued that

they were inadmissible hearsay under Rule 801.  6R.3207-3224, 3349-3350; see

also 2R.517-534.

The court agreed that Wright could not admit the recordings.  In particular, it

ruled that because the government had relied on Day's testimony, and not audio

clips of the telephone calls, Rule 106 did not apply.  6R.3210-3211.  The court

further ruled that Wright could not rely on Federal Rule of Evidence Rule 803(3)—

*i.e.*, then-existing state of mind—to admit a statement of belief or past events.

6R.3212-3218.  The court determined, however, that two particular statements that

Wright had made during the calls fell under Rule 803(3); the court permitted

Wright to offer those portions as audio clips.  6R.3219-3224, 3343, 3349-3351.

The government indicated that, if Wright played the clips, it would invoke Rule

106 to play the full recordings, to which Wright's counsel responded they did not

object.  6R.3350-3351.

During cross-examination, Wright's counsel asked Day about the back-to-

back telephone calls and played the admitted audio clips.  6R.3554-3559.  The

government, on redirect, played the full recordings.  6R.3578-3582.  Wright's

counsel again stated, "[n]o objection."  6R.3579.  When the government pursued

additional questions damaging to Wright upon playing the recordings (6R.3582-

3584), Wright's counsel argued that the use of Rule 106 was unfair (6R.3589-

3590).  The court responded that the evidence was presented in accordance with

the rules.  6R.3590.

ii.  As the record shows, by intentionally deciding to forgo an objection

below, Wright waived any argument that the court abused its discretion when it

permitted the government to invoke Rule 106 to play the back-to-back telephone

calls between Wright and Day.  See *Tesone* v. *Empire Mktg. Strategies*, 942 F.3d

979, 991 (10th Cir. 2019).

In any event, the court correctly applied Rule 106 and therefore did not

abuse its discretion.  Wright could not invoke Rule 106 where the government

relied on Day's oral testimony, not a written or recorded statement, to recount

Day's conversation with Wright. Thus, when Wright sought to play the actual telephone calls, he had to do so under a hearsay exception. Although Wright could play only a portion of the recordings under Rule 803(3), once he did so, the government could play the full recordings under Rule 106 to avoid misleading the jury. Even if the court erred, which it did not, the ruling was harmless because the jury ultimately heard the full recordings, which is what Wright wanted, albeit through a different presentation of the evidence.

2.  Wright also challenges (Br. 44-47) the court's refusal to permit him to cross-examine Day regarding an application Day submitted to the Social Security Administration (SSA) for Supplemental Security Income (SSI) nine months after defendants' arrest. 6R.2958-2964, 2966-2967, 3191-3207; see also 2R.507-516. The court did not abuse its discretion in limiting this line of questioning, nor did its decision preclude Wright from fully challenging Day's credibility.

a.  During trial, the court overruled the government's motion in limine to limit defendants' questioning of Day on whether he reported his FBI payments as taxable income. 6R.2958-2963, 2967-2968, 3191. Wright also wanted to question Day about an SSI application on which Day excluded his FBI activities as "work." 6R.2964. Because the SSA had not alleged income fraud or false filings against Day, the court did not permit Wright to explore the issue. 6R.2964; see also 6R.3195-3196, 3199, 3201. The court indicated that it would have reached a

- 166 -

contrary conclusion under different facts (6R.2966, 3192-3194, 3204-3206), and

stated that the Sixth Amendment neither required it to hold a trial-within-a-trial

(6R.3207) nor permitted Wright to confront Day with speculation (6R.3197).

      b.  Wright argues (Br. 45-46) that the court abused its discretion by

misapplying Federal Rule of Evidence 608(b), which permits a party, on cross-

examination, to inquire into "specific instances of a witness's conduct" where

probative of the witness's "character for truthfulness or untruthfulness."  Fed. R.

Evid. 608(b).[39]  That rule, as Wright concedes (Br. 46-47), did not permit him to

introduce extrinsic evidence of Day's SSI application.  Nor did it grant him an

absolute right to inquire about the application.  Cf. Wright Br. 45-47; see 2R.511-

513.  Rather, Rule 608(b) leaves such inquiries to the district court's discretion.

See Fed. R. Evid. 608(b) (the court "may" permit such inquiry on cross-

examination).

      Here, the court acted well within its discretion in not permitting Wright to

inquire about Day's SSI application, thereby avoiding a trial-within-a-trial and jury

confusion.  Nor did that ruling violate Wright's confrontation rights.  See *Holmes*

v. *South Carolina*, 547 U.S. 319, 326-327 (2006) (noting the Constitution permits

---

[39]  Wright also relies (Br. 45-47) on Rule 613.  That aspect of Wright's
argument is forfeited because he did not rely on the rule below (see 2R.510-516;
6R.3191-3207) and failed to argue plain error on appeal.  See *Tesone*, 942 F.3d at
991.  In any event, Day's statements on his SSI application were not prior
inconsistent statements that contradicted his trial testimony.  See 6R.3201.

courts to exclude evidence that is repetitive, only marginally relevant, or poses an undue risk of confusion); *United States* v. *Atwell*, 766 F.2d 416, 420 (10th Cir. 1985) (stating Rule 608(b) is subject to Rule 403 balancing and that evidence may be excluded without violating confrontation rights).

Regardless, even if the court erred, the error was harmless. Defendants extensively pressed Day on cross-examination in order to challenge his credibility and truthfulness, including by specifically asking him about his FBI payments and whether he reported them as taxable income. See, *e.g.*, 6R.3140-3159, 3392, 3542-3353, 3680. Any questions Wright sought to ask Day about his SSI application were cumulative of this evidence. In sum, there was no error, let alone cumulative error that affected Wright's substantial rights.

## CONCLUSION

This Court should affirm defendants' convictions and sentences.

Respectfully submitted,

STEPHEN R. MCALLISTER
  United States Attorney

ANTHONY W. MATTIVI
  Assistant United States Attorney
  District of Kansas
  290 Carlson Federal Building
  444 SE Quincy Street
  Topeka, KS  66683
  (785) 295-7698

ERIC S. DREIBAND
  Assistant Attorney General

ALEXANDER V. MAUGERI
  Deputy Assistant Attorney General

s/ Erin H. Flynn
THOMAS E. CHANDLER
ERIN H. FLYNN
ALISA C. PHILO
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Stn., P.O. Box 14403
  Washington, D.C.  20004-4403
  (202) 514-5361
  Erin.Flynn@usdoj.gov

## STATEMENT REGARDING ORAL ARGUMENT

The United States does not oppose defendants' requests for oral argument and agrees that, given the issues involved and the voluminous record in this case, oral argument would aid this Court's review.

# CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(g):

1.  This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B), and this Court's order dated April 17, 2020, because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 38,844 words according to the word processing program used to prepare the brief.

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2019 in Times New Roman 14-point font.

s/ Erin H. Flynn<br>
ERIN H. FLYNN<br>
  Attorney

Dated:  May 8, 2020

## CERTIFICATE OF DIGITAL SUBMISSION

I certify that the electronic version of the foregoing CONSOLIDATED

BRIEF FOR THE UNITED STATES AS APPELLEE, prepared for submission via

ECF, complies with the following requirements:

1. All required privacy redactions have been made under Federal Rule of

   Appellate Procedure 25(a)(5) and Tenth Circuit Rule 25.5;

2. With the exception of any redactions, every document submitted in digital

   form or scanned PDF format is an exact copy of the written document filed

   with the clerk; and

3. The ECF submission has been scanned for viruses with the most recent

   version of Windows Defender (Version 1.2.3412.0) and is virus-free

   according to that program.

s/ Erin H. Flynn
ERIN H. FLYNN
   Attorney

Dated:  May 8, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2020, I electronically filed the foregoing

CONSOLIDATED BRIEF FOR THE UNITED STATES AS APPELLEE with the

United States Court of Appeals for the Tenth Circuit via this Court's CM/ECF

system, which will send notice to all counsel of record by electronic mail.  All

participants in this case are registered CM/ECF users.  Pursuant to this Court's

General Order dated March 16, 2020, the United States will await further notice

before submitting paper copies of this filing.

s/ Erin H. Flynn
ERIN H. FLYNN
 Attorney

# ADDENDUM

### AUDIO RECORDINGS OF DEFENDANTS' IN-PERSON MEETINGS

| DATE | EXHIBIT SERIES[1] |
|---|---|
| June 14, 2016 | 13* |
| July 9, 2016 | 22, pt 1**<br>22, pt 2** |
| July 18, 2016 | 14** |
| July 31, 2016 | 24** |
| August 8, 2016 | 15** |
| August 14, 2016 | 16** |
| September 2, 2016 | 127** |
| September 18, 2016 | 17** |
| September 25, 2016 | 18** |
| October 5, 2016 | 129** |
| October 12, 2016 | 21**<br>49 (audio-video excerpt of Ex. 21) |
| October 14, 2016 | 19** |

\*  Excerpted audio clip exhibits offered and admitted against Stein only under Rule 801(d)(2)(A) (see 6R.2739-2740; Supp.2R.108; Supp.3R.3)

\*\*  Unless noted in the trial transcript, excerpted audio clip exhibits offered and admitted as coconspirator statements under Rule 801(d)(2)(E) consistent with the district court's rulings at the pre-trial *James* hearing (see 6R.1575-1632, 2725-2727, 2738-2740; Supp.2R.50-132)

---

[1] The fully admitted audio clips associated with defendants' in-person meetings are contained in Supp.1R, in a folder labeled "Trial Exhibits" and a subfolder labeled "Government Exhibits." The corresponding transcripts used at the pre-trial *James* hearing for purposes of determining the admissibility of these exhibits are included in Supp.1R, in a folder labeled "Motions Exhibits."

# ATTACHMENT

| From: | Judge Melgren |
|---|---|
| To: | Mattivi, Anthony (USAKS); jim@jamesrprattlaw.com; karis@fcse.net; Hahn, Mary (CRT); melody_brannon@fd.org; michael@shultzlaw.net; rich_federico@fd.org; Berkower, Risa (CRT); tyler@fcse.net |
| Cc: | Justin Cook |
| Subject: | 6:16-cr-10141-EFM USA v. Allen et al -- Independent evidence re James hearing |
| Date: | Friday, March 23, 2018 6:47:31 PM |

Counsel:

At our Thursday evening James hearing, we bogged down on the relationship of the starting date of the conspiracy for these purposes vis-a-vis independent evidence. My law clerk and I have looked at that issue today, and I am acquainting you with my preliminary conclusions to hopefully avoid unnecessary work over the weekend.

Before admitting statements into evidence under the coconspirator exception to the hearsay rule, the Court must determine by a preponderance of the evidence that (1) a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy. The Tenth Circuit has held that Bourjaily requires at most that there be some independent evidence linking the defendant to the conspiracy. United States v. Martinez, 825 F.2d 1451, 1453 (10th Cir. 1987). The evidence need not be "substantial." United States v. Rascon, 8 F.3d 1537, 1541 (10th Cir. 1993).

Ms. Brannon contends that the June 14 statements are not admissible under Fed. R. Evid. 801(d)(2)(E) because the Government would need to provide "independent evidence" connecting Mr. Allen to an agreement on June 14th to establish the beginning of the conspiracy. In other words, the "independent evidence" must corroborate the agreement on the date that it began—June 14.

After reviewing the case law, and consulting with my astute law clerk, I have concluded that independence evidence existed as of June 14. The Tenth Circuit has defined "independent evidence" as simply "evidence other than the proffered [coconspirator] statements themselves." United States v. Owens, 70 F.3d 1118, 1125 (10th Cir. 1995). Testimony regarding "direct observations and contacts with defendant" qualifies as independent evidence. Id. (citing United States v. Hernandez, 829 F.2d 988, 995 (10th Cir. 1987)). So is summary testimony of a government agent regarding other out of court detailed factual statements made by a coconspirator to the agent during an investigation. See id.

Brody Benson's grand jury testimony is sufficient. Mr. Benson testified that Mr. Allen met with Defendant Stein on June 14th, and Mr. Stein raised the idea of using an explosive device against Muslims in Garden City. Although Allen mostly was silent and listened, and Mr. Benson was not "100% sure if [Allen] was in agreement with [Stein], he didn't quite seem to be in disagreement." Mr. Benson then testified that he believed Stein and Allen were "planning something" and that "concerned [Mr. Benson] greatly." Then, the Government's evidence shows that on July 18th, Wright, Stein, and Allen were all present, they were talking about the skills they could offer in support of the plan, and they attempted to recruit another individual to be part of their plan.

While this evidence may not be "substantial," it does not need to be. It is entirely sufficient for the Court to conclude that a conspiracy existed between Mr. Stein and Mr. Allen beginning on June 14. "The

evidence need not show an express agreement to support a conspiracy charge." United States v. Clark, 717 F.3d 790, 805 (10th Cir. 2013). "The agreement requirement may be satisfied entirely through circumstantial evidence, that is, it may be inferred from the facts and circumstances of the case." Id. "Such facts and circumstances include the joint appearance of defendants at transactions and negotiations furthering the conspiracy, the relationship among co-defendants, and their mutual representations to third parties." Id. Based on the Government's evidence, there is "independent evidence" connecting Mr. Allen to an agreement on June 14th to establish the beginning of the conspiracy. Mr. Benson's testimony was based on "direct observations and contacts with defendant," and thus qualifies as independent evidence. See Owens, 70 F.3d at 1125. And the July 18th recording is circumstantial evidence corroborating the June 14th agreement.

However, this raises the issue of whether the June 14 recording of Stein's conversation itself is admissible as a statement of a co-conspirator (as opposed to admissible only against Stein himself), because if the independent evidence is testimony from Brody Benson about Allen's arrival and agreement, that happened after Stein's statement. In my opinion, this issue remains open.


Eric F. Melgren

United States District Judge
District of Kansas
United States Courthouse #414
401 N. Market
Wichita, Kansas  67202